IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA

vs.                                    Criminal No. 19-1380

MUSTAFA ALOWEMER

-----

Transcript of Detention Hearing held on Friday,
August 16, 2019, in the United States District Court,
700 Grant Street, Pittsburgh, PA  15219, before Honorable
Cynthia Reed Eddy, United States Magistrate Judge.

-----

APPEARANCES:

For the Government:    U.S. Attorney's Office
                       by Soo Song, Esq.


For the Defendant:     Federal Public Defender's Office
                       by Andrew Lipson, Esq.


Court Reporter:        Noreen A. Re, RMR, CRR
                       700 Grant Street
                       Suite 5300
                       Pittsburgh, PA  15219


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

2

P R O C E E D I N G S

-----

IN OPEN COURT - DEFENDANT PRESENT WITH COUNSEL

-----

THE COURT:  Good morning.  This is the time scheduled for the detention hearing in the matter of United States of America versus Mustafa Alowemer at Criminal No. 19-1380.  Is the government ready to proceed?

MS. SONG:  We are, Your Honor.  Thank you.

THE COURT:  And would counsel please identify herself for the record.

MS. SONG:  Yes.  Good morning, Your Honor.  Soo Song on behalf of the United States.  Special Agent Gary Morgan is at counsel table with me.

THE COURT:  And would defense counsel please identify himself for the record.

MR. LIPSON:  Good morning, Your Honor.  My apologies for being late to the hearing.  I went to your initial courtroom up there and then went to Judge Horan's regular courtroom and found out it was in 6-A.

THE COURT:  Okay.  Well, you found us now.

MR. LIPSON:  My name is Andrew Lipson from the Federal Public Defender's Office on behalf of Mr. Alowemer.

THE COURT:  Thank you.  The government has filed a request for detention in this case and indicated that there's

a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the Defendant as required by the safety of the community, which means the Defendant will bear the burden of proof.

Miss Song, is there any evidence that the government wishes to put on the record before I hear from the defense?

MS. SONG:  Yes, Your Honor.  We would ask that the Court take judicial notice of the complaint and the preliminary hearing transcript, and I have some brief testimony.

THE COURT:  Okay.  Do you have those marked as exhibits to be admitted?

MS. SONG:  I have the still shots marked as exhibits, and the videos will be played on the computer.

THE COURT:  Okay.  I will take judicial notice of the preliminary hearing transcript, which I've reviewed in preparation for this hearing.  Therefore, the evidence that was presented at the preliminary hearing is as if it were also presented at this hearing.

MS. SONG:  Thank you, Your Honor.

THE COURT:  You may present your other evidence, Miss Song.

MS. SONG:  Your Honor, at this time we call Special Agent Gary Morgan to the witness stand.

THE COURT:  Agent Morgan.  Actually, before you

4

testify, I need to ask the courtroom deputy to swear the interpreter.

(Interpreter sworn.)

(Witness sworn.)

THE DEPUTY CLERK:  Please state and spell your name for the Court.

THE WITNESS:  Gary Morgan, G-A-R-Y M-O-R-G-A-N.

-----

GARY MORGAN

a witness herein, was duly sworn and testified as follows:

-----

DIRECT EXAMINATION

BY MS. SONG:

Q.  Special Agent Morgan, you have been a special agent with the FBI for how long?

A.  Approximately 16 years.

Q.  And what assignments have you had during your time as a special agent with the FBI?

A.  I've been assigned to the Joint Terrorism Task Force both in the Chicago Division and the Pittsburgh Division.  In that capacity I'm charged with investigating matters pertaining to international terrorism cases.

Q.  What other relevant training or employment have you had as a federal employee or otherwise that relates to intelligence gathering, investigation and/or terrorism?

A.  I've received extensive training on conducting investigations, conducting interviews, handling and processing evidence at crime scenes, a number of training certifications pertaining to those areas.

Q.  Have you, in fact, served as an intelligence analyst for another agency?

A.  Yes.  I was an intelligence analyst for the Drug Enforcement Administration for six years.

THE COURT:  The interpreter is a little loud, Mr. Lipson.  So if you could move the microphone towards you, and we'll see if that improves the acoustics here.

Q.  Special Agent Morgan, you said you work with a Joint Terrorism Task Force here in Pittsburgh; is that correct?

A.  Yes, ma'am.

Q.  And in that capacity have you supported the investigation into Mustafa Alowemer?

A.  Yes, I have.

Q.  Did you testify at a prior proceeding before this Court and this judge on June 21, 2019?

A.  Yes, ma'am.

Q.  And was that a preliminary hearing, probable cause hearing?

A.  Yes, it was.

Q.  Very briefly, Special Agent Morgan, because you testified, I believe, for nearly 90 minutes on June 21st, what was the

nature of the plot that the FBI was able to disrupt in this investigation?

A.  Mr. Alowemer, conspiring with two other individuals, devised a plot to place multiple Improvised Explosive Devices at or near the Legacy International Worship Center with the intention of those devices detonating in succession to cause death and harm to individuals in the surrounding community. And that attack was intended to be carried out in support of the Islamic State.

Q.  And attribution for that act was to be claimed by whom, just to be clear?

A.  The Islamic State.

Q.  Otherwise referred to as ISIS?

A.  Yes, ma'am.

Q.  Special Agent Morgan, I'm going to ask you some pointed questions about flight risk for this Defendant.  Can you reiterate for the Court what is meant by the term "nephir"?

A.  Nephir is a term used by extremists to express the desire to travel overseas and engage in jihad.  In this instance Mr. Alowemer used the term "nephir" to express his desire to travel to Syria, enter the battlefield and die as a martyr in support of the Islamic State.

Q.  And in the course of the FBI investigation from March through June, is nephir, or this desire to travel and die as a martyr, a topic that was raised by the Defendant?

A.  Yes.  Mr. Alowemer raised that topic on a number of occasions.

Q.  Special Agent Morgan, did the Defendant specify where overseas he desired to die as a martyr on the battlefield?

A.  Yes.  Specifically, Mr. Alowemer stated his desire to travel to Syria.

Q.  Did the Defendant talk about how he would get there?

A.  Yes.  On one occasion -- at least one occasion -- Mr. Alowemer inquired of the online covert employee if that individual knew of anyone who could help Mr. Alowemer travel to Turkey and then from Turkey enter Syria and achieve his goal of entering the battlefield.  And Turkey was known as a point that people would use to enter Syria to join the fight with ISIS.

Q.  In discussions with the online covert employee and the CHS, did the Defendant engage in discussion with them about crossing other international borders to get out of the United States?

A.  Yes.  Mr. Alowemer discussed -- there were general conversations regarding the ability to cross the United States border with Canada or Mexico and then from there depart and travel overseas.

Q.  What would be desirable about crossing into Canada or Mexico?

A.  It was stated that that could be done without the

necessary paperwork or passport that would be generally required to cross a border.

Q. Special Agent Morgan, I'm going to ask you some targeted questions about the danger presented by this Defendant towards others. Did this Defendant, in the course of the investigation, exhibit animus toward specific groups of people?

A. Yes. Yes. Both towards specific groups of people in very general terms and animus towards larger groups of people as well.

Q. More specifically, is the nature of the animus we're discussing just distaste for certain groups of people or an intention and stated desire to see violence --

MR. LIPSON: Objection, Your Honor. Leading.

THE COURT: Overruled. You may answer the question.

A. It was -- the animus was of a nature that was specific to carrying out acts of violence against individuals, both specified individuals and general groups of people.

Q. Now, Special Agent Morgan, can you start to describe the different groups that this Defendant exhibited violent animus towards.

A. Yes. Those groups would primarily be Shia Muslims, Yazidis, Christians, members of law enforcement, first responders, as well as members of the military and some general animus towards Jewish individuals as well.

Q.  Let's start with Shia Muslims.  Can you tell the Court the nature of the Defendant's stated animus towards Shia Muslims.

A.  Yes.  Upon Mr. Alowemer's first meeting with an undercover employee, Mr. Alowemer identified what he characterized as a Shia mosque as a viable target for attack.  And Mr. Alowemer, being Sunni, there is sectarian violence within the Islamic world, primarily among extremists between Sunnis and Shia Muslims.

Q.  And is that a perspective that is advocated or consistent with ISIS?

A.  Yes.  ISIS is a Sunni extremist organization.

Q.  Special Agent Morgan, you mentioned Christians.  Please tell the Court the specific violent animus that was described by the Defendant towards Christians.

A.  The ultimate target Mr. Alowemer proposed for attacking was a church that he characterized as being frequented by Nigerian Christians, who he further characterized as being polytheists.

Q.  Why did the Defendant want to target polytheist Nigerians?

A.  Mr. Alowemer made statements regarding avenging the brothers in Nigeria.  There have been actions by the Nigerian government in opposition to Islamic State factions within the country.

Q.  And to be clear, Special Agent Morgan, when you say "avenging the brothers," who are you talking about?

A.   Islamic State members.

Q.   Special Agent Morgan, you mentioned Yazidis.  What was the nature of this Defendant's animus towards Yazidis?

A.   Mr. Alowemer provided a photograph of three individuals who were Yazidi students -- possible students at the high school that Mr. Alowemer attended.  He presented those individuals as viable targets, if the brothers wanted to act against the Yazidis.

In addition to that, more globally, Mr. Alowemer stated that there were a number of Yazidis in the Pittsburgh area who gather in large numbers and have celebrations; and they could be presented as targets as well.

Q.   So, to be clear, you said there were specific individuals that the Defendant identified as Yazidis whose photographs he provided to ISIS supporters through the investigation?

A.   Yes, ma'am.  And the FBI subsequently located -- identified and located those individuals.  They were interviewed, and they had no idea that Mr. Alowemer had any sort of animus towards them.  They had never had any sort of prior negative interactions with Mr. Alowemer.  They were completely taken aback.

Q.   And why did the Defendant articulate the Yazidis as suitable targets for ISIS?

A.   Kurdish Syrians in Syria, with the assistance of the United States military, were able to repel the final

*G. Morgan - Direct*                                          11

stronghold of the Islamic State from a city called Al-Baghuz in Syria.  So the suggestion was that attacking these Yazidis would avenge the Islamic State for the loss of that city.

Q.  Attacking the Yazidis in Pittsburgh would avenge ISIS for acts committed overseas?

A.  Yes, ma'am.

Q.  Special Agent Morgan, you mentioned animus towards service members, military.  What did the Defendant articulate in terms of a desire to inflict violence upon them?

A.  I believe it was in April of this year Mr. Alowemer made reference to having seen a lone US military member in the woods two weeks prior to the conversation he was having. Mr. Alowemer stated that he could have attacked that individual who's alone in the woods.

The undercover employee inquired as to why Mr. Alowemer stated "to avenge our brothers in Iraq and Syria" and to -- again, he made reference to the city of Al-Baghuz.

Q.  Attacking the serviceman is revenge for acts committed, again, overseas by ISIS?

A.  Yes, ma'am.  Overseas.

Q.  Was there discussion about students who might be affiliated with the military?

A.  Yes.  Mr. Alowemer made reference to individuals who were from his school.  The way he characterized it were individuals who while attending college worked for the military.  That was

assessed to possibly be a reference to members of the ROTC. Using coded WET language that Mr. Alowemer and the undercover employee used previously such as "cooking" for the creation of explosive devices and "meals" for detonating those devices, Mr. Alowemer made statements about those individuals tasting their cooking and that they would enjoy it or words to that effect.

Q.  So, in effect, bombing these military-affiliated students?

A.  Yes, ma'am.

Q.  Special Agent Morgan, you mentioned law enforcement, first responders.  What violence, animus or intention was articulated by the Defendant against them?

A.  So the ultimate target Mr. Alowemer selected was the church.  Mr. Alowemer proposed placing two Improvised Explosive Devices at that location, one of which would have detonated soon after being placed.  The second was to be detonated a number of hours later.

Mr. Alowemer stated that the intention of detonating that device a number of hours later was that law enforcement personnel and first responders would be present at the location responding to the scene.  Mr. Alowemer made a statement that he wanted to make police "afraid to step."

In one instance, he referred to the police as the "infidel police."  And Mr. Alowemer further stated he wanted to shut down the City of Pittsburgh through that attack.

Q.  So you said he referred to the police as "infidel police"?

A.  Yes, ma'am.

Q.  And wanted them to "be afraid to step" --

A.  Yes, ma'am.

Q.  -- was his phrasing.  Special Agent Morgan, you reviewed maps that were attached to the criminal complaint that was filed in this case?

A.  I did.

Q.  Do you recall whether there was a police station that was depicted or indicated on that map by the Defendant?

A.  There was.  Mr. Alowemer circled the police station.  I believe it was Zone 1.

Q.  Special Agent Morgan, you said there was some indication that the Defendant had an animus against Jewish people.  How did you learn that?

A.  On Mr. Alowemer's desktop computer, the background on the computer screen was an image of what has been assessed to be the Al-Aqsa Mosque, which is a mosque in Jerusalem.  And beneath the mosque there is text in English which states something to the effect of "Oh, Allah, please cleanse Al-Quds from Jewish contamination."

Q.  What is "Al-Quds" referring to?

A.  Al-Quds is an Arabic reference to Jerusalem.

Q.  This was the Defendant's computer in his home?

A.  Yes, ma'am.

*G. Morgan - Direct*                                                    14

Q.  Had a statement to cleanse the Jewish contamination?

A.  Yes, ma'am.

Q.  Special Agent Morgan, you've indicated the groups that the Defendant articulated a violent intention towards.  Can you summarize how he intended to inflict violence on some or all of those groups.

A.  Yes.  Mr. Alowemer inquired about being provided with a firearm equipped with a silencer.  Mr. Alowemer discussed his previous use of a hand grenade while in Syria.  Mr. Alowemer purchased a number of components and precursors that he expected to be assembled into Improvised Explosive Devices.

Q.  The bombs that were the topic of the plot that you testified extensively about, what was the intention in terms of the level of destruction for the church that was targeted?

A.  Mr. Alowemer stated he wanted to totally destroy the church.  When Mr. Alowemer was advised by the undercover employee that to do so would require a very large -- the construction of a very large device, and a device of that size would cause death to people residing in the nearby community.

Q.  So even if the church itself was vacant, the force was intended to be such that people in the neighborhood would be killed?

A.  Yes.  And when Mr. Alowemer was made aware of that fact, he raised no objections to that loss of life.

Q.  Special Agent Morgan, I want to ask you about something

you made reference to.  Did the Defendant in his own words engage in violence even before arriving in the United States?

A.  Yes.  Mr. Alowemer stated while in Syria there was an individual acting as a sniper who was located in a minaret; and Mr. Alowemer threw a grenade at the minaret destroying it, presumably killing the sniper.

Q.  This was in Syria prior to traveling to Jordan or entering the United States?

A.  Yes, ma'am.

Q.  Special Agent Morgan, I want to ask you some questions that delve a little deeper into the Defendant's desire for martyrdom or potentially self-harm.  Is it the case that this Defendant articulated a desire to die and kill himself in a violent act?

A.  Yes.  Mr. Alowemer repeatedly stated his desire to make nephir to Syria where he wanted to make his way onto the battlefield and die as a martyr in support of the Islamic State.

Q.  Did he ever describe a dream or vision that was consistent with that desire to die as a martyr?

A.  Yes.  On one occasion Mr. Alowemer requested assistance in translating a dream.  Within the context of the conversation, it pertained to traveling overseas, again entering the battlefield, dying as a martyr in support of the Islamic State.  In his dream Mr. Alowemer stated he was wearing a

flowing white gown.

He was going to -- he intended to go to mosque, but his mother was preventing him from going.  The significance of the flowing white gown is that's often used by individuals to indicate that they've died a martyr and that they were in heaven.

Q.  Died either on the battlefield or would that pertain to a suicide bomber, for example?

A.  Yes.  Either one.

Q.  Special Agent Morgan, was the topic of suicide addressed by this Defendant in his post-arrest interview?

A.  Yes.  Subsequent to Mr. Alowemer's arrest, he was briefly interviewed.  During the course of that interview, Mr. Alowemer stated that he had, while as a student at the high school he attended, considered suicide.

Q.  Did the FBI verify that he did, in fact, make a disclosure at his high school about thinking about suicide?

A.  Yes.  Agents of the FBI spoke with a representative of the Pittsburgh high school, who confirmed that Mr. Alowemer stated he previously had suicidal ideations.  The individual at the school that Mr. Alowemer brought these concerns to her attention referred Mr. Alowemer to Resolve Crisis Center.

Q.  Special Agent Morgan, do you know whether the FBI, in the process of handing over the Defendant to the US Marshals, made sure to make a note about the reference to suicide?

*G. Morgan - Direct*                                                17

A.  Yes.  US Marshals were notified during the course of the intake process.  And I believe, as a result of that notification, Mr. Alowemer was placed on suicide watch.

Q.  For some period of time?

A.  Yes, ma'am.

Q.  Now, Special Agent Morgan, you testified about a Facebook profile that was used by the Defendant in the preliminary hearing.  Do you recall that?

A.  Yes, ma'am.

Q.  Can you describe for the Court what, if anything, was on that Facebook profile that relates to self-harm.

A.  Yes, ma'am.  A Facebook profile and site was identifiable to Mr. Alowemer, as it had the vanity handle name "Mustafa Alowemer."  Additionally, the profile photo of that Facebook page was a photograph identifiable with Mr. Alowemer.

On the Facebook page, in Arabic there was a sentence to the effect that it was expressing Mr. Alowemer's desire to die in a manner which would prohibit him from being buried with the traditional Muslim customs.

Q.  Because his body wouldn't be in a condition to be buried?

A.  That was the assessment that was made, yes.

MR. LIPSON:  Objection.

THE COURT:  Excuse me.  Would you state your objection, please.

MR. LIPSON:  It was a leading question, Your Honor.

It was really the government is testifying.

THE COURT:  This was testified to at the preliminary hearing in this manner, but I'll ask Miss Song to rephrase her question.  This has previously been testified to.

MR. LIPSON:  And, Your Honor, I would say we are kind of rehashing testimony that was already testified to at the preliminary hearing.  I understand that we're before Your Honor today for purpose of judicial economy.  If there's something new that the witness could offer, I understand the nature of that testimony.  But this is something that's already been put onto the record.

THE COURT:  Okay.  Miss Song, you want to rephrase your question?

MR. LIPSON:  I shall.  I'll make a note that suicide was not referenced at the prior hearing.

THE COURT:  That's correct.  Suicide was not previously referenced.

BY MS. SONG:

Q.  Special Agent Morgan, did the FBI, through its linguist, develop a professional interpretation of the Facebook?

A.  Yes.  And that interpretation was that Mr. Alowemer desired to die in a manner suggesting that he would die during the course of an explosive attack.

Q.  Special Agent Morgan, let me take you to the date of arrest of this Defendant.  Did the Defendant disclose what he

told his family in terms of where he was going that day?

A.   Yes.  Mr. Alowemer told his family that he was going to meet with a friend named Juan, when, in fact, he went to meet with the undercover employee.

Q.   So, according to him, he was not honest with his family about where he was going that day?

A.   That's correct.

Q.   Special Agent Morgan, are you aware of the status of the housing situation for the family of the Defendant?

A.   Yes.  Mr. Alowemer's family has been served with an eviction notice.

Q.   Special Agent Morgan, I would like to present some exhibits through your testimony.  Can you remind the Court what a nasheed is, again.

A.   A nasheed is an acapella chant that has been adopted by a number of extremist organizations.  They often play those nasheeds over images of attacks being executed.  It's essentially used as propaganda and recruitment material.

Q.   When you say "they," who are you talking about?

A.   The Islamic State and other like-minded extremist organizations.

Q.   You testified that the Defendant, in fact, wrote and recorded a nasheed in this case; is that correct?

A.   Yes, ma'am.

Q.   And how did the FBI come to acquire that?

A.  Mr. Alowemer was anxious to share the nasheed on multiple occasions, both with an online covert employee and the undercover employee.  He actually sang the nasheed in the presence of the undercover employee on one occasion.

MS. SONG:  Your Honor, at this time we'll play Exhibit No. 3.

Q.  Special Agent Morgan, you've reviewed this as the nasheed recording?

A.  Yes, ma'am.

(Recording played in open court.)

Q.  Special Agent Morgan, does that continue for over another minute?

A.  Yes, ma'am.

Q.  Would you tell the Court the interpretation of that nasheed.

A.  In the nasheed Mr. Alowemer expresses his desire to travel overseas in support of the Islamic State.  And he makes references to his blood flowing for his religion, expressing his desire to die on behalf of the Islamic State.

Q.  Would you briefly read the interpretation.

A.  I would.  May I have it?

Q.  For the reference, this was printed in the criminal complaint that was filed; is that correct?

A.  Yes, ma'am.  The nasheed is entitled "The Longing for Martyrdom."  "The best news is when you call to get ready for

*G. Morgan - Direct*                                               21

jihad.  Fight the enemy of soldiers of Baghdadi.  I miss the people, but do not know why.  I am waiting for paradise.  The love of martyrdom has inhabited my heart.

"The land of jihad is what I wish for.  I wait for the taste of martyrdom.  I am focussed on defeating the enemy.  Defeating the Shiites astounded me.  I long for the promise of Allah.  He promised me paradise.  He motivated me for martyrdom.  With worship, he enlightened me.

"Oh, Bagdahdi, your soldiers are your swords in battle.  We are the letters of your name against your enemies.  I long for the land of the caliphate.  I'm expecting to raise the banner.  I will spill my blood for the victory of my religion."

Q.  Now, Special Agent Morgan, you introduced and testified about a bay'ah video in the prior proceeding; is that correct?

A.  Yes, ma'am.

Q.  Given it's been almost two months, can you remind the Court of the significance of bay'ah?

A.  Yes, ma'am.  A bay'ah video is what many extremists utilize to pledge their support to an extremist organization, in this instance that organization being the Islamic State.

Q.  This is a video that the Defendant sent to whom?

A.  The Defendant sent this video to the online covert employee.

Q.  And to whom is the Defendant swearing his allegiance?

A.   Abu Bakr Al-Baghdadi, who is the self-professed caliphate, caliphate of the Islamic State.

Q.   If you would, describe for the Court -- the Defendant is depicted in this video?

A.   Yes, ma'am.  Mr. Alowemer is in the video.  He is wearing a mask covering the lower portion of his face.  And in the video over his right-hand shoulder I believe is what's commonly referred to as the Black Standard.  It's a flag utilized by many extremist organizations to include the Islamic State.

It's white Arabic text on a black background, which is essentially the Shihada, which is the Muslim profession of faith.  An approximate translation is "There is no God but Allah, and Mohammed is his messenger."

(Video played in open court.)

Q.   Special Agent Morgan, Exhibit No. 2 was played at the preliminary hearing.  Can you summarize again to the Court what it depicts.

A.   That's a video of an individual who's equipped with what appears to be a rocket-propelled grenade launcher.  There's a vehicle approaching.  The individual equipped with the RPG launcher fires at the vehicle.  The vehicle continues for a short distance and then further detonates in close proximity to a building, completely destroying that building.

Q.   At some point in the video the ISIS flag you described is

depicted?

A.  It is.  It's in the top left-hand corner.

        (Video played in open court.)

Q.  Special Agent Morgan, that video was sent by the Defendant to whom?

A.  The undercover employee.

Q.  Of the FBI?

A.  Of the FBI, yes, ma'am.

        MS. SONG:  Those are all my questions, Your Honor.

        THE COURT:  Would you like to cross-examine?

        MR. LIPSON:  Yes, Your Honor.

                        -----

                CROSS-EXAMINATION

BY MR. LIPSON:

Q.  Special Agent Morgan, you stated on direct testimony that my client allegedly asked the online covert employee how he could get to Turkey so he could travel to Syria; correct?

A.  No.  Mr. Alowemer asked the online covert employee if the online covert employee knew of anyone who could assist him in traveling to Turkey.  Not how to get to Turkey, but if someone could assist him in doing so.

Q.  The implication being, of course, that my client did not know that person; correct?

A.  Yes.

Q.  And that he believed that the online covert employee would

know someone that could do that; correct?

A.   He was making the inquiry, yes.

Q.   The online covert employee held himself out to be someone that was in support of ISIS; correct?

A.   Yes, sir.

Q.   And held himself out to be someone that was knowledgeable about tactics related to ISIS-related ends?

A.   Yes.

Q.   And told Mr. Alowemer that he was someone who had been involved with ISIS for some time; correct?

A.   I don't know if it was characterized that far.  There was some representation that the OCE was familiar with the Islamic State, yes.

Q.   You testified that my client was asking the OCE questions about how to effect ISIS-related ends; correct?

A.   Yes.

Q.   The implication is that there was a discrepancy of knowledge, that the OCE was knowledgeable and my client was not; correct?

A.   Yes.

Q.   That's pretty much the relationship with the other FBI agents in this case as well; correct?

A.   I don't know that I would characterize it that way, no.

Q.   For example, on June 21st, you testified under oath that one of the FBI agents, undercover FBI agents, was a bomb

expert; right?

A.  Yes.

Q.  They held themself out to be a bomb expert; correct?

A.  Yes.

Q.  And they held themself out to be someone that could create homemade explosives; correct?

A.  Yes.

Q.  And in that capacity, they were the bomb expert in this purported conspiracy that the government is alleging here; correct?

A.  Yes.

Q.  Not my client, but, in fact, the undercover FBI agent; right?

A.  Yes.

Q.  My client -- you stated on June 21st under oath that contact was first made by Mr. Alowemer in approximately March of 2019; correct?

A.  I believe so.  If I had the transcript, I could more completely answer your question, I believe.

        MR. LIPSON:  Your Honor, permission to approach the witness?

        THE COURT:  You may approach.

        (Document given to witness for his review.)

        MR. LIPSON:  For the record, I did just provide Special Agent Morgan a copy of the official transcript from

*G. Morgan - Cross*                                                    26

the June 21st preliminary hearing before Your Honor.

Q.  If you could turn your -- if you could turn to page 11, line 19.  I believe that is the subject of my question. Please read it to yourself, and let me know if that refreshes your recollection about the beginning of FBI contact with Mr. Alowemer.

            (Witness reviews document.)

A.  Yes.  In March of that year it was determined that the investigation had progressed to that point.

Q.  And thereafter -- starting at that point, the online covert employee reached out to my client and purported to be someone sympathetic to ISIS; correct?

A.  They were in regular contact.  And I believe both Mr. Alowemer -- Mr. Alowemer initiated conversations as well is my understanding.

Q.  The first time that the online covert employee and Mr. Alowemer communicated, who reached out to who?

A.  I believe the OCE contacted Mr. Alowemer.

Q.  You also stated on June 21st under oath that during the course of this investigation, Mr. Alowemer was under extensive surveillance; correct?

A.  That's correct.

Q.  And those were your words, "extensive surveillance"?

A.  Yes.

Q.  And isn't it true that, in addition to the extensive

surveillance, law enforcement was tracking Mr. Alowemer's whereabouts from at least April 18, 2019, until his arrest; correct?

A.  Yes.

Q.  And, in fact, there was also a device to track where his car was going starting from at least May 19, 2019; correct?

A.  I'm unaware of the date, but I know a device was utilized, yes.

Q.  And your understanding is that occurred over the course of the investigation, that not only his cell phone and his location was being monitored, also his car and its location was being monitored?

A.  For a period of time, yes.

Q.  During that time, did Mr. Alowemer ever drive up to or across the Canadian border?

A.  Not that I'm aware of, no.

Q.  At any point did he drive down to or close to the Mexican border?

A.  Not that I'm aware of, no.

Q.  Was there any point at which he really left the Pittsburgh area?

A.  Not that I'm aware of.

Q.  Mr. Alowemer was a senior in high school during the course of this investigation; correct?

A.  Yes, sir.

Q.  And so pretty much what he was doing day in and day out was going home and going to school; correct?

A.  In addition to his regular activities, Mr. Alowemer was in regular and frequent contact with the online covert employee and then engaged in five meetings with an undercover employee that lasted for hours at a time.

Q.  I understand.  And I understand there were meetings with the undercover FBI agents during the course of the investigation.  But when you're talking about the routine of my client's life during the courses of the investigation; that is, from March 2019 up to his arrest in June 2019, he was a high school student living at home with his parents and going to school every day; correct?

A.  If the question is was he a typical high school student, I would say, no, as a trained investigator.  Mr. Alowemer was engaged in a plot to carry out a terrorist attack.

Q.  My question is not whether or not he was a typical high school student.  My question is, his routine, as you understood it, was to live at home with his parents and to go to high school every day so he could graduate in early June 2019?

A.  I would say that's accurate.  Additionally, his routine included the activities I previously stated.

Q.  In the course of your investigation, you are aware that Mr. Alowemer was completing both junior and senior high school

in the school year of 2018 and 2019; correct?

A.  I was not aware of that, no.

Q.  You're aware of many things.  You're not aware --

A.  That he was completing both his junior and senior year?
No, sir, I was not aware.

Q.  So you were unaware of after a regular day of school that
he would go to school for an additional couple hours so he
could do additional course work so he could graduate in
June 2019?

A.  I was not aware of that.

Q.  Did the agents that you discussed with not mention that at
all?

A.  That was not a topic of discussion.

Q.  You testified on direct examination today that my client
purported to have engaged in an attack while living in Syria;
is that correct?

A.  That is the statement Mr. Alowemer made, yes.

Q.  You understand that Mr. Alowemer fled Syria into Jordan in
2013; correct?

A.  Yes.

Q.  You understand that he would have been 15 years old at
that time; correct?

A.  Yes.

Q.  And so it's your testimony today that Mr. Alowemer
represented that prior to fleeing to Jordan at age 15 that he

engaged in a grenade attack on a mosque in Syria?

A.   That's the statement Mr. Alowemer made, yes.

Q.   What efforts did you personally make to verify that statement?

A.   I did not make efforts to verify that statement.  If efforts were made to verify that, that would have been done by the large investigative team.

Q.   As far as your communications with law enforcement, did they provide you with any information about their verification of that statement?

A.   Considering the state of Syria, it's very difficult to verify any information within the country of Syria.

Q.   My question, Special Agent Morgan, is during the course of your communications with agents in this case, did they mention anything about verification of Mr. Alowemer's purported statement that he engaged in a grenade attack on a mosque at age 15 or younger?

A.   In Syria, no.  That was not discussed.

Q.   You never asked them that?

        THE COURT:  Sir, I think that he answered the question.  You can move on now, please.

Q.   I don't want you to make any statements identifying the identities of any of the undercover agents in this case, but do you know how old they were?

A.   I don't know anything about them.  I don't know their

identities, their ages.  No.

Q.  My client's 21 years old.  Do you know if they're younger than my client?

A.  No.  They would not be younger than 21.

Q.  They would probably be older than 21; right?

A.  That's correct.

Q.  In fact, I think that you stated on June 21st that both of those undercover agents had been working with the FBI for at least a couple years; correct?

A.  I think I was speaking in general terms with respect to undercover employees.  How long those individuals had been employed with the FBI, I couldn't say.

Q.  Do you have a general idea of how old they are?

       MS. SONG:  Objection.

A.  We established they were older than the Defendant.

       THE COURT:  Already asked and answered.  Move on, please, Mr. Lipson.

Q.  (Pause.)  The government played a video of a truck bombing that -- a truck bombing of a building that purportedly occurred in Syria; correct?

A.  I'm not sure of the exact location of the video; but, yes, it's a truck bombing of a building.

Q.  There's no allegation whatsoever that my client was at all involved with that particular incident; correct?

A.  That's correct.  It's just indicative of propaganda that

G. Morgan - Cross                                          32

he was disseminating.

Q.   That propaganda is readily available on the Internet; correct?

A.   I suppose if you look for it, yes.

Q.   In the course of your experience as a special agent in this area, where would one find a video such as that?

A.   Specific to this investigation, Mr. Alowemer was first discovered through his contact with an ISIS recruitment website on the Dark Web.  I suspect that's perhaps where it occurred.

Q.   You suspect, but you don't know; right?

A.   I don't know.

Q.   Are there other places where one could obtain a video such as that?

        MS. SONG:  Objection, Your Honor.  Is that related to detention?

        MR. LIPSON:  Your Honor, I think -- the government played a video of a large explosion for the Court and the gallery to see.  And, Your Honor, I believe that it should be established that this is something that my client was not involved with, nor -- there was some specific place where this can only be found online and that this is readily available.  And, honestly, you know --

        THE COURT:  Mr. Lipson, do you have evidence of a specific place where that can be found that's not on the Dark

Web?

MR. LIPSON:  No, I don't.  That's why I'm asking the special agent who's --

THE COURT:  You can ask him if he knows where his client got it, and then let's move on.

BY MR. LIPSON:

Q.  Do you know where my client got that?

A.  I do not.

MR. LIPSON:  No further questions, Your Honor.

THE COURT:  Any redirect, Miss Song?

MS. SONG:  No, Your Honor.

THE COURT:  Thank you, Agent Morgan.  You may step down.  Miss Song, do you wish to move the Exhibit Nos. 1, 2 and I think No. 3 in the preliminary hearing into evidence?

MS. SONG:  Yes.  We reoffer the still shots that are representative of the videos played in court.

THE COURT:  Any objection?

MR. LIPSON:  No, Your Honor.

THE COURT:  Okay.  They're admitted.  So no other evidence on behalf of the government?

MS. SONG:  No, Your Honor.  Thank you.

THE COURT:  Mr. Lipson, would you like to present any evidence?

MR. LIPSON:  I would, Your Honor.

THE COURT:  You may do so.  Do you have a witness to

call?

MR. LIPSON:  I do.  But I would like to place a couple things on the record before calling my first and only witness.

THE COURT:  Okay.  You may proceed, sir.

MR. LIPSON:  Your Honor, I would like to provide the Court and move into evidence what's been marked as Defense Exhibit B, which is a copy of which I provided to the government prior to the hearing, immediately prior to the hearing, which is a letter from Community College of Allegheny County, CCAC, congratulating Mustafa Alowemer, my client, for his acceptance to CCAC.  And this letter is dated November 8th of 2018.

THE COURT:  Any objection?

MS. SONG:  No, Your Honor.

THE COURT:  It's admitted.

MR. LIPSON:  Your Honor, I would also like to move into evidence what's been marked as Defense Exhibit C, which is a compilation of documents that go to the type of student that Mustafa Alowemer was while at Brashear High School.  This is a six-page exhibit, Your Honor.  The first page of which is an official transcript from Pittsburgh Brashear High School.

The second page of which is a letter from Brashear High School to Mr. Alowemer stating that "The faculty of Pittsburgh Brashear High School would like to take this

opportunity to congratulate you, Mr. Alowemer, on achieving the Brashear High School Scholastic School Letter Award during the school year."  This would be for the school year of 2016-17.

"You are among the first to receive this honored award.  As such, you have joined a new group of proud lettermen of Brashear High School."

The letter goes on to congratulate him on a job well done.  That's page 2 of the exhibit, Your Honor.  Pages -- I apologize.  I said it was a six-page exhibit.  It's a five-page exhibit.

Pages 3, 4 and 5 of what has been marked as Defense Exhibit C are certifications from Brashear High School, all establishing that Mr. Alowemer was on the honor roll each of the three years that he attended Brashear High School.  And I would like to move that into evidence.

THE COURT:  Any objection?

MS. SONG:  No objection, Your Honor.

THE COURT:  It's admitted, Mr. Lipson.

MR. LIPSON:  Lastly, Your Honor, I would like to move into evidence what's been marked as Defense Exhibit D, which is a photograph of my client on the day he graduated high school.  Certainly one of the few photographs that you'll see circulating online or in the press these days of him smiling. I believe that that's appropriate for the Court to see in

36

light of the circumstances of this case.

THE COURT:  Any objection?

MS. SONG:  No, Your Honor.

THE COURT:  It's admitted.  Thank you, Mr. Lipson.

MR. LIPSON:  Your Honor, I do have one more exhibit to introduce; however, I would like to introduce that through my one and only witness, which would be Mr. Alowemer's mother, Fatmeh Alouwaimer.

THE COURT:  Okay.  Please come forward and be sworn, ma'am.

(Witness sworn.)

THE DEPUTY CLERK:  Please state and spell your name for the record.

THE WITNESS:  My name is Fatmeh Alouwaimer, F-A-T-M-E-H A-L-O-U-W-A-I-M-E-R.

-----

FATMEH ALOUWAIMER

a witness herein, was duly sworn and testified as follows:

-----

DIRECT EXAMINATION

BY MR. LIPSON:

Q.  Good morning, Ms. Alouwaimer.

A.  Good morning.

Q.  Please explain your relationship to my client.

A.  Mustafa Alowemer is my son.  He's my oldest son.

Q.   And where are you from originally?

A.   I'm from Syria.

Q.   Where in Syria?

A.   The City of Dara'a.

Q.   And since you've lived in Syria, what countries have you resided?

A.   I left Syria to Jordan as a refugee, and then from Jordan I came as a refugee to the United States.

Q.   And why did you leave Syria?

A.   Because of the war that was going on in Syria.

Q.   And did you and your -- you and your family left in order for -- for safety; correct?

A.   That's correct.

Q.   And do you recall approximately when you left Syria?

A.   Yes.  As I recall, it was January 31, 2013.

Q.   From there, where did you go?

A.   To Jordan.

Q.   And then for how long were you in Jordan?

A.   Less than four years.

Q.   When you were in Jordan, was your eldest son, Mr. Mustafa, permitted to go to school?

A.   He has not been admitted to school in Jordan.

Q.   And so instead of going to school, what did he do?

A.   He was working and helping his father.

Q.   And then after Jordan, do you recall when you came to the

United States?

A.   August 1, 2016.

Q.   How did you and your family view the opportunity to come to the United States?

A.   When the emigration contact us in Jordan and they offered us the opportunity if you want to travel to the United States.

Q.   How did you feel about that opportunity?

A.   Personally, I wasn't willing to leave my parents behind. But my kids, they were very happy, because I was hearing good things about the United States.  Because he was working hard helping his father, and he was taking the opportunity to travel to the United States.  Mustafa and Shahid were very delighted to take this opportunity and to find a better life and to pursue his future.

Q.   You mentioned another child of yours.  Were you referring just now to your eldest daughter?  You don't need to state your other children's names, especially because they are minors.  It's safe to say that Mustafa, your eldest son, and his other siblings were excited about the opportunity coming here?

A.   My eldest son is Mustafa.  He was the one most excited to take this opportunity.  Because he wants to pursue his academy education.  He wants to pursue a happy life.

Q.   You did mention his desire -- Mustafa's desire to pursue his education.  Explain that to me, what he's done since he's

been here to do that.

A.  We make contacts with the school.  And, fortunately, he was enrolled in that school and thanks God he was very happy.  He was able to return to school.  Because he spent almost four years in Jordan.  He did not go to any school.  So he was very excited to return and be admitted back to school in the United States.

Q.  And how many years did it take him to graduate high school?

A.  Three years.

Q.  How was he able to do that in three years?

A.  He was very excited, because he completed 21 years of age; and he took actually two years.  He finished them in one year.  So he combined the courses together.

Q.  How hard did he work?

A.  The last year he worked hard.  He was taking classes during school hours and after school hours from 7:00 a.m. until 6:00 p.m.

Q.  Can you describe Mustafa's relationship with his siblings.

A.  He has only one sister and two brothers.  He was sympathetic, very compassionate.  He was very compassionate to all of us.  He was helping us, because he's my eldest son.

Q.  You mentioned that he's the eldest son.  What does that mean?

A.  In our Middle Eastern culture, the eldest son carries all

the burden or carries all the responsibility.

Q.  In your opinion, how did your son Mustafa handle that burden or responsibility?

A.  Well, it's part of his duties, since he's the eldest son.

Q.  But how -- what are some examples of things that he would do?

A.  Because he's the eldest son.  And then in the absence of his father, so he has to take this responsibility.

Q.  For example, how did your other children get to school?

A.  It was very ordinary or regular admittance.  The sponsoring refugee agency was the one who helped them -- who helped enroll them in school.

Q.  I was asking a slightly different question.  On a day-to-day basis, did Mustafa help your other children get to school and back from school?

A.  He used to wake them up in the morning, and he was escorting his brothers and sister to school, and he used to bring them back from school.

Q.  Did he do that with anyone else in the community?

A.  Yes.  Our neighbor kids.  They were Africans, and they were helping take them -- he was taking them to school and bring them back.

Q.  And so would you say that your son was punctual and went to school frequently and was careful not to miss school?

A.  He was very careful.  He never skipped classes.

Q.  So when he had a place to be, he would go there?

A.  Yes.  He has no place else to go other than the school.
Except on weekends, Saturday and Sunday, he used to help me go
shopping, to the grocery, the market.

Q.  During the course of -- since your son has been arrested,
you've been in contact with me and members of my office;
correct?  Both me and members of my office.

A.  That's correct.

Q.  Did you work with anybody in your community to talk -- to
create some sort of list of people that support your son?

A.  Yes.

        MR. LIPSON:  Your Honor, permission to approach the
witness?

        THE COURT:  Have you shown that to the Assistant US
Attorney?

        MR. LIPSON:  I have provided a copy.

        THE COURT:  Very well.  You may approach the witness,
Mr. Lipson.

        MR. LIPSON:  Your Honor, I'm providing Ms. Alouwaimer
a copy of what's been marked as Defense Exhibit A.

        (Witness reviews document.)

A.  It's a list of my neighbors' names and friends.

Q.  Please describe what that list -- what that document is.

A.  Those are my neighbors, my friends, Mustafa's friends.

Q.  And there are names and signatures on this list; correct?

A.   Yes.  And phone numbers as well.

Q.   And where was this signed, if you know?

A.   My home.  Most of these signatures were done in my home, and other signatures were living like far from my house.  I used to go and have them sign on this document.

Q.   As far as you can describe, what does the people in your community signatures -- what did that mean?

A.   They support Mustafa, and they are willing to -- if they will have to be questioned, they will answer to any question.  And this is an indication of their support and loving to Mustafa.

            MR. LIPSON:  Your Honor, I would like to move into evidence what has been marked as Defense Exhibit A, which is a petition to the United States District Court of the Western District of Pennsylvania demonstrating -- as consistent with Ms. Alouwaimer's testimony demonstrating members of her community and Mustafa Alowemer's community showing support and discussing the nature of his character.

            THE COURT:  Any objection?

            MS. SONG:  No objection, Your Honor.

            THE COURT:  Mr. Lipson, it's admitted with the proviso you must follow our local rules.  And I'm going to request that you redact the telephone numbers of these persons.  You've already done so.  That's fine.  I hadn't seen a copy of it yet.  Very well.  Thank you.  It's admitted.

BY MR. LIPSON:

Q.  Miss Alouwaimer, the top of this document states "We are friends, family and neighbors of Mustafa Alowemer.  We know Mr. Alowemer as a peaceful, nonviolent young man who is a positive contributor to our community.  As the undersigned, we support his release and return to his family and our community"; correct?

A.  It's very clear to me.

Q.  Lastly, Ms. Alouwaimer, in the course of my representation of your son, I described to you what a third-party custodian is; correct?

A.  Yes.

Q.  What is your current job right now?

A.  I'm a house mother.  I stay at home, and I work at home.

Q.  So what is your daily schedule?

A.  Well, like any other mother or housewife, I wake up about 4:30 or 5:00 in the morning.  And then I wake up my children and my husband to go to work.  And while my kids are at school, I do the housework, like any other housewife does.  I cook for them.  I see whatever they need.  Listen to them.  I help them with whatever I can.

Let's say if they need anything to do on their behalf, I'll do.  We spend time as a family together in the evening, happy hours when we sit together as a family.  In the late afternoon we eat together.  We dine.  The kids go to bed.

*F. Alouwaimer - Direct*                                        44

Then I finish my housework.  And then after when my kids go to bed, then it's my turn to go to bed.

Q.  How often do you leave your home?

A.  Rarely, unless there's something urgent.  I don't leave my home.

Q.  If your son were to be released back to your home, where would you sleep?

A.  With him.

Q.  So you would insist that you sleep in the same bed as him?

A.  Same bed.  Same room, yes.

Q.  There are no firearms in your home; correct?

A.  No.

Q.  There's no large scary dogs or animals in the home?

A.  No.

Q.  When we discussed you being a third-party custodian, you understand that it would be your job to supervise and be essentially kind of an officer of the court in supervising your son?

A.  Yes.

Q.  You understand you're under oath right now?

A.  Yes.

Q.  And if your son were released to your home and you were third-party custodian, do you take an oath to the Court to insure that he shows up at all court proceedings?

A.  Of course.

Q.  And you understand that the Court may impose conditions that it feels necessary for his release.  If you were to see him violate any of those conditions, do you take an oath to call his probation officer immediately?

A.  Of course.  Of course, I'll call the probation officer. It's for our own safety and for his safety.

THE COURT:  Could I see counsel briefly at sidebar.

(Sidebar discussion held but not recorded.)

Q.  You did just mention for the safety of your family.  What do you mean by that?

A.  Because I will be jeopardizing myself.  What I meant for the safety of my family, because I undertook -- I'm under oath and undertook or I vote to comply with the terms and conditions.  So I will be jeopardizing myself.  It will be my responsibility to report everything to the court, if needed.

Q.  And you would be comfortable to essentially turn your son in if he did anything that violated the conditions of his release?

A.  Of course.  I will do everything necessary.  If I fail to do so, then I will do necessary contact, contact the court or the probation officer to take over.

Q.  No further questions.

THE COURT:  Any cross-examination?

MS. SONG:  No, Your Honor.

THE COURT:  Okay.  Thank you, ma'am.  You may step

down.  Any further evidence that you would like to have admitted, Mr. Lipson?

MR. LIPSON:  No, Your Honor.

THE COURT:  Okay.  I'll hear summation by the government and then by the Defendant, as you have the burden.

MS. SONG:  Your Honor, the presumption in this case reflects Congress' judgement there are particular classes of offenders that should ordinarily be detained prior to trial.  And those who plot material support of terrorism is among those offenders.

Very simply, Your Honor, clearly and convincingly, this Defendant is a danger to the community.  He was determined to travel to Syria and die as a martyr and to commit nephir.  And he is a risk of flight by more than a preponderance.  But, more importantly, it is obvious that the Defendant is a young man who very likely experienced challenge and upheaval in his life, but fundamentally his desire for martyrdom and suicide combined with this violent animus towards Christians, Shiites, Yazidis, those in the military, first responders and Jews is lethal and, frankly, toxic and creates a risk that the community should not have to bear.

I will not reiterate the factors.  The Court is very, very familiar with them.  But we have a long course of conduct.  We have ample evidence.  And the history and characteristics of this Defendant, by his own description to

these FBI employees he has himself engaged in conflict prior to even coming to the States, perhaps when he was a teenager.

If this Defendant were released, Your Honor, the nature and seriousness of the danger to a lot of people would be extreme and unacceptable.  Notwithstanding his mother's good intentions, the fact is she resided in the home with him during the months he was plotting to bomb the church.

He was in daily contact with people who talked about ISIS and had violent designs upon explosives and other people. And he met with those individuals for hours in the Pittsburgh area without her knowledge or intervention.  And we just don't think that she can assure the safety of the community.

THE COURT:  Thank you.  Mr. Lipson, would you like to make arguments?

MR. LIPSON:  I would.  Thank you, Your Honor.  Your Honor, if this is, in fact, a presumption case, then that means there is a rebuttable presumption that Mr. Alowemer must be detained pending the course of this case.  However, that is a rebuttable presumption.

That rebuttable presumption is not the burden of persuasion, Your Honor.  It is a burden -- all that rebuttable presumption places on Mr. Alowemer is a burden of production that he must provide, quote-unquote, some evidence of forming the basis that he will appear and not pose a threat to the community.  And that's United States versus Carbone,

48

C-A-R-B-O-N-E, at 793 F.2d 559, 560.  That's a Third Circuit case from 1986.

The Defendant's burden of production for that "some credible evidence" is relatively light and has been construed as easy to meet.  And that's Judge Diamond's statement in United States versus Chagra, 850 F. Supp. 354, at Penn cite 357.  The quantum of evidence to rebut the presumption is not high.  Rather, the Defendant need only come forward with some credible evidence conflicting with that presumption.

Your Honor, in United States versus Talbert, the late Judge Lancaster found that letters showing that a Defendant played an active role in his community and coached a local football team was enough to rebut the presumption that they were a danger to the community in that case.  That was a 2011 case at Case No. 11-CR-151.

Your Honor, if Mr. Alowemer produced this "some credible evidence" he is, in fact, not a danger and he is a contributing member of his community, that shifts the burden back to the government, as in any typical detention hearing. And the burden of persuasion is back on the government to argue that there are no set of conditions whatsoever that the Court can impose that would reasonably assure my client will show up to court and not be a danger to the community.

As Your Honor is well aware, the Bail Reform Act is an Act that favors the release of an individual who's presumed

innocent until convicted in a court of law to be on release and in their community.

Your Honor, I believe that today Mr. Alowemer has met that burden of production that presumption puts on him.  His mother testified that he's a caring son and loving brother to his siblings.  Mr. Alowemer would drive his siblings and other members of the community, other members, I believe she testified, of African descent, which is contrary to the government's testimony from Special Agent Morgan that he has animus towards members from Nigeria.

That the Defendant has worked while in Jordan to help support his family, and the Defendant has -- it's been established that Mr. Alowemer is a hard-working student, attended school regularly, arrived on time and graduated four years of high school in only three years.

The school records that I admitted as Defense Exhibit C, Your Honor, establish that Mr. Alowemer maintained a high grade point average.  He graduated in three years. That he was on the honor roll in each of the years that he attended Brashear High School.  That he got a special commendation from Brashear High School.  And he had already been accepted to CCAC, which is inconsistent with an individual planning nephir.  Your Honor, the petition --

THE COURT:  Excuse me, Mr. Lipson.  About how much longer do you think you'll be?  We may need to recess and come

50

back this afternoon.

MR. LIPSON:  I believe that I have about five to ten minutes left.

THE COURT:  Could you try to conclude in five minutes?  I've paid attention to the evidence; and we did get started a little late on your behalf, sir.

MR. LIPSON:  And I understand that, Your Honor.  I'll do my best.  Your Honor, the petition that is admitted as Defense Exhibit A shows 81 signatures, 81 signatures from members of Mr. Alowemer's community here in Pittsburgh that say that he's a kind, caring individual and that they would support his coming back to his family.

Your Honor, seldom is the case presented to a court where 81 individuals will either show up or put their name on a document to vouch for an individual charged with a federal offense.  And this is -- this case falls into that category. The allegations against my client are very serious.  I understand that.  But Mr. Alowemer maintains his innocence.

And I believe that what the evidence has shown from the government is that there was no concrete plan by my client to engage in any sort of attack in this country or in this community until there was contact by FBI agents in March 2019.

During that time, he was on extensive surveillance. There was tracking of his devices, tracking of his car.  And he was not communicating with anyone else about these

activities other than the undercover agents in this case.

Your Honor, I would just briefly direct your attention to page 58 of the June 21st transcript where my colleague, Sam Saylor, asked of Special Agent Morgan "He didn't meet with anyone else apart from the FBI or what turned out to be the FBI about any ISIS-related matters?"  The answer of Special Agent Morgan was "No."

So what we have here is a situation that an investigation began in March 2019.  He meets with the undercover agents in this case.  He speaks exclusively with these people, and there's no other communications with anyone else.  To the extent the Court -- so, Your Honor, I believe that that underscores the main point here is that my client is not a fundamentally dangerous person.

The special agent testified that he asked agents if there was a way or people that could help get him back to his home country.  He does not know himself even how to do that. The testimony of the special agent is that he asked the undercover agent for -- purportedly asked for a firearm.  This is Pittsburgh.  This is the United States.

THE COURT:  You've got another minute.  Please, sir. Or we can come back this afternoon.

MR. LIPSON:  Your Honor, you had mentioned that the hearing could last until 11:20.

THE COURT:  Well, I have to make my decision, sir.

52

MR. LIPSON:  I understand that.

THE COURT:  So please wrap up.  But if you want to take a break now and come back this afternoon, we could do that.

MR. LIPSON:  I would like to avoid that, Your Honor.  But I will move forward to make my argument.

THE COURT:  Thank you.

MR. LIPSON:  Your Honor, he was under extensive surveillance.  He was not meeting with anyone else.  There was no concrete plan to do anything until FBI agents began to talk with him.  He does not know how to get a firearm.  He does not know how to leave this country and emigrate back to Syria on his own.

The allegations are that a bomb expert spoke to him about creating a bomb, and he was apologizing to that expert for not getting the right materials.  I think the evidence establishes that he was doing some of those actions at the direction of those agents.

Your Honor, I do not believe that if released to his home, to the third-party custodianship of his mother on home detention with a limit on his Internet access, phone access, and a limit on any sort of communication outside of his home, other than with his attorney or his family or doctors, that the Court could be reasonably assured that he cannot pose an actual danger.

He simply has not done anything concrete to injure anyone in his life.  There's no criminal history here.  He's a high school graduate.  He's worked hard to get to that point, Your Honor.  I believe that there are a set of conditions within this Court's power that can be imposed on Mr. Alowemer that would assure he's both not a flight risk and also not a danger to the community.  Thank you.

THE COURT:  I have made my detention decision in this case.  And in making the decision, I have considered the following factors.  First, on July 16, 2019, a Federal Grand Jury in the Western District of Pennsylvania returned an indictment charging the Defendant with one count of attempting to provide material, support and resources to a foreign terrorist organization, ISIS, in violation of 18 USC Section 2339(b)(a)(1) and two counts of distribution of information relating to explosives, destructive devices and weapons of mass destruction in violation of 18 USC Section 842(p)(2)(a).

Pursuant to the Bail Reform Act, there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the Defendant as required for the safety of the community.  In ruling on this rebuttable presumption, I have listened to the evidence of the Defendant, as well as the testimony provided by the special agent.

I've considered the request of the United States Attorney, as I said, and the evidence which it has presented. I've also considered the Pretrial Services report and the defense counsel's presentation and the testimony of the Defendant's mother.

I note that the crime charged is a crime of violence. That the offense charged is a serious offense that poses a threat to persons or to the community, if the Defendant were to be released. I've considered the weight of the evidence in this case. There is at least probable cause to believe that the Defendant committed the offense by virtue of the Grand Jury's finding of a true bill of indictment, as well as by my finding of probable cause at the preliminary hearing.

In addition, as to evidence that was presented at the preliminary hearing and that evidence presented to me today, the Court has considered these additional factors, which point to the nature and circumstances of the offense. There was a course of conduct over numerous months that involved online expressions of intent to commit violent acts on behalf of ISIS.

There were at least four to five in-person meetings with the undercover agents in which the Defendant selected the specific target, presented instructions to build an explosive device and acknowledged that that device, if detonated, could bring harm to numerous persons and death in the community.

The Defendant targeted a church to discourage Christian worship, and he planned to use a second explosive device programmed to detonate when law enforcement responded to the initial blast.  He planned his getaway and his alibi.  He purchased numerous materials to construct an explosive device according to the bomb-making instructions, which he provided.

Numerous items were found in his home including the mask worn in the video, as well as an Islamic Black Standard flag, which was depicted on the video.  In addition, evidence today showed that the Defendant does have violent animus towards numerous religious associated persons including Christians, Jewish persons, Shia Muslims and Yazidis.

He also has shown animus towards people in the military, as well as military associate students.  I also note that the Defendant is 21 years old, a high school graduate, apparently a very bright individual who completed high school in a shorter amount of time than most people and who was awarded honors and has been accepted into college.

I note that the Defendant came to this country in 2016 with his family from Jordan, and he still has relatives in Jordan and in Syria.  I reviewed the Pretrial Services officer's recommendation that the Defendant be detained.  The Pretrial Services Office assessment was as follows.  That the Defendant poses a risk of nonappearance for the following

reasons.

The offense charged.  The Defendant is charged with participating in an extensive plan to bomb a local church and attempted to enlist the assistance of others in carrying out the plot.  He has ties to a foreign country.  He recently entered the United States.  He was born in Syria, lived in Jordan, although he does have numerous family members living with him here.

And according to information provided by the government, he was placed on suicide watch at the time of his arrest.  He has lacked a verifiable employment.  However, based upon the testimony of his mother, he has been helpful to his family and his father and has been attending school.

Pretrial Services also made the assessment that the Defendant poses a risk of danger for the following reasons. He's been charged with planning an act of violence which could have caused mass destruction.  There are safety concerns for the community.  In addition to targeting the church and its members, the Defendant had no concern for possible damage to the surrounding residential areas.

The Pretrial Services report also notes that, according to the criminal complaint, the Defendant has a sophisticated level of knowledge in the use of operational security and strategic planning, which is bolstered by his use of social media and mobile messaging and spreading the message

of his extremist organization.

The Pretrial Services office recommendation is that there is no condition or combination of conditions that would assure the safety of the community or the Defendant's appearance at trial.

I have listened to the testimony as presented by the Defendant's mother. And while I find her to be very sincere, I also note that those acts with which the Defendant is accused occurred during a time period when he was in his mother's home. And while the Defendant may have come forward with some evidence to rebut the presumption, to the extent that burden then shifted to the government, the government has met their burden. I'm ordering that the Defendant be detained until the time of his trial.

Is there anything further on behalf of the government?

MS. SONG:  No, Your Honor.  Thank you.

THE COURT:  Is there anything further on behalf of the Defendant?

MR. LIPSON:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you.  We're adjourned.

-----

(Whereupon, the above-captioned matter was concluded.)

-----

58

I N D E X

-----

WITNESS:                                    PAGE:

GARY MORGAN
   Direct by Ms. Song                          4
   Cross by Mr. Lipson                         23


FATMEH ALOUWAIMER
   Direct by Mr. Lipson                        36

-----


C E R T I F I C A T E


         I, NOREEN A. RE, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.



s\ Noreen A. Re                    January 29, 2020
NOREEN A. RE, RMR, CRR             Date of Certification
Official Court Reporter