IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
)
    v. ) Criminal No. 19-219
)
MUSTAFA MOUSAB ALOWEMER )

**POSITION OF DEFENDANT**
**WITH RESPECT TO SENTENCING FACTORS**

NOW COMES Mr. Mustafa Mousab Alowemer, through his counsel, Assistant Federal Defender Andrew Lipson, respectfully filing this position with respect to sentencing factors pursuant to Fed. R. Crim. P. 32(f), Local Rule 32(c)(4), and U.S.S.G. § 6A1.2, as well as subsequent Court order.  In support thereof, counsel states:

1.    Undersigned counsel and Mr. Alowemer have reviewed the Presentence Investigation Report.

**Factual Objections to Paragraphs 22, 23 and 24**

2.    Mr. Alowemer objects to the characterization of certain events that transpired during his offense. It appears these paragraphs were drafted by the government and adopted wholesale by the United States Probation Office, and Mr. Alowemer objects in order to more accurately state what the evidence demonstrates in this case.

3.     First, with respect to Paragraph 22, it discusses the motivation behind Mr. Alowemer's selection of the Legacy International Worship Center as a potential target. The paragraph paraphrases the interaction between Mr. Alowemer and the undercover agents, which has the effect of distorting how the conversation actually unfolded. Mr. Alowemer proposes the following, more accurate, version of Paragraph 22:

On June 2, 2019, Alowemer and the UCE met for a third time in the Pittsburgh area for nearly 3 hours. Alowemer identified a church with "polytheists and infidels" as a target to plant an explosive device. Alowemer also described the church as "Nigerian."  Alowemer proposed planting the explosive at 2:00 or 3:00 a.m. and detonating shortly thereafter. At this meeting the UCE asked "So, why the Nigerians? All of them are polytheists." Alowemer responded "they [Nigerians] are all polytheists. We take revenge for our brothers in Nigeria." When asked if there was an Islamic State in Nigeria, Alowemer responded "There is an Islamic State or there was an Islamic State in Nigeria." When the UCE asked further details about ISIS in Nigeria, Alowemer said "I am not sure about this" but that "they all were pious." The UCE suggested that the attack would cause other "brothers" to rise up and Alowemer agreed."

2

4.     Likewise, with respect to Paragraph 23, it states "At several points during the meeting, the UCE made clear that the explosive force necessary to accomplish Alowemer's desired attack would likely kill many people in the residential area surrounding the Church, even if the Church were unoccupied at the time of explosion." This sentence is only partially accurate. It fails to state that Mr. Alowemer identified the other homes that may be collaterally damaged by an explosive device and expressed his belief that no one lived in those homes, nor that anyone would be in the worship center at the time of detonation. At that time, Alowemer confirmed the primary motive was to destroy the building, not to harm or kill individuals.

5.     Finally, with respect to Paragraph 24, it states "Alowemer provided the UCE with the items that he had purchased in the preceding days that were intended to be used for assembly of the destructive device …." While it is accurate that Mr. Alowemer purchased those materials, he did so at the direction of the UCE, who held himself out to be an explosives expert. The description of Mr. Alowemer activities should reflect that dynamic.

**Objection to Enhancement under Section 3A1.4**

6.     Mr. Alowemer objects to Paragraph 40, which applies the "terrorism enhancement" at U.S.S.G. § 3A1.4. That guideline states:

3

a) If the offense is a felony that involved, or was intended to promote a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than 32, increase to level 32.

b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Section 3A1.4 is satisfied if the offense is felonious conduct that: (1) "involved" a crime of terrorism, or (2) was "intended to promote" a crime of terrorism. *See United States v. Aswan*, 607 F.3d 306, 311 (2d Cir. 2010). Application Note 1 to Section 3A1.4 states that a "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5), which in turn defines a "federal crime of terrorism" as "an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, and (B) is a violation of [the enumerated statutes]." The offense to which Mr. Alowemer pled guilty, 18 U.S.C. § 2339B(a)(1) providing material support to the terrorist organization, is one of the enumerated statutes.

7.     Therefore, in order for the terrorism enhancement to apply, the government must prove that Mr. Alowemer **specifically intended** that his material support offense (1) "influence or affect the conduct of government by intimidation or coercion," or (2) "to retaliate against government conduct." *United States v. Alhaggagi*, 978 F.3d 693, 699-700 (9th Cir. 2020) ("The parties agree, consistent with the district court's decision and those of our sister circuits that have addressed the issue, that § 2332b(g)(5)(A) imposes a specific

4

intent requirement."); *see also United States v. Stewart*, 590 F.3d 93, 137 (2d Cir. 2009). In other words, to satisfy Section 2332b(g)(5)(A), the government must show the defendant provided material support "with the purpose of influencing or affecting [or retaliating against] the government conduct and planned his or her action with this objective in mind." *United States v. Wright*, 747 F.3d 399, 407 (6th Cir. 2014); *United States v. Hassan*, 742 F.3d 104, 148-49 (4th Cir. 2014); *United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014. Here, the government cannot establish either prong.

*Mr. Alowemer's offense was not calculated to influence or affect government conduct.*

8.      Regarding the "influence and affect" prong, the government cannot put forth sufficient evidence showing that Mr. Alowemer "specifically intended" that his offense conduct "influence or affect the conduct of government by intimidation or coercion." *See Alhaggagi*, 978 F.3d at 701. The government falls well short of its burden because it cannot identify which government Mr. Alowemer specifically intended to influence or affect through his offense conduct nor what government actions Mr. Alowemer intended to influence or affect. Rather than impact government conduct, Mr. Alowemer targeted the worship center of a discrete civilian population – whom he described as "polytheist Christians" – for religious reasons.

9.      In *United States v. Rana*, No. 09-CR-0830 (N.D. Ill. 2012)[1] Mr.

Rana was convicted under 18 U.S.C. § 2339B(a)(1) for plotting an attack on the

Danish newspaper *Jyllands-Posten*. *See Rana*, No. 09-CR-0830, Trial Tr. at 3-5,

ECF No. 389. The plan involved beheading hostages, fighting to the death with

Danish security forces, and providing material support to Lashkar-e-Taiba, a

Pakistani terrorist group responsible for killing over 160 people in the

November 2008 Mumbai attacks. Yet despite a detailed planning of this violent

attack, the application of the terrorism enhancement was rejected. The Court

found that Mr. Rana's plot targeted the Danish newspaper for its cartoon

depictions of the Prophet Muhammad, but did not intend to influence or affect

any specific government entity by intimidation or coercion.

10.     Like Mr. Rana, Mr. Alowemer's plans involved attacking the

worship center of certain civilians: attendees of the Legacy International

Worship Center whom Mr. Alowemer described as "polytheist Christians."

While Mr. Alowemer is explicit about his targeting of polytheist Christians,

there is no discussion of an intent to influence or affect the actions of a

government or government entity. The Legacy International Worship Center is

a private church, not government property. While other courts have applied the

---

[1] Because much of the case is under seal, parts of the description below come from documents filed in other cases involving the enhancement. *See, e.g., United States v. Alhaggagi*, No. 3:17-cr-00387 (N.D. Cal. 2019), Def.'s Supp. Sent. Mem. at 8 n. 6, ECF No. 124.

6

enhancement to offense conduct targeting government property, where private property is targeted, the link between the proposed target and a specific intent to influence or affect government conduct is far more attenuated. *See United States v. Khatallah*, 314 F. Supp. 3d 179, 199 (D.D.C. 2018) (listing "several courts [which] have applied and upheld the terrorism enhancement for defendants who targeted government facilities"); *United States v. Stafford*, 782 F.3d 786, 792 (6th Cir. 2015) (targeting government infrastructure "is at least some evidence of intent to affect government conduct.").

11.     After Mr. Alowemer mentions his animosity towards polytheist Christians to the undercover agent, the agent and Mr. Alowemer briefly discuss possibly planting a second explosive device. In this context, Mr. Alowemer made a single, off-hand comment that this potential second explosive could "lock down the whole – whole Pittsburgh." PSR ¶ 24. While this stray comment is a signal that Mr. Alowemer expressed in that moment that he wanted to cause gridlock in Pittsburgh, there is no mention of what conduct by government officials he is specifically intending to influence or affect.[2]

---

[2] Furthermore, the city of Pittsburgh is not the United States government. The support for Syrian fighters and ISIS expressed by Mr. Alowemer has no relationship to the actions of the Pittsburgh city government. Mr. Alowemer never makes or infers such a connection between Pittsburgh and ISIS. There is no case that defense counsel is aware of in which the application of the terrorism enhancement was triggered because of an intent to cause gridlock in a geographic area, or to influence city or municipal officials.

12.     The enhancement is not triggered by spreading fear in the name of ISIS. If the Section 3A1.4 enhancement applied to any defendant whose conduct furthered or bolstered the fear that ISIS seeks to perpetuate, then it would apply in every material support case. Every foreign terrorist organization seeks to influence government conduct (or to retaliate) against governments and every instance of material support furthers those terrorist organizations. *See Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). Yet that is not the standard for applying the enhancement under Section 3A1.4. *Alhaggagi*, 978 F.3d at 701 (although "any support given to a terrorist organization ultimately inures to the benefit of its terrorist purposes," that analysis "fails to properly differentiate between the intent required to sustain a material support conviction … and the intent required to trigger the terrorism enhancement"). Additional elements must be proven to merit the 12-point enhancement under Section 3A1.4. *See United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008) (finding that facts supporting the conviction do not give rise to an automatic inference of the required intent to support the enhancement).

13.     It cannot be established that Mr. Alowemer specifically intended to plant an explosive to target the actions of a government. *See, e.g., United States v. McDavid*, 396 Fed. Appx. 365, 372 (9th Cir. 2010) (upholding the application of the enhancement noting that the group had discussed a number of different ways to disrupt the government and the economy and the object of

8

the conspiracy was federal facilities). While Mr. Alowemer expressed animosity for polytheist Christians, within hundreds of pages of recorded online and in-person communication, Mr. Alowemer makes not a single reference to the conduct of any government that he hopes to influence or affect (nor a possible outcome as a result of any purported influencing) from his plans to plant explosives at the Legacy International Worship Center.

*Mr. Alowemer's offense was not calculated to retaliate against government conduct.*

14.    Regarding the "retaliation" prong, the government also cannot offer sufficient evidence to show that Mr. Alowemer "specifically intended" that his actions were to "retaliate against government conduct." *See, Alhaggagi*, 978 F.3d at 703. Indeed, the government cannot explain what government conduct Mr. Alowemer specifically intended his offense to retaliate against.

15.    In cases where courts apply the Section 3A1.4 enhancement pursuant to the "retaliation" prong, it must be established (1) which government the offense was calculated to retaliate against, and (2) what that government did to cause the defendant to seek retaliation. *See id.* ("Cases applying the retaliation prong rely on evidence that the defendant intended to respond to specific government action."). In *United States v. Van Haften*, 881 F.3d 543, 544 (7th Cir. 2018), the defendant traveled to Turkey "to join ISIS's war against America" because he wanted to retaliate against the United States

government's treatment of Muslims and specifically for the United States government's treatment of him as a sex offender. In *United States v. Dye*, 538 Fed. Appx. 654, 666 (6th Cir. 2013) the defendant firebombed a federal courthouse in retaliation for pending charges he faced. The Sixth Circuit upheld the application of the terrorism enhancement, concluding that firebombing that specific bailiff's office showed the defendant's intent to retaliate against the federal institution for its ongoing criminal case against him. *Id.* In *United States v. Mandhai*, the defendant "plan[ned] to bomb electrical transformers in retaliation for the U.S. government's support of Israel and other countries that oppress Muslims." 375 F.3d 1243, 1245 (11th Cir. 2004). The defendant had been told by an FBI undercover agent that "an effective way to harm the U.S. government was to bomb electrical substations." *Id.* at 1246. The *Mandhai* defendant also confessed to the retaliatory motive – namely, the United States' financial support of Israel. *See id.* The Eleventh Circuit upheld the application of the enhancement. In *United States v. Khatallah*, the defendant "directed the attacks [on the U.S. Special Mission in Benghazi] because he objected to the United States' intelligence presence in Benghazi following the overthrow of former Libyan dictator Muammar Gaddafi." 314 F. Supp. 3d 179, 183 (D.D.C. 2018). The district court found that the defendant's choice of target – a U.S. diplomatic facility – was a "physical manifestation of the U.S. government, and . . . attacking it suggest[ed] a desire to retaliate." *Id.* at 199.

10

16.     In the above cases it is clear: (1) the specific government action against which the defendant's offense was calculated to retaliate, and (2) that the government action was government conduct. By comparison, the evidence set forth by the government in Mr. Alowemer's case is far murkier. There is no evidence showing which government Mr. Alowemer's activities were 'calculated' to retaliate against or what 'government conduct' spurred the retaliation. *See* 18 U.S.C. § 2332b(g)(5)(A). The word "retaliate" is defined as "to return or repay in kind" and "to attack in return."[3] A retaliatory act is incited by a first action. In Mr. Alowemer's case, there is no indication what this first action might be (nor what government is responsible).

17.     Even when given the clear opportunity to claim the attack as an act of revenge, Mr. Alowemer only expresses vague support for ISIS in Nigeria. At the June 2, 2019 meeting, Mr. Alowemer is directly asked by the undercover agent why he is targeting a church frequented by people of Nigerian and African descent. To this, he responds "They are all polytheists. We, we, take revenge for our brothers in Nigeria." However, in the very next line in their conversation, the undercover agent asks about whether Mr. Alowemer's reference to brothers in Nigeria is to Boko Haram. Ultimately, Mr. Alowemer says he is not sure whether Boko Haram pledged fealty to ISIS. Quickly, Mr.

---

[3] "retaliate, v.1." *OED Online*, Oxford University Press, June 2022, www.oed.com/view/Entry/164167. Accessed 7 July 2022

Alowemer then says he "curses" the French army in Nigeria. There is no description of any action on the part of the Nigerian government nor any need for vengeance expressed. Later, the undercover agent further prompts Mr. Alowemer to give a reason as to why the target is the Legacy International Worship Center. To this, Mr. Alowemer simply expresses support for brothers doing a great job" against "infidels" in Nigeria but gives no reason for retaliation against the Nigerian government (or any other government). The law demands more than nonspecific gestures of support. The government's evidence is insufficient for the enhancement to apply based on the "retaliation" prong.

18.    Therefore, the enhancement under Section 3A1.4 should not be applied and Mr. Alowemer's advisory Guideline range should be adjusted accordingly.

**Departures:**

19.    Undersigned counsel intends to argue for a departure – or in the alternative a variance – pursuant to Sections 4A1.3, 5H1.3, and 5K2.20.

20.    Undersigned counsel intends to ask for a downward departure due to his criminal history being overrepresented pursuant to Section 4A1.3. Prior to the actions that resulted in the criminal charge in this case, Mr. Alowemer had never been convicted of a crime and had no documented criminal history.

12

PSR at ¶ 48-49. "If reliable information indicates that a defendant's criminal history category substantially over-represents the seriousness of the defendant's actual criminal history or the likelihood that the defendant will commit other crimes," a court has discretion to depart downward. U.S.S.G. § 4A1.3(b); *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). In *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003), the court made clear the broad discretion to depart downward extends in cases involving the terrorism enhancement: "A judge determining that § 3A1.4(b) over-represents the seriousness of defendant's past criminal conduct or the likelihood that defendant will commit other crimes always has the discretion under § 4A1.3 to depart downward at sentencing." *See also United States v. Stewart*, 590 F.3d 93, 143-44 (2d Cir. 2009) (holding that despite application of Section 3A1.4 courts retain the discretion to depart downward); *United States v. Benkahla*, 501 F. Supp. 2d 748, 759 (E.D. Va. 2007), *aff'd*, 530 F.3d 300 (4th Cir. 2008) (same holding). Indeed, departures are "encouraged" where the applicable criminal history category fails to accurately reflect a defendant's true criminal history or the likelihood he will commit other crimes. *United States v. Dixon*, 318 F.3d 585, 588 (4th Cir. 2003).

21.     Undersigned counsel also intends to argue for a departure – or in the alternative a variance – pursuant to Section 5H1.3. As reflected in the PSR, Mr. Alowemer suffered enormous torment and tragedy resulting from the

Syrian civil war. He witnessed unimaginable violence and brutality, he was displaced from his home, forced to flee to Jordan, lived in a Jordanian refugee camp, forewent formal education for years to make ends meet for his family, and then moved to the Northview Heights neighborhood in Pittsburgh. It is a remarkable and sad tale, and he endured all of it during his formative adolescent years. Mr. Alowemer was evaluated by an expert and defense counsel will submit a report demonstrating that his offense conduct was largely the product of serious psychological issues resulting from the years of trauma he endured.

22.    Undersigned counsel also intends to ask for a formal departure based on Section 5K2.20. A court may depart downward in "exceptional cases" if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; (3) represents a marked deviation by the defendant from and otherwise law-abiding life. U.S.S.G. § 5K2.20. Application Note 3 to §5K2.20 permits consideration of "the defendant's (A) mental and emotional conditions; (B) employment record; (C) record or prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense." Considering the evidence here and the permitted considerations, Mr. Alowemer's matter is such an exceptional case to warrant a departure under Section 5K2.20.

14

23.   Undersigned counsel reserves the right to file a Sentencing

Memorandum prior to the sentencing hearing regarding all the factual and

legal issues pertinent to this case

Respectfully submitted,

*s/ Andrew Lipson*

Andrew Lipson
Assistant Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222
Main: 412-644-6565
Fax: 412-644-4594

*s/ Sam Saylor*

Sam Saylor
Assistant Federal Public Defender
1500 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA  15222
Main: 412-644-6565
Fax: 412-644-4594

15