IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 19-219 |
| MUSTAFA MOUSAB ALOWEMER | |

**UNITED STATES' RESPONSE TO DEFENSE OBJECTIONS TO PRESENTENCE REPORT**

AND NOW comes the United States of America, by its attorneys, Cindy K. Chung, United States Attorney for the Western District of Pennsylvania, and Soo C. Song, Assistant United States Attorney for said district and submits this Response to defendant Mustafa Alowemer's Objections to the Presentence Report, Doc. No. 127. The United States respectfully requests that this Court consider the following response together with additional evidence that will be adduced at the sentencing hearing and in anticipated sentencing memoranda.

The United States incorporates by reference the magistrate judge's findings of probable cause in support of the criminal complaint and the specific finding that Mustafa Alowemer was a danger to the community and necessarily in need of detention pending trial. Doc. Nos. 3, 15-25.

I.    **Procedural History**

Defendant Mustafa Alowemer was charged by criminal complaint on June 18, 2019, with one count of violating 18 U.S.C. § 2339B(a)(1), attempting to provide material support and resources to a designated Foreign Terrorist Organization ("FTO"), namely the Islamic State of Iraq and al-Sham (ISIS), and two counts of violating 18 U.S.C. §842(p)(2)(B), distribution of information relating to explosives, destructive devices, and weapons of mass destruction. Doc.

1

No. 3, Ex. A.  The detailed criminal complaint and attachments contained information, predicated upon recorded and documented communications with an Undercover FBI Employee (UCE) and FBI Online Covert Employee (OCE), demonstrate that Alowemer plotted to bomb the Legacy International Worship Center (the "Church"), a church located at 2131 Wilson Avenue on the North Side of Pittsburgh, Pennsylvania, using a weapon of mass destruction, namely a bomb or explosive device.  According to defendant Alowemer, based upon recorded conversations with the FBI Undercover Employee (UCE) on June 2, 2019, and June 11, 2019, his motivation included a desire to detonate a device at the Church to support the cause of ISIS and to inspire other ISIS sympathizers in the United States to join together and commit similar acts in the name of ISIS. Defendant Alowemer chose Sunday as the day of the week for the bombing in order to cause fear in religious practitioners to prevent then from going to their places of worship on Sunday.

> *This operation must be done on a Sunday night[13] in order to shock the enemies of Allah almighty everywhere and all over America, and in order to [illegible] from going to their churches and instill fear in their hearts. Around 3:00 or 4:00 at night.*

Doc. No. 3-1; Doc. No. 25 at 24-25.

Alowemer also targeted the Church, which he described as Christian and Nigerian, in order to "take revenge for our [ISIS] brothers in Nigeria" and because he believed it to be a church of polytheist Christians.  See Doc. No. 25 at 24; Doc. No. 62 at 9-10.  Alowemer was aware that numerous people in or around the Church could be killed by the explosion.  Doc. No. 25 at 30-31; Doc. No. 62 at 14.  As early as April 2019, in documented conversations with the OCE on, Alowemer offered to help ISIS brothers identify "Yazidis" residing in Pittsburgh to "avenge our [ISIS] brothers in Baghuz," a conflict in Syria between Kurdish-led Syrian forces, assisted by the

2

United States, and ISIS forces in March 2019.  Doc. No. 25 at 13, 16-17; Doc. No. 62 at 10-12.  In his writings and in communications with the UCE, Alowemer also expressed his willingness to kill an American serviceman because "he killed our sisters in Baghuz and Iraq" and affirmed that his hostility towards the Assad Syrian government drove his support of ISIS.  Doc. No. 62 at 11-12.

In an in-person discussion with the UCE, the defendant also described a plan to detonate a second device so that law enforcement and first responders would already be on scene.  He referred to police officers as "infidel police" and made the statement that he wanted to make them "afraid to step."  Doc. No. 25 at 12-13.  Defendant Alowemer's bomb-plot included stationing the CHS across from the Zone 1 police station on the North Side of Pittsburgh and the map that he provided the UCE during their planning sessions included a hand-drawn circle around the police station. Doc. No. 25 at 27-28; Doc. No. 62 at 12-13.  In his detailed written plan for the operation and its post-math, Doc. No. 3-1 at 20, Alowemer expressly mentioned his desire to surveil the police:

> 9)  *We should - with the permission of Allah almighty - pay attention to the locations of the infidel police and how they move and we should observe all cameras if Allah almighty wills.*

ISIS was a designated FTO throughout the timeframe of the offense plead to by defendant Alowemer and remains a designated FTO today.  Throughout the course of the months-long FBI investigation, Alowemer's online activity demonstrated his substantial consumption and approval of ISIS propaganda, aspirations to join ISIS, a desire to commit acts of violence in the United States and overseas in the name of ISIS and his intent to inspire other ISIS "brothers" in the United States to join together and take similar action in the name of ISIS and against the United States to

influence the United States and other governments.  See Doc. No. 3-1; Doc. No. 25 at 16, 18; Doc.

No. 62 at 8-15.   As early as 2005, a person known by many names and referenced herein as Abu

Bakr al-Baghdadi ("al-Baghdadi") was identified as a senior leader of the terrorist groups now

referred to as ISIS.  On April 12, 2019, defendant Alowemer recorded himself by video pledging

his allegiance in the form of a bay'aa oath to al-Baghdadi.  This video was admitted and shown in

magistrate court.  Also in April 2019, defendant Alowemer sent the UCE a self-authored Arabic

"nasheed" entitled, "The Longing for Martyrdom" that appeared to be addressed to Abu Bakr al-

Baghdadi, the leader of ISIS.  Defendant Alowemer's nasheed translates as follows:

> ***The Longing for Martyrdom***
> *The best news is when you call get ready for jihad.*
> *Fight the enemy. O soldiers of Baghdadi.*
> *I miss the people but do not know why.*
> *I am waiting for paradise.*
> *The love of martyrdom has inhabited my heart.*
> *The land of jihad is what I wish for.*
> *I wait for the taste of martyrdom.*
> *I am focused on defeating the enemy.*
> *Defeating the Shi'tes astounded me.*
> *I long for the promise of Allah.*
> *He promised me paradise.*
> *He motivated me for martyrdom.*
> *With worship he enlightened me.*
> *O Baghdadi your soldiers are your swords in battle.*
> *We are the letters [of your name] against your enemies.*
> *I long for the land of the Caliphate.*
> *I am expecting to raise the banner.*
> *I will spill my blood for the victory of my religion.*  Doc. No. 3-1 at 11.

On July 17, 2019, a federal grand jury in the Western District of Pennsylvania returned a

three-count indictment: Count One charged the defendant with violating 18 U.S.C. § 2339B(a)(1),

attempting to provide material support to ISIS; Counts Two and Three charged the defendant with

4

violating 18 U.S.C. §§ 842(p)(2)(A) and 844(a)(2), that is, distribution of information relating to explosives, destructive devices, and weapons of mass destruction to a person, knowing such person intended to use the information in furtherance of federal crime of violence (to wit, 18 U.S.C. § 2332a(a)(2), use of weapons of mass destruction). Doc. No. 18.

On September 16, 2021, defendant Mustafa Alowemer plead guilty to Count 1 of the Indictment pursuant to the terms of a plea agreement entered into with the United States. Doc. Nos. 110, 110-1, 112.

Sentencing is scheduled for November 4, 2022.

## II.     Defendant's Factual Objections

Defendant Alowemer raises factual and legal objections to the Presentence Report. Defendant Alowemer will also seek departures pursuant to §§ 4A1.3, 5H1.3, and 5K2.20, which the United States intends to oppose.

### A.     Paragraphs 22, 23, and 24

#### 1.     Paragraph 22

Paragraph 22 of the Presentence Report summarizes information that was set forth in the criminal complaint affidavit filed on June 18, 2019, Doc. No. 1, and is an accurate statement.

The criminal complaint information is set forth here:

27.    On or about June 2, 2019, ALOWEMER and the UCE met for a third time in the Pittsburgh area for approximately three hours.  Near the start of the meeting, ALOWEMER provided the UCE with two rings bearing the ISIS insignia, intended for the UCE and the CHS to keep as gifts from ALOWEMER.  In the course of the meeting, ALOWEMER communicated what he described as a "mushrikeen"[12] and "Nigerian" church as his new target for conducting a violent attack.  In articulating his idea, ALOWEMER expressed the hope that destroying the Church with explosives in the name of ISIS would inspire other ISIS "brothers" in the United States to join together and take similar actions.  Furthermore, in the following exchange with the UCE, ALOWEMER explicitly tied his support for ISIS to his rationale for wanting to target Nigerians in particular:

| | |
|---|---|
| *ALOWEMER:* | *All of them are Mushrikeen [Polytheist Christians].* |
| *UCE:* | *Oh yeah! Polytheist and infidels.* |
| *ALOWEMER:* | *And the – uh, this house is still for the ones who go to church because they are Nigerians …* |
| *UCE:* | *Yeah. So, why the Nigerians? All of them are polytheists.* |
| *ALOWEMER:* | *They are all polytheists. We, we, take revenge for our brothers in Nigeria.* |
| *UCE:* | *There is an Islamic State or there was an Islamic State in Nigeria.* |
| *ALOWEMER:* | *Of course there is.* |

2.    Paragraph 23

Similarly, paragraph 23 of the PSR is accurate and summarizes information that was contained in the criminal complaint affidavit at Doc. No. 1 paragraph 30, testified to

at a preliminary and detention hearing, Doc. Nos. 25 and 62, and will be supplemented by information presenting at time of sentencing.

The criminal complaint, authorized by Magistrate Judge Cynthia Reed Eddy, reads:

30.       Furthermore, during the meeting on or about June 2, 2019, ALOWEMER discussed with the UCE what supplies ALOWEMER could purchase to enable the construction and assembly of an explosive device strong enough to destroy the Church.  ALOWEMER agreed to purchase 9-volt batteries, acetone (in the form of nail polish remover), ice packs, and nails for use in constructing the device to be used in the attack upon the Church, which would be similar to some of the devices described in the manuals sent by ALOWEMER to the UCE.  ALOWEMER and the UCE agreed that, to avoid suspicion, they should make purchases of these items at different times, in small quantities, and from different stores. On several occasions throughout the meeting, the UCE made clear that the explosive force necessary to accomplish the desired attack would likely kill many people in the residential area surrounding the Church, even if the Church were unoccupied at the time of explosion, to which ALOWEMER did not object.

At the preliminary hearing on June 21, 2019, the agent clarified that while it was conveyed to Mr. Alowemer that a device of that size "would result in death and injury to individuals in the surrounding residential neighborhood," the defendant did not articulate the congregants of the church as his target.  Doc No. 25 at 31.

Testimony at the detention hearing on August 16, 2019, was also clear that:

> "Mr. Alowemer stated that he wanted to totally destroy the church.
> When Mr. Alowemer was advised by the undercover employee that
> to do so would require a very large – the construction of a very large
> device, and a device of that size would cause death to people
> residing in the nearby community … when Mr. Alowmer was made
> aware of that fact, he raised no objections to that loss of life."  Doc.
> No. 62 at 14.

Contrary to the defense assertion, the evidence supports the statement that the defendant was cognizant that his desired attack would kill many people in the surrounding neighborhood,

even if the church itself were unoccupied.  Doc. Nos. 3, 25, 62.  While the defense suggests that defendant Alowemer did not believe that people lived in the homes in proximity to the church, the United States does not believe that is a credible statement, given the fact that the defendant previously resided in that area and because he conducted extensive surveillance of the neighborhood which would have refuted that belief.

The United States does not object, however, to the addition of the following statement at the end of paragraph 22: "The defendant's primary stated motive was to destroy the church."

3.      Paragraph 24

Paragraph 24 is accurate as written, particularly when read in conjunction with paragraph 23 of the PSR and the criminal complaint affidavit, because defendant Alowemer did provide nail polish remover, ice packs, and 9-volt batteries to the UCE.  Paragraph 23 clarifies that "Alowemer asked the UCE what supplies Alowemer could purchase to help assemble an explosive device strong enough to destroy the Church."   The criminal complaint contains the statement that a "review of the online communications and discussions with the UCE and the CHS" indicates that "ALOWEMER believed the UCE to have expertise in constructing destructive devices and explosives, based in part on representations made by the UCE." Doc. No. 1 at 13.

III.    **United States Sentencing Guidelines Victim Related Adjustment – Section 3A1.4**

Defendant Alowemer objects to the application of the Terrorism enhancement in § 3A1.4, which increases the defendant's offense level by 12 levels, because "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."

A.      Elements and Overview

United States Sentencing Guidelines ("U.S.S.G.") Section 3A1.4 is categorized under chapter three as a victim related adjustment for terrorism. Section 3A1.4 states, in pertinent part, that:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

The terrorism sentencing enhancement requires that the "offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). While the defendant concedes that the crime of conviction for defendant Alowemer, 18 U.S.C. § 2339(B)(a)(1), is an enumerated offense, the sentencing enhancement does not require that the offense itself be a federal crime of terrorism, but rather that the offense, "involved, or was intended to promote" a federal crime of terrorism.

A "federal crime of terrorism" is defined by cross-reference to 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4(a), app. n. 1. "Federal crime of terrorism" has two elements: (1) the defendant must have been convicted of violating a statute enumerated at 18 U.S.C. § 2332b(g)(5)(B); and (2) the offense must have been, "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A). A violation of a statute enumerated in 18 U.S.C. § 2332b(g)(5)(B) is a federal crime of terrorism if the offense was "calculated to influence or affect the conduct of government by intimidation or

coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).

The terrorism enhancement may apply even if a defendant's actions were remote from physical violence or the defendant lacked the means and the ability to carry out an ultimate terroristic act. See United States v. Mandhai, 375 F.3d 1243, 1248 (11th Cir. 2004) (the court held that the "defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation" is not determinative); United States v. Wells, 163 F.3d 889, 899 (4th Cir. 1998). The enhancement may apply irrespective of whether the defendant's conduct risked or caused death or carried a substantial risk of injury. United States v. Dowell, 430 F.3d 1100 (10th Cir. 2005); United States v. Thurston, No. CR 06-60069-01-AA et al., 2007 WL 1500176 (D. Or. May 21, 2007). The enhancement does not require that the offense involve violence. United States v. Ali, 799 F.3d 1008, 1014 (8th Cir. 2015) (enhancement applied to provision of material support in the form of funds to an FTO, Al Shabaab); United States v. Assi, 586 F. Supp. 2d 841, 843 (E.D. Mich. 2008), affirmed, 428 Fed. App'x. 570 (6th Cir. 2011) (enhancement applied to provision of material support in the form of "global positioning satellite modules, night vision goggles, and a thermal imaging camera" to an FTO, Hizballah).

"[T]the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." United States v. Stewart, 590 F.3d 93, 143 (2nd Cir. 2009) (citing United States v. Meskini, 319 F.3d 88, 92 (2d Cir.), cert. denied, 538 U.S. 1068,

10

123 S. Ct. 2240 (2003)).[1]

In applying the enhancement in § 3A1.4, courts have cautioned against the conflagration of personal motive and "calculation towards a specific outcome. Proof of a defendant's personal motivation may not be required. The motivation requirement can be satisfied if the *offense itself* was motivated by political ideology or the desire to influence the government, even if the defendant's own personal motivations cannot be proven. See United States v. Mohamed, 757 F.3d 757, 760 (8th Cir. 2014); see also United States v. El-Mezain, 664 F.3d 467, 571 (5th Cir. 2011); United States v. McDavid, 396 Fed. App'x 365, 372 (9th Cir. 2010) (enhancement applied where conspirators discussed ways to disrupt government through crimes). For example, in United States v. Awan, the Second Circuit found that "the application of §3A1.4 . . . does not require a finding that [the defendant] was personally motivated by a desire to influence or affect the conduct of government. Rather, the government need only demonstrate that [the defendant] intended to promote a crime calculated to have such an effect, . . . whatever [the defendant's] reason for committing them," 607 F.3d 306, 316 (2010).

---

[1] Application Note 4 of § 3A1.4 contemplates an upward departure (as opposed to application of § 3A1.4 itself) where "the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. Section 3A1.4 cmt. n.4 (2009). In this case, the Court need not consider Application Note 4, because the application of § 3A1.4 is clearly appropriate. Viewed in the aggregate, the enhancement itself and the potential for upward departure in "near-miss" cases reflect an understanding that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and difficulty of deterring and rehabilitating the criminal, and thus, terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003).

In United States v. Arcila Ramirez, 16 F.4th 844, 854 (11th Cir. 2021), the Eleventh Circuit held that the defendant's personal motive for committing the offense is irrelevant, and, instead, the court can look to circumstantial evidence and draw reasonable inferences to determine if the defendant's conduct was calculated to influence government conduct.

Similarly, in United States v. Stein, 985 F.3d 1254 (10th Cir. 2021), the defendants conspired to bomb an apartment complex and mosque where the defendants believed a large number of Somali Immigrants resided.  The defendants selected this target looking for a way to attack local Muslims in retaliation for the Pulse Nightclub shooting that had been carried out by an American citizen of Afghan descent.  See id. at 1261.  The Tenth Circuit found that the district court properly applied the terrorism enhancement, U.S.S.G. § 3A1.4, even though the primary target was a civilian population and the offense was not primarily calculated to influence or retaliate against government conduct.  Though the defendant's primary motivation was anti-Muslim sentiment, there was "ample evidence demonstrating that defendants' offenses were also calculated to influence or retaliate against government conduct."  Id. at 1267.  In doing so, the court rejected the defendants' contention that because their primary target was a civilian population, the district court should only have imposed an upward departure and not the full terrorism enhancement.  "[S]pecific intent may be found even if the record does not contain direct evidence of the defendant's particular frame of mind."  United States v. Wright, 747 F.3d 399, 408 (6th Cir. 2014).  Even if the defendant had a "purportedly benign motive," such as "to assist an oppressed group of Muslims," the court is permitted to make a "natural inference" that certain offenses or conduct demonstrate the necessary intent.  Id. at 408-09.

12

B.       The Meaning of "Government" in 18 U.S.C. § 2332b(g)(5)(A)

While defendant Alowemer expressed animus against governments that included the United States, the "government" being influenced, affected, or retaliated against need not be the United States federal government in order for the terrorism enhancement in § 3A1.4 to apply.  The Eighth Circuit applied the enhancement where the defendants' "offenses were calculated to influence or affect" the Transitional Federal Government of Somalia "by intimidation or coercion or to retaliate against the government." United States v. Ali, 799 F.3d 1008, 1032 (8th Cir. 2015) (discussing the defendant's "vocal support of al Shabaab's efforts to expel the TFG by force, and their fundraising efforts in support of that cause").

Likewise, the Fifth Circuit found that a Colombian terrorist group's attempt to influence Colombia met the enhancement criteria. See United States v. DeAmaris, 406 F. Supp. 2d 748, 750 (S.D. Tex. 2005) (asserting "the most reasoned approach to defining the word 'government' as used in § 2332b(g)(5)(A) is to define 'government' as including any government, foreign or domestic, and not to limit it to the United States government"); United States v. Puerta, 249 Fed. App'x 359, 360 (5th Cir. 2007) (finding no plain error where the enhancement is applied attempting to influence or affect the conduct of the Colombian government, rather than the U.S. government).

The Sixth Circuit found that a Hizballah supporter's attempts to influence Israel met the criteria as well.  United States v. Assi, 586 F. Supp. 2d 841, 849 (E.D. Mich. 2008) (asserting the defendant's course of conduct was calculated to influence or affect the conduct of the Israeli government); see also United States v. Assi, 428 Fed. App'x 570, 574 (6th Cir. 2011) (finding that

13

"the term 'government' in 18 U.S.C. § 2332b(g)(5) includes foreign governments").

In addition, the Second Circuit applied the enhancement to a scheme designed to influence to Egyptian government. United States v. Stewart, 597 F.3d 514 (2d Cir. 2010), affirmed, 686 F.3d 156, 162 (2d Cir. 2012) (applying the enhancement to a lawyer who smuggled messages between an imprisoned defendant she was purportedly representing and third parties that related to an Egyptian militant group, al-Gama'a, and "its violent efforts to overthrow the Egyptian government."). Finally, the Middle District of Florida applied § 3A1.4 to defendant whose goal was to overthrow secular governments and impose Sharia law as evidenced by information recovered from his computer. United States v. Bell, 81 F. Supp. 3d 1301, 1312 (M.D. Fla. 2015).

Contrary to the defendant's assertion the enhancement may apply to conduct that was merely intended to intimate or coerce a state or local government, such as the City of Pittsburgh, and not the federal government. See United States v. Harris, 434 F.3d 767, 773 (5th Cir. 2005) (applying the terrorism enhancement to the destruction of a municipal building housing the local police station); see also United States v. Thurston, No. CR 06-60069-01-AA et al., 2007 U.S. Dist. LEXIS 38185, at *50 (D. Or. May 21, 2007) (finding the "plain language of the statute does not identify a specific form or level of government" and that "all forms of government are included in the broad sweep of the phrase"); United States v. Tubbs, 290 F. App'x 66, 68 (9th Cir. 2008) (affirming the application of the enhancement to defendants who were convicted of conspiracy to commit arson and the destruction of an energy facility). "It is surely uncontroversial that a crime can target civilians but be intended to provoke a reaction from the government or be committed to retaliate against government conduct." United States v. Allen, 364 F. Supp. 3d 1234, 1245 (D.

14

Kan. 2019).

## IV.    Defendant's Offense was Calculated to Influence and Retaliate Against Governments

Based upon the evidence before the Court, and additional evidence that will be presented at sentencing, defendant's criminal acts were calculated to influence governments or retaliate against them for wrongs against ISIS "brothers."  To sustain the enhancement under § 3A14, the court can rely upon express statements of a desire to influence or retaliate, which exist here, or infer the natural and logical impacts of the intended crimes.  United States v. Stein, 985 F.3d 1254 (10th Cir. 2021).  The Court need not find that the defendant's primary or exclusive motivation was to influence a government, but that it was an aspect of the calculation.  Id. at 1267.

Defendant Alowemer was explicit in his desire for revenge against the Nigerian government for perceived wrongs inflicted upon ISIS members: (Doc. No. 3-1 at 16).

| UCE: | Yeah. So, why the Nigerians? All of them are polytheists. |
| --- | --- |
| ALOWEMER: | They are all polytheists. We, we, take revenge for our brothers in Nigeria. |
| UCE: | There is an Islamic State or there was an Islamic State in Nigeria. |

In addition to his desire to "lock down" the whole City of Pittsburgh through the detonation of the bomb, the act was clearly intended to influence and retaliate against the United States and inspire other ISIS adherents in the United States to commit acts of terror.  See Doc. No. 3-1 at 17. Alowemer also offered to provide information on local Kurdish Yazidi families if ISIS "brothers"

wanted to seek revenge for "our brothers from al-Baghuz."[2] Doc. No. 3-1 at 9; Doc. No. 62 9-11.

Because "ISIS is an enemy of the United States," taking actions to support ISIS "is some evidence that [the defendant's] conduct was calculated to influence or affect the conduct of the United States because ISIS's terrorist acts are intended to intimidate or coerce the United States." United States v. Khan, 938 F.3d 713, 719 (5th Cir. 2019). The fact that a defendant sought to inspire like-minded individuals to engage in similar violent conduct nationwide is a factor in assessing whether § 3A1.4 applies. United States v. Allen, 364 F. Supp. 3d 1234, 1246 (D. Kan. 2019).

Further, the defendant's reliance on United States v. Alhaggagi, 978 F.3d 693 (9th Cir. 2020), is misplaced. The defendant conflates the analysis of specific intent with motive and argues that the terrorism enhancement does not apply, because the defendant was motivated to act for "religious reasons." The focus is not on the defendant's motives for acting but whether the violent or intimidating act of planning to bomb a church in the name of ISIS is an action that would necessarily impact the government or retaliate against government conduct. The defendant in Alhaggagi engaged in non-violent conduct, opening social media accounts, and the Court of Appeals distinguished non-violent conduct from violent acts such as planning bombings of government buildings, electrical sites, or bridges. See id. at 702. "In other words, one can open a social media account for a terrorist organization without knowing how that account will be used;

---

[2] According to public sources, Al-Baghuz is a town located in Eastern Syria. A reasonable interpretation of this statement is that ALOWEMER is referring to a battle between Kurdish-led Syrian forces, assisted by the United States, and ISIS fighters in or around February and March 2019. ISIS fighters were defeated and lost control of the only remaining territory that they controlled in Eastern Syria.

16

whereas it is difficult to imagine someone bombing a government building without knowing that bombing would influence or affect government conduct." Id.

If defendant Alowemer had succeeded in his attempt to detonate a powerful explosive and destroy a church in a high-density urban neighborhood, with collateral death and injury to civilians, and claimed the crime on behalf of ISIS, saying "we have arrived," his crime would certainly have influenced government conduct and served as retaliation for multiple affronts he ascribed to the United States and other governments.

## V.    **Conclusion**

Defendant Alowemer's offenses were indisputably calculated to influence or affect the conduct of government and to retaliate against government conduct. Those governments included Nigeria, the United States, Syria, and the City of Pittsburgh. For all of the reasons articulated above, in addition to evidence that will be adduced at sentencing, the United States respectfully requests that this Court overrule the defendant's objections.

Respectfully submitted,

CINDY K. CHUNG
United States Attorney

/s/ Soo C. Song
SOO C. SONG
Assistant U. S. Attorney
Pittsburgh, PA
DC ID No. 457268

17