IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA

      vs.                          Criminal No. 19-219

MUSTAFA MOUSAB ALOWEMER


-----


Transcript of Proceedings held on Friday,
November 4, 2022, in the United States District Court,
700 Grant Street, Pittsburgh, PA  15219, before Honorable
Marilyn J. Horan, United States District Judge.


-----


APPEARANCES:

  For the Government:   U.S. Attorney's Office
                       by Soo C. Song, Esq.


  For the Defendant:   Office of the Federal Public Defender
                       by Andrew Lipson, Esq.
                       and Samuel G. Saylor, Esq.

  Court Reporter:   Jane Proud, RDR, CRR
                    700 Grant Street
                    Suite 6260
                    Pittsburgh, PA  15219


Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

2

P R O C E E D I N G S

(In open court.  Defendant present with counsel.)

THE COURT:  We are convened this morning in the case of the United States of America v. Mustafa Mousab Alowemer, at 19-219.  Ms. Biggs, would you please administer the oath to our interpreter?

THE CLERK:  Please raise your right hand.  Do you solemnly swear or affirm that you will well and truly interpret between the court, counsel, and the defendant in the proceedings being held, so help you God?

THE INTERPRETER:  I do.

THE CLERK:  Thank you.

THE COURT:  Counsel, please enter your appearance for the record.

MS. SONG:  Good morning, Your Honor.  Soo Song on behalf of the United States.

MR. LIPSON:  Good morning, Your Honor.  Andrew Lipson from the Federal Public Defender's Office on behalf of Mr. Alowemer.

MR. SAYLOR:  And Sam Saylor.

THE COURT:  Good morning, Mr. Alowemer.

THE DEFENDANT:  Good morning.

THE COURT:  The record reflects that on September 16, 2021, Mr. Alowemer pleaded guilty to count one of the indictment at criminal number 19-219.  We are here today for

sentencing.

Ms. Biggs, would you please administer the oath to Mr. Alowemer?

(Oath administered.)

THE COURT:  Mr. Alowemer, do you understand that, having declared and affirmed to tell the truth, your answers to my questions today are subject to the penalties of perjury or of a making a false statement if you do not answer truthfully?

THE DEFENDANT:  I do.

THE COURT:  In preparing for today's hearing, I've consulted many sources of information.  I've considered the sentencing guidelines and the probation office's presentence investigation report.  I've also considered all of the filings of record and all arguments of counsel to date.  As regards the sentencing guidelines, they are advisory only, but the court is obligated to consult them in determining the imposition of a reasonable sentence.

Initially, courts must precisely calculate a defendant's guideline sentence.  In doing so, I must rule upon any objections to the guideline calculations and state how those rulings on the guideline calculations affect the guideline numbers.  I must also formally rule on any motions filed by the parties and state on the record whether I'm granting a departure from the guideline sentencing range and

4

how that departure affects the guideline calculation.

Finally, I must also consider the statutory factors set forth in Title 18 United States Code Section 3553(a) in setting the sentence I impose, after which I may or may not vary from the sentence calculated under the guidelines.

The probation office has conducted a presentence investigation report and prepared that report and submitted it to counsel and the court. At this time I do want to acknowledge the court's appreciation to Officer Erin Stewart for the work she's done on this matter and for the federal probation office for their work on this investigation, the report and all assistance provided to the court.

Mr. Alowemer, have you read the presentence investigation report?

THE INTERPRETER: Yes, I did.

THE COURT: And have you reviewed that in detail with your defense counsel?

THE INTERPRETER: I did.

THE COURT: The government had no objections to the presentence report. Mr. Alowemer did file objections through counsel. Mr. Alowemer objects to the factual recitations set forth in paragraphs 22, 23 and 24. Such objections do not affect the guideline calculation. He also objects to the application of a 12-level enhancement to the offense level and the elevation of his criminal history category to Roman

numeral VI, pursuant to section 3A1.4(a), the terrorism enhancement.

Finally, Mr. Alowemer seeks a downward departure for several reasons, alone and together.  Said reasons include that his criminal history is substantially overrepresented pursuant to section 4A1.3(b), that a departure is warranted based upon his mental and emotional conditions under section 5H1.3, and that a departure is warranted based upon aberrant behavior pursuant to section 5K2.20.

On November 1, 2022, I issued tentative findings of fact and rulings of law tentatively overruling in part and tentatively granting in part Mr. Alowemer's factual objections.  I have reserved ruling on his objection to the terrorism enhancement and his requests for downward departure until after both parties have had the opportunity to present evidence and argue on the issues at sentencing.

Mr. Alowemer also requests a variance from the guideline sentence.  After I've made rulings on the objections and requests for departures and after I've calculated the appropriate recommended guideline sentencing range, I will address the request for a variance.

The government has filed a response opposing Mr. Alowemer's objections, arguing that the section 3A1.4(a) terrorism enhancement was properly applied.  The government has in its response stated intentions to present evidence to

support the application of the enhancement, and at this point we will proceed into testimony, evidence, and argument on the terrorism enhancement.

Ms. Song?

MS. SONG:  Thank you, Your Honor.  At this time, the United States calls Special Agent Nick Edquist to the witness stand.

THE CLERK:  Good morning, sir.  Please raise your right hand.

(Oath administered.)

THE CLERK:  Please go ahead and have a seat in that chair and can you please state and spell your name when you sit, and speak into the microphone, please.

THE WITNESS:  Yes.  My name is Nicholas Edquist, N-i-c-h-o-l-a-s E-d-q-u-i-s-t.

NICHOLAS EDQUIST

a witness herein, was duly sworn and testified as follows:

DIRECT EXAMINATION

BY MS. SONG:

Q.  Sir, would you please tell the court how you're employed?

A.  I am a special agent with the FBI.

Q.  And what is your area of specialty with the FBI?

A.  I am a member of the Joint Terrorism Task Force and specifically investigate cases of international terrorism.

Q.  What's the highest level of education that you have

attained?

A.   I have a master's degree.

Q.   What work did you do before joining the FBI?

A.   I previously worked in investment banking.

Q.   Your current assignment is located where?

A.   I'm a member of the Joint Terrorism Task Force in Chicago.

Q.   And prior to that were you located in Pittsburgh?

A.   Yes, I was.  I was in Pittsburgh for a little over two years.

Q.   Special Agent Edquist, you were the case agent on this investigation?

A.   Yes, I was.

Q.   And you swore an affidavit in support of probable cause for the criminal complaint?

A.   Yes, I did.

Q.   Special Agent Edquist, in your capacity as a case agent was it your responsibility to oversee the online undercover investigation into this defendant?

A.   Yes, I was.

Q.   And was it your responsibility to monitor all electronic communications that this defendant engaged in?

A.   Yes, it was.

Q.   Was it your responsibility as the case agent to supervise and coordinate any in-person meetings with undercover FBI employees?

8

A.   Yes, that was my responsibility.

Q.   And there were FBI employees, multiple FBI employees utilized in this investigation?

A.   That's correct.

Q.   And can you detail the different types of FBI employees that were used in this case?

A.   So we initially used an online covert employee, or OCE, to engage with the defendant in an online capacity, but we also utilized an in-person undercover employee which is another FBI employee and I'll use the term UCE to refer to that, and we also utilized a confidential human source, or CHS, and that's someone who is not employed by the FBI but works with us in a confidential manner.

Q.   Special Agent Edquist, you, as the case agent, have reviewed the defendant's online accounts?

A.   Yes.

Q.   And also as the case agent, you reviewed the contents of his electronic devices?

A.   Yes, I did.

Q.   And following the defendant's arrest, did you interview him in a post-arrest interview?

A.   Yes, I did interview him.

Q.   Special Agent Edquist, let's start very generally, then we'll work through a number of exhibits.  Can you summarize for the court what the culmination of this investigation was?

A.   In summary, on June 19th, 2019, the FBI arrested the
defendant for attempting to provide material support to the
Islamic State of Iraq and al-Sham, or ISIS, which is a
designated foreign terrorist organization.  More specifically,
the defendant was plotting to use a weapon of mass destruction
to destroy the Legacy International Worship Center, which is a
Christian nondenominational church located in Pittsburgh.

Q.   Who chose that church as the target?

A.   The defendant did.

Q.   Who provided the details about the plan?

A.   The defendant.

Q.   And who provided the specifics of the plan in writing?

A.   The defendant.

Q.   Roughly how long was this investigation, Special Agent
Edquist?

A.   The total investigation spanned several months.  The
period in which the FBI employees were engaging with the
defendant was approximately three months.

Q.   Along with the defendant, who else was going to plant the
bomb that was going to destroy the church?

A.   The defendant was involved in his plot along with two
individuals that he believed to be members of ISIS based in
the United States but instead were a UCE, as I mentioned
before, and a CHS.

Q.   Special Agent Edquist, what was the defendant's stated

10

objective with this plot and bomb?

A.   The defendant stated that he chose this particular target because he wanted to seek revenge for his ISIS brothers in Nigeria because he perceived this church to be a Nigerian Christian church.

Q.   Could we show Exhibit Number 2.1, please?  Special Agent Edquist, what is this a transcript of?

(Courtroom monitor technical difficulties.)

(Off-the-record discussion about technical difficulties.)

THE COURT:  Does everyone have a hard copy of the exhibits?

MR. LIPSON:  Your Honor, we could follow along with the paper copy.  The only issue is I don't know if Mr. Alowemer won't be able -- we'd be kind of bunched together.  Thank you, Your Honor.

THE COURT:  I have a screen.  So I'm good.

MR. LIPSON:  Much appreciated.

THE CLERK:  Are you asking for the Zoom link separately?

MR. LIPSON:  My apologies.  Your Honor, we were going to have our defense-obtained interpreter observe the proceedings, so we had sent that link to her.  I also think that at least for a portion of the hearing today Dr. Weine, who submitted a report I believe at Exhibit C and with the sentencing memorandum, would also observe part of the

11

proceedings.  So I know they were intending to observe this.
I'm not sure if there's an issue with the Zoom.

THE COURT:  There might be.  I don't know.  My
suggestion is that you plan for a phone backup for listening
purposes in case we don't have the Zoom link.

MR. LIPSON:  Thank you.

MR. WILLIAMS:  Maybe the time difference, too, in
Egypt, maybe she's not ready.

MR. LIPSON:  That would be a first for her.

MS. SONG:  Are we ready to proceed, Your Honor?

THE COURT:  Are you ready, Mr. Lipson?

BY MS. SONG:

Q.  Special Agent Edquist, can you describe for the court what
Exhibit 2.1 is?

A.  This exhibit is a transcript of the surreptitiously
recorded meeting that took place between the defendant and the
UCE on June 2nd, 2019.  This was their third meeting.  And
this particular portion of the transcript shows when the
defendant first introduced his idea and started talking about
the specifics of the proposed plot to blow up the church,
Legacy International Worship Center.

Q.  Okay.  And if you would, there are multiple pages in this
exhibit, so I'm going to ask you to proceed in summary
fashion.  If we could look at the second page of Exhibit 2.1
towards the top, can you clarify for the court what the

specific reference to Nigerians was in relation to the church there?

A.  The defendant believed that this church was a Nigerian Christian church, and this is when he first mentions that the target that he had chosen was for Nigerians and identifies it as being a church.

Q.  And Special Agent Edquist, what other important aspects of the plan are discussed in this excerpt or at that meeting with the UCE and the defendant?

A.  So this is where the defendant first laid out not only identifying the target but talked about its location.  He talked about what roles he would have, what role the UCE would have, what role the CHS would have in the plot.  He uses maps to show where they would drive, how he would go about taking -- putting -- taking a bomb in a backpack and setting it at the church and then how they would get away and then also talking about where they would meet afterwards, that they had an alibi.

Q.  And Special Agent Edquist, I'm going to direct your attention to page 11 towards the top of this exhibit.  Can you summarize for the court what's transpiring there between the undercover FBI employee and the defendant?

A.  So this is again where the defendant articulates that it's a church for Nigerians and the undercover was asking him, well, why are the Nigerians -- why is this the target?  And

this is when the defendant states why he has chosen it.  He says, we take revenge for our brothers in Nigeria.  And then the discussion proceeds to talk about the ISIS presence in Nigeria.

Q.  And Special Agent Edquist, through the remainder of that meeting, what, if anything, did the defendant say about taking credit for the bombing?

A.  The defendant eventually, I believe, during the fourth meeting talked about different ways in which he would -- in which they would be able to show that the attack had been conducted on behalf of ISIS.

Q.  Special Agent Edquist, I want to ask you about the online investigation that preceded these in-person meetings with the defendant.  Can you summarize for the court how the FBI was able to utilize an online undercover agent to further this investigation?

A.  Yes.  So in 2018, we became aware of various instances in which the defendant had utilized online accounts and other venues to express his support for ISIS to attempt to communicate with at least one other known ISIS supporter and express his support for the use of violence in support of ISIS.  Based on that body of evidence, we made the decision that we wanted to engage with the defendant with an OCE to determine if he was simply a passive supporter online or someone who actually wanted to take that next step and carry

14

out an illegal activity or an act of violence in support of ISIS.

Q. And the OCE represented himself as whom or what was his role in connection to ISIS?

A. The OCE portrayed himself as an ISIS member who lived in Europe but was at the time in one of the Middle Eastern countries for family reasons for an extended period of time.

Q. And Special Agent Edquist, in the course of these communications, did the defendant send anything to the OCE that was related to ISIS?

A. Yes. Very early on in their discussions, the defendant not only expressed his support for ISIS and his desire to return to Syria and conduct jihad and expressing, requesting help in getting back to Syria, he also repeatedly sent the OCE ISIS propaganda through various outlets.

Q. Did the defendant and the online covert employee talk about weapons?

A. Yes, they did.

Q. What did they say?

A. The defendant specifically asked the OCE if he or the brothers in the United States could help provide him with a weapon with a silencer.

Q. So at some point there was discussion about other ISIS brothers in United States?

A. That's correct. The initial few weeks they were talking

about their beliefs and sharing propaganda, and in April the defendant escalated the rhetoric not only asking for a weapon, talking about potential ISIS brothers in the United States, but also offering up information about specific individuals in the Yazidi Pittsburgh community for ISIS to take if they wanted it to seek revenge for activities in Syria.

Q.   And how did that conversation develop between the defendant and the online covert employee about the Yazidis?

A.   The defendant brought it up on his own accord that he had information about local Yazidis in Pittsburgh and, based on what was going on in Syria and his perception that members of the Yazidi community were fighting and defeating ISIS in Syria, he wanted to offer up information on them as targets if the brothers wanted that information to do something about it.

Q.   And he made clear that he had relationships with actual individual Yazidis that he would offer as targets?

A.   Yes.  He mentioned going to school with a couple of them. He actually sent pictures of three of them and stated that he essentially is friends with them and he can get to know them really well and they have no idea the beliefs that he harbors.

Q.   In the course of talking to the OCE, did the defendant express or commit allegiance to ISIS in some formal fashion?

A.   Yes, he did.  Two days after he asked to be provided with a weapon, he submitted a video to the OCE in which he pledged his oath of allegiance to the leader of ISIS at the time, Abu

16

Bakr al-Baghdadi, and that's known as a bay'aa.

Q.   If we can show the witness Exhibit 1.1?  Special Agent Edquist, what are we looking at in Exhibit 1.1?

A.   This exhibit is just a screenshot of one of the many, many ISIS propaganda videos that the defendant sent to the OCE proactively without request.  And this is, just again, representative of the volume of information and the type of information that he was sending.

Q.   Did the OCE ever send the defendant any ISIS propaganda?

A.   I do not believe he did.

Q.   And you would know?

A.   I would know.

Q.   Could we show Exhibit 1.2, please?  Special Agent Edquist, what's shown here?

A.   This exhibit is a screenshot of the defendant's own Telegram channel that he created, explicitly pro-ISIS Telegram channel he created on April 7, 2019.  He subsequently invited the OCE to join it.  In addition to the OCE and the defendant, there were obviously several other subscribers in the channel, and it was over the course of three days contained a substantial volume of videos, images, news stories all focused on ISIS.

Q.   And with respect to the other people who had joined this channel, can you say that you know the identities of all those people?

A.    I cannot say that.

Q.    Could we see Exhibit 1.3, please?    Special Agent Edquist, what is depicted in Exhibit 1.3?

A.    This image is a screenshot or a still-shot of one of the many propaganda videos that was in the channel.    Specifically, this one is focused on ISIS' province in West Africa, and this is again representative of many of the videos that he was sending in this channel.

Q.    Could we review Exhibit 1.4?    Special Agent Edquist, can you describe to the court what we're looking at in 1.4?

A.    This exhibit is an FBI linguist's translation of the bay'aa that Mr. Alowemer, the defendant, sent to the OCE on April 12th, 2019.

Q.    So the actual file was a video or audio-video file?

A.    The defendant sent the OCE a video file of him making the bay'aa, and this is just the translation of that video.

Q.    And the video that the defendant sent, you reviewed that, as that is Exhibit 4.3.    We don't need to play that.    But you reviewed the video that is offered in 4.3, is that correct?

A.    Yes, I have.

Q.    Now, Special Agent Edquist, describe for the court how the investigation transitioned from an online covert employee to in-person meetings?

A.    So as we discussed, the defendant had asked the OCE about other brothers, other ISIS members and supporters in the

18

United States and expressed a desire to meet with them if available. After the defendant sent his bay'aa video to the OCE, the OCE provided the defendant with contact information for what he believed was another ISIS member based in the United States but was actually the UCE. And within a day of receiving that information, the defendant proactively reached out to the UCE and they initiated near-daily communications from that point forward.

Q. So this is an important point. So the contact information was provided by the online undercover to the defendant and within 24 hours the defendant proactively reached out to that individual?

A. That's correct.

Q. That he thought was a brother in the United States?

A. That's correct.

Q. Was there any discussion or how did those discussions begin then with the undercover employee and the United States?

A. So the very initial discussions were again about ISIS, about religion. The defendant asked to be provided with a secure phone because he perceived his current phone to be electronically surveilled, so he wanted to be able to communicate in a secure manner. He also again offered up the information about the local Yazidis and eventually expressed a desire to meet with the UCE in person.

Q. And did the defendant tie the local Yazidis to events that

were happening that ISIS was engaged in militarily?

A.   Yes, he did.

Q.   And how did he do that?

A.   The defendant repeatedly referred to Baghuz especially when talking about the Yazidis, and Baghuz is a reference to a small town in eastern Syria near the Iraq border, and that's relevant because it was essentially the last stronghold that ISIS remained as part of its physical caliphate in Iraq and Syria, and in February 2019, Kurdish-led forces along with U.S.-led coalition forces initiated a campaign to retake that portion of Syria, which they eventually did successfully in March 2019.  So this was all occurring as the defendant was engaging with the OCE and then eventually engaging with the UCE.

Q.   In the electronic communications with the UCE and the defendant, did they talk about conducting an attack in the U.S.?

A.   Yes, they did.

Q.   And in these electronic communications, did they discuss the fact that the defendant had pledged his allegiance to the head of ISIS in the video?

A.   Yes.  Very early on in their initial communications the defendant confirmed that he had sent his bay'aa video to the OCE.

Q.   And he didn't express any remorse in having done so?

20

A.   He did not.

Q.   How do the online communications transpire in a meeting?

A.   Very early on in their conversation they agree to meet in the Pittsburgh area, and within three days of their initial communications they did in fact meet in the Pittsburgh area in person.

Q.   And the date of that first meeting was?

A.   April 16th, 2019.

Q.   And before we get into some exhibits again, Special Agent Edquist, you know, generally can you summarize for the court meeting one on April 16?

A.   So the defendant met with the UCE and the CHS together for approximately 3 1/2 hours in the Pittsburgh area.  And very early on the discussion was focused on mutual support for ISIS, again talking about the Yazidis, talking about world events, talking about their ideology, but more specifically eventually getting into talking about different ideas, different opportunities to conduct violent attacks in the United States.

Q.   Other than the Yazidis, what other type of attacks were discussed?

A.   The defendant specifically mentioned a recent experience where he had seen a U.S. service member and that, if he had had a weapon at the time, he could have killed that service member and his stated reason again was because he was

affiliated with the U.S. military and what they were doing against his brothers and sisters in Baghuz.  In addition to that, the defendant specifically talked about a Shia mosque in the Pittsburgh area that he believed would be a good target for a bombing.

Q.  So the defendant said he could kill a U.S. soldier.  Did other terror attacks such as 9/11 come up in that investigation?

A.  Yes.  When the UCE was talking about how important it was to plan and make sure that, if they were to carry out an attack, the planning would have to be perfect, the defendant explicitly referenced 9/11 as an example of a perfect plan.

Q.  Did the defendant articulate, you know -- other than what you said already, did the defendant articulate animus towards the United States because of the military conflicts going on with ISIS in other locations around the globe?

A.  Yes.  The defendant and the UCE and CHS talked about a number of global events and historical battles, and in reference to one of those battles, the defendant specifically referred to U.S. and French forces as crusaders invading the Middle East and killing their brothers and sisters.

Q.  Special Agent Edquist, at this first meeting what was said about explosives, if anything?

A.  They talked about a variety of different types of explosives.  The defendant brought up the idea of grenades and

made a reference to having used a grenade in his past.  They also talked about various IED options.

Q.  So explosives and bombs were topical from the first?

A.  Yes.

Q.  Special Agent Edquist, in this first meeting, did the defendant reference the leadership of ISIS?

A.  Yes.  There were references to -- I believe references to Abu Bakr al-Baghdadi, but more notably the defendant on two separate occasions referred to Abu Mohammed al-Adnani, which is important because that individual was previously the spokesman in charge of external operations for ISIS, and he notably made a famous speech in September 2014 in which he urged supporters around the world who aren't able to travel and join the caliphate to instead conduct attacks where they lived and implored people who didn't have access to explosives or firearms to use whatever form of weapon they could find, whether a vehicle, a knife, a rock, et cetera.

Q.  Special Agent Edquist, you said that the defendant had said, if he had a secure phone or secure device, that he could be more comfortable communicating, is that correct?

A.  That's correct.

Q.  And what, if anything, was done with respect to that request by him in that first meeting?

A.  During that meeting, the UCE and CHS provided the defendant with a new device.

Q.  Was there -- well, let me ask you this.  Can you characterize for the court the second meeting?

A.  The second meeting occurred on April 25th, approximately nine days later, again with the UCE and CHS in the Pittsburgh area.

Q.  Before I ask you for questions about that meeting, in the intervening time after the provision of that phone to the defendant, did there continue to be online communications between the UCE and the defendant?

A.  Yes.  The UCE and the defendant communicated on a near-daily basis.  The defendant was also communicating less frequently with the CHS and also still with the OCE on an intermittent capacity.

Q.  Then on April 25th is the second meeting.  Would you summarize for the court what happened in that meeting?

A.  At the second meeting, the defendant and the UCE and CHS initially talked about a recent ISIS attack in Sri Lanka that included the targeting of a Christian location.  The defendant also showed the UCE and CHS a video that he had found and that he had on his phone that appeared to be depicting the White House burning and ISIS militants taking down the American flag over the White House and raising the black banner that ISIS uses.

Q.  Did the defendant talk about writing his own songs or his own creative material in relation to ISIS?

24

A.   Yes.  On April 20th, the defendant actually sent lyrics to a nasheed, which is essentially a poem that's typically communicated via a chant format and is typically used in ISIS propaganda videos and other extremist propaganda materials. He had sent lyrics to his own self-authored nasheed on April 20th and then during the meeting on April 25th actually saying a nasheed to the UCE and the CHS.

Q.   Is the translation of that nasheed included in the government exhibits at 2.4?

A.   Yes, that is it.

Q.   Now, I want to ask you something important.  You said that at this meeting the defendant showed a video that particularly referenced the United States and ISIS -- as a target of ISIS?

A.   Yes.

Q.   Could we see Exhibit 2.10, please?  And Special Agent Edquist, tell the court what we're looking at in this video. This is not the actual video, correct?

A.   It is not.  This video is -- are screenshots of a video that was pulled from the defendant's device.  That is believed to be the same video he was referencing in the second meeting. And the various screenshots show the White House from above and eventually show the U.S. flag in tatters and shows the White House burning and then it shows ISIS militants lowering the flag, throwing it to the ground and raising the black banner.

Q.  Can we look at the subsequent pages of that exhibit, please?  The second page.  And the third page.  There's some text in English, Special Agent Edquist.  Can you, for the record, say what's in there?

A.  The top picture says, and the sun shone of jihad, with the black banner flying in the background.

Q.  And the page prior had some text.  If we could go to the second page of that exhibit.  What's the text at the bottom of that?

A.  The bottom screenshot says, there is no time to slap and howl.

(Court reporter asked for clarification.)

THE WITNESS:  There is no time to slap and howl.

Q.  In the video, what's happening at that particular point in the video?

A.  At that particular time it appears that the White House is on fire or there's flames around the White House and the flag, the American flag is being dropped to the ground.

Q.  And replaced with the flag that's in the final page in the exhibit?

A.  That is correct.

Q.  Special Agent Edquist, after the second meeting, can you describe for the court how, if at all, discussions intensified about explosives between the defendant and the FBI employee?

A.  So for about a little over a month after the second

meeting, mostly throughout the month of May, again the UCE and the defendant were in near-daily communications.

MR. LIPSON:  Your Honor, my apologies to interrupt the witness.  I just heard Mr. Alowemer is having a little trouble following along.  Rather than the interpreter kind of interpreting word by word, which would severely, I think, slow down the proceeding and I think is unnecessary, would it be possible to ask counsel for the government and the witness to speak a little more slowly?  I think that will assist Mr. Alowemer and help him to follow what's going on.

THE COURT:  Absolutely.

MS. SONG:  That's fine.

Q.  So Special Agent Edquist, we were talking about the intensification of explosives discussions.

A.  Yes.  Throughout the month of May the defendant and the UCE talked on a near-daily basis, and a lot of the discussion started to revolve around explosives.  The defendant was sending the UCE a significant amount of ISIS propaganda material at the time, one of which included a video depicting a vehicle-borne IED exploding and taking out multiple-story buildings.  In addition to that, they began to talk in coded language about explosives-making using terms such as cooking. Eventually the discussion evolved into the defendant talking about different ideas that he had for the next time they would meet.  He eventually in mid to late May invited the UCE to

join multiple bomb-making groups on an encrypted messaging platform.  Then finally, the defendant in late May sent the UCE multiple instruction guides that included explicit instructions about how to create explosive material, how to construct explosive devices.

Q.  Okay.  Let's start with Exhibit 2.5.  Can you explain to the court what we're looking at in this exhibit?

A.  This exhibit is a screenshot of the communications between the defendant and the UCE.  The defendant's text is in the white boxes.  And this is just again a reference to the defendant saying, that doesn't mean that we are all going to stop from jihad, and then eventually saying, I have some ideas I've been looking for almost from two weeks.

Q.  Let's look at Exhibit 2.6.

A.  This exhibit is another screenshot talking about -- or the defendant making a reference again of wanting to meet with the UCE again and referencing having a good plan that he thinks that the UCE would like.

Q.  And 2.7.

A.  This is a screenshot again of a communication on a different platform.  The defendant is using the name AbuShimaa131, and in this instance, the defendant states, there are a couple of studies, which I believe to be a reference to students, who work with the military.  If they are going to college with me, we might start hunting, brother,

and feed them.

Q.  And what did hunting and feeding and cooking refer to in the coded language over time that the UCE and the defendant engaged in?

A.  So they typically used the word cooking as a coded word to talk about making explosives or anything related to explosives.  They used the terms meals, food, spicy, and the term hunting kind of goes along with that.  Using coded language.

Q.  Did the defendant refer to cooking with a timer with the UCE?

A.  Yes, they discussed cooking with a timer.

Q.  And did the defendant clarify in other communications that he was exposed to students at his high school that appeared to have a military interest or commitment?

A.  Yes.  The defendant referenced military-affiliated individuals potentially at school with him.

Q.  Exhibit 2.8, please, Special Agent Edquist.

A.  This exhibit is a screenshot of the bomb-making group that the defendant had invited the UCE to join, one of the bomb-making groups that he invited him to join.

Q.  In the discussion -- and just for the record, you know, there's an image on the top left of that screen.  There's no mystery that the focus of this group was explosives?

A.  That's correct.  The name of the group, I believe, was

Military Lessons For Beginners, but there was no ambiguity about what the focus of this group was.

Q.  In the defendant's discussions and invitation to this group, did he project a familiarity with individuals or with the specific content of this and other groups?

A.  Yes.  The defendant and the UCE talked about this group and also mentioned a specific individual who the defendant believed created the groups, and he advised the UCE to reach out to this individual directly.  He also indicated that he had reached out to him directly.

Q.  So he named the person?

A.  Yes.

Q.  And he gave instructions to the UCE as to how to interact with him?

A.  Yes.

Q.  Can we look at Exhibit 2.9?

A.  This exhibit again is a screenshot of their communications from late April, and what's notable about this is the defendant sharing official news release from one of the ISIS media outlets that is documenting a recent interview by -- of the leader of ISIS at the time, Abu Bakr al-Baghdadi, which is very notable because he had not made appearances over the nearly prior five years.  So this is his first big interview and media appearance after a long time being dormant.

Q.  Let me just ask you whether through this address did Abu

Bakr al-Baghdadi reference ISIS in Africa specifically?

A.   Yes.   Among a number of topics, Abu Bakr al-Baghdadi referenced various provinces and what those provinces of ISIS were doing and specifically mentioned Africa.

Q.   And Special Agent Edquist, you mentioned that the defendant sent a video of an explosion to the UCE in this time frame we're talking about, is that correct?

A.   That's correct.

Q.   And is that the video that appears at Exhibit 4.7?

A.   Yes, this is it.

Q.   And is this representative -- was this the only video or is it representative of other like content that the defendant was sending to the UCE?

A.   This was definitely not the only video or the only material that the defendant was sending to the UCE at the time.

        MS. SONG:   You can play that exhibit, please.

     (Video played.)

Q.   Special Agent Edquist, in this time frame that we're talking about, you also said that the defendant sent instructions about how to make bombs, is that correct?

A.   Yes, he did.

Q.   And can you describe for the court how the FBI assessed the value or the potential risk of those instructions?

A.   So on two separate days the defendant sent a total of

31

three instructional guides that all had some relation to bomb-making or explosives.  We had all three of those documents translated by FBI linguists and then sent those translations to the FBI laboratory for professional analysis and evaluation, and they made the determination that two of the three documents, if the guidance and instructions were provided or were followed closely, that they could result in the construction of a viable destructive device.

Q.   Special Agent Edquist, what types of materials would a person need to follow those instructions?

A.   In some cases household materials such as Christmas lights, batteries, nail -- acetone from nailpolish remover. Other things that you could find either at home or buy at a store in any location.

Q.   Did one or more of these guides make clear that these were instructions for individuals focused on jihad?

A.   Yes, they did.

Q.   And did one or more of these instructional guides talk about other ways to launch attacks against the enemies of ISIS?

A.   Yes.  One of the guides, in addition to talking about a variety of different explosive devices and chemical mixes, also detailed organizational protocols, training, and other guidance for conducting jihad in addition to different ways to conduct an assassination.

Q.  Special Agent Edquist, the defendant and the undercover meet again in Pittsburgh, is that correct?

A.  That's correct.

Q.  When was this third meeting?

A.  The third meeting took place on June 2nd, 2019.

Q.  And would you summarize for the court what transpired in this meeting before we get into the exhibits?

A.  In summary, this is the meeting when the defendant first introduced the idea of targeting the Legacy International Worship Center in Pittsburgh.  He also provided the UCE with maps with a few other written materials, with rings that bore the ISIS insignia.

Q.  Did the topic of supplies come up in this third meeting?

A.  Yes.  Towards the end of the meeting they also talked about what potential items would be needed as precursors to construct an IED and discussed how they would go about making those purchases.

Q.  I'm going to refer you back to Exhibit 2.1, which has multiple pages, but in the discussion of the attack and targeting this Nigerian church, was it clear that people --

MR. LIPSON:  Objection, Your Honor.  The government is assuming a fact that it's already been in the sentencing memo is not accurate.  This was not a Nigerian church.  The government just asked the question as if it was a Nigerian church, but on page 6 of the sentencing memorandum already

conceded that this is not a church affiliated with the Nigerian community at the time of the event.

MS. SONG:  Your Honor, we're talking about the defendant's characterization and the defendant's words at this time.

THE COURT:  The objection is overruled.

MS. SONG:  If they're not, it's of no moment.

Q.  Special Agent Edquist, in this exhibit is it clear that people around the church could die with the force necessary to flatten the church?

A.  Yes.  On multiple occasions the UCE made it clear that for him to construct a device that would achieve the defendant's objectives of destroying the building, it would need to be powerful enough to potentially take out buildings and houses nearby, which would include anybody who is inside those houses.

Q.  Could we go to the fifth page of this exhibit towards the top?  What was some of the phrasing that the defendant deployed to talk about the bomb or the backpack bomb?

A.  For example, the defendant said, so we can just test -- undetermined -- we put the fear in their hearts so they hold. And then they again start talking about a reference to a bag of fear.  Inshallah, it is the bag of fear.  It will put fear in their hearts, God willing.

Q.  Could we look at Exhibit 2.2, please.  Special Agent

Edquist, is this another example of how the prospect of this bomb killing people was certainly contemplated at different points during the discussion?

A.   Yes.   This is a transcript from the same meeting, and again they're talking about the potential impact of carrying out this attack and whether it might involve the killing of people.

Q.   Page 2 of that exhibit, Special Agent Edquist, what effect does the defendant contemplate on the City of Pittsburgh?

A.   The defendant introduces the idea of potentially utilizing a second bomb.   He proposed using a bomb set to go off at night to destroy the church and then having a second bomb with a delayed timer that would be set to go off two or three hours later when police and other first responders were on the scene, which would have the effect of likely killing people who were responding to the scene but in a more general level, striking fear and potentially shutting down the City of Pittsburgh.

Q.   Now, Special Agent Edquist, if you would, look at Exhibit 4.2.

A.   This exhibit is a surveillance photo that was taken by FBI employees that depicts the defendant at a Walmart store purchasing three boxes of nails, and this particular picture occurred between the fourth and the fifth meetings prior to the defendant's arrest.

35

Q.   And if we could look at Exhibit 4.5?  What relevance does this exhibit have to this point in time with the UCE communication?

A.   So this exhibit is two separate still-shots from an ISIS in West Africa propaganda video which was found on one of the defendant's electronic devices subsequent to his arrest.  This is notable in relation to the defendant's proposed plot to target what he perceived to be a Nigerian church, and the bottom still-shot is a representation that was included in the video showing the ISIS black banner spreading from various towns throughout Northern Nigeria depicting the fact that they were taking territory in Nigeria and imposing their will on the Nigerian people and the Nigerian government.

Q.   And is this video indicative of other videos that were found on the defendant's devices?

A.   Yes, it was.  This is just one video of many.

Q.   And just to clarify, the map on the second part of that exhibit on the first page of 4.5 is depicting Nigeria?

A.   That's correct.

Q.   If you would take a look at Exhibit 4.6 and tell the court what we're looking at?

A.   This exhibit is a collection of screenshots that were taken from one of the defendant's devices.  It's unclear whether he took them himself or they came from one of the groups or channels that he was involved in, but it's a

collection of screenshots depicting what was going on

specifically in Nigeria and also in other Western African

countries specific to the Islamic State in West Africa.

Q.  Now, Special Agent Edquist, how did the conversation about

the supplies needed to build the bomb to flatten the church

transpire?

A.  The defendant and the UCE talked about different materials

that would be needed and how they would go about making those

purchases.  The defendant agreed to purchase four different

types of items, batteries, cold packs, acetone via nailpolish

remover, and nails.

Q.  And was the defendant told to buy these things or did he

ask what he should buy?

A.  I don't recall exactly how it was brought up initially.

The UCE explained to the defendant these are what needed to go

into the bomb, but the defendant on multiple occasions asked

the UCE for the list of things so that he could go buy them

and provide them to the UCE who had portrayed himself as an

expert bombmaker.

Q.  And Exhibit 3.1, if you would take a look at that exhibit?

A.  This exhibit is a picture of two rings that the defendant

gave to the UCE for himself and for the CHS.

Q.  At this meeting?

A.  At the third meeting, that's correct.  And the

defendant -- the rings themselves just bear part of the

Islamic Shahada, which in of itself is not troublesome, not a problem, but the defendant himself even acknowledged that these were, quote/unquote, ISIS rings.

Q.  At this third meeting did the defendant begin to share the specific location of the churches and these maps with the UCE?

A.  Yes.  During this meeting the defendant brought two separate maps and used them to roughly describe to the UCE where the church was located and how they would go about carrying out the attack.

Q.  Now, Special Agent Edquist, after the third meeting, did the activity progress to a fourth meeting?

A.  It did.  On June 11, 2019, the defendant met again in the Pittsburgh area with the UCE and the CHS.

Q.  And what significant actions transpired in that June 11th meeting?

A.  So at the beginning of the meeting the defendant brought along several of the materials that he had purchased since the last meeting and provided them to the UCE and CHS.  He also went with the UCE and the CHS to go conduct surveillance of the proposed target and to talk through the different locations of interest including where the CHS would be located to conduct surveillance on the nearby police station.  After returning to their meeting location, they talked in further detail about the plot again using maps, more detailed maps this time, also written operational guidelines that the

defendant had drafted himself that he subsequently gave to the UCE and the CHS.

Q.   Was there some effort to actually go to the intended bomb site?

A.   Yes.   They drove together.   They drove in the UCE's car intentionally.   The defendant expressed concerns potentially about utilizing his vehicle.   So they drove together in the UCE's car to target the different locations of interest or to scope out the different locations of interest.

Q.   Can I direct your attention to Exhibit 2.3?   Would you tell the court what we're looking at in this transcript?

A.   This is the transcript from that fourth meeting, partially.   And in this particular instance the defendant identifies what he believed to be the name of the church.   He says, the name of the church I thought it's kind of funny. It's called Cornerstone.   We're going to destroy that stone. And then starts laughing.

Notably, the church where the Legacy International Worship Center is located used to be called Cornerstone and actually has that name on the building.

Q.   In that discussion, what did the defendant say about Nigeria?

A.   So immediately talking about destroying the church, the defendant then mentions the brothers in Nigeria and Nigeria are doing a great job and specifically references a recent

terrorist attack that killed 95 of the, quote/unquote, infidels in a large operation. And even prior to this while the defendant was just talking one-on-one with the CHS, he again brought up the target and mentioned that it was for Nigerians, mentioned that the intended goal was to strike fear, and also then bragged to the CHS that it was he who had brought up the idea of introducing a second bomb.

Q. For first responders?

A. That's correct.

Q. Special Agent Edquist, what discussions about taking credit or publicizing credit for this attack occurred in this meeting, the fourth meeting?

A. So the defendant expressed concerns about recording a video or using electronic devices to share the information to claim credit. Instead he proposed potentially leaving the ISIS flag along with a sign including the words "we have arrived" or a variant thereof to be able to claim credit for ISIS while also limiting the potential of being caught.

Q. Special Agent Edquist, could you please review Exhibit 3.2, and tell the court what we're looking at here?

A. This exhibit is a picture of one of the printed-out maps that the defendant brought to the meeting, the fourth meeting, and then annotated. You can see he circled the location of the church. He also circled the location where the UCE would be parked and also identifies the route that they would escape

40

the area after setting the bomb in place.

Q.  And per his instructions, you said the UCE or the CHS was to monitor a police station?

A.  That's correct.

Q.  And I think your screen will show your fingerprint.  Can you just clarify where, the circle where the church was on this map?  No?

A.  No, it won't take it.  It's the circle towards the bottom of the screen that's just north of the Odell Robinson Jr. Funeral Home.

Q.  And Exhibit 3.4?  Or, I'm sorry.  3.3?

A.  This is the second printed-out map that the defendant brought.  Again, this is the nearby police station just south of the intended bombing location, and the location on here that's circled, which is right by the Valero gas station, is where Pittsburgh Bureau of Police Zone One station is located. And the defendant had specifically stated that the CHS' role would be to monitor the police station before and during the plot to conduct countersurveillance essentially to ensure that, if there was any indication they were aware of what was going on, he could notify the defendant and the UCE.

Q.  Exhibit 3.4?

A.  This picture is a photo of all of the six bottles of nailpolish remover that the defendant purchased from a Target store and also brought with him to the fourth meeting on

41

June 11th.

Q.   What was it in nailpolish that was important to the bomb that they were going to construct?

A.   The UCE had told the defendant that they needed acetone which is a component of nailpolish remover.

Q.   Exhibit 3.5?

A.   This exhibit is the first of two pages front to back of the handwritten operational guidelines that the defendant drafted and brought with him to the meeting and discussed with the UCE and CHS.

Q.   The writing is whose?

A.   That is the defendant's in Arabic.

Q.   And what -- there are markings on the right-hand side, Xs and other markings in pen.  What do those signify?

A.   As it was relayed to me by the UCE and CHS, those markings indicated as the defendant went through each point he marked it off to notify that they had talked about that specific topic and were moving on to the next one.

Q.   And 3.6?

A.   3.6 is just a partial second page of the operational guidelines again in Arabic.

Q.   If you would review 3.7?

A.   3.7 is the FBI linguist's translation into English of the operational guidelines that the defendant had written and provided to the UCE and CHS.

Q.  And what, relative to the purpose of this attack, is represented in this document, Special Agent Edquist?

A.  So, much of the document are different aspects of the plot, laying out who needs to be involved, the equipment they would need, how they would get away, different security measures that needed to be taken.  Notably, the second bullet is a reference to when it should be done, but the defendant specifically states that it needs to be done in order to shock the enemies of Allah Almighty everywhere and all over America in order to -- illegible -- from going to their churches and to instill fear in their hearts.

Q.  Who chose the day of this week as Sunday in this attack?

A.  The defendant chose it.

Q.  Why did he articulate that Sunday was important to do this?

A.  The defendant stated multiple different reasons.  At one point he did mention he was looking into when prayer services were, which indicated he was aware that Christians generally go to church on Sunday.  He did mention that he wanted to do it at night primarily because he wanted to do it when there were less people out in a way that would lessen the chances of them getting in trouble or getting caught.

Q.  Did he -- you said that he was trying to find out when prayer was.  Was there an iteration of the plan where he talked about doing it when people were in the church?

43

A.   Yeah, there was a discussion, a back and forth where he mentioned, you know, potentially trying to do it during prayer services and asked the UCE when those would be, to which the UCE told him approximately 11 a.m. or roughly 11 a.m. on a Sunday morning.

Q.   Did the defendant in his discussions with the UCE make clear that he had observed this church?

A.   Yes, he did.

Q.   One time or more than one time?

A.   He mentioned on several different occasions.  He articulated that he used to live very close to the church.

Q.   Did the defendant say anything about observing people going to the church?

A.   The defendant did state that.  He had claimed that he had seen people going to church and other times he had stated that there was nobody there.  So he was using conflicting information.

Q.   If you would look at Exhibit 3.8, please.

A.   This image is just a still-shot from video recording of that fourth meeting on June 11th.  This is shortly before the defendant gets into the UCE's vehicle before they go conduct surveillance at the target.

Q.   And Exhibit 3.9?

A.   And this is another still-shot from that meeting shortly after they return from conducting surveillance when the

44

defendant was standing at his vehicle.

Q.   And what's he holding in that picture, per the transcripts?

A.   The defendant had previously told the UCE and CHS that he keeps either a bat or a stick of some sort in his car for safety purposes.  So this was him pulling it out and smiling to the UCE and CHS about it.

Q.   You listened to the audio of these communications, Special Agent Edquist?

A.   Yes, I did.

Q.   And are these images consistent with the demeanor that you perceive on those audio recordings?

A.   Yes, they are very consistent.  Throughout the defendant's interactions with the UCE and the CHS, he seemed very jovial, eager, did not express any concern about his safety, did not express any concern about the safety of his family, and never appeared under duress.

Q.   Special Agent Edquist, if you would look at Exhibit 4.1?  Tell the court what we're reviewing here.

A.   This exhibit is a still-shot of the defendant exiting a Target store with a bag in his hand from June 10th, 2019, which was the day before the fourth meeting.

Q.   And Exhibit 4.2?

A.   And again, this is the one we talked about earlier, the surveillance photo taken by an FBI employee of the defendant

making a purchase of nails at a Walmart store.

Q. So just to be clear, could we do a close-up on the conveyor belt? So those are the nails that the defendant was purchasing?

A. Yes. There are three boxes of nails. And they had specifically talked about the need to make small purchases using only cash at different locations so as not to arouse suspicion.

Q. In the discussions about the explosives, what was the function of the nails in the bomb?

A. The UCE made it clear that the nails would serve an anti-personnel purpose, that the only reason you would use nails or ball bearings or other shrapnel like that is to go above and beyond just destroying a building.

Q. Meaning what? You say anti-personnel, what does that mean? What are you referring to, to people?

A. Anti-personnel, people, yes.

Q. Special Agent Edquist, after this fourth meeting and surveilling the target, was there a final meeting between the defendant and the UCE?

A. Yes. The defendant met with the UCE alone for a fifth and final time on June 19th.

Q. And what, if anything, at that meeting was said about whether this was to be the only violent undertaking that these individuals would do?

46

A.   So in their preceding conversation, the defendant, UCE and CHS had talked about the need to not get caught carrying out this proposed plot and the potential to carry out future plots, and at this meeting the defendant discussed ways in which they could potentially carry out future plots to include bringing new people into the fold, bringing in new group members.  And the defendant specifically spoke about a potential individual in Chicago who may have similar ideology who may want to be involved in future plots.

Q.   So the defendant's goal was to expand the number of people.  Does he make any comments about other ISIS supporters in the United States?

A.   Yes.  I believe on at least one occasion he mentioned that there was no way it was just them, there had to be more similar supporters, and that part of the idea behind their proposed plot was to inspire other similar like-minded report -- or like-minded supporters to carry out similar attacks.

Q.   In the United States?

A.   In the United States.

Q.   And where would the next attack take place per the defendant?

A.   The defendant talked about a few different opportunities. I believe he mentioned that they shouldn't do it in Pittsburgh, that they should do it in another location.

47

Q.   The second attack?

A.   Any proposed next attack.

Q.   In this final meeting, what that you haven't already talked about did the defendant say about how to avoid getting caught, about operational security?

A.   This is -- in this meeting, consistent with what they talked about before, the need to potentially go dark online, to cease communications in the time leading up to the plot, and establish new social media accounts, new handles, so that after a certain amount of time had expired after the attack, they could re-establish communications again.

Q.   What did the defendant say, if anything, about -- if they were caught, how they identify each other?

A.   The defendant stated and on multiple times alluded to the potential of being caught and being arrested and interrogated and mentioned the importance of them limiting what they knew about each other so that if they were interrogated, they would only give limited information and would not result in other members of their group being caught.

Q.   Special Agent Edquist, the defendant was arrested in conjunction with the fifth meeting?

A.   Yes.

Q.   Did you conduct a post-arrest interview?

A.   Yes, I did.

Q.   Would you summarize for the court, you know, what he said

about this terrorist plan?

A.   So in summary, the defendant acknowledged his involvement in this plot.  He said that he was involved in terrorist things.  He acknowledged that he knew that what he was doing was wrong, and there was something inside him that he believed was forcing him to do this.

Q.   Can I stop you for just a moment?

A.   Yes.

Q.   Was terrorist and terrorism, those were words he used?

A.   Yes.  Quote, terrorist things.

Q.   Did the defendant say anything about these acts as being against the United States?

A.   Yes.  He made a statement along the lines of he knew it was wrong and he knew he shouldn't be doing this against the United States based on everything that the country had provided to him and his family.

Q.   In the course of your interview, did the defendant mention other nations that he was upset with?

A.   Yes.  As part of the discussion, trying to understand why the defendant held the ideology he did and what could be underlying that, he talked about his profound sadness about what was going on in the Middle East and alluded to his animosity towards multiple governments including potentially the United States.

Q.   In terms of the origins of his terrorist desires, how

early did the defendant, in his words, date those desires?

A.   He stated that his belief, his ideologies, his support began while he was in Jordan before he came to the United States.

Q.   Which would have been years prior to 2019?

A.   That's correct.

Q.   Did the defendant make statements about knowing that these terrorist plans were wrong?

A.   Yes, he did.   On multiple occasions he said he knew what he was doing was wrong.

Q.   In the course of your interview, Special Agent Edquist, did the defendant admit to the written plan and to the targeting of the church on the North Side?

A.   Yes.   He acknowledged the church.   He acknowledged that he had provided maps.   He acknowledged that he had -- eventually acknowledged that he had provided the written guidelines.

Q.   How did the defendant characterize the area around the church?

A.   He stated that the area around the church was completely empty and that no one was around, so, therefore, that's why he was targeting it because he didn't want to hurt anybody.

Q.   In the course of your investigation, once you figured out what the target was, did the FBI make efforts to research that area and surveil that area?

A.   Yes.   After the third meeting when we made the

determination of the proposed target, we researched the church, had physical surveillance at different times in the area and then, subsequent to the actual arrest, one of my colleagues actually interviewed the pastor of the church.

Q.   Do people live in that area immediately around the church?

A.   Yes, they do.

Q.   Is there an active church congregation in that church?

A.   Yes, there is.

Q.   In the course of your post-arrest interview with the defendant, did he ever minimize his role in the terrorist plan?

A.   Yes.   On numerous occasions he minimized or intentionally misrepresented his involvement.   Instead of -- he acknowledged his involvement in it but stated that all the ideas, all the planning, all the specifics were coming from the UCE.   He also stated that the UCE threatened him and his family and that the only reason he was involved was because he worried about his own safety and his family's safety.

Q.   And you have reviewed every communication between the defendant and the FBI employee, is that correct?

A.   Yes.   Every communication and the translations as well.

Q.   Is there ever a threat or a coercion articulated by the FBI employees?

A.   No, there's not.

Q.   So, just to be clear, you said that the defendant -- there

51

were some aspects of his interview that were inaccurate.  Can you be more specific for the court?

A.   There were several instances.  He misstated how many times he met with the UCE.  He misstated time lines.  He misstated again saying that it was the defendant who came up with the idea and that was driving the specifics of it.  He misrepresented the fact that it was he who invited the UCE to join the bomb-making group instead of the other way around. That's just one of several instances.

Q.   Did he admit to buying bomb-making components to include the nails?

A.   Yes, he did.

Q.   Was he accurate in his assessment of when and how he got those?

A.   Not exactly.  I believe he stated -- he stated that he had made purchases two months ago, which is very clearly not accurate.

Q.   Because it was more like two days ago?

A.   That's correct.

Q.   Special Agent Edquist, after you interviewed the defendant and he in his own words characterized his ISIS commitment to years prior to the FBI contact, did you make some further effort to determine whether the defendant was communicating with ISIS adherents before 2019?

A.   Yes.  Subsequent to the arrest, we seized numerous

52

electronic devices from his vehicle and his home.  Also executed search warrants on numerous online accounts that he operated.  In the course of reviewing all that content, identified several instances that potentially showed his radicalization, his ideology did carry back to many years before the FBI ever engaged with him.

Q.  As early as when?

A.  For example, we seized a micro SD card from the residence that, upon review, contained numerous extremist nasheeds, video, other material, all of which had timestamps dating back to 2015, 2016, 2017.

Q.  In the course of your investigation, did you determine that the defendant was conversing with another person who is engaging in criminal conduct in support of ISIS?

A.  Yes, we did.

Q.  Can you tell the court about that?

A.  So beginning in April 2018, the defendant began to send a friend request on Facebook to an account that belonged to a woman who was eventually arrested in June 2018 for providing material -- or attempting to provide material support to ISIS. This woman would typically hack Facebook, Twitter accounts, operate encrypted online accounts, apply her own moniker that she used across all the accounts and then would use those accounts to disseminate ISIS propaganda to, to disseminate information about explosives and poisons, to recruit others to

53

join and support ISIS and potentially communicate with ISIS supporters.

Q. Did this ISIS defendant articulate a desire to commit attacks in the United States?

A. She did not articulate a desire of herself, but she promoted it for others and she provided the information to do that.

Q. Did this particular defendant share or propagate explosives instruction guide?

A. Yes, she did.

Q. This particular defendant pled guilty?

A. Yes. She was arrested in June 2018 very shortly after the defendant had been engaging with her online, and she eventually pled guilty in 2019.

Q. Through your review of the defendant's communications, was he aware that she was arrested and charged?

A. Yes. He, in fact, in his conversations with the OCE in March 2019, he made a specific reference to her moniker, not her true name, but the moniker that she used online and referenced the fact that she had been arrested based on her activities and support of ISIS.

Q. Special Agent Edquist, other than the communication with that other charged defendant, did the defendant communicate with other people using social media accounts prior to 2019?

A. Yes. On numerous instances, the defendant utilized his

primary Facebook account at the time to not only communicate with others that he perceived or appeared to perceive to be ISIS supporters and to talk about support for ISIS, but also undertook other activities such as searches, savings of videos, other similar activities that were explicitly related to support for ISIS.

Q.  And when you are talking about communications, are we talking about back and forth, not just posting likes or something to that effect?

A.  Yes.  Beyond that.  Talking about private messages between accounts.

Q.  In any of the private messages did the defendant appear to be talking to people who were in the military sphere of ISIS activity?

A.  Yes.  There was one particular account that he went back and forth with that was a potential relative of some sort who appeared to be portraying himself as being in Syria and being actively involved in some type of military activity.

Q.  If we could look at the second page of 4.4?  Special Agent Edquist, can you tell the court what this depicts?

A.  This is an image from September 2017 that the defendant sent using his Facebook account to another individual on Facebook and, as it was summarized to me by an FBI linguist, it's a reference to ISIS remaining until Resurrection Day, and you can see what is potentially the defendant holding that

55

handwritten note with the Pittsburgh skyline in the background.

Q.   And the date on this, Special Agent Edquist, is 2017, per the caption?

A.   September 10, 2017, correct.

Q.   Special Agent Edquist, if you would look at Exhibit 5.1? Tell the court what we're looking at there.

A.   This exhibit is a screenshot of the likes of the defendant's SoundCloud account that was pulled on February 26, 2019.

Q.   And is it the sum total or is it representative?

A.   It's just representative.  A few of the pages of dozens of likes of nasheeds and other videos that had been posted to SoundCloud that the defendant subsequent liked.

Q.   Is the content overtly ISIS as labeled?

A.   Overtly ISIS or, if not ISIS explicitly, extremist in nature in supporting the use of extremist violence.

Q.   Special Agent Edquist, you have explained that your focus as an FBI agent is international terrorism.  Could you characterize for the court how intensive the FBI investigation into the defendant was?

A.   Every investigation like this that involves a lot of physical surveillance, undercover interaction, and an active threat, an individual expressing a desire to conduct an attack, is extremely resource intensive not only within the

squad running the investigation but across the entire office and across the entire FBI, and this particular investigation leveraged resources from various parts of the organization.

Q. Outside of Pittsburgh?

A. That's correct.

Q. Special Agent Edquist, if a bombing did take place at a church in Pittsburgh in the name of ISIS, would that have affected the FBI and the U.S. government?

A. Yes, it absolutely would. Any terrorist attack in the United States, any attempted terrorist attack in the United States has a profound societal impact, but beyond society, has an impact on the government, specifically the FBI. This particular proposed attack, if carried out on a house of worship, would have an even more profound impact. It would result in changes in priorities, potential surges in resources. It would have impacts on other pending investigations just given the nature and potential for destruction that was involved.

MS. SONG: Your Honor, we move to admit all of these exhibits. This witness has laid foundation for essentially all of them. I didn't publish every single one, but we offer all of the exhibits and the criminal complaint and other materials that the court's already made clear it has reviewed.

THE COURT: Any objection?

MR. LIPSON: Your Honor, no objection.

57

THE COURT:  They're admitted.

MS. SONG:  Those are all my questions, Your Honor.

THE COURT:  Mr. Lipson?

MR. LIPSON:  Your Honor, may I ask for an opportunity for a brief recess.  I feel like we've been at it for a little -- you know, a little over an hour and a half, and I thought maybe everyone could take a break.  It would be great to confer with Mr. Alowemer.

THE COURT:  We'll take 15 minutes.  That means 10:17 I'll be back on the bench.

THE CLERK:  All rise.  Court is adjourned until 10:17.

(Recess.)

CROSS-EXAMINATION

BY MR. LIPSON:

Q.  Good morning, Special Agent Edquist.

A.  Good morning, sir.

Q.  You understand you're still under oath?

A.  I do.

Q.  Just going into the background of your involvement with this investigation, were you the lead investigator throughout the course of this investigation?

A.  Not throughout the entire investigation.

Q.  Can you describe how that came about that you eventually became the lead investigator?

58

A.   So the investigation was initiated in 2018.  I joined the Pittsburgh JTTF in December 2018 and, approximately a month after I started, the case was given to me to run as the primary case agent.

Q.   That was in approximately January of 2019?

A.   Late December, 2018, early 2019, yes.

Q.   Just to situate it for the court, the first contact by an undercover agent in this case occurred on March 8th of 2019, correct?

A.   March 8th is when the friend request was sent to the defendant, that's correct.

Q.   And that's the online covert employee known as the OCE sent a Facebook request to Mr. Alowemer on a Facebook account associated with him, correct?

A.   That is correct.

Q.   He didn't reach out to the OCE, right?

A.   He did not.

Q.   Your testimony today regarding what occurred at these meetings is from your review of the transcripts and listening to the audio of those meetings, correct?

A.   That and discussions with the UCE and CHS following the meetings.

Q.   And to be clear, you weren't at those meetings that Mr. Alowemer had with the UCE or the CHS from April to June of 2019, correct?

A.   That's correct, I did not participate in any of the meetings.

Q.   And you weren't in any meeting at any point throughout the course of this investigation with Mr. Alowemer except for on the day of his arrest on June 19th, 2019, correct?

A.   That is correct.

Q.   And so your testimony today about your knowledge of what Mr. Alowemer said or what was said to him or what you interpreted as what he meant was from your review of the transcripts and your listening to the audio of those transcripts, correct?

A.   That is correct, and discussions with those who were engaging with him.

Q.   I want to direct your attention to some things that you testified to before on direct.  At one point you started talking about the roles of the different individuals, of the three individuals that were involved in this plot, correct?

A.   That's correct.

Q.   And there's three individuals.  There was the UCE, the undercover employee; the CHS, the confidential human source; both of whom had affiliations with the FBI; and then there was Mr. Alowemer, correct?

A.   That is correct.

Q.   And based on your review of the transcripts and you're having been the lead investigator -- or the lead on this whole

investigation, the UCE, the undercover employee, held himself out to be an expert on explosives, correct?

A.   That is correct.

Q.   He held himself out to be a brother affiliated with ISIS and that he had experience in creating these weapons of mass destruction, bombs, correct?

A.   That is correct.

Q.   It wasn't Mr. Alowemer's expertise.  That was the UCE's expertise, correct?

A.   Yes, the bomb-making was the UCE's expertise.

Q.   And in the first meeting on April 16th of 2019, he made that clear to Mr. Alowemer, right?

A.   Yes.  He made it clear that he had a background in cooking or explosives making.

Q.   And Mr. Alowemer didn't say, hey, you're now the bomb expert.  He's like, I'm an expert on making bombs, and that fixed his role in the group as the bombmaker, correct?

A.   That is correct.

Q.   A confidential human source, also known as the CHS, was the money guy, right?

A.   That's correct.

Q.   His expertise and what he made himself out to be was someone that had a history of doing international money transfers in assistance for ISIS goals, is that correct?

A.   Yes, that was part of his persona.

61

Q.  That was conveyed to Mr. Alowemer as well by the CHS, correct?

A.  Yes, it was.

Q.  And he said, I've been doing this for a while and I know how to transfer money internationally to get money either from ISIS or to send money to ISIS, correct?

A.  I don't recall if he said, I've been doing this a while, but yes, he articulated that he has experience in doing that.

Q.  And Mr. Alowemer's role was information, correct?

A.  In what regard?

Q.  He was charged in that first meeting you discussed that you will gather information about potential targets because you're from Pittsburgh and you know what's going on here.  Is that correct?

A.  Yes, that was part of his role.

Q.  I don't want to belabor it, but we have an explosives expert, we have a money resource expert, and we've got an information expert, correct?

A.  That is correct.

Q.  We know just from your investigation of Mr. Alowemer that his expertise in the field of information is just simply he had lived in Pittsburgh for approximately 2 1/2 years as of March of 2019, is that correct?

A.  As of that time, yes, he had lived in Pittsburgh 2 1/2 years.

Q.   And during that time he was going to high school, correct?

A.   Yes, he was going to high school during that time.

Q.   And he lived with his parents and his siblings, correct?

A.   That is correct.

Q.   I want to talk to you about the bay'aa video.  The bay'aa video, for the record, is just the video that Mr. Alowemer sent to the online covert employee on, I believe, April 13th of 2019, correct?

A.   He did send it, but it was on April 12th.

Q.   It was on April 12th?

A.   That's correct.

Q.   My apologies.  And that is a video in which he recited standard language pledging allegiance to the leader of ISIS and to support ISIS generally, correct?

A.   Yes.  And it appeared to closely follow what he had previously told the OCE the language that he was going to use for his bay'aa because they had talked about it on multiple occasions.

Q.   You're an expert in -- well, let me say you have experience in investigating international terrorism, correct?

A.   That is correct.

Q.   So you're familiar with the bay'aa language, correct?

A.   Yes, generally.

Q.   And it's fixed language, correct?

A.   Not in every scenario.  There's different language that

people use.  Some of the language is fixed, but different individuals use different language when they actually do their bay'aa.

Q.  So for example, if one were to Google search bay'aa pledge, some language would pop up on Google to say this is the general standard language in a bay'aa pledge, correct?

A.  I'm sure that's the case.  I can't speak to it personally.

Q.  But given your background, that would not surprise you, right?

A.  It would not surprise me, given what one can find on the internet, that there's language about conducting a bay'aa.

Q.  We'll get into what one can find on the internet shortly, but all right.  You agree, though, that the bay'aa that Mr. Alowemer sent to the OCE on April 12th of 2019 was from a script, correct?

A.  Yes.  I believe that's accurate.

Q.  Special Agent Edquist, I want to direct you to a document which has been marked for identification as Defense Exhibit 2, a copy of which I provided to the counsel for the government and which I believe the court has, and there's, I guess, four stacks next to you.  I think it would probably be the second stack, depending on which order, the second or the third stack, but in the top left it should say DX2.  You probably are familiar with this document which was produced by the government in connection here at document 23.  Looking at this

64

document, do you know what this is?

A.  This appears to be the transcript of the -- some of the conversations between the translated conversations between the OCE and the defendant.

Q.  Okay.  And your name appears on the first page of that document as the requesting official and office and that says -- correct?

A.  That's correct.

Q.  And on there it says SA, which I assume means Special Agent, Nicholas D. Edquist, PG, is that correct?

A.  That is correct.

Q.  What does PG stand for?

A.  Pittsburgh.  That's how we notate the Pittsburgh office, the Pittsburgh division.

Q.  Even though you were working out of the Chicago office at that time, because this investigation was local here to Pittsburgh, that's why you put PG?

A.  No, I was working in the Pittsburgh office at the time. I've since moved to the Chicago office.

Q.  Oh, my apologies.  I understand now.  Just flipping through this document, is this consistent with what you understood the United States government produced to defense counsel in connection with a summary of the translated communications between Mr. Alowemer and the online covert employee?

65

A.  Yes, that's correct.

Q.  And in the bottom right you'll see that the first page of this document is Bates stamped GOVT_19219_00319, correct?

A.  That is correct.

MR. LIPSON:  Your Honor, for purposes of this hearing and just for ease of reference, when I refer to a Bates number, I intend to refer to the last three numbers of that Bates.  I think that will --

THE COURT:  That's fine.

MR. LIPSON:  -- will make everyone's life a lot easier.

Q.  So Agent Edquist, the online covert employee made first contact with Mr. Alowemer, correct?

A.  That is correct.

Q.  He befriended Mr. Alowemer on March 8th of 2019, right?

A.  Yes.  He sent the friend request on that date.

Q.  The online covert employee was the first person in that communication ever to mention a bay'aa video, correct?

A.  I believe that's accurate.  If you want to point me to the page that you're referencing?

Q.  Yes.  Will you turn to page 336 of what's been marked as Defense Exhibit 2?  And direct your attention to the OCE's second-to-last statement on page 336 at the bottom.

A.  Yes.  I see that.

Q.  And there the OCE says, the brothers may ask you to

provide a video with your bay'aa to the commander of the believers.

Is that correct?

A.   That is correct.

Q.   And you'll notice that bay'aa right there has a footnote next to it which connotes that this is the first time it's being referenced in the transcript because at the outset of these transcripts there's a key for certain terms that are said in Arabic that has important purposes for the purpose of the investigation, is that correct?

A.   That is correct, yes.

Q.   And the bay'aa referenced here on page 336 by the OCE has a footnote -- has a superscript footnote next to it, correct?

A.   That is correct.

Q.   And thereafter, that footnote doesn't appear in this transcript.  It's just in this first instance, right?

A.   I believe that's accurate, yes.

Q.   Now, briefly, I want to just -- if you turn back to the previous page, page 335, if you look at the top of the page, it will indicate that this conversation occurred on March 16th of 2019, correct?

A.   That is correct.

Q.   Turning back to page 336, in response Mr. Alowemer says, brother, you know that I want to do nafir to Syria.

Can you describe to the court what nafir means?  And

n-a-f-i-r.

A.   It's my understanding of nafir, it has multiple meanings. It can mean immigration, but in this context that the defendant was speaking, it has a specific connotation of traveling to conduct jihad.

Q.   And during the course of your investigation, it's your understanding that when Mustafa Alowemer was referring to nafir, he meant returning back to his home country, Syria, correct?

A.   That is correct.

Q.   Mr. Alowemer's from Syria, right?

A.   Yes, he is.

Q.   You did some background about his path to the United States, correct?

A.   That is correct.

Q.   You're familiar with some of the sentencing document that defense counsel has submitted with this -- in connection with this hearing, correct?

A.   Yes, I am.

Q.   And Mr. Alowemer is a refugee from Syria and spent four years as a refugee in Jordan before coming to the United States, correct?

A.   Yes.  I believe approximately four years.

Q.   And when I say refugee from Syria, I'm referring to the Syria civil war that broke out in 2011, correct?

A.   Yes.  I'm familiar with that, yes.

Q.   You're familiar with that conflict, correct?

A.   Yes.

Q.   That ongoing conflict, correct?

A.   That is correct.

Q.   Turning your attention to 337, top of the next page, OCE says, in the video you simply state your pledge of allegiance and send it to me either on -- and there is a redacted-out term which I assume is another social media platform -- or on Facebook, whichever is safer.

     Is that correct?

A.   That's correct.

Q.   And Mr. Alowemer says, do they want that now?

     Is that right?

A.   Yes.

Q.   And do you assume from that that Mr. Alowemer was referring to the ISIS brothers when he said they?

A.   Yes, that would be the interpretation.

Q.   So he's asking the online covert employee what he believes the ISIS brothers want Mustafa to do, correct?

A.   Yes, he's asking do they want it right now.

Q.   And the OCE, based on their communications, is holding himself out as an authority on what the ISIS brothers would want Mr. Alowemer to do in this situation?

A.   Yes.  In multiple instances he holds himself in that

authority but also states numerous times I will have to check with the brothers. So he doesn't have full executive authority.

Q. He's a go-between between leadership of ISIS and Mr. Alowemer or at least holding himself out to be that, correct?

A. I wouldn't say leadership. That can have a lot of connotations, but members of ISIS, yes, that is an accurate representation.

Q. Real-life members of ISIS?

A. That is correct, yes.

Q. International terrorist organization?

A. Yes.

Q. OCE responds, not right this moment. Whenever you get a chance to do so.

Right?

A. Yes.

Q. Mr. Alowemer says, okay. Allah willing. Does that mean I cannot meet the brothers before I pledge allegiance?

Is that what he says?

A. Yes.

Q. And OCE says, I think so. And for security reasons, of course.

Is that correct?

A. That is correct.

70

Q.  And Mr. Alowemer says, Allah willing, my brother.

Right?

A.  That's correct.

Q.  And then OCE says, another thing that I did not understand but I was told that you know for sure, something called Google card.  But at this point bay'aa is the most important thing.

Is that what he says?

A.  That is correct.

Q.  Skipping a little bit further down, Mr. Alowemer says, I know it, brother.  I will talk to you later.  My father just got home and I don't want him to know.

Is that right?

A.  That's right.

Q.  If you could turn to page 338?  This is a communication that Mr. Alowemer sent to the OCE on March 18th of 2019, correct?

A.  That is correct.

Q.  That's two days later.  And it's on the immediately following page.  So this is the next communication after that previous conversation on the 16th ends and Mr. Alowemer sends to the OCE, right?

A.  Yes, the next substantive conversation.

Q.  And what Mr. Alowemer says here is, peace be upon you, my noble brother.  I know I'm responding late to you, my brother. But praise be to Allah, I'm in trouble.  The police visited my

residence and wanted to interrogate me. They told me that all my electronic devices to include my cellphone and computer are being monitored and that I'm under surveillance. They told me I won't be getting my green card nor will I get a passport. They also told me that I have an interview with the American intelligence. That's why I don't want to put my siblings -- and then in block quotes family -- because I imagine this was translated from Arabic into English, is that correct?

A. That is correct.

Q. I don't want to put my siblings, family, into any trouble. I'm late to respond to your message, but a number of supporters living in the U.S. were arrested because of Facebook including Hind Salah Eddine and a brother from Uzbekistan. Please forgive me, my brother, and ask the brothers to forgive me, too. I don't want to sever my contact with you, but can you send me a number for a brother in Turkey, for if Allah allows it and I was able to escape from the hands of the polytheists, I will do nafir. Please forgive me, my brother. Please ask the brothers to forgive me.

Is that what the transcript says?

A. It is.

Q. What is your interpretation of this statement by Mr. Alowemer to the OCE?

A. My interpretation is Mr. Alowemer is potentially having thoughts about who he's talking to, what he might be getting

himself involved with and is looking for a way out, potentially using an excuse, and is trying to find a way to off-ramp himself. But what's notable is even within that he's still saying can you send me a number for Turkey because I still want to conduct nafir and travel to Syria, or I want to travel to Turkey to get to Syria.

Q. To this point -- and this is March 18th. This is ten days after the Facebook request. Mr. Alowemer is repeatedly referencing desire to go back to Syria, correct?

A. That is correct.

Q. In fact, there's an instance in which -- and I can direct you to it, but there is an instance in which the OCE asked, what do you prefer? Lone wolf activities here in the United States or nafir? And Mr. Alowemer responds, I would like to do regular nafir. I want to immigrate back home to Syria, correct?

A. Yes. Throughout this investigation he made that clear, but they're not one or the other. He made clear he wanted to do an attack. Eventually he made clear he wanted to do an attack here, get away and ultimately do nafir to Syria.

Q. You do recall, though, that the OCE very early on in their communication says, what do you prefer to do? What do you want? And he said he would like to go back to Syria, is that right?

A. Yes, early on in their conversations that's what he

articulated.

Q. So on March 16th, the OCE asked him to do a bay'aa pledge. On March 18th, the next time Mr. Alowemer contacts him, he comes up with this ruse that his home was raided by the police. Correct?

A. That is correct.

Q. Because you, being the lead FBI agent on this investigation at the time, I'm sure did some background and confirmed there was no police raid of Mr. Alowemer's home, right?

A. That is correct.

Q. That was a lie that he told the OCE?

A. Yes. It was possible he was talking to immigration attorneys and there was conversation about why his potential immigration situation was being delayed, so there may have been elements of truth in there, but overall the allegation that the police came and interrogated him through our investigation had no bearing.

Q. This is an instance in which he used elements of truth but ultimately told a lie in order to get what he wanted from the OCE, correct?

A. I don't know if it's what he necessarily wanted. I think it's just him trying to find potentially a way to back out of his current conversation, but again, what's notable is he's still asking for contact, and then he reinitiates conversation

74

on his own accord two days later and pretends as if nothing happens.

Q.  Oh, no, Mr. Alowemer did not get off that ramp, but it is notable that shortly after the request for the bay'aa that he made this statement, correct?  That did happen?  Let me ask you that.

A.  It did happen.

Q.  What I think is notable might be different than what you think is notable.

I want to direct your attention to 339 about two-thirds of the way down the page -- well, if you could review -- if you could review the communication on that page silently to yourself?

A.  The whole page or is there a specific part that you want to focus on?

Q.  From messages sent on March 21st, 2019, to about they hacked into all my accounts.

A.  Okay.  Okay.

Q.  Towards the bottom -- so this is Mr. Alowemer here three days later on March 21st continues this farce about the police involvement and the monitoring of his phones, correct?

A.  That's correct.

Q.  And the OCE, the undercover FBI online employee, says, brother, this whole thing is not normal.

Is that correct?

75

A.    That is correct.

Q.    And Mr. Alowemer says, I need some time alone with Allah.
Is that right?

A.    That is correct.

Q.    I want to direct your attention to page 360 in what's been marked as the same exhibit, Defense Exhibit 2.  If you actually turn to page 359, the transcript indicates that these are communications that occurred on April 6th of 2019, correct?

A.    That is correct.

Q.    And then turning back to page 360, at the top the OCE again brings up the bay'aa video.  Says, that's for sure, my brother.  And by the way, the brothers trust the people I trust, but since you have not made the bay'aa pledge allegiance, they may refuse to record their voices at this time, quoted a comment, and then it says, may Allah protect you too, my dear.
Is that what the OCE says?

A.    That is correct.

Q.    And then Mr. Alowemer makes a response but not to the issue of the bay'aa, and the OCE again says, I don't mean that you have to do the bay'aa now.  You know your security situation better than I.
Is that right?

A.    That's right.

Q.   That's a question.  Are you in communication with the OCE between -- throughout this time?

A.   Yes.  The OCE and the handling agent as well.

Q.   So the OCE also knows, based on information either you provide or that you both received, that Mr. Alowemer did not -- his home was not raided by police, correct?

A.   Yes.  I believe the OCE was aware of that.

Q.   And the OCE knows that none of his phones are being monitored at that time, correct?

A.   That is correct.

Q.   And Mr. Alowemer responds, and I want to make the bay'aa soon.  However, my security situation, as I told you, is kind of difficult.  Please forgive me and ask the brothers to forgive me.

     Correct?

A.   That is correct.

Q.   And when Mr. Alowemer says ask the brothers to forgive me, he's referring to ISIS brothers, right?

A.   That is correct.

Q.   And he seems to have at least some concern and desire for the OCE to convey to the brothers his apologies for not creating this pledge, correct?

A.   I don't know if that's in relation to having not sent the bay'aa or the potential that because of his security situation he might put them including the OCE at risk, at some type of

security risk.

Q.  Whether it's either, Mr. Alowemer's concerned?

A.  Yes.

Q.  He asked for them to forgive him, right?

A.  That's correct.

Q.  Turning your attention to page 371 of Defense Exhibit 2, actually, once again, if you turn back to page 370, you'll see that this is a text communication that occurs on April 10th of 2019, correct?

A.  Correct.

Q.  This is a full month after he's been communicating with the OCE, right?

A.  Right.

Q.  Their first communication was on March 9, right?

A.  That is right.

Q.  And the OCE asked for the bay'aa video on March 16th, correct?

A.  Yes.

Q.  And it's April 10th and that still has not been sent, correct?

A.  That is correct.

Q.  And turning you to the top of page 371, the OCE says, and the brothers were under the impression that you made the bay'aa.  So I told the brother that you have not made the bay'aa yet.

78

And Mr. Alowemer responds to another aspect of that prior -- is that correct, that the OCE says that?

A.   That is correct.

Q.   And Mr. Alowemer says, can I make the bay'aa while masked? And then the OCE says, I can ask the brothers about making the bay'aa while masked.

Is that right?

A.   That is right.

Q.   You can record the bay'aa, and send it to me by any method, even by email, then delete it from your device as soon as you send it.

Is that what the OCE says?

A.   That is correct.

Q.   And Mr. Alowemer says, do you mean audio recording?

Is that right?

A.   That's correct.

Q.   And then further down, the OCE says, video recording.

Correct?

A.   That is correct, video recording.

Q.   So you interpret that as Mr. Alowemer is asking can I do this by audio and the OCE says, no, it has to be video?

A.   That's one interpretation.  Another possibility is he's clarifying an audio recording and the OCE is clarifying, no, a video recording.

Q.   And by clarifying, he's explaining what's necessary from

reportedly what the brothers and ISIS is telling him is necessary, correct?

A.   Yes.   I guess what I'm trying to relay is by the defendant asking do you mean audio recording doesn't necessarily imply he didn't want to do a video recording.   He's simply asking an audio recording.

Q.   Fair enough.   The OCE then says, you can wear the same mask as in the above picture, right?

A.   Yes, that's correct.

Q.   And that's a mask that is kind of a scary mask.   It has kind of a skull, almost like a -- this was April of 2019.   So it wasn't COVID yet, but it's kind of like a COVID mask with a skull face on it, correct?

A.   That's accurate, yes.

Q.   And the OCE is saying you can wear the same mask as in the above picture that Mustafa had previous -- Mr. Alowemer had previously sent, correct?

A.   That is correct.

Q.   And then the OCE goes, send me the video when you get a chance and delete it from your device immediately after sending it to me.   Do you know the text of the bay'aa?

Is that what he says?

A.   That's correct.

Q.   And Mr. Alowemer says, Allah willing, my brother.   Yes, I know?

80

A.   That's correct.

Q.   And so that pattern that dovetails with what we were discussing earlier, that there is this, although there may be different versions, there's kind of a fixed pledge that this bay'aa typically includes, correct?

A.   That is accurate, yes.

Q.   And the OCE is saying, are you aware of what the text is? And Mr. Alowemer is saying, yeah, I know that.

A.   Yes.

Q.   I'll direct your attention to page 374.  This is a text communication between Mr. Alowemer and the OCE on April 12th of 2019, so two days after the last communication.  Is that right?

A.   That is correct.

Q.   And it is in this conversation that Mr. Alowemer sends a recorded video of him doing the bay'aa pledge, is that correct?

A.   That is correct.

Q.   And directing your attention to the bottom, the third-to-last OCE comment on this page, he says, now the brothers will be ready to meet.

Is that right?

A.   That is right.

Q.   I'd like to direct your attention to what's been marked as Defense Exhibit 3, which would be right there on the ledge

next to the witness box.  This is what was produced by the government in connection with discovery in this case as document number 24.  Do you recognize that document?

A.  Yes, I do.

Q.  What is that document?

A.  This is an accumulation of the in-person -- or the transcripts of the in-person meetings between the defendant and the UCE and CHS.

Q.  And on the front page it says:  Requesting official and offices and it says Edquist comma Nicholas Daniel, correct?

A.  Correct.

Q.  So you requested that this transcript -- sorry.

A.  Sorry.

Q.  You requested that this transcript was made in connection with the investigation, correct?

A.  That is correct.

Q.  And you reviewed this transcript?

A.  I did, yes.

Q.  Do you have any reason to doubt its accuracy?

A.  No.  I mean, there's potential probably minor words here and there, but nothing material.

Q.  Is that also consistent with your understanding of what was marked as Defense Exhibit 2, the transcript of the communications with the OCE, that you believe that's correct and accurate as well?

A.   Yes.  The only thing I want to specify about these is they're audio recordings and they're required to have interpretation based on what the person listening to it can hear.  So there may be misinterpretations.  Whereas, what's in the written communications, there is no ambiguity.

Q.   That makes sense.  I want to direct your attention to page 498 of what was marked as Defense Exhibit 3.  Once again, by 498, this is the same Bates convention as Defense Exhibit 2.  498 -- one moment.

Based on your knowledge of this, this is a -- this is a transcript of the in-person meetings with Mr. Alowemer on June 2nd of 2019.  I see, for the record, you're looking further back in the transcript to confirm the date.  I'll give you time to do that.

A.   Yes.  June 2nd, 2019.

Q.   And just to reorient the court, this is the meeting where Mr. Alowemer presents the plan which ultimately became the subject of the plot that they engaged in, is that correct?

A.   That is correct.

Q.   And so turning back to page 498, Mr. Alowemer tells the UCE, I didn't want to the bay'aa allegiance.  I don't wanna, I didn't want to communicate with you or with --

        MR. LIPSON:  One moment, Your Honor.  May I have a moment to confer with counsel for the government?

     (Off-the-record discussion.)

83

Q.   So what he says is, I didn't want to -- I didn't want to the bay'aa allegiance.  Bay'aa is spelled b-a-y-'-a in this instance.  It could also have been spelled b-a-y-'-a-a.

I don't wanna, I didn't want to communicate with you or with Abu Hafsa, and then I just thought about it.  There's a -- I don't have any excuse.  I can go.  I can go and dot, dot, dot, jihad in the name of God.  I can travel.  I mean, I have the opportunity when you told me when.  And then there is an area that was redacted.  UCE responds yes.  And Mr. Alowemer then says, not Abu Hafsa.  Our brother here.  There is a brother, blank, redacted, in Iraq and he's the one who got me in contact with a brother from Britain, another brother, I don't know him, the other brother, who spoke with you and Abu Shami, S-h-a-m-i, I suspect, and then I have no excuse.  Why would I say?

Is that correct?  Is that what Mr. Alowemer says?

A.   That is correct.

Q.   So on your direct testimony you stated that two days after requesting a weapon, that Mr. Alowemer submitted a bay'aa video.  That is technically accurate, correct?

A.   That is correct.

Q.   From what you read through just now on cross-examination, the process by which Mr. Alowemer submitted that bay'aa video was over the course of approximately a month of conversations between the OCE where the OCE brought up the bay'aa video

affirmatively on three separate occasions before it was ultimately sent on April 12th.  Is that correct?

A.   That is correct.

Q.   Yet that bay'aa video was played by the government at the preliminary hearing in this case, correct?

A.   Yes, that's correct.

Q.   That bay'aa video was also played by the government at the detention hearing in this case, is that correct?

A.   That is correct.

Q.   The bay'aa video is referenced in the criminal complaint in this case, is that correct?

A.   That is correct.

Q.   Now, earlier you mentioned that there's a lot of stuff on the internet that relates to ISIS, correct?

A.   That is correct.

Q.   And throughout your testimony on direct, you referenced materials that Mr. Alowemer sent to either the OCE or the UCE over the phone throughout the course of the investigation, right?

A.   That is correct.

Q.   Your presumption is that Mr. Alowemer was able to find that on the internet, correct?

A.   Yes.  In specific, certain avenues or certain venues on the internet.

Q.   Certain venues.  And I note that there was referenced in

earlier affidavit to Mr. Alowemer accessing aspects of the dark web, but you can get these materials just on the regular, old internet, not the dark web, correct?

A.  Certain of these materials.  There's, I think, a lot of the technology companies have been doing a better job of getting rid of them to help prevent the dissemination of them, but the defendant was known and actively involved in several groups on encrypted messaging application that is widely known for being used to disseminate these types of materials.

Q.  And it's fair to say that he probably either found these on the internet or that these items were sent to him or were sent to a group that he was a part of on social media, correct?

A.  That is accurate.

Q.  And certain social media platforms automatically download materials if you're part of a certain group and one of its members uploads that material to that group, correct?

A.  That is correct.

Q.  WhatsApp is an example of that where if you're on a group chat and someone sends a photo of themselves on a sunset, all of a sudden that sunset downloads on everybody's phone, correct?

A.  I believe that's accurate, yes.

Q.  And that's true of other social media platforms, correct?

A.  I can't definitively say all of them, but yes, there are

platforms like that.

Q.   Was a forensic review done of Mr. Alowemer's devices to determine if he affirmatively sought out and downloaded some of these materials or if they automatically downloaded onto his phone by virtue of being a member of one of these social media groups?

A.   It was not, no.

Q.   It was not done.  So you can't say whether or not that happened?

A.   No.  We can just say that he had access to those materials because they were on his devices.

Q.   And in fact, on direct examination you said that these materials were found on his phone, correct?

A.   Yes.  On several devices that he possessed.

Q.   But sitting here today, you can't say by the mere fact that it was found on his phone that he actively and affirmatively downloaded those materials, correct?

A.   Well, there are materials that were downloaded, for example, to his desktop computer that he would have had to affirmatively downloaded.

Q.   That would be a separate issue.  I'm talking about on his phone.

A.   On his phone, yes, a forensic examination was not done to discern what was downloaded versus what was just sent to him.

Q.   Throughout your direct testimony you referred to the

battle of Baghuz, correct?

A.   Correct.

Q.   Can you spell Baghuz?  I don't want to misspell it, but perhaps for the court reporter and the record.

A.   There's multiple transliterations, but how it's generally been spelled in these documents is B-a-g-h-u-z.

Q.   And that is a battle that occurred involving an ISIS defeat in what is currently the borders of Syria?

A.   Yes.  In Syria.

Q.   And it was a big battle, correct?

A.   Yes.  It is notable primarily because it was the last stronghold of ISIS' physical caliphate in Iraq and Syria.

Q.   Isn't it true that in every reference, there aren't many, but of the references that Mr. Alowemer makes to Baghuz throughout this investigation he never once mentions the United States in connection with that battle?

A.   I would say that's not accurate.

Q.   Do you have an instance in which he refers to the United States' involvement in Baghuz?

A.   Yes.  During the first meeting with the undercover and with the UCE and CHS on April 16th.  He's talking about seeing a U.S. service member in the woods and that if he had a weapon, he would have killed him.  He articulated the reason why is he's with the U.S. military.  They killed our sisters in Baghuz.

Q.   We'll come back to that.   Other than that instance, when he refers to the Yazidis that he knows in Pittsburgh, does he refer to the Yazidis' involvement with the United States government?

A.   I do not believe so.

Q.   In any other reference to Baghuz throughout this does he reference and in particular targeting Yazidis or any sort of celebration that they may have, does he refer to the United States' involvement in that particular battle?

A.   When talking about the Yazidis specifically?

Q.   Yes.

A.   I do not believe so.

Q.   I want to direct your attention to Government Exhibit 2.4. I don't know if you have --

MR. LIPSON:   Your Honor, if I could ask the member of the government team to publish Government Exhibit 2.4 to the monitor in front of the witness?

Q.   Agent Edquist, this is a nasheed, spelled n-a-s-h-e-e-d, which is a poem that Mr. Alowemer claimed to have written and performed for the undercover agents, correct?

A.   That is correct.

Q.   Can you review that very briefly the words on Government Exhibit 2.4?

A.   Yes.   Okay.

Q.   Where does it reference United States government?

89

A.   It does not specifically reference the United States.

Q.   Where does it reference any government?

A.   An actual acknowledged government or an entity such as ISIS?

Q.   An actual acknowledged government.

A.   It does not.

Q.   About the middle of the page it says, it references defeating the Shiites, is that correct?

A.   That's correct.

Q.   Did you say that the fundamental nature of this nasheed is religious in nature?

A.   I would say its violence in support of an extremist ideology is the underlying premise of the entire nasheed.

Q.   Fair enough.  I don't know to be -- let me rephrase that. Is this nasheed portraying a fundamentalist religious ideology in the advocating for jihad and defeating the enemies of that ideology?

A.   It is expressing a religious ideology, but I think what's important to note is that it's clearly directed to Abu Bakr al-Baghdadi who was the leader of ISIS at that time.  ISIS is a fundamentalist organization that does not believe in man-made government.  You can't separate politics and governance from religion.  They're one in the same.

Q.   There's references to Allah, correct?

A.   Yes.

Q.   There's references to jihad, correct?

A.   That is correct.

Q.   Jihad is considered like a holy war?

A.   Yes.  It literally means struggle, but it's used for violence.

Q.   There's reference to paradise, correct?

A.   That is correct.

Q.   And that was a poem, Government Exhibit 2.4 is a poem that Mr. Alowemer claimed to have written and performed for the undercover agents, correct?

A.   Yes.  He sent the lyrics to the UCE, he sang it, and he also sent a recording of him singing it to the OCE.

Q.   And the last line of that is, I will spill my blood for the victory of my religion.

     Correct?

A.   That is correct.

Q.   Turning once again back to some of the materials that were found on Mr. Alowemer's phone and some of which that he sent to the agents during the course of this case, you testified that at times certain videos and certain propaganda, ISIS propaganda was sent to the undercover agents, correct?

A.   That is correct.

Q.   When you say ISIS propaganda, what do you mean?

A.   That's a generic term, but it could be any mix of news releases, videos to promote the group, to promote its

ideology, to promote the use of violence in support of that ideology.

Q.   And that's a common core communication of ISIS to the greater world, this propaganda that they put out usually on the internet, correct?

A.   That is correct.

Q.   And it glorifies the objectives of ISIS, correct?

A.   That is correct.

Q.   And at the time that this investigation occurred, ISIS was operating in Syria, is that right, primarily in Syria?

A.   At the time he was sending the materials?

Q.   Yes.

A.   As I mentioned before, I mean, by that point they had physically lost just about all of their caliphate.  There is obviously still ISIS operations members, supporters physically located in Syria, but at that point they did not have the caliphate like they did several years before.

Q.   Is it fair to say that ISIS I guess put itself on the worldwide map, so to speak, based on their military victories in Syria?

A.   I guess how would you -- could you clarify that question?

Q.   I'll strike the question.  I'll move on.

     Turning your attention to Government Exhibit 2.9, if I could ask the government team -- well, that was quick.  Thank you.

On direct testimony you referenced the news release by ISIS and al-Baghdadi that's referenced in this screenshot by Mr. Alowemer, correct?

A. That is correct.

Q. And you testified that Mr. Alowemer sent this to -- I believe this would be the UCE during the course of their communications, correct?

A. That is correct.

Q. And you noted on direct that the news release from ISIS references Africa, correct?

A. Yes, it does.

Q. Does it reference a country in Africa?

A. I don't believe it specifically references -- it references the various provinces that had developed as ISIS was losing its caliphate, its physical caliphate in Syria and Iraq. It was focusing on its various branches in different parts of the world.

Q. When it's referencing Africa, it is referring to the continent, correct?

A. I believe so, because there's multiple branches in the continent of Africa.

Q. So no specific government is referenced in this news release, correct?

A. Not that I recall.

Q. On direct the government walked you through a video of an

explosion that occurred at Government Exhibit 4.7, which I do not need you to call up, please. Do you know where that occurred?

A. I do not know exactly where that occurred.

Q. Judging by the images in there, it appears that it occurred somewhere in the Middle East; is that fair to say?

A. I think that's a fair assumption.

Q. Could it have occurred -- could it have been shot and filmed in Syria?

A. That's very possible, yes.

Q. I'm going to walk -- I want to go back to what is Defense Exhibit 2, which was document number 23 as produced by the government in this case to defense counsel. I want to direct your attention -- I want to talk about these discussions by Mr. Alowemer about nafir. If I can direct you to page 321 to 322. Now, if you're on 321, this document starts on page 319. The first page of translated communications over the course of months of communications with the online covert employee, this is the first page of transcribed material between Mr. Alowemer and the OCE, correct?

A. That is correct.

Q. That's page 321?

A. That's correct.

Q. And the date of this communication was on March 8 of 2019, correct?

A.   March 8th is when the friend request was sent.  I think the defendant accepted it -- I don't know the date that he accepted it, but they began conversing on March 9th.

Q.   My apologies.  Yes, March 9th of 2019.  The last line the page Mr. Alowemer says, indeed, I ask Allah to relieve us and grant us nafir.

Correct?

A.   That is correct.

Q.   And then that footnote appears right next to nafir because that's first time it's mentioned, correct?

A.   That is correct.

Q.   On the first page of the transcripts of anything transcribed in this case, Mr. Alowemer is talking about nafir, correct?

A.   That is correct.

Q.   And that is -- and in the context in which Mr. Alowemer has discussed nafir throughout this investigation, that's the desire to return back to Syria, his home country, and fight for -- fight for his country?

A.   I don't know if I would say fight for his country.  Fight for ISIS.

Q.   Fight for ISIS?

A.   The group that he's supporting, yes.

Q.   Is nafir a term exclusively used by ISIS or is that something that's been used before even ISIS came into

existence?

A.   It's not a term used exclusive by ISIS.

Q.   It is not a term used exclusively by ISIS?

A.   That is correct.

Q.   In response, on page 322, the OCE says, amen, oh, lord of the universe.  But brother, the situation is a little difficult now.  I'm in contact with the brothers, and they don't recommend nafir at this time.

Is that right?

A.   That is correct.

Q.   Is it fair to say that the OCE, who is an undercover agent, dissuades Mr. Alowemer from the idea of traveling back to Syria?

A.   Yeah, that's an interpretation, but it's also part of his persona, trying to present himself as being a legitimate individual with ISIS contacts, someone who is in the know and knows what the current situation is.  Because at that time, as I mentioned, ISIS was losing its physical caliphate, a lot of countries were cracking down on travelers trying to get to the caliphate.

Q.   You said yes, that's an interpretation.  Would you say that that's a fair interpretation?

A.   I would say it's a fair interpretation.

Q.   Okay.  I want to turn your attention to page 332.  Now, during this time the OCE is holding himself out to be a person

96

of -- an Iraqi citizen that is in Europe taking care of his ailing father, correct?

A.   That is correct.

Q.   So the OCE says I'm in Europe right now, effectively, to Mr. Alowemer, correct?

A.   No.  I believe he says, I live in Europe, but I'm actually back in Iraq at the moment taking care of my --

Q.   I got it flipped.  He lives in Europe but he's back in Iraq taking care of his ailing father?

A.   That is correct.

Q.   Page 332, which are text communications on March 13th of 2019, so that's four days after this began, Mr. Alowemer says a third of the way down the page --

A.   Can you repeat the page number?

Q.   Sorry.  332.

A.   Still 332.

Q.   You agree that this is a text communication from March 13th of 2019, correct?

A.   Yes, that's correct.

Q.   And about a third of the way down the page on 332, Mr. Alowemer says, when are you going to do nafir, brother?
     Is that right?

A.   Yes, that's correct.

Q.   And then a couple lines down from there, OCE says, brother, I'm ready for nafir any time, but the brothers want

me to go back to Europe.

Is that correct?

A.  That's correct.

Q.  Mr. Alowemer says, I understood what you mean.

Correct?

A.  Yes, that's correct.

Q.  And the OCE says, sometimes a strike in the enemy's heartland has a bigger impact.

Correct?

A.  That is correct.

Q.  Is this the first time any reference to an enemy's heartland is referenced?

A.  I can't say for certain without going through it, but I believe that is accurate.

Q.  Skipping down further, Mr. Alowemer says, if I want -- ignoring a reference to the enemy's heartland, Mr. Alowemer says, if I want to do nafir to Turkey and then to Syria or Iraq, do you know someone who can help me?

Is that what he asked?

A.  That is correct.

Q.  And the OCE says, yes, Turkey now is the best gate for nafir.

Is that right?

A.  That is right.

Q.  And Mr. Alowemer says, I swear by Allah, my brother, I'm

thinking of nafir, but I don't know anyone there.

Is that what he says?

A.   That is correct.

Q.   And the OCE says, I have some trusted brothers there and this is their specialty.

Is that right?

A.   That is correct.

Q.   And then the OCE one line down says, amen.  Just get your residence document and passport and leave the rest to me.

Correct?

A.   That is correct.

Q.   So it's fair to say that the OCE, after Mr. Alowemer now has expressed twice an interest in returning back to Syria, has said, I can help you with that, is that right?

A.   That is correct.

Q.   Turning the page to 334, this is the same communication, same day, same time -- or same general time frame.  The OCE says, listen, my brother, if traveling is an issue for you and if the brothers have a cell in America, are you willing to cooperate or meet with them if this is what the brothers say?

Is that what he says?

A.   That is correct.

Q.   Mr. Alowemer says, for sure.

Right?

A.   Yes.

Q.   And the OCE says, okay.  Do you allow me to ask the brothers and tell them about your intention to do nafir and see what they suggest?

Is that right?

A.   That is right.

Q.   I direct your attention to page 351.  This is a communication between Mr. Alowemer and the OCE on April 3rd, 2019, almost three weeks later.  Do you agree?

A.   Page 351?

Q.   Yeah.

A.   I just want to confirm the date.

Q.   Take your time.

A.   Yes.  April 3rd, yes.

Q.   April 3rd.  That's three weeks after the last communication I referenced on March 13th, correct?

A.   Yes.

Q.   And so on April 3rd, 2019, about a few lines down, Mr. Alowemer says again, brother, is the opportunity for nafir set off for jihad to Iraq and Sham, S-h-a-m, which is another word for Syria, still open?  Which the interpreter says, available?

Is that what he says?

A.   Yes.

Q.   And the OCE says, Allah willing, yes.

Is that right?

100

A.   That is correct.

Q.   And Mr. Alowemer responds, or is the situation bad somehow?

Right?

A.   That is correct.

Q.   And the OCE says, the brothers changed their tactics.

Is that correct?

A.   It is correct.

Q.   And then one line down the OCE follows up with that saying now they mostly depend on attack and retreat principle tactic.

Is that correct?

A.   That is correct.

Q.   And here's what we talked about earlier.  The OCE further down on the page says, what do you prefer, nafir or lone W, which is interpreter references as lone wolf, without going into details, of course.  Is that what the OCE says?

A.   That is correct.

Q.   Can you explain what lone wolf means in the context of a terrorism investigation?

A.   A lone wolf is just a colloquial term for someone carrying out an attack on their own potentially in a very small group without a whole lot of guidance or specific support from the actual FTO.

Q.   And the OCE is asking what do you prefer to Mr. Alowemer, correct?

A.   Yes.

Q.   And Mr. Alowemer responds to a previous string in the conversation but then he says, I mean a regular nafir.

Is that right?

A.   That is correct.

Q.   And the OCE says, what's a regular nafir?  I do not understand what you mean.

Correct?

A.   That is correct.

Q.   And Mr. Alowemer writes, I mean, hijrah, h-i-j-r-a-h, which the translator note says means migration, because the brothers in Syria are suffering badly.

Is that what Mr. Alowemer says?

A.   That's correct.

Q.   And the OCE says, yes, yes, I understood.

Correct?

A.   That is correct.

Q.   Turning to the next page, page 352, which is the same conversation, the OCE about a third of the way down says, and as you know, there are other options if nafir is difficult.

Is that what he says?

A.   Yes.  It's a reference to what they've been talking about.

Q.   With nafir?

A.   Nafir and other options.

Q.   And Mr. Alowemer says, you are right.  I know that.

Correct?

A.   That is correct.

Q.   I want to turn your attention now to page 394.  This is a communication between Mr. Alowemer and the OCE on May 5th of 2019, correct?  The previous page I think indicates that?

A.   Yes, that's correct.

Q.   Just to situate it for the court, May 5th, Mr. Alowemer has already met with the UCE and the CHS -- meets with the UCE on two occasions on April 16 and on April 25th, correct?

A.   That is correct.

Q.   And he already met the CHS I think one of those occasions as well, correct?

A.   It was both occasions.

Q.   On both occasions, okay.

A.   Yes.

Q.   And by May 5th, Mr. Alowemer's role of searching for specific targets, the information expert in their little group has already been set, correct?

A.   Yes, that's part of his responsibilities in their group.

Q.   And so turning your page to 394, which is on May 5th of 2019, Mr. Alowemer, whose online name now reads Abu Shimaa, A-b-u S-h-i-m-a-a, writes, are you still in contact with the brothers in Turkey?

Is that right?

A.   That is correct.

Q.   And the OCE says, not directly but through other brothers.
Is that correct?

A.   That is correct.

Q.   Abu Shimaa, who you understand to be Mr. Alowemer, correct?

A.   That is correct.

Q.   Mr. Alowemer a couple lines down says, can you send me their names, if that's possible?  I need to obtain some information about the situation of nafir from Turkey to Syria because the brother's thinking about that.
Correct?

A.   That is correct.

Q.   So it's fair to say that he's asking about nafir even after he's been contacted directly by the undercover agents, correct?

A.   Yes.  It's very accurate.  And as I testified earlier, nafir was never out of the realm of possibilities.  It was not one or the other.  He articulated the desire for one or more attacks in the United States with the ultimate intention of conducting nafir and getting back to Syria where he would die as a proper martyr.

Q.   Yeah, as the OCE said, there are other options other than nafir, when he spoke to Mr. Alowemer, correct?

A.   Yes.  And that was preceded by talk about potentially meeting brothers in the United States.

Q.   I want to turn your attention to -- so enough about nafir. I want to talk about this concept of meeting brothers in United States.  I think that's great that you just said that. Can you go to 368?  We'll go back a little bit.  Page 368.  If you check the previous page -- actually, two pages prior, you can see that this is a communication between Mr. Alowemer and the OCE on April 9th, 2019?

A.   That is correct.

Q.   And on page 368 about a third of the way down in the middle of what the OCE states, he says, the brother also said that it's possible that they can provide you with a secure device if you live in the same city as they live in without having to meet.  That's if you have any reservations to meet one of the brothers, they can drop the device in what is called a dead drop.  Do you know what I mean?  Are you still there, my brother?

Is that what the OCE says?

A.   Yes.

Q.   And Mr. Alowemer in responding to that says, brother, let them do what they think is better.  It would be a good idea if they can provide me with a secure device because I don't trust this device.

Correct?

A.   Correct.

Q.   And this is after that whole ruse in which Mr. Alowemer

lied about having been -- his home was searched and that his devices were being monitored, is that correct?

A.   That is correct.

Q.   Because this is April 9th, 2019, correct?

A.   Correct.

Q.   And the OCE then responds, do you want to meet one of the brothers?  Or do you want to do the dead drop?

Is that correct?

A.   That is correct.

Q.   And Mr. Alowemer responds, I want what's safest for them. Whatever they think is secure, I will do, Allah willing.

And then he asks, what do I tell them?

Is that right?

A.   Yes.

Q.   So he's asking the OCE, what should I say to that or what do you think I should do, correct?

A.   That is correct.

Q.   And the OCE responds and tells him exactly that.  He says, brother, whatever you want.  I don't see that two friends meeting in a coffee shop is raising suspicion for them.  Just greeting, a normal chat.

Is that right?

A.   That's correct.

Q.   And Mr. Alowemer then responds, I have no problem, my brother.  I want what's safest for them.

106

Correct?

A.   That's correct.

Q.   OCE then responds, okay then.  I will tell the brother that you were willing to meet one of the brothers and he will deliver the device, Allah willing.

Is that what he says?

A.   That is correct.

Q.   The OCE, turning to page 369, the next page, the OCE about halfway down the page says, I will send a message to the brother now and I will let you know what his answer will be immediately, Allah willing.  He will provide me with all the details and the descriptions of the brother, the location and the time of the meeting, and I will convey all that information to you, Allah willing.

Is that right?

A.   That is right.

Q.   Turning your attention to page 370, the next page.  This is now a communication the following day, April 10th, 2019, correct?

A.   That is correct.

Q.   And going to last OCE statement on that page, the OCE writes, my noble brother, the brothers there have a presence in the city of Philadelphia which is in the same state that you live in according to what they told me.  However, it's too far from Pittsburgh.

Is that right?

A.  That is correct.

Q.  There's other references to the bay'aa because at the same time the OCE is talking about Mr. Alowemer's need to send a bay'aa pledge, correct?

A.  Yes.  To appear authentic.  A legitimate ISIS operation would not allow someone to meet with them until that person has shown that they are pledging their allegiance and their loyalty.

Q.  Now, Mr. Alowemer responds to the brothers being in Philadelphia, which is too far from Pittsburgh, and says, yes, my brother, I know that.  That's correct.  My brother, I suggest they drop the device at a safe place and I go get it.

Is that right?

A.  Yes, that's accurate.

Q.  On April 10th, when the OCE tells him that there are potential ISIS brothers located in Philadelphia, and that's a little too far from Pittsburgh, even though it's in the same state, Mr. Alowemer said, you know, let's just do a dead drop instead of meeting.

Correct?

A.  He suggests that.  I don't think it's because he didn't want to meet.  He repeatedly over and over again says he doesn't want to harm the brothers and he's concerned about his security.  So he's offering that as an alternative, not

expressing that he doesn't want to meet with them.

Q.  This isn't in connection of just mere distance, not security, correct?

A.  Well, it's consistent with the whole conversation.  I don't think you can just look at one little snippet of an entire conversation where he's repeatedly expressing concern about his own security about doing anything that would harm his fellow brothers that he wants to meet.

Q.  I understand that's your interpretation.  But in this particular -- in this particular exchange, Mr. Alowemer says, I will do whatever they think is best, and then the OCE comes back and says that they're in Philadelphia, that's too far, and Mr. Alowemer just says, let's just do a dead drop. Correct?

A.  Yes, a dead drop, then immediately asks them to provide him with a weapon as well.

Q.  All right.  I'll turn your attention to document 24 again -- sorry -- what's been marked as Defense Exhibit 3 again, which is document 24, which is what we went through earlier.  I'll turn your attention to page 433 and 34.  This is a transcript of the first meeting between Mr. Alowemer and the UCE on April 16th, 2019, correct?

A.  Yes.  The defendant, the UCE and the CHS all together.

Q.  And so the UCE is on page 433 is talking to Mr. Alowemer and the CHS during their first meeting on April 16th, correct?

A.   That's correct.

Q.   And the UCE explains his philosophy about conducting these kind of operations and what he says is, so I guess what I'm saying is if it's -- if we have the intention for to us do something, then getting information is good, but if we're not willing to do it, then it is a waste of time for you to get more information.  So we have to decide or each, each individual person needs to decide are we willing, do we have the intent to do this?  Because if we don't, then we're wasting our time.  And if, if we are talking about getting more information but we don't really mean it, like we don't have the intention, then that's -- that might be hypocrisy.

     Is that what the UCE says?

A.   That is correct.

Q.   Continuing on to 434.  The UCE continues, because if any person here is not certain they want to do this, then that Muslim needs to leave.  Because we can't -- we don't want to -- how do you describe?  Like you -- you understand what I'm trying to say?  I'm trying to describe it better.

     Mr. Alowemer, is that what he says?

A.   That is correct.

Q.   The UCE goes on and says, there is no point for anyone to be at this table unless they want to do something.

     Is that right?

A.   That's correct.

Q.   The UCE goes on, I'm no shaykh, spelled s-h-a-y-k-h.  I'm a -- I'm a -- no emir, e-m-i-r, nor shaykh, with laughter. You've seen online there are so many brothers that just talk.
     Correct?  That's what the UCE says?

A.   That's correct.

Q.   He goes on, he says, that keyboard courage.
     Correct?

A.   That's correct.

Q.   The UCE goes on even further, they want -- they want to say, oh, jihad of the pen.  They're just -- they're just scared.  They're cowards.  That's why talk is so small, it's cheap.  Talk means nothing.
     Correct?

A.   That's correct.

Q.   And this is the first meeting between Mr. Alowemer and the UCE and the CHS, correct?

A.   That is correct.

Q.   And this is the meeting in which the CHS holds himself out to be an explosives expert, correct?

A.   I don't know if he had already held himself out at that point at the point of this conversation, but at that meeting he did talk, he alluded to himself being an explosives expert.

Q.   The same with the CHS being an expert on international money transactions with ISIS?

A.   I believe that came up at the second meeting, not at the

first meeting, but the context is this all came up after the defendant had been talking to an OCE for over a month, had taken all these steps that I laid out, had reached out proactively to the UCE, had met with the UCE, had already offered information about Yazidis in the Pittsburgh area, had already asked to be provided with a weapon, he already referenced Abu Mohammed al-Adnani, the spokesman for ISIS, and sent numerous propaganda videos.  So the context is important where this statement is made.

Q.  Context is always important.  I believe that.  We'll get into that shortly.  But this is the UCE's speech on the first time that they met, correct?

A.  First time they met in person, yes.

Q.  Okay.  I want to turn your attention to page 481.  We're jumping ahead.  481, this is a transcript of the third meeting on June 2nd, 2019.  If you could review -- if you could review the entire communication on page 481 and let me know when you've had an opportunity.

A.  I'm ready.

Q.  You read it?

A.  Yes.

Q.  This is at the time that Mr. Alowemer presents his plan for the plot with the Legacy International Worship Center, correct?

A.  That is correct.

Q.  And at the bottom -- and what he indicates is that he wants this to be done at 3 a.m., correct?

A.  Yes.  I believe --

Q.  That's right at the bottom?

A.  Yes.  Like at 3 a.m. in the morning.

Q.  And Mr. Alowemer then asks the UCE, what do you think --

MS. SONG:  Your Honor, the witness read the page.  If there's a question, I would encourage Mr. Lipson to ask it.  He doesn't need to read the transcript into the record.

THE COURT:  I've already read the page twice.  So if you can just get to the question.  Our timeline is going to give us a problem in a little while.

MR. LIPSON:  Okay.  Well, I did ask the question if this was where he did present the plan and I want to direct the witness and the court's attention and create the record, frankly, Your Honor, of what's said at the very bottom.  So if I could ask --

THE COURT:  We'll get there, yes.

MR. LIPSON:  All right.  Thank you.

Q.  Mr. Alowemer then asks him, what do you think?  What do you think about it?

Correct?

A.  That's correct.

Q.  So Mr. Alowemer asks the UCE about his plan, correct?

A.  I think that's a specific allusion to that time, that

suggested time, what do you think about that?

Q.   And the UCE responds as follows:  Well, this is what I'm wondering is, are there people inside the church at that time or are people inside the house at that time?  Do you want to get the mushrikeen, m-u-s-h-r-i-k-e-e-n, which the translator notes is polytheists, Christians, or do you want to just burn the building and destroy the building?
     Correct?

A.   That is correct.

Q.   That's what the UCE asks Mr. Alowemer, right?

A.   Correct.

Q.   And on the next page 482, Mr. Alowemer says, I'm going to think more about the answer to this question.
     Correct?

A.   That is correct.

Q.   So he already proposed it at 3 a.m., the UCE asks this question, and Mr. Alowemer is going to perhaps reconsider, correct?

A.   My interpretation of that is think more about whether there might be people inside at that time or whether he wants to actually take lives of people or if he's just focusing on the building.

Q.   Let's go later in that conversation, 493.  Two-thirds down the page, the UCE says, well, the most important thing is not how to build them, and referring to bombs, is to know what we

114

want, what effects we want from the bomb.  What do we want?

He then goes to ask --

MS. SONG:  Your Honor, I don't understand why counsel has to read in the transcript.  There's a question for the witness.  He's oriented to the page and where on the page.  Reading in the transcript is not accomplishing the question.

THE COURT:  I understand your objection.  It's overruled.

Q.  The UCE then goes on to say, well, we have to know, like, uh, what we want.  I -- effect from the explosives or from the bombs on the target.  Like, do we want the target -- Mr. Alowemer interrupts him and says, what type of the -- and the UCE finishes his sentence, like, I knew the destruction of the target.  Killing or destroying or both dot, dot, dot movement.

Is that what he says?

A.  That's correct.

Q.  Mr. Alowemer responds, this, for this target I will see first the church if it's made of wood or rocks.  If it's both, woods and rocks, whatever it is, we need destruction and fire.  The UCE says, okay.  Mr. Alowemer then says, so both of them.

Is that correct?

A.  That's correct.

Q.  And the UCE says, okay.  The UCE then goes back and says, what about killing?

Bringing it back to that, correct?

A.   Yes.   Trying to figure out if the defendant is seeking to kill people through this plot.

Q.   And Mr. Alowemer says, killing?

Correct?   He asks that question?

A.   That's correct.

Q.   And the UCE says, yes.

Right?

A.   That's correct.

Q.   And Mr. Alowemer responds, I don't think there's going to be people in there.

Correct?

A.   That's correct.

Q.   And the UCE says, okay.

Right?

A.   That's correct.

Q.   And Mr. Alowemer then says, so it's going to be burning and destruction.

Correct?

A.   That's correct.

Q.   And the UCE then says, okay.

Right?

A.   That is correct.   And this is the same meeting, again, where the defendant flips back and forth about whether there will be killing and in which the UCE repeatedly asks him and

tells him that the type of device needed to destroy the building would likely destroy nearby homes.

Q.   I know that's what you testified to on direct.  And then 501 -- can you go to 501?  The middle of 501, the UCE then says, and then we -- you think that the killing will come after this operation?

     Is that right?

A.   That's correct.

Q.   Bringing it back to killing.  Correct?

A.   That's correct.

Q.   And then Mr. Alowemer says, God willing, God willing.
     Correct?

A.   That's correct.  Affirmatives.

Q.   Well, it says, God willing.  Correct?

A.   Inshallah.  That's an affirmative response to the question.

Q.   It means God willing, correct?

A.   Yes, that's the literal translation.

Q.   It's immediately after that, after the UCE brings up killing again that the concept of the second bomb starts to be discussed, correct?

A.   That is correct.

Q.   Very briefly I'd like to take you back to 425.  Just a clarification.  We had discussed at the time of the UCE's speech about the intestinal fortitude, I'll put it, of the

members of their cell.  I had asked you if at that time the roles of the members of the group had been laid out to Mr. Alowemer, and you were not certain about that.  But turning back to page 425, if you could review that briefly. It's prior to that the UCE had explained that he was an explosives expert, correct?

A.  Prior to this?

Q.  We previously went through UCE comments on page 434, at which point I had asked you at the time of the UCE's speech about what I characterize as the intestinal fortitude of their cell, whether or not Mr. Alowemer was aware of the UCE's role as the explosives expert, and I think you had said something to the effect of it was said at this meeting, but I don't know if it had been said before that speech or not, correct?

A.  Yes, that's correct.

Q.  And turning to eight pages prior in the transcript, is it fair to say that the UCE had explained his expertise in the role of bomb-making at that point?

A.  On page 425?

Q.  Yes.

A.  Can you point out what specific comment you're looking at?

Q.  My apologies.  I don't think he does say there.  I'll move on.

THE COURT:  May I ask are you intending to offer these exhibits?

118

MR. LIPSON:  At this time, no, I'm not.

THE COURT:  Okay.

Q.  Turning back to page 510, can you please review --

MR. LIPSON:  And I won't -- Your Honor, I assure the court I am not going to do three pages of transcripts right now, but I would ask can Agent Edquist review pages 510 through 513 silently and then I'll ask some follow-up questions, Your Honor.

THE COURT:  You may proceed.

A.  Okay.

Q.  Appreciate that, Agent Edquist.  This is where the UCE's explaining what's needed to make a bomb, correct?

A.  That is correct.

Q.  He goes over ice packs, correct?

A.  That is correct.

Q.  Batteries, correct?

A.  Yes, that's correct.

Q.  Nailpolish remover, correct?

A.  That's correct.

Q.  Metal pieces, correct?

A.  Right.

Q.  And throughout that, the UCE is talking about them and sometimes individually Mr. Alowemer or the CHS going out and buying them, correct?

A.  Yes.  A lot of references to we.  We need to do this, we

need to buy these.

Q.   You need to do this.  You need to do that, as well.
Correct?

A.   Can you point to a specific example?

Q.   Middle of page 511.  UCE says, like the easy thing that we can start to get now, if you want, is things like nails or metal screws or metal objects.  Like you can get those at Home Depot, you know?  I mean, also, and then build the igniter system.  We can get the nine-volt batteries, you know, the battery, the nine-volt battery, you can get it at Walmart.  It is easy.
     Correct?

A.   That is correct.

Q.   And this is, I believe, at --

     MR. LIPSON:  Just a moment, Your Honor.

Q.   This is during the third in-person meeting, correct?

A.   That is correct.

Q.   On June 2nd?

A.   Correct.

Q.   The UCE has established himself as the explosives expert, correct?

A.   Correct.

Q.   He lists off all the items that are needed?

A.   That's correct.

Q.   He provides places where Mr. Alowemer can go get these

120

materials, correct?

A.   That is correct.

Q.   And even he suggests to buy them in small increments over a period of time to avoid detection, correct?

A.   Yes, they discuss that.

Q.   It's fair to say that Mr. Alowemer, after the discussion of a second possible bomb, decides that only one is necessary, correct?

A.   I think by the time he was arrested, yes, he had made a statement that as of now as his thinking at that time only one would be needed.

Q.   If we can go to 538, that would be great.   When we were talking about this earlier, Agent Edquist, the UCE asked, well, are we trying to destroy something or are we trying to kill people.   Correct?

A.   From which meeting?   From the June 2nd meeting?

Q.   From the June 2nd meeting early on.   We went over that transcript earlier.

A.   Yes.   Trying to clarify what the defendant's intentions and goals were.

Q.   Mr. Alowemer said, let's do this at 3 a.m., and the UCE says, well, what's our target?   What are we trying to do here? Are we trying to destroy or are we trying to kill?   And Mr. Alowemer says, I need to think about that.

     Correct?

A.   That is correct.

Q.   And you testified on direct, Mr. Alowemer comes back and says, let's do a second one.

Correct?

A.   That's correct.

Q.   And counsel for the government even said to plant a second bomb when there's first responders that may be there, correct?

A.   That's correct.

Q.   But after that, Mr. Alowemer says, we only need one.

Correct?

A.   Are you pointing to a specific reference?

Q.   Yeah.  On page 538, third quote from the bottom, Mr. Alowemer says, we want to destroy and burn, comma, I think that just one bag is enough.

Correct?

A.   Yes.  And then I believe he comes back and says, we need the second bag.

Q.   Well, Abu Dujana says, like last time we spoke about having the first bag and then a second bag.  Mr. Alowemer then says -- that's what Abu Dujana says, correct?

A.   That's correct.

Q.   And Abu Dujana is the UCE, correct?

A.   That's correct.

Q.   And Mr. Alowemer says, so we need the second bag.  Say we have to come back, the first bag, the second bag has a remote

so we can throw.  So I think it's an unsecure -- not safe for us because, you know, I was thinking about on my way back I'm going to drive the -- so I think just one for now.

Correct?

A.  That's correct.

Q.  It's fair to say that he says no second bag, just one, correct?

A.  Yes.  At that time.

Q.  And he says this in the context of saying that he just wants to destroy and burn.  There's no reference to killing.

Correct?

A.  That is correct, but the further context is the repeated admonishments by the UCE that such a bomb would destroy nearby houses.

Q.  And would it -- well, if we're talking about whole context here, isn't it fair to say that Mr. Alowemer also said that he does not believe that people live in those nearby houses, correct?

A.  Yes.  He definitely stated that.  He also lived near those houses and knew that there were people living by those houses.  And we have evidence to show that at that time there were very clearly people residing in those residence based on vehicles, based on people passing by.

Q.  Well, Agent Edquist, you can't have it both ways.  You're going to take him at his word to say what his intention is at

123

some points, but when it doesn't -- but you can say, oh, we think he's lying on this instance, but not on others.  I mean -- you have to take him --

A.  On the face of it, it doesn't make sense to say that no one lived nearby that church, and he himself stated that he went by the church frequently, and if he did that, he would have known that there were people living by it.  On the face of it, the claim does not make sense.

Q.  On page 538 he says, we want to destroy and burn. Correct?

A.  That is correct.

Q.  He does not say we want to kill. Correct?

A.  That is correct.

Q.  Turning your attention to 539, the next page, second quote from Mr. Alowemer, he says, we don't have to, unintelligible, we don't have to say that we're ISIS.  We'll stay quiet. Correct?

A.  That is correct.

Q.  This is on June 11th, the fourth meeting, the second-to-last meeting before he's arrested, correct?

A.  That is correct.

Q.  And after this fourth meeting and after these comments, he doesn't say, oh, I want to go back to a second bag again, correct?

124

A.  I do not believe so.

Q.  And he doesn't go back and say after saying that we stay quiet, we don't say that we're from ISIS, he doesn't go back to say, oh, actually, we should say we're from ISIS, correct?

A.  That's correct, but again, contextually, before this statement's even made he makes the claim that they want to leave an ISIS flag at the scene of the crime.

Q.  And then after that --

A.  With statements about it.  So the claim that he didn't want to state that they're ISIS is because he wanted to stay quiet.  It's operational security which he articulated pretty in depth throughout this operation.

Q.  And that said, the last statement in kind on whether or not to say that they're ISIS or not, he says, let's stay quiet.

Correct?

A.  Yes.  For security purposes.  Not because he doesn't want this attack to be conducted on behalf of ISIS.

Q.  That's how you interpret the transcript, correct?

A.  Based on the entire body of evidence, of the online communications, the in-person interactions.

Q.  Thereafter, he does not say, let's leave a flag, though?

A.  No.  Because he already stated he wants to leave a flag.

Q.  And in between saying that he wanted to leave a flag and his arrest, he said, let's stay quiet.

Correct?

A.  Stay quiet as in transponding a video or recording some type of electronic version.  Typically what ISIS does is they'll record something so that they can use it as propaganda, whether it's recording the attack as it's occurring, the planning, some statement ahead of time.  That's standard operational procedure for a group like ISIS.  He's saying, let's leave a flag so we know who did it, but for operational security purposes, we need to be dark for many days leading up to the attack and then after the attack and then we will re-establish communications.

Q.  Right before he says we'll stay quiet, he says we don't have to say that we are ISIS.

Correct?

A.  That is what he says.

Q.  That's my only question.  On direct testimony you testified that this wasn't just about this attack, that they were planning and had aspirations to do more of these kinds of activities after this, correct?

A.  That's correct.

Q.  Were there any concrete plans for any of that?

A.  No concrete plans.

Q.  No location was selected, right?

A.  No specific targets, no.

Q.  No targets.  That was my next question.  You got me there.

126

No targets, right?

A.   That's correct.

Q.   No means of how to carry out whatever after-plot that may have occurred, correct?

A.   Nothing formalized, but again contextually, this is all after he's been talking about various forms of bombs, grenades, handguns, different methods of attack and has already articulated and identified specific attack targets, but nothing was formalized for a future plot just yet.

Q.   Generalized ambition?

A.   That is correct.

Q.   Mr. Alowemer's from Syria, correct?

A.   That's correct.

Q.   His first language is not English, correct?

A.   Correct.

Q.   You did the post-arrest interview, correct?

A.   That's correct.

Q.   Some might call that an interrogation, correct?

A.   You can call it that or an interview, yeah.

Q.   Mr. Alowemer didn't have an interpreter with him in there, right?

A.   That is correct.  He was asked if he wanted an interpreter, and he said he did not need one.

Q.   He spoke the best English he could, correct?

A.   That is correct.

Q.   You testified on direct that he saw this action as against the United States, correct?

A.   Yes.   He made a statement that about knowing that it was wrong and that it wasn't right to do it to the United States.

Q.   And sitting here today, do you know if he meant by violating the laws of the United States?  He had just been caught violating the laws of the United States.  That's why we're here today.  Could that have been what he meant?  Is that possible?

A.   That he made that statement in a legal sense or in a -- I guess what's your question?

Q.   Do you know exactly what he meant when he said that?

A.   I can never know exactly what somebody means in a statement, but based on what he was saying, acknowledging that he knew that what he was doing was wrong to an entity within the United States, to a government that had provided him and his family with benefits.

Q.   He mentioned the government of the United States?

A.   He didn't specifically say the government, but he said they provide us housing -- I don't remember the exact words, but there's specific references to benefits received because of their refugee status.

Q.   You interpreted that to mean --

A.   The government provides.  The church doesn't provide that to them.  The U.S. government did.

128

Q.   Well, there were religious organizations that did provide things for the Alowemer family, is that correct?

A.   That's true, but not the Legacy International Worship Center.

Q.   You were also asked about questions throughout this investigation, did anybody make any overt threats to him, and you said, no, right?

A.   That's correct.

Q.   No -- and I'm sure as the undercover agents with the FBI that they were probably trained not to do anything that would be considered a threat to the individual under investigation, right?

A.   That is correct.

Q.   It's probably something they're specifically trained to not do, right?

A.   Trained to not do it because it doesn't make sense from an investigative perspective, but also because the FBI does not threaten people violently.

Q.   Of course.   Would you say ISIS is a dangerous organization?

A.   Yes, I would.

Q.   Engage in clandestine activities throughout the world?

A.   Yes.

Q.   They carry out plots and attacks against civilian populations?

A.   Yes.

Q.   In Syria alone the way they treated local civilian populations is abhorrent, correct?

A.   That is correct.

Q.   Sexual assaults, is that correct?

A.   That is correct.

Q.   Beheadings?

A.   Correct.

Q.   It's a worldwide organization, correct?

A.   Correct.

Q.   Has infrastructure, right?  Like intelligence?

A.   Yes.  It has intelligence capabilities, yes.

Q.   There's probably a financial monetary wing to an organization like that, correct?

A.   Yes.  Severely degraded from what it used to be, but yes, there are formal structures.

Q.   I'm sorry.  I didn't mean to cut you off.

A.   There are formal structures within the organization, yes.

Q.   And the ISIS propaganda that we talked about earlier probably boasts some of those capabilities, correct?

A.   I think that's a fair statement.

Q.   And they boast that to individuals that consume that content, correct?

A.   Can you clarify what sense you're getting at?  A lot of these propaganda videos aren't focused on this is our

130

financial wing and we make X number of dollars.  It's focused on the violence and the ideology.

Q.  Would you say that there is at least a fair amount of ISIS propaganda out there that boasts their international capabilities to achieve their goals?  Is that fair?

A.  Yes.

Q.  And that they are a legit organization doing what they do, correct?

A.  I guess it depends how you define legitimate.

Q.  Let's just say capable of carrying out some of their objectives?

A.  Yes.

Q.  And from the moment that the OCE contacted Mr. Alowemer on March 8th, 2019, and then began speaking to him on March 9th, 2019, he represented he's in contact with these brothers of ISIS, correct?

A.  Yes.

Q.  He's in contact with this organization, right?

A.  Members of the organization, yes.

Q.  And the OCE represents that he has spoken specifically with brothers in ISIS about Mr. Alowemer, correct?

A.  Referenced him, yes.

Q.  And that the brothers have asked about him to the OCE, correct?

A.  Correct.

131

Q.   And then on April 16th he has his first meeting with somebody who is supposedly a member of ISIS here in the United States, correct?

A.   Correct.

Q.   And that individual holds himself very quickly in that first meeting to be a bomb explosives expert, correct?

A.   I don't know if it was very quickly to our previous discussion, but yes, in that first meeting.

Q.   Throughout the meetings --

A.   It eventually came up.

Q.   Throughout their meetings you see his expertise in making dangerous weapons became very clear, correct?

A.   Correct.

Q.   The CHS' experienced with transferring monetary -- money across international boundaries became very clear, correct?

A.   Correct.

Q.   Let me ask you this:  Is it fair to say that if someone is not overtly threatened, that they may be fearful in communicating with people who are involved with such a serious organization?

A.   I think that's very much a possibility, but the body of the evidence of the defendant's engagement did not bear that out at any point.

Q.   His engagement, correct?

A.   His engagement with the UCE and the CHS, the OCE.

132

Q.   Before April of 2019, are you aware of any plots conceived of by Mr. Alowemer to attack a target here in Pittsburgh?

A.   No.

Q.   Are you aware of any plots to target a -- specific plots to target any location here in the United States?

A.   No.

Q.   Are you aware of any instance in which he reached out and met with someone purported to be involved in these kinds of activities?

A.   Reached out, yes.  Met with, no.

Q.   Never met with anyone?

A.   Not to my knowledge.

Q.   And never engaged in a plot or any specific attack here in the United States?

A.   Not to my knowledge, no.

Q.   And that happened after he was contacted by the undercover agents, correct?

A.   That is correct.

Q.   I'd like to direct your attention to document 24, page 424.  Turning to the middle of the page, Mr. Alowemer tells the CHS, I never used a weapon.

     Correct?

A.   That's correct.

Q.   CHS says, in your life you haven't used a weapon?

     Right?

133

A.   That's correct.

Q.   And Mr. Alowemer says, I haven't used a weapon.

Correct?

A.   Correct.

Q.   Six pages later, page 430.  Mr. Alowemer says, can you tell me about safety?  I will do anything you tell me currently because, truthfully, I don't know anything.

Is that what he says?

A.   Which page are we on?

Q.   Page 430.  Sorry.  It's right under verbatim translation.

A.   Oh, yes.  Yes, that's right.

Q.   That's what he says, correct?  Turning to page 493.  The middle of the page slightly below the middle of the page, Mr. Alowemer says, I don't know that much about creating bombs and stuff like this, so I'm just trying to learn.

Is that right?

A.   That is correct.

Q.   And turning to page 515, the top of the page -- I'm sorry. I'll wait for you to get there.  My apologies.  The top of the page, Mr. Alowemer says, thanks be to God.  I should note -- one moment.  I believe this is at the June 2nd, 2019, meeting. Do you agree?

A.   Just one second.  Yes, June 2nd.

Q.   You're at 515?

A.   Yes.

134

Q.   Mr. Alowemer says, thanks be to God.  Without God almighty and without you, we wouldn't have reached this resolution. Thanks be to God.  We wouldn't be able to -- we wouldn't be able to -- to do this without you.

Correct?

A.   Correct.

Q.   That's talking to the UCE, correct?

A.   Correct.

Q.   Middle of the page, Mr. Alowemer says, if you are being honest, if you are not here, we wouldn't be do anything.

Right?

A.   That's correct.

Q.   The UCE agrees and says, yeah.

Right?

A.   I don't know if he's saying like, yeah, that's true. That's just a yeah, yeah, acknowledgment.  It's an acknowledgement of the statement, yes.

Q.   He says yeah, right?  Mr. Alowemer then says, because I don't know nothing, like literally nothing about this.

Right?

A.   About bomb-making, yes.

Q.   And the UCE says, yeah.

Right?

MR. LIPSON:  Your Honor, one moment just to confer with co-counsel.

THE COURT:  Very well.

MR. LIPSON:  Your Honor, no further questions.

THE COURT:  Ms. Song, how long do you anticipate?

MS. SONG:  I'll be very brief.

THE COURT:  We'll then take a lunch recess when you're done.

MS. SONG:  Okay.

REDIRECT EXAMINATION

BY MS. SONG:

Q.  Special Agent Edquist, you were asked questions about the nafir and the defendant's desire to go home, as it was characterized.  What did the defendant want to go do if he traveled back to Syria?

A.  He articulated that he wanted to return home to fight, conduct jihad and ultimately die as a martyr.

Q.  On behalf of ISIS?

A.  Correct.

Q.  And why couldn't he go home?  You reviewed all of the communications.  What was the primary obstacle to his ability to travel internationally?

A.  His immigration status.  He was still classified as a refugee and did not possess a green card.

Q.  And did he make that statement on multiple occasions when talking to the OCE?

A.  Yes, on frequent occasions.

Q.   Was he frustrated about his inability to travel home?

A.   Yes, he was.

Q.   Was the FBI, if the defendant had persisted in his sole desire being to go home, have directed the investigation in that regard?

A.   Yes.

Q.   And then one last question, Special Agent Edquist.  With respect to the electronics that you were asked some questions about, is it apparent that there are documents and images in the defendant's devices that he sent to other people including the UCE and OCE?

A.   Yes.

Q.   And are there communications that are obviously attributable to him and not the result of some passive download through an application or platform?

A.   Yes.

Q.   And do some of those communications date back well prior to 2019?

A.   Yes, they do.

          MS. SONG:  That's all, Your Honor.

          THE COURT:  Very well.  Nothing further?

          MR. LIPSON:  Nothing further, Your Honor.

          THE COURT:  We'll take a recess.  Is everybody -- are you comfortable with 45 minutes?  Ms. Proud, are you?  We'll resume at 1:15.  We do have an issue with our interpreter

needing to get to a flight and counsel should also adjust their timing for me to do my job based upon the record created.  So plan your afternoon presentations accordingly.  1:15.

THE CLERK:  All rise.  Court is in recess until 1:15.

(Lunch recess.)

THE COURT:  Ms. Song.

MS. SONG:  Thank you, Your Honor.  The United States at this time calls Dr. Colin Clarke.

(Oath administered.)

LAW CLERK, MR. WILLIAMS:  Can you please state and spell your name?

THE WITNESS:  Sure.  My name is Colin, C-o-l-i-n, Clarke, C-l-a-r-k-e.

COLIN CLARKE

a witness herein, was duly sworn and testified as follows:

DIRECT EXAMINATION

BY MS. SONG:

Q.  Dr. Clarke, how are you employed?

A.  I'm the director of research at the Soufan Group.

Q.  What is the Soufan Group?

A.  Soufan Group is a security and intelligence consulting firm based in New York City.

Q.  Would you describe for the court your education?

A.  I have a Ph.D. in international security policy.  I have a

138

master's degree in global affairs and an undergrad degree in communications and writing.

Q.   What would you describe as your area of study and focus?

A.   Transnational terrorism, with a focus on the Middle East.

Q.   Have you published on terrorism?

A.   Yes.

Q.   Books?

A.   Yes.  Several.

Q.   Articles?

A.   Dozens.  Not hundreds.

Q.   Do you speak consistently on the topic of terrorism?

A.   Constantly.

Q.   Is ISIS a foreign terrorist organization that you are focused upon?

A.   Yes.

Q.   Dr. Clarke, have you traveled to the regions where ISIS and other foreign terrorist organizations are active?

A.   Yes.

Q.   Have you interviewed individuals who claimed allegiance to some of those organizations?

A.   I have.

Q.   Dr. Clarke, through your work and experience have you had the opportunity to review primary source documents related to terrorism?

A.   Yes.  Many times.

139

Q.   What kinds of documents are we talking about?

A.   Everything from financial documents from the Islamic State, although much of that is classified, when I was working at the RAND Corporation, to manifestos, terrorist writings, long debates between various jihadi ideologues.

Q.   Have you reviewed videos and other audio recordings?

A.   Yes.

Q.   Can you tell us when ISIS was recognized as a foreign terrorist organization?

A.   Well, according to the U.S. government, the listing goes back to 2004, and it springs out of ISIS' predecessor, Al Qaeda in Iraq, which is what the group grew out of.  Then subsequently many of the ISIS affiliates or branches were named as separate FTOs in subsequent years.

Q.   What can you tell us about the term dowlah?

A.   It's really just to mean state, to refer to the state-building apparatus that the Islamic State was constructing across the world with the headquarters in Raqqah and the secondary headquarters in Mosul.

Q.   What is ISIS an acronym for?

A.   Islamic State in Iraq and Syria.  You might see ISIL, Islamic State in Iraq and Levant.  And you might just see IS, Islamic State.  It's all the same thing.  Some people say Daesh.

Q.   What's the term Levant mean?

140

A.   It's to describe the region that encompasses parts of Iraq, Syria, Lebanon, that general area.

Q.   And what symbolism or is there a flag that identifies ISIS internationally?

A.   The black flag that we've seen several times already today.

Q.   Dr. Clarke, what's the area of influence of ISIS?

A.   Primarily, you know, as we've spoken about, Iraq and Syria, but this was truly a global organization.  You know, they spanned multiple continents.

Q.   Very briefly, can you describe to the court the structure, the leadership structure of ISIS?

A.   So it was a hybrid organization, I would say.  It had a fairly hierarchical leadership, but when you kind of look globally, there was different wilayats or franchises, if you will, and they all reported to ISIS central or ISIS core. Various degrees of command and control therein looking at the different branches across Egypt, the Philippines, Afghanistan, West Africa, East Africa, parts of sub-Saharan Africa like Mozambique and the Democratic Republic of the Congo.

Q.   You're aware, Dr. Clarke, that this prosecution focused on events that led up to the defendant's charges in 2019?

A.   Yes.

Q.   Can you tell the court about the leadership of ISIS in June of 2019 and earlier?

141

A.   So led by Abu Bakr al-Baghdadi who is an Iraqi born in Samarra in 1971, but a good portion of ISIS' upper echelon was Iraqi and Syrian although there were Chechen and others in the mix.

Q.   If you had to describe the mission for the primary objective of ISIS, what would you say?

A.   I would take ISIS' own motto, which is remain and expand, to consolidate the territory they controlled, but very much their vision was to re-establish the Islamic caliphate, in their words.

Q.   Tell us about that term caliphate.

A.   Historical, you know, going back to the Ottoman Empire and even before, we can go back quite far in history, but the way they envisioned it was stretching from what they called al-Andalus, which is southern Spain going back to the days of the Moors, all the way across the world to Southeast Asia, Indonesia, encompassing what they call the Ummah, or the global community of believers.

Q.   So their goal was to have a religious state that transcended national boundaries?

A.   Yeah.   A religious state that transcended -- they don't recognize state boundaries.   They see that as a colonial creation in many ways.   And when you say a religious state, I would say through the implementation of very austere Shariah, their version of Salafism, they didn't really recognize a

division between politics and religion.  It was all one because only God could answer for all that.  So even governments where hard core Islamists were in control, for example, in Gaza with Hamas, they looked at them as apostates because they sat for elections.  That was something that was totally anathema to the Islamic State.

Q.  Is it possible, Dr. Clarke, to separate political versus religious objectives of ISIS?

A.  No, not in their mind.

Q.  Why is that?

A.  They look at it as one in the same.  Again, they don't recognize human authority beyond the caliph itself, and there's a whole number of conditions that one would have to meet to be considered a caliph which Baghdadi did including being able to prove lineage going back to, you know, earlier figures.

Q.  How does ISIS use terrorism to affect governments and nations?

A.  Well, really it's their raison d'etre.  It's their primary reason for being, which is to conduct attacks to force their adversaries to either acquiesce or to change their policies.

Q.  How has ISIS and, in particular, as to the time period we're talking about, 2019 and the year or two prior, how has ISIS regarded other non-Muslim religious minorities or non-Sunni --

A.  Yeah, you could even -- Muslim, they looked at Shia as what they call apostates or rafida.  Sometimes they would call them dogs.  They persecuted ethnic and religious minorities like the Yazidis.  The Yazidis were a primary campaign of systematic rape, including teenagers, and torture, and then they kind of have tiers of where people sit.  Westerners, Christians, infidels, other apostates, so --

Q.  In the time frame that we're talking about, was ISIS focused on Yazidis?

A.  Very much so.  They maintained a focus on Yazidis throughout through exploiting them, selling them at slave markets or using them as incentives to get people to join their group.  So individuals with certain skill sets that were recruited would be afforded maybe the rank of emir and more sex slaves than someone else.

Q.  Can you explain for the court how ISIS operated as a military organization during the time that we're talking about?

A.  I mean, in no uncertain terms, it was a military juggernaut.  There's probably no other terrorist organization in my study that combined the conventional military capabilities of the Islamic State with the asymmetric capabilities and the capabilities of conducting external operations like we've seen all over the world where they've launched attacks.

Q.  And in these military conflicts, who was ISIS fighting? Were there other national armies?

A.  Everybody.  They were fighting the Kurds.  They were fighting the Assad regime.  They were fighting Shia.  They were fighting the global coalition to defeat Daesh, which formed in late 2014 and is comprised of 85 different nations primarily driven by the United States and its close allies. You'll notice that in their propaganda, the U.S. and the French are particular targets of their ire, but not -- certainly not limited to that in terms of when they do discuss nation states.

Q.  So you mention that the U.S. and the French in particular were targets of their ire.  How did ISIS use revenge for such grievances to affect governments like the United States?

A.  Well, they sought to conduct terrorist attacks to compel those governments to change their policies; namely, to get them to withdraw from areas where they're conducting military operations.

I'm sorry, can I interrupt for one second?  Can I just move some of these?  I just want to move them up.  I don't want to screw it up for someone.  Thank you.

Q.  Dr. Clarke, let's focus on the time period in 2019.  Which nations in particular were deemed enemies of ISIS and worthy of revenge?

A.  Well, the United States is at the very top of that list

145

because it's the main entity capable of destroying the caliphate. So in ISIS propaganda they frequently singled out the United States. Sometimes they would say in particular Americans; other times they would refer to the U.S. and the Israelis as the crusader Zionist alliance, infidels, or various other governments. But the U.S. was the primary driving force behind revoking the territory that the caliphate held. Even when the Kurds were fighting, it was the U.S. that was training and equipping them, that was providing intelligence, reconnaissance, logistical support. None of that would have been possible without the U.S., and they recognize that.

Q. Was there a coalition that went beyond the United States that was actively fighting ISIS militarily in the time frame we're talking about?

A. I'm sorry. Can you repeat that?

Q. Was there a coalition beyond the United States, a coalition of governments that was active in engaging ISIS?

A. Yeah. I would say the global coalition to defeat Daesh, which is 85 separate nations.

Q. 85 separate nations you said?

A. Correct.

Q. What were some of the characteristic terrorist tactics that ISIS would employ against its enemies?

A. Suicide bombings, vehicle-borne improvised explosive

devices, or VBIEDs.  In fact, they were able to industrialize VBIED factories and film them in many of their propaganda videos.  And frequently in their propaganda they would feature videos of themselves executing hostages, executing captured Kurdish soldiers, executing journalists, beheading them, lighting them on fire and videotaping it, drowning them and videotaping it, having children as young as 9 years old, shoot them in the head execution style, videotape it.

And this was in many ways multipurpose.  It was meant to intimidate their adversaries and recruit some of the most hardened sociopaths in the world to join their organization. There was no equivocating about what this group stood for. They made clear of that.

Q.  Did ISIS, in the time frame we're talking about, use attacks against civilians in an effort to exact revenge or influence governments?

A.  Frequently.

Q.  What are some examples?

A.  November 2015, an attack in Paris, France, 130 people killed.  March 2016, Brussels, Belgium, attacks against commuter rails, train stations, airports.  January 2017, Reina nightclub in Turkey in Istanbul.  And then there's also the inspirational attacks which we've suffered here in the United States in San Bernardino; Orlando; Columbus, Ohio; New York City.

147

Q.  By inspirational attacks, can you explain that term for the court?

A.  So that's someone that may not have been in direct contact with the Islamic State or Islamic State operatives but were inspired by their direction of saying, go out there.  We talked about Mohammad al-Adnani earlier and his admonition to strike wherever you are, to strike infidels wherever you can find them, and if you don't have the means, the weapons, to do it with a rock.  He said something like smash their head with a rock, get a vehicle and do that.  In fact, we saw a spike in vehicle attacks worldwide in places like Stockholm, Berlin, Nice and elsewhere where large numbers of civilians, men, women and children were murdered.

Q.  Including in the United States?

A.  Yes.

Q.  Dr. Clarke, how did ISIS recruit or -- let me rephrase that.  How successful was ISIS at recruiting fighters to come to the Middle East and engage in military battles?

A.  We've never seen a mobilization on this scale in history in terms of foreign fighting in the modern era.  At least 40,000 foreign fighters from 110 different countries flocked to the caliphate.

Q.  You said 40,000?

A.  Correct.

Q.  What if an individual supported ISIS and wanted to help

148

ISIS and couldn't get over there?  What did ISIS admonish them or advise them to do?

A.  This started happening more frequently as nations criminalized travel to conflict zones to participate on the side of an FTO like ISIS.  I spent many years attending workshops and conferences in places like the Global Counterterrorism Forum where countries were saying we're now criminalizing this travel.  This is great, but the second order effects of that were what we called frustrated foreign fighters, people that were unable to leave their countries where they were living and travel to the caliphate for what they would say make hijrah, and so they were told explicitly in no uncertain terms including from ISIS top leadership that you're more valuable conducting attacks where you are now particularly if you live in the west,

Q.  Did ISIS emphasize claiming credit for these inspired terrorist attacks in the west and elsewhere?

A.  Yeah, very much.  Through a mock news agency they would often claim responsibility labeling the individual perpetrators, quote/unquote, soldiers of the caliphate.

Q.  Did ISIS encourage those inspired attackers to leave a symbol or a message claiming the attack for ISIS?

A.  Yes, they did.

Q.  Dr. Clarke, what were ways that ISIS insisted upon loyalty or proof of allegiance?

149

A.   As we discussed here today, a pledge of bay'aa.

Q.   And pledging bay'aa served what function for that organization?

A.   I think it differentiated the kind of run-of-the-mill -- we used the term keyboard warrior earlier -- from an actual committed recruit who was intent on doing something and not just sitting behind a keyboard.  This was your kind of initiation in many ways to show that you weren't all talk.

Q.   Have you reviewed the bay'aa in this instance, the video of the defendant's bay'aa?

A.   Yes.

Q.   Prior to coming to court?

A.   Yes.

          MS. SONG:  Can we play Exhibit 4.3, please?

          THE COURT:  It's on my screen now.

          MR. LIPSON:  We have it here as well.

     (Video played.)

Q.   If we could look at Exhibit 1.4?  Dr. Clarke, have you reviewed this translation of that bay'aa prior to court today?

A.   Yes.

Q.   What features do you think are important for the court to understand in this particular translation?

A.   Obviously, the part highlighted in red is pretty critical, and that's something that we've heard Abu Bakr al-Baghdadi himself say and leadership of ISIS basically saying, you know,

if you die without making this bay'aa, it's a waste.  Right?
So if you are truly a soldier of the caliphate, that's a big
part right there.

Q.  And the caliphate, as you explained, has a religious
significance?

A.  Again, it's very difficult to disaggregate religious and
political.

Q.  That was my question.  Is it both a religious and
political concept?

A.  Indeed.

Q.  And prior to today, Dr. Clarke, you reviewed the
translation of the nasheed in this case as well?

A.  Yes.

Q.  If we could look at 2.4?  There was some discussion about
this earlier, but is there anything that merits mention to the
court in this translation?

A.  I think, you know, it's pretty straightforward.  Keep in
mind, these are poems that are often sung a cappella and
transposed across videos that include attacks, that include
beheadings and things like that, so there's context.  This
isn't going into an edited volume of poetry.

Q.  And if you had to characterize the role that nasheeds play
in ISIS recruiting, how would you do that?

A.  It's part of the aesthetic.  Just like we saw in the
video, the finger wagging.  They're all similar, which gives

them an air of consistency which shows that they're all part and parcel of the same ideology organization.

Q.   Now, Dr. Clarke, you've reviewed some of the evidence in conjunction with this prosecution, is that correct?

A.   Correct.

Q.   And you're aware that the defendant identified the target as a Nigerian church?

A.   I am.

Q.   During the time frame of this investigation, what was ISIS doing vis-a-vis Africa and Nigeria?

A.   So in 2019, the caliphate's on its last legs particularly in and around Baghuz in that spring.  And rather than, through their propaganda, show all these losses which are mounting, they tend to paint a picture of what they see as good news.  And so there's a large shift which hadn't been present beforehand to a focus on Africa and some of the groups there including the Islamic State in West Africa Province or ISWAP.  That was an area of the world where they felt they had momentum.  It became increasingly more significant to them than it had been years earlier when it was kind of on the back burner.  So it was a cause celebre in some ways among aspiring jihadis, ISIS supporters and ISIS members.

Q.   So Nigeria specifically was an area of military focus for ISIS at this time, right?

A.   Yes.  Nigeria.  But I would broaden that to say the Sahel

region at large.  So the surrounding countries, Niger, Burkina Faso, Mali.  Again, this is an organization that doesn't really recognize borders in that sense, but this is also a part of Africa where you've got a fault line running between Islam and Christendom, and so there's a lot of conflicts here, and it plays -- it's tailor made to the Islamic State's focus on sectarianism which was a big part of their ideology and their recruitment.

Q.  Was Nigeria a part of that 85-nation coalition that you have referred to?

A.  Yes.

Q.  What do ISIS adherents mean when they refer to individuals from that region as polytheists or mushrikeen?

A.  Basically that they're Christians is who they're referencing there.

Q.  Dr. Clarke, in that region, in addition to those nations that you mentioned, what was the role of the United States in that particular area including Nigeria?

A.  Well, as the world's strongest military power, the United States is responsible for what we call security cooperation and building partner capacity and that means working with partner nations especially in challenging conflicts like sub-Saharan Africa to train and equip military forces to combat transnational terrorists including in that part of the world during that time frame.

Q.  If we could put up Exhibit 2.1, page 11, please.  Top portion of that page.  Dr. Clarke, based on your knowledge and research, can you explain some of the discussion that's going on here with respect to Nigeria and Boko Haram, et cetera?

A.  Yeah, so there's questions about, you know, Boko Haram, the focus on Nigeria.  I mean, there's literally books written about this so I could go on for hours, but there was a fissure between Boko Haram, Abubakar Shekau, who is their leader, who had originally pledged bay'aa to the Islamic State and then had a falling out and that kind of paved the way for the emergence of ISWAP or Islamic State of West Africa Province.  So a lot of fratricide, a lot of internecine, bickering between Al Qaeda and Islamic State in every area where they were both active.

Q.  So the defendant makes the statement:  Boko Haram, it did not pledge fealty, brother.  What is that referring to, the rift that you were describing?

A.  Yeah, exactly.  There was a lot of uncertainty at this time over which group was loyal to, you know, either Al Qaeda or ISIS.  It was a bit messy, but the Islamic State West Africa Province ultimately ended up gaining leverage and becoming the dominant jihadi entity in that part of the world.

Q.  There's another statement by the defendant in response to the question are there soldiers from France in Nigeria, and he says mostly French army soldiers.  What about that comment?

MR. SAYLOR:  I'm going to object, Your Honor.  That's not a fair characterization of what the transcript says.

MS. SONG:  Mostly French army soldiers.

MR. SAYLOR:  Your Honor, I believe the government says other soldiers from France and Nigeria.  There's a line that you skipped.

Q.  Let's focus on the defendant's words, Dr. Clarke.  He says, quote, mostly French army soldiers?

A.  Right.

Q.  End quote.  Can you explain that reference?

A.  Yeah.  So through Operation Barkhane and other military deployments, that's the French, you know, sphere of influence due to colonial times.  So the French have kind of also, being Francophone countries in the part of that world, primary responsibility for counterterrorism operations in countries like Mali and the Sahel more broadly.  Again, France, even where France has the primary lead, they're being supported by the U.S. military in terms of some of our more -- how do I say this? -- exquisite intelligence gathering capabilities, things like signals intelligence.  Probably I shouldn't say more than that.

Q.  Dr. Clarke, you have reviewed the defendant's reference or some materials to an April 2019 Abu Bakr al-Baghdadi interview?

A.  I'm sorry.  Can you repeat the month and year?

Q.   In April of 2019?

A.   Correct.

Q.   The release of an interview with Abu Bakr al-Baghdadi?

A.   Right.

Q.   Can you explain for the court the significance of that message at that point in time?

A.   Yeah.  So actually, you know, I wrote on this extensively and appeared in the media talking about this.  This was a month after Baghuz was taken.  This was the first time that Baghdadi had spoken in nearly five years.  He felt compelled to provide a morale boost to what was then a sagging organization at least in Iraq and Syria, and he basically said, you know, for those that want to travel to join the caliphate, you're better served conducting attacks in your countries of origin or where you are now.

He also said things like, you know, this fight isn't over.  We haven't abandoned the caliphate.  This is a struggle.  This is a transition period.  And again, the media of ISIS at that time was focusing on what they perceived to be good news stories in other parts of the world where they weren't suffering such heavy defeats.

Q.   Did he specifically reference ISIS groups in Africa in that address?

A.   He did.  He said something along the lines of we still have ISIS groups in, I think it was, Mali and Burkina Faso

pledging bay'aa. While the territorial caliphate in Iraq and Syria may be hurting, look, we've got new franchises popping up and there's a lot of activity now in other parts of the world.

Q. The defendant referenced and praised attacks in Sri Lanka in April of 2019. Can you explain for the court what was happening in those attacks?

A. Yeah, so that was an ISIS-linked attack in Sri Lanka on Easter Sunday, and Islamic State-linked individuals from a local Sri Lankan group had attacked churches, hotels and other western targets.

Q. Churches specifically were among those targets?

A. Yeah, whenever they could, they sought to attack churches. You know, that's true for the ISIS franchise in the Sinai Peninsula in Egypt. That's true for ISIS in the Philippines. That's true for really any time that they could strike out against a target of Christianity, they would take that opportunity to do so. It was part of their harassment and intimidation campaign against what they called nonbelievers.

Q. Dr. Clarke, you mentioned Al Baghuz, and that's come up a few times. Very sort of succinctly, can you explain to the court why that was so central in the defendant's references?

A. It was a major focus at the time because it was literally the last sliver of territory in what had once been a territory that covered the size of Great Britain and included almost 12

million people.  So now they're down to that very last sliver where you have all the remaining fighters kind of crammed in, at least the remaining fighters in that region.  So it was a huge, hugely significant moment.

Q.  And ISIS forces lost?

A.  They did.  And the result of that now, those that were captured and remain, we see the kind of legacy of what the Islamic State left behind in some of these camps in Al Hol and Al Roj and other places where you've got ISIS fighters, women, children, others.

Q.  And what countries would you want revenge upon if you were taking revenge for Al Baghuz?

A.  First and foremost, the United States.

Q.  Dr. Clarke, in their inspired attacks, does ISIS encourage attacks against U.S. military and soldiers?

A.  Yes.

Q.  At the time of the investigation, Dr. Clarke, did ISIS encourage attacks upon U.S. law enforcement?

A.  Yes.

Q.  Dr. Clarke, you're familiar with some of the characteristic operational security methods employed by ISIS adherents?

A.  Correct.

Q.  Did you see evidence of some of those operational security methods in this case?

158

A.   I did.

Q.   Can you describe some of those?

A.   Use of end-to-end encryption, you know, deleting and wiping, attempting to wipe servers of evidence, taking other kind of security precautions, but that was not uncommon for an ISIS member to be very acutely aware of operational security.

Q.   In planning attacks, did ISIS place a priority upon keeping the operative groups small?

A.   Yes.

Q.   Dr. Clarke, there's a defense expert that has suggested that the defendant's conduct resembles that of a keyboard warrior.  Let me ask you this:  In your view, is the evidence that you reviewed consistent with that phrase?

A.   No.

Q.   Why is that?

A.   Because the defendant went far beyond that and was communicating with individuals about the mechanics of what an attack would look like.  A keyboard warrior is sometimes we derisively refer to them as ISIS fanboys or cheerleaders. This was far more than that.  A cheerleader is someone that kind of retweets, back when ISIS was on Twitter, propaganda or, you know, drops things in a Telegram chat room.  They don't go beyond that.  Hence, keyboard, right?  They're not actually actively taking steps to conduct plots or attacks.

          MS. SONG:  Those are all my questions, Your Honor.

159

THE COURT:  Cross.

MR. SAYLOR:  Your Honor, may I have five minutes --

THE COURT:  We'll wait.  You can have five minutes.

MR. SAYLOR:  Thank you.

(Pause in proceedings.)

MR. SAYLOR:  Your Honor, I am ready.  Thank you.

THE COURT:  Proceed.

CROSS-EXAMINATION

BY MR. SAYLOR:

Q.  Good afternoon, Dr. Clarke.

A.  How are you?

Q.  I'm well, thanks.  As a preliminary matter, you and I have met before, is that correct?

A.  Not in person.

Q.  Not in person but over video, is that right?

A.  Briefly.

Q.  We spoke about this case actually?

A.  Yes.

Q.  And we told you about our client, that we were seeking an expert witness for our client?

A.  Yes.

Q.  This is about eight months ago or so?

A.  I don't recall.

Q.  Does that sound generally in the ballpark?

A.  Yeah, I think so.

160

Q.   We wanted an expert witness to testify to present to the judge here to seek a lower sentence in the case, is that right?  Is that what you understand about our meeting?

A.   Yes.

Q.   And essentially how the meeting concluded is that you told us that you would not be willing to testify on behalf of Mustafa because you didn't believe that you wanted to testify on behalf of someone seeking to reduce their sentence in a case like this, is that accurate?

A.   I don't recall.

Q.   Subsequent to that meeting you then were contacted by the government about this matter?

A.   Yes.

Q.   And when was that?

A.   A couple of weeks ago maybe.

Q.   And you never told the government that you spoke to us about this case?

A.   I did.

Q.   You did.  Okay.  Are you aware they never told us?

A.   I just really recalled it this morning when I saw you both in here.  I remember a woman on the call.  And I was thinking that you looked familiar and started thinking and really jogged my memory today.

Q.   So you told the government this morning?

A.   I did.

161

Q.  That I had talked to you about it?

A.  Yeah.

Q.  Did you provide a report to the government prior to testifying here?

A.  No.

Q.  And just to be clear, you don't know my client, Mr. Alowemer?  You don't know him, correct?

A.  In what way?

Q.  You don't know him in person?

A.  No.

Q.  You never met him before?

A.  Of course not.

Q.  You don't know when he came to this country?

A.  Just from reading some of the documents several years ago, but no, I don't know him in person.

Q.  You're not familiar with what's on his asylum application?

A.  No.

Q.  You're not familiar with what's on his immigration forms?

A.  I don't believe so.

Q.  You don't know anything about his childhood or how he grew up?

A.  Not really.  I do know that he spent time in a refugee camp.

Q.  Yep.

A.  But prior to that -- I mean, I'm also aware of events that

162

precipitated him going to the refugee camp just from doing what I do for a living.

Q. Right, right. Mostly what you know is or 99% of what you know about this case is the pages that the government handed to you in preparation for this testimony, this testimony today, is that right?

A. In terms of the defendant specifically, but my knowledge about the Islamic State, its operations, its attacks, its recruiting --

Q. I'm not questioning that.

A. Okay.

Q. But about my client in particular?

A. Correct.

Q. I want to go through a little bit of your testimony here, and you talked extensively about ISIS and the kinds of degrees of command and control they have over people that subscribe to their ideology and people that are fighters.

A. Sorry. To characterize it more succinctly, I was talking about command and control between the wilayats.

Q. Between the wilayats?

A. Wilayats, franchises, affiliates.

Q. Okay. And that leadership and that command and control is fairly strong, is that right?

A. It's not a -- it depends. It depends on the wilayat. It depends on the time frame.

Q.   It depends on the time frame.  Okay.  But in terms of -- strike that.

What you were learning about ISIS is you're studying the writings and the speeches and the documents of the leadership. Is that fair to say?

A.   That's one fraction of a larger pool, yeah.  I mean, not to make light of it, but I've literally been studying this every day for 20 years.  I mean, not the Islamic State in particular, right, but transnational terrorism, yeah.  So primary sources, secondary sources, yeah, pretty much everything that you could think of.

Q.   Right.  You are the expert.  I mean, that's literally your job to know almost everything there is to know about ISIS in particular, is that right?

A.   Yeah, I mean, I try to, but --

Q.   You've convinced me.  Those documents and those writings would not necessarily be available to everyone or to a man on the street, is that right?  You have access to things and you spend most of your time --

A.   If they had an internet connection, it would be.  I'm not talking about classified stuff here.  I made reference to because I do have classified documents, but my information here is clearly based on unclassified documents that you, the man, the woman, whoever on the street could access.

Q.   Is it fair to say you spend eight hours a day at least

reviewing these things?

A.   That would be a really good day.  My wife would be happy if I spent eight hours.  Probably more like 12, but, yeah, I get your point.

Q.   You talked a little bit about -- let's actually jump right to Boko Haram and your description of that.  You said that there was some confusion about Boko Haram and that there was a schism between ISIS and Al Qaeda?

A.   Yeah.  So at the strategic level, ISIS, what we call ISIS core or ISIS central and Al Qaeda core, Al Qaeda central, but then when you drill down a level further to the provincial level, it's a bit murkier.  So not only was there confusion, there was often a lag effect in terms of when we kind of figured out what was happening because, you know, it's not like immediately it becomes clear that this one faction broke off, started a new, you know, group, had the requisite followers, control of territory.  I would say it was very murky particularly in that time period and in many ways still is.

     I work with folks -- one of my frequent co-authors wrote a book on Boko Haram, speaks the local languages fluently, and so even someone like that would say it's not always clear.

Q.   Not always clear, but this lack of clarity, would you say that it became more pronounced after 2019?

A.   No.  I would say things became a bit clearer after that.

Q.   After that?

A.   Yeah.

Q.   Is there a date that --

A.   Abubakar Shekau was really clearly on the outs and in fact was ultimately killed by ISWAP, so the leader of Boko Haram. But there's just a lot of other factions and subfactions, and again, to disaggregate that, it's not as neat as we'd like it to be, especially as an analyst.

Q.   Especially as an analyst?

A.   Yeah.  I mean, it's -- yeah.

Q.   Wouldn't the ISIS -- or at times -- let's talk about the period in 2019.  At times the propaganda arm of ISIS you said it was losing quite a bit of territory in Syria in that area of the world?

A.   Yeah, it had lost Baghuz which was its last sliver of territory.  Even in parts of West Africa where it was losing territory it was consolidating.

Q.   The propaganda arm of ISIS would have claimed that Boko Haram was part of it, isn't that right?

A.   Again, it would depend on exactly when.  So that changes over time.

Q.   Isn't another name for Boko Haram ISIS in West Africa?

A.   So they claim that, but then there was a competing group that was actually recognized by ISIS.  So they were both using the name for a while, which is why I'm saying it was

confusing.

Q.   And this is -- what time are we talking about here?  What period of time are we talking about here?

A.   Probably around that time.

Q.   Around?

A.   2019.

Q.   2019?

A.   Ish.  It's hard to remember in particular.

Q.   Okay.  But Boko Haram is and had been a number of years before 2019 claiming to be ISIS in West Africa?

A.   Yes.

Q.   So Boko Haram is saying "I'm ISIS"?

A.   Yes.

Q.   ISIS is saying Boko Haram is with us, correct?

A.   At a certain time frame they are.

Q.   In 2018 and 2019 is the time frame I'm talking about.

A.   Yeah, but again there's these splits with Shekau, the leadership.  There's others making claims.  Add up all of the franchise groups, this one is by far the messiest.

     If you look at Libya, if you look at the Sinai, if you look at Southeast Asia, if you look at ISIS Khorasan Province in Afghanistan, that one by far -- or ISIS in Somalia, ISWAP, I think most experts would agree is by far the single-most difficult case to disaggregate.  We also -- you know, you're talking about a part of the world where there's very little

167

local reporting. There's a lot of complicated factors there. The governments themselves don't often control their borders.

Q. Okay. But again, I think I just want to clarify that I'm talking about what the groups themselves are issuing propaganda to claim, and you agreed with me just now that ISIS is claiming Boko Haram and that Boko Haram is claiming they're also a part of ISIS. Is that a fair statement?

A. I'm sorry. Can you repeat it?

Q. In terms of the propaganda being issued worldwide, is that a fair statement?

A. I was asking if you could repeat it.

Q. The terms of the propaganda that was being issued there by both groups, both are claiming to be in league with each other in 2018, 2019?

A. Are both claiming to be ISIS at that time?

Q. Yes.

A. It's hard for me to remember exactly the year where that happened, but suffice to say it's basically ISWAP ascended during that time, right, the non-Boko faction.

Q. I'm sorry. By ISWAP you mean ISIS, Islamic State in West Africa?

A. Correct. The group that we today recognize, right? So Boko lost out. They were defeated militarily and big chunks of Boko were subsumed by ISWAP.

Q. Is Boko Haram considered a Sunni organization?

A.   Yeah.  All of these groups are.  If you're Al Qaeda or ISIS, these are all Sunni, Salafi, jihadi organizations.

Q.   That's why there was an allegiance there; is that fair to say?

A.   Between?

Q.   Boko Haram and ISIS.

A.   The fact that they were both Sunni is why there was allegiance?  I mean, you couldn't be a part of ISIS unless you were Salafi.  It's not like Lebanese Hezbollah, right, is a Shia group is trying to join.  And sectarianism is the driving force behind a lot of this.  It takes on different flavors in different locales.

Q.   You said that -- you were talking about how ISIS would view Shia Muslims as apostates, right?

A.   Right.  Nonbelievers.

Q.   Nonbelievers.  Is there -- and sort of -- and then it also sees Christians or polytheists is what you say as also being against them or in opposition.  Is there a --

A.   Pecking order?

Q.   A hierarchy.  Yeah.  Thank you.

A.   I knew what you were getting at.  There seems to be from their propaganda.  They typically -- and even Baghdadi himself talked about we need to first conquer the Shia, then the Sunni nonbelievers, right, so those that support governments like Saudi Arabia.

I don't know how much you want me to nerd out here on the near enemy versus the far enemy, the ideological roots. Christians are included there. But in fact ISIS did allow some Christians to live under the caliphate because, historically, there's something called jizyah or a tax that you can pay as long as you're not opposing that group, but that didn't apply to all Christians. So how they determine that is unclear.

And then you had groups like the Yazidis who were given no quarter and in fact were sold at slave markets and forced to take birth control so they could be raped without getting pregnant.

Q. I guess in that answer I didn't hear if there was a hierarchy, but Shia --

A. I would say generally Shia --

Q. And then Christian?

A. -- at the top, Christian or infidels, yeah. But they're also quite opportunistic. So if they could attack the west, they weren't going to say, well, we're just going to go for Shia instead, right? It was -- and they continue to attack Shia. There was an attack that they claimed just two weeks ago in Tehran against a Shia mosque.

Q. So let me ask about propaganda real quick. ISIS has been flooding the internet with propaganda for years; is that fair to say?

A.  Yes.

Q.  And usually through its official media?

A.  Official media but also its cheerleaders, its fanboys and other places.

Q.  And I think I reviewed a few articles, not every article you wrote but just a few for this, and there's an article which you said and maybe you would agree with it here is that the propaganda created a vivid unreality.  Is that fair to say?

A.  That I said that?

Q.  Yeah, you wrote that.

A.  Like I said, I've literally written hundreds of articles. What year and what -- again, because I think a lot of this stuff is context specific.  If I said ISIS was ascending, it was.  If I said ISIS was defeated, it also was.  So it depends what year.

Q.  Right.  The actual propaganda that ISIS was promulgated here you wrote, quote --

A.  Can you tell me what article?

Q.  An article in Foreign Affairs.

A.  Yeah, what year?  And if I had a co-author.

Q.  Well, I mean, let's just talk about propaganda in general.

A.  Sure.

Q.  Which it doesn't present an accurate picture of reality, generally, is that right?

A.   I don't know.  I mean, I would have to think about that.

Q.   Okay.  You don't know?

A.   Does propaganda -- sometimes it's meant to be deliberate and other times it's hyperbolic.

Q.   Mm-hmm.

A.   Right?  So like Abu Mohammed al-Adnani says we're going to conquer your Rome and step on your cross and enslave your daughters.  Do I think he's literally going to conquer Rome? No.  Do I think he wants to?  Yeah.

Q.   Would you agree that much of the propaganda that ISIS promulgates is targeted towards men under 25 who feel isolated?

A.   Absolutely not.

Q.   Absolutely not?

A.   Correct.

Q.   That's targeted to everyone?

A.   So the lion's share of ISIS propaganda was quite positive in nature and it was meant to present a picture of the Islamic State as some idyllic place.  That's why you had so many families flock there.  The Islamic State's propaganda was so sophisticated that I've compared it to -- I don't know if you have this article -- Madison Avenue, where it was targeted, segmented, different demographics, different countries, different subgroups.  What we saw on the news here were the beheadings, but that was the tip of the iceberg.  So it would

be inaccurate to say that the lion's share or -- I'm sorry, you didn't use the term lion's share -- the majority of ISIS propaganda -- and how did you come up with 20 to 25?  I didn't get that demographic.

Q.  Under 25 I said.

A.  No, I would disagree with that.

Q.  Disagree?

A.  Some of it certainly was, clearly.

Q.  In terms of the online radicalization process itself, I'm quoting, actually, you from testimony in 2017, that we don't actually understand quite a bit of how people become radicalized online.  Would you agree with that statement that you made?

A.  Yeah, I would agree with that.  I think we're gaining more understanding as there's more academic literature, as there's more studies, but we often look for monocausal factors and it's typically anything but.

Q.  And you would agree with me that we just don't know when people become or how people become keyboard warriors, as you say, and then become more radicalized from that, is that fair?

A.  You're asking me do we know about what makes someone cross the line from a keyboard warrior --

Q.  Yeah.

A.  -- to committing an attack?

Q.  I'm saying --

A.    If we knew, that's what the government and the counterterrorism authorities would love to know, what gets one across the line in an ISIS context or in a domestic terrorism context.  We don't have that magic power to know when someone is going to go from just talking to acting, but if they are talking about committing an attack, based on their history, especially a group like ISIS, we should take that seriously.

Q.    But there are plenty of keyboard warriors that never follow through with any sort of attack, is that right?

A.    Correct.  And they also don't go down the road and --

Q.    And --

(Court reporter interrupts.  Overlapping speech.)

        MR. SAYLOR:  Sorry.

        THE WITNESS:  Sorry.

Q.    Have you reviewed the information in this case prior to the undercover agent's contact with my client?

A.    If I did, it was not in depth.

Q.    Okay.  So you would not be able to say anything substantive about it?

A.    The fact that he was sharing ISIS or jihadi propaganda prior to engagement with the undercover, what I would say to that is there's clearly a history there and it wasn't something that just started if it dates back years and that's just -- but I couldn't speak to the content.

Q.    You couldn't speak to the content.  Okay.

A.   But we could, I mean, if you tell me what it was and we could talk about it in detail if you like.

Q.   Probably not going to surprise you with it here.  You talked about how ISIS takes credit for attacks?

A.   Yes.  Claim of responsibility is what we call it.

Q.   I'll get to the question, which is ISIS tends to take credit for attacks that they do, that they urge.  Is that fair to say?

A.   Yes.

Q.   It's not meant to be a trap.

A.   No.  I'm just thinking through -- so we talk typically about three tiers of the way they conduct attacks.  We call them direct attacks, inspired attacks, or virtual plotter/planner.  So there's different modalities, but they do take credit for those attacks that were done in their name.  They typically will call the person a soldier of the caliphate.

Q.   They take public credit on the internet about these attacks?

A.   Correct.

Q.   And the people that actually perpetrate the attack also take credit as well?

A.   Well, very often they're dead, but beforehand they'll do some kind of a bay'aa.

Q.   Beforehand.

A.  A video of martyrdom.

Q.  And just to clarify, in terms of the people that share propaganda from ISIS, they are not what you would consider a monolithic group?  They're not joining ISIS for the same reasons or sharing that propaganda for the same reasons.  Is that fair to say?

A.  You're talking about tens of thousands if not more people.

Q.  Right.

A.  So I don't think tens of thousands of people are monolith.

Q.  Each of those people have their various private reasons or reasons that they might find more persuasive for consuming ISIS propaganda?

A.  Yeah, I guess I would say that's accurate although I would say one commonality is supporting a group.  You're not going to share propaganda of a group or an ideology you don't support.  I mean, I wouldn't.

Q.  There's no one that's consumed or viewed propaganda from what you would consider ISIS that is also not an ISIS member or is not someone who is fully supportive of it?

A.  Can you rephrase?

Q.  Yeah.  Sorry.  That was a complicated question.  I might just withdraw it.

        MR. SAYLOR:  If I may have a moment, Your Honor?

        THE COURT:  Mm-hmm.

        MR. SAYLOR:  Thank you, Your Honor.

THE COURT: Any redirect, Ms. Song?

MS. SONG: No, Your Honor. Thank you.

THE COURT: You may step down, sir. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: Ms. Song?

MS. SONG: Those are all our witnesses in support of the enhancement, Your Honor.

THE COURT: Mr. Lipson, is there any evidence to be presented by the defense in way of evidence concerning the enhancement?

MR. LIPSON: One moment, Your Honor. Let me just confer.

(Off-the-record discussion.)

MR. LIPSON: Your Honor, I'm going to mark for the record Defense Exhibit 1, which is a copy of Special Agent Edquist's affidavit in support of search warrant for information associated with Facebook user identification numbers, and there's two identification numbers associated with Facebook accounts associated with Mr. Alowemer. This is an affidavit that was signed by Nicholas Edquist, special agent, Federal Bureau of Investigation, April 3rd, 2019.

Your Honor, I think in particular, which I think will be the subject of argument, is paragraph 32 of this document, a copy of which I did provide to the court before the hearing and a copy of which I did provide to counsel for the

government.  This is not something I had intended to move into evidence, but I think after discussion with co-counsel, I think it just makes sense rather than reading it verbatim into the record.  So Your Honor, I think co-counsel, Mr. Saylor, will make argument based on paragraph 32 and other I guess -- other related paragraphs during our argument.

THE COURT:  So you're offering Defense Exhibit 1 into the record?

MR. LIPSON:  That's correct.

THE COURT:  Government, any objection?

MS. SONG:  I note that it remains under seal.  I don't object to its admission, but I also just point out for the record that the witness himself was never questioned about this and he was on the stand for a long time.

MR. LIPSON:  Just in response to that, the affidavit speaks for itself.  It was signed by the witness, and I think that's the nature of it.

THE COURT:  Well, it's been offered as an item of exhibit on behalf of the defense.  I'll ask the government -- does the defense rest?  That document, Exhibit Number 1, is admitted under seal.  Anything further evidentiary-wise on behalf of the defense germane to the --

MR. SAYLOR:  Germane to the terrorism enhancement, Your Honor, no.  We rest.

THE COURT:  You rest.  Does the government have any

rebuttal relative to the exhibit?

MS. SONG:  No, Your Honor.

THE COURT:  Now we're to the point of argument on the enhancement.  Defense?  Mr. Saylor.

MR. SAYLOR:  Thank you, Your Honor.  Good afternoon. I know it's already been a lengthy day and there is more after this.  I am addressing the terrorism enhancement that is a significant enhancement here, a 12-level enhancement.  And it is our argument here that the government simply has not met its burden in this case.  I have submitted two filings that are pertinent to this, a position which details why the government cannot meet its burden and a reply to the government's argument.  To put it very simply, the increases in sentences for these defendants whose conduct satisfy certain conditions beyond the bare facts of the qualifying conviction, in this case, 2339B, cannot suffice.  The enhancement does not automatically apply.

And I think that should be a big take-away of the government's presentation and the government's -- what you've heard from the government's witnesses is that ISIS is scary. No doubt.  ISIS is threatening to the U.S. and other countries.  No doubt.  But it is whether the defendant here had a specific intent to commit the offense that he committed and it was calculated to affect the conduct of the government and the conduct of a government and it has to be calculated to

influence or retaliate against that government conduct.

In sum, the government here -- and I use the word government a lot -- cannot prove that Mr. Alowemer's actions here regarding the Legacy Worship church had the intent necessary to meet the requirements of the enhancement.  Of course, any support to a terrorist organization ultimately inures to the ultimate benefit of the terrorist purposes, but this reasoning totally misses the mark.  The material support statute requires knowledge, but the enhancement requires this specific intent.

And there are three main take-aways I'd like the court to come away with.  One is the actual target is a private Christian church.  Because Mr. Alowemer sees the world through an us versus them religious lens.  That's revealed throughout the conversations with the OCE and the UCE.  It means he's not targeting government.  It means he's not targeting the conduct of government.  His motivation is religion.  He's targeting religious practice.  Agent Edquist said that he wanted to interrupt Sunday services.  His ten-point plan mentions nothing about government, but it mentions everything about interrupting Sunday worship.

Houses of worship are the overall targets here, and that begins with in our sentencing memo we detailed how there was some discussion about targeting a mosque.  And that's why I kind of got into it with Dr. Clarke about whether there's

sort of a hierarchy of ISIS, people who are consuming that propaganda who dislike Shia Muslims versus polytheists because there was a lot of discussion with the OCE and the UCE, oh, they're going to strike a mosque. Notice that a government building never comes up. Government conduct comes up in stray sentences that the government is going to hammer. I know they are. But in hundreds of pages of chats, religious difference is the focus and is the inquiry.

The reason why we just moved in the affidavit in support of the search warrant is that it details when Mr. Alowemer became most animated on Facebook. He became most animated on Facebook when he is talking about Nigerians practicing a different religion, in this case Sufiism. He curses them for claiming the land to be blessed but over and over again through the chats he discusses apostates and healing thyself meaning healing the Muslim religion from within. Again, that is the sort of overall scope of and sort of the umbrella under which we should view this.

The cases that apply the terrorism enhancements, it is clear, the second point, is that it is clear the government conduct against which the defendant is targeting or is calculating his actions to effect or retaliate against, it's crystal clear. And that's seen throughout the cases in which the government cites in their brief, Stein and Allen in the Tenth Circuit, a recent case in which there's a manifesto

that's supposed to be published contemporaneous with the attacks. Clear there that in that manifesto they're telling Americans -- in that case it was white nationalists targeting Muslims. They're telling Americans to wake up. They're protesting the immigration policy of the Obama administration, and they're clearly linking their attack to this government conduct. They're saying the United States need to change its policy regarding immigrants. Here, there is no such clear link, no government conduct that's clearly stated, but that they want -- that Mr. Alowemer wants to change through this plot.

It's also not clear which government. I do believe that the government in response here will say, well, he mentions the Nigerian government, that he wants to retaliate against the Nigerian government. It is unclear how a private church in Pittsburgh is supposed to influence the Nigerian government. We're not attacking a Nigerian government building. We're not mentioning some sort of government building, that he wants to change government policy. Again, that shines through in every case in which the terrorism enhancement applies.

And that brings us sort of to the last point here, which is there was a back and forth in the briefs about how the personal motivations of the defendant just doesn't matter. I think Ms. Song will say it just doesn't matter what he

182

actually believed, what his private motivations are.  There's language in Awan, which is a Second Circuit case that Your Honor I'm sure is familiar with that says that primary motivation doesn't matter.  Here it can't be disregarded entirely.  It still has to be coupled with his understanding of the politics, which is clearly limited.

I asked Dr. Clarke.  He did say on direct that it was confusing whether Boko Haram is actually affiliated with ISIS and what the relationship was there, but I think it was clear that in the propaganda that ISIS and Boko Haram are linked. They are linked.  And Mustafa doesn't know, he doesn't know in the most clear exchange in which the government is going to hammer and say, yes, it was that the plot is to take revenge against -- for our brothers in Nigeria, but he doesn't know whether Boko Haram and ISIS are in league.  All that matters to him is that Boko Haram are pious, are they sufficiently religious.  That's the key word.  But whether there's some affiliation there, he's unsure.  But clearly, if he's that much -- that far deep down the rabbit hole, as it were, then he probably should know.  He probably should know that Boko Haram's name was ISWAP, Islamic State in West Africa.

There cannot be a sense in which personal beliefs don't matter at all because then it's completely decoupled from the specific intent requirement.  There cannot be a situation in which his actions to be calculated are totally

divorced from what the beliefs about the world are.  And I'll just note for Your Honor that the government wants it both ways, and my co-counsel on cross-examination touched on this a little bit, and I'll just revisit, which is essentially the government concedes that the church is not Nigerian and wasn't Nigerian at the time and that he's just mistaken about it.  But does personal motivation matter then?  They got into it in the sense of his words say, well, he didn't believe that there are people that are living in the houses around the church, but in this case, if the church is not Nigerian, then what does it matter?  That's sort of the logic that it comes to when we're divorcing the beliefs and the personal beliefs from this intent requirement that the enhancement demands.  So I would just draw attention to that and draw attention to them wanting it both ways, as it were.

I'll just address -- I think I've addressed a few government arguments here, but I would urge Your Honor to recognize that the government here's trying to shoehorn in that Mr. Alowemer's conduct here or actions here are targeting government conduct by saying ISIS does this, ISIS does that.  And I hope you see what they're doing.  Because Congress wanted to impose a harsher punishment on someone that committed an enumerated offense and then intended to influence the conduct of government.  Under the government's definition, any conviction under 2339B would automatically serve that

intent requirement that's necessary, and that just can't be true.

I want to make sure I've hit everything, but Your Honor is familiar with the briefing here, and I don't want to exhaust my time up here. So I will close. Thank you.

THE COURT: Ms. Song?

MS. SONG: Your Honor, the evidence in this case is extraordinarily clear. It's far beyond a preponderance. This court need not infer anything because the defendant's words speak for themselves. His target, in his words, was a Nigerian church, and the question was put to him why, and he said, to take revenge for our ISIS brothers in Nigeria. There is nothing mysterious about this. This was political; it was militaristic. This was retaliation for Nigeria and the United States and a coalition of governments defeating ISIS in that area and battling ISIS in that area.

These military conflicts that ISIS is engaging in are not civilian. War and military are government actions. There's just simply no confusing that this was solely a religious grievance as the defense would have you believe. Governments wage war, and his stated grievance, among many, was to take revenge for military actions that governments took against ISIS in Nigeria including Nigeria and the United States.

ISIS, as you heard, is a foreign terrorist

185

organization and its mission and definition is both political and religious. The nature of terrorism, particularly when it comes to foreign terrorist organizations like ISIS, necessarily merge those concepts, and as much as the defendant would have you believe that motivations are either religious or political and they can't be both, that's just not true, and there's not a case they can cite to that would say that.

ISIS and the defendant aspire for a caliphate. This would subsume national boundaries, as you heard from Dr. Clarke, a Muslim state, and that's a religious concept and objective. And who stood in the way in the view of the defendant and through hours and hours of recordings and statements, it was the United States, it was Nigeria, it was France and other governments, but we're focused on Nigeria and the United States.

You have the defendant's words and you have evidence in the form of his own collection of articles and maps of Nigeria showing the spread of ISIS in Nigeria, images depicting the conflict that ISIS was engaged in in Nigeria. And when he's laughing about destroying the church, he immediately refers to success that ISIS was experiencing at that moment in June in 2019 in Nigeria. His objectives were religious and political because that is the essence of the terrorist organization that he swore his allegiance to.

He was intoxicated, Your Honor, by the example of the

Sri Lankan Easter bombings which targeted churches, and he, again, in his own words, wanted to strike fear in the hearts of Christians and make them afraid to go to church.  And in his plan, the only government that is referenced is America, is the United States of America.  Everywhere and all over America.  He doesn't say Christians.  He is applying nation state labels to his intended revenge targets.

Let's talk about his animus towards the U.S. government.  The evidence of his animus towards the U.S. government abounds in this case.  He showed the undercover a video of his vision, which is the ISIS flag being raised over a burning White House as the American flag burns.  At the time of the defendant's crime, you heard from Dr. Clarke there was the frustrated foreign fighter phenomenon.  Of course he wanted to travel in his initial comments overseas and fight, but he didn't have papers and he couldn't do it.  And he was instead moved to commit an act on domestic soil which is exactly what ISIS was encouraging frustrated would-be foreign fighters to do at that point in time.

He blamed the United States government for ISIS' losses especially Baghuz.  He mentioned it multiple times.  And the U.S., as you heard from Dr. Clarke, was the sworn number one enemy in relation to Baghuz.  The defendant himself called them crusaders, infidels.  He fantasized about killing a U.S. soldier just because he was a U.S. soldier.  He

187

fantasized about exploding bombs on students who were ROTC students or who had adopted some military affiliation that he knew through his school.

In his nine-point written plan, as I said, he references Christianity as well as the United States and, more importantly, Your Honor, in his post-arrest interview you heard from Special Agent Edquist, he characterized his crime of terrorism, and that was his word, as an act against the United States, as an act against the country of the United States, and he even admitted some remorse given the opportunities the that the country of the United States had afforded him.

The defendant, through his words and through a lot of the testimony you heard today as well, Your Honor, was very fixated on the infidel police of the zone one station. He circled it on the map. And his original plan, as you heard, was to surveil them and then detonate a secondary device that would have killed them. This was a plan that he bragged about in the moment to the CHS. All of his plans in whatever iteration involved a chilling surveillance of that zone one station up to the day of his arrest.

This defendant, again through his words, Your Honor, wanted to lock down the whole City of Pittsburgh. He wanted everyone to be afraid to step and he wanted to strike fear in the hearts of everyone by planting bags of fear in the form of

explosives.  Those are his words, Your Honor.

I will refer you to the defendant's argument which is extraordinarily myopic and really not supported by the law. There is nothing that says that the motivation must be exclusively religious or exclusively political, as Mr. Saylor said.  The defense is trying to add conditions by saying there has to be a manifesto, that his statement of revenge or intent to influence the government has to be repeated.  There's no case that says that.  But in this case there is ample evidence in the form of the defendant's words and his writing and his actions that show that he was trying to both effectuate revenge and influence governments.  But it is inconceivable to think that, if he succeeded in bombing a church and killing the people who lived around the church in the name of ISIS in any city in the United States, that the government would not be influenced.

And the court in Allen and some of the other cases that we mentioned acknowledged as much, that civilians can be a target or at least a collateral target but the action can still be calculated to influence the government or to take revenge for government action.

As to the -- I will just very briefly address the defendant's attempt to create confusion around who is actually practicing in the church.  There's certainly not a case that says that the defendant has to have perfect knowledge of

geopolitical events as they relate to Nigeria. His knowledge was actually exceptionally good and nuanced. He was consuming these articles. He's the one that recognized that there was a question with Boko Haram. But that's really neither here nor there because it's clear that his revenge strategy was both the Nigerian government and the United States and certainly his actions were calculated to affect the United States and, by extension, Nigeria.

There's a case in the Fourth Circuit, Your Honor, as to ISIS in particular, the Elshinawy case, that looked at a very similar situation where the defendant had pledged a bay'aa and loyalty to ISIS and claimed to be a soldier and expressed his support in the abstract for ISIS' vengeful attitudes toward the United States, and that was sufficient. And we have far more than that in this case, Your Honor. And so for those reasons, we urge you to apply the enhancement and the defendant's sentencing guidelines have to be 240 months.

THE COURT: Ms. Stewart, anything on behalf of the probation office relative to the enhancement issue?

MS. STEWART: I have nothing to add, Your Honor. Thank you.

THE COURT: We're going to take a ten-minute recess, and then I'm going to want to consult with counsel in chambers at 3:05.

(Recess.)

THE COURT:  Mr. Lipson, I'm sorry, is your conversation at this point concerning my moving forward with ruling on the enhancement issue or something else?

MR. LIPSON:  It was something else, Your Honor.

THE COURT:  I thought so.  And the reason I'm interrupting you -- and I will certainly give you the time for that conversation -- I do want to get this portion of the record completed because our interpreter needs to depart.

MR. LIPSON:  Absolutely, Your Honor.  I understand.

THE COURT:  I'll give you what time you need for whatever conversation that doesn't relate to the ruling on the enhancement after we're done with that.

MR. LIPSON:  That makes sense, Your Honor.  We were not discussing the aspect of the court's ruling.

THE COURT:  Then is everybody prepared for the court to proceed to rule?

MS. SONG:  Yes, Your Honor.

MR. LIPSON:  Yes, Your Honor.

THE COURT:  Very well.  Counsel, and Mr. Alowemer, particularly, I have carefully studied the record, everything that has been presented, everything that's been filed in the case.  I've also carefully listened to all the testimony that was presented today.  All of those matters have been taken into consideration and my assessment and determination of the terrorism enhancement issue in this case.  I've also reviewed

the transcripts of Mr. Alowemer's June 21, 2019, preliminary hearing, the August 16, 2019, detention hearing. I've read the affidavit in support of a criminal complaint and a lot of the exhibits that came in today as they were presented and discussed and also in relation to those from the defense that were not admitted during the course of cross-examination today. I copiously tried to follow along with the reading. So I believe I have a very, very clear picture of the entire record in this case.

As counsel have very ably argued in their briefs, and counsel for both sides have done a very good job in briefing this issue, section 3A1.4(a) requires that Mr. Alowemer's felony offense be one that either involved a federal crime of terrorism or was intended to promote a federal crime of terrorism. A federal crime of terrorism is defined as an offense that, A, is calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct; and, B, is a violation of one of the statutes listed in Section 2332b(g)(5). As already noted by counsel, the offense to which Mr. Alowemer pleaded guilty, 18 USC section 2339B(a)(1) is one of the enumerated statutes. Therefore, subsection (B) is met.

The question remaining is whether Mr. Alowemer's offense was calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against

government conduct.

As to the applicable standard of proof, it is this court's opinion that the Third Circuit would maintain its position that a preponderance of the evidence standard applies to fact-finding relevant to sentencing under the sentencing guidelines.  The Third Circuit has held the burden of proof for fact-finding relevant to sentencing in this case involves sentencing judges are free to find facts by a preponderance of the evidence provided that the sentence actually imposed is within the statutory range and is reasonable.  And that is pursuant to United States v. Fisher case, 502 Federal 3rd 293, 305, Third Circuit 2007.  Although I find the preponderance of the evidence standard applies in this case, I do note and find that the evidence in support of applying the enhancement in this case also satisfies the clear and convincing standard.

For the terrorism enhancement to apply, the defendant must have the requisite intent necessary to satisfy the definition of the federal crime of terrorism beyond the intent required to establish a violation of the material support statute.  Several courts have addressed the difference between the defendant's intent in violating the offense of conviction and the specific intent that must be shown in order to apply the enhancement.

We have reviewed all of the filings in this case, reviewed cases cited and cases in addition to those cases

cited.  I do agree with the courts that have concluded that a defendant's personal motive in committing the offense is not relevant, and in considering whether a defendant had the specific intent to commit an offense calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct. Government must show that the defendant's offense was planned to influence, affect, or retaliate against government conduct even if that was not the defendant's personal motive.  The defendant's personal motive is simply not relevant, as is stated in the Stein case.  Enhancements were applied where the defendant's conduct was calculated to retaliate against government conduct even if such conduct was also calculated to accomplish other goals simultaneously.

Focus is not on the motive of the defendant but on his offense and as to whether it was calculated, planned for whatever reason or motive to achieve the stated object. Specific intent may be found even if the record does not contain direct evidence of the defendant's particular frame of mind.  In weighing whether the circumstances applies, courts should consider the evidence under the totality of the circumstances.

To that end -- and I do note that counsel for the defense has argued that the court cannot totally ignore personal motives or world view when considering specific

intent determinations.  I do not intend to ignore such relationship or focus upon the totality and circumstances of the case.  It is this court's intention and contemplation in consideration of the entire record to look at and contemplate and apply the totality of the facts as they apply in this case.

As to the specific government or governments being sought to be influenced, affected or retaliated against, this court agrees that the term government as used in section 2332b(g)(5)(A) applies to any government, foreign, domestic, and local or municipal.

Considering the totality of the circumstances in this case, the facts as set forth in the government's response to the defense objections to the presentence report as well as all evidence presented in this case and arguments and evidence received today establish by a preponderance of the evidence as well as clear and convincing evidence that the terrorism enhancement applies in this case to Mr. Alowemer.

Some of the facts that I have considered more specifically, but I do want to underscore I've considered all facts and the complete record before the court.  I've considered that Mr. Alowemer stated that he was motivated at least in part to detonate a device at the Christian polytheist Nigerian church, the Legacy International Worship Center, to support the cause of ISIS, to inspire other ISIS sympathizers

195

present in the United States to join together and to commit similar acts in the name of ISIS, and to take revenge for, quote, our ISIS brothers in Nigeria, end quote.  He expressed his hope that he would die by being blown up as in a suicide bombing which would render traditional Islamic funeral rituals impossible.  That's not applicable to some of the plotting in the case, but in the totality of the circumstances it does go to the circumstances and his intentions and motivations in relation to his intentions in the actions at issue in this case.

Mr. Alowemer also expressed his willingness to assist in avenging, quote, our brothers, end quote, in Al Baghuz, a city in Syria, against ethnic Kurdish Yazidis, the enemies of Allah, by providing his, quote, brothers with the identification of Kurdish Yazidis living locally as targets. Al Baghuz is a city in Eastern Syria which is the last city in Syria that ISIS controlled until Kurdish Syrians, with the support of the United States, defeated ISIS.

Mr. Alowemer discussed in person with the undercover agents opportunities to participate in a violent attack on the United States in support of ISIS.

At a third in-person meeting with government agents, Mr. Alowemer identified the Nigerian church as a target for a violent attack.  In this meeting, he expressed his hope that destroying the church with explosives in the name of ISIS

would inspire other brothers in the United States to join together and take similar action.

Mr. Alowemer explained that in destroying the church, quote, we take revenge for our brothers in Nigeria on behalf of ISIS.  The Nigerian government had taken actions in opposition to ISIS factions within Nigeria.

Mr. Alowemer raised the possibility of setting a second delayed explosive device timed to explode when the first responders were on the scene after the first explosion with the goal that the second explosion would cause authorities to lock down the whole City of Pittsburgh potentially killing law enforcement officers and certainly affecting the operation of the city government, federal officials and law enforcement personnel.

I do acknowledge and note that that second delayed explosive was abandoned at the end of the plotting by Mr. Alowemer.  However, it does go to the totality of the circumstances and it is germane to the overall intent in this case.

Mr. Alowemer was told by the undercover agent that to accomplish the goal of totally destroying the church that might require an explosive force that would result in death and injury to people in the surrounding residential area around the church.  Mr. Alowemer voiced his belief that there were no other persons living in the area as he felt it, but

there was possibility of other people being injured or killed.

Mr. Alowemer also suggested that the conspirators leave an ISIS-affiliated flag or sign with the words "we arrived" near the scene of the attack so that ISIS would be able to claim credit for the attack.  Again, whether or not that was continued to be an intent of his in relation to the flag at the final phase of the planning, the fact that it was stated by him as part of his objective, that does go to the intent in this case.

Mr. Alowemer's handwritten instructions for attacking the church provided therein that the operation must be done in the early hours of Sunday to shock the enemies of Allah everywhere and all over America.  He also wanted to instill fear in religious practitioners and prevent them from going to their places of worship.

Mr. Alowemer expressed his desire to undertake nafir in support of ISIS which meant that he wanted to answer the call for jihad or travel to conduct jihad.

Mr. Alowemer composed a nasheed, which is an a cappella chant, expressing his desire to travel overseas in support of ISIS and expressing his desire to die on behalf of ISIS.

Mr. Alowemer also pledged a bay'aa in which he appeared in a video he created to pledge his support and allegiance to Abu Bakr al-Baghdadi, the leader of ISIS.

Mr. Alowemer indicated he also wanted to target a single United States soldier for a violent attack. In doing so, he indicated to the undercover agent that when he saw a soldier alone, he had the idea that he could kill him. When asked why he wanted to do that, Mr. Alowemer expressed a desire to retaliate against the United States military and explaining that the United States military had, quote, killed our brothers in Baghuz and in Iraq.

Based upon the totality of the record in this case, it is this court's conclusion that Mr. Alowemer's offense was calculated to influence or affect the conduct of governments including the United States, the City of Pittsburgh, the Pittsburgh police, Nigeria, and by implementing these acts, to intimidate or coerce, and that this offense was also calculated to retaliate against the United States and Nigerian governments for their conduct in relation to ISIS brothers. As such, the terrorism enhancement provided under Section 3A1.4(a) properly applies in this case.

The next phase of this case will involve the issues of departures and then the guidelines and sentencing portion of the case. We are going to recess at this point to give the defense an opportunity to speak with his client for purposes of what further business we conduct today.

MR. LIPSON: Your Honor, just briefly. As it relates to the court's ruling, Mr. Alowemer maintains his objection.

THE COURT:  Understood.

MR. LIPSON:  For purposes of the record.  And I should note that I understand the court cited the totality of the circumstances and listed.  Mr. Alowemer does disagree that at the time that he reflected that he made any claim about a service -- an American -- a former American serviceman that it was in any way related to Baghuz.  I understand that that was the testimony of Agent Edquist today but just think it is necessary for the record that he does dispute that.

THE COURT:  I understand.  I know our interpreter needs to go, but if he would take an opportunity, our court reporter has indicated a willingness to stay a little longer if you wish to proceed with the route we discussed about your witness traveling.  That's a defense issue.

MR. LIPSON:  I'm going to -- me and Mr. Saylor will confer with Mr. Alowemer right now.

THE COURT:  Just the other question I have is, before we lose our interpreter, if there's going to be a colloquy on that, we need to address that.

MR. LIPSON:  Understood, Your Honor.

THE COURT:  We'll briefly adjourn, but everyone stay pat.

(Recess.)

THE COURT:  Counsel, where are we at?

MR. LIPSON:  Your Honor, after conferring with

co-counsel and my client, without a court interpreter here, we're just not comfortable moving forward with any witness. And so I do appreciate the court's understanding about that. I have conferred with Dr. Guarnera who will be able to move things around with her schedule and is agreeing to fly back to Pittsburgh next Wednesday, and she could be available for an afternoon hearing. Your Honor, I did confer with our office and the mandatory training that we have scheduled for that particular day, and it's my understanding that myself, Mr. Saylor and Ms. John would be required to be at that training until 12:30.

THE COURT: Then let's look at another day because, if we're not going to do the psychologist until afternoon and we have three more witnesses, my experience from today is such that we're not going to be done by 4:30 on Wednesday if we start at 1.

MR. LIPSON: That may be the case.

THE COURT: I've done this long enough.

MR. LIPSON: I trust the court's instincts on that, Your Honor.

THE COURT: So Mr. Williams, when is the interpreter available?

LAW CLERK, MR. WILLIAMS: Next week it was Wednesday, Thursday and Friday, but Friday is Veterans Day. He had Monday or Tuesday available. He said let him know and it will

201

work.

THE COURT:  What about Tuesday?

MR. LIPSON:  Tuesday of next week?

THE COURT:  The 7th.

LAW CLERK, MR. LINSENMEYER:  The 8th.

MS. SONG:  That's fine for the United States.

THE COURT:  Wait.  Tuesday.  Richard.

LAW CLERK, MR. WILLIAMS:  Did I write it wrong?  I gave her all the wrong dates.

THE COURT:  Tuesday the 8th.  I think the only thing I have is a 9:00 change of plea.

MR. LIPSON:  One moment.

THE COURT:  I know you'll need to check with your witness.  I understand.

MR. LIPSON:  Your Honor, as far as my schedule is concerned, I am available.  I've already voted, and there's no issue with that.  If I can have a moment to speak with --

THE COURT:  Your witness.  Absolutely.  Ms. Song, did you say you were available?

MS. SONG:  That's fine.  Yes, Your Honor.

(Off-the-record discussion.)

MR. LIPSON:  Your Honor, is the court envisioning a -- how -- like a hearing from when to when on Tuesday, just trying to understand?

THE COURT:  I have a 9:00 plea that I may try to

shift.  I'm thinking probably we would start at 10:00 on Tuesday, the 8th, and we would use what time is needed.

MR. LIPSON:  So the court is otherwise available from 10:00 on for the remainder of the day?

THE COURT:  Mm-hmm.

MR. LIPSON:  Understood.

THE COURT:  But I expect us to use that time wisely.

MR. LIPSON:  I expect that that should be sufficient, more than sufficient.

THE COURT:  More than sufficient would be my categorization of it, counsel.  Understand that I have read everything in the record and I've read that report, every word, every footnote, completely, notwithstanding that I got it Monday.

MR. LIPSON:  I will keep that in mind as I walk Dr. Guarnera through explaining to us how trauma affects the adolescent brain.  I think with that, we're awaiting for one more piece of information about our third witness that day, which is Christina Tapu, who I know is a teacher with Pittsburgh Public Schools.  So she required a subpoena to have her testify today --

LAW CLERK, MR. LINSENMEYER:  They may be off.

MR. LIPSON:  It's Election Day.

LAW CLERK, MR. LINSENMEYER:  Our school district is off.  I should say there's parent/teacher conferences that

203

day, so teachers are occupied.

MR. LIPSON:  We're just waiting for word on that.

THE COURT:  Understood.

(Off-the-record discussion.)

THE COURT:  Mr. Lipson, the mother in me has to ask the question, did you text the teacher or phone call the teacher?

MR. LIPSON:  I actually asked that same question of my co-counsel.  I guess that's the mother in me.  Your Honor, we texted and called.  The call went straight to voice mail.

THE COURT:  Okay.

MR. LIPSON:  It might be that because she was in the courthouse all day that her phone ran out of battery.  Your Honor, we could --

THE COURT:  We're just going to schedule it for 10:00 on Tuesday the 8th to resume and rely on the power of the subpoena.

MR. LIPSON:  Okay, Your Honor.

THE COURT:  We're adjourned.  Thank you.

(Proceedings concluded at 3:58 p.m.)

-----

204

C E R T I F I C A T E

        I, JANE PROUD, RDR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.

        S\ Jane Proud
        JANE PROUD, RDR, CRR
        Official Court Reporter

                        I N D E X

        WITNESS:                    DIRECT CROSS REDIRECT RECROSS

        For the Government:

        NICHOLAS EDQUIST              6      57     135      --
        COLIN CLARKE                137     159     --       --