IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

vs.                                Criminal No. 19-219

MUSTAFA MOUSAB ALOWEMER

-----

Transcript of Proceedings held on Tuesday,
November 8, 2022, in the United States District Court,
700 Grant Street, Pittsburgh, PA  15219, before Honorable
Marilyn J. Horan, United States District Judge.

-----

APPEARANCES:

| | |
|---|---|
| For the Government: | U.S. Attorney's Office<br>by Soo C. Song, Esq. |
| For the Defendant: | Office of the Federal Public Defender<br>by Andrew Lipson, Esq.<br>and Samuel G. Saylor, Esq. |
| Court Reporter: | Jane Proud, RDR, CRR<br>700 Grant Street<br>Suite 6260<br>Pittsburgh, PA  15219 |

Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

2

P R O C E E D I N G S

(In open court.  Defendant present with counsel.)

THE COURT:  Good morning.  We are convened in the continuation of sentencing proceedings in the case of the United States of America v. Mustafa Alowemer at -- what's that number?  19-219.  Counsel?

MS. SONG:  Good morning, Your Honor.  Soo Song on behalf of the United States.

MR. LIPSON:  Good morning, Your Honor.  Andrew Lipson, along with my co-counsel Sam Saylor, on behalf of Mr. Alowemer.

THE COURT:  Mr. Alowemer, good morning.  We're ready to proceed with further testimony, evidence?

MR. LIPSON:  Yes, Your Honor.  At this time, the defense would call Ms. Shahid Alowemer.  That's S-h-a-h-i-d Alowemer.

(Oath administered.)

THE CLERK:  Can you please go ahead, watch your step right there, have a seat, and I need you to speak into the microphone.  Can you please state and spell your name for the record?

THE WITNESS:  I'm Shahid Alowemer, S-h-a-h-i-d A-l-o-w-e-m-e-r.

MR. LIPSON:  Your Honor, I should note before I begin my direct examination, Ms. Alowemer, like Mr. Alowemer's,

primary language is Arabic.  She's learned English very well, very proficiently and she's -- I'll get into some of that detail, but Your Honor, if there's any issue, she may ask for the interpreter to interpret a question or to have interpret her response.  But in the first instance, she's going to attempt to do so in English.

THE COURT:  Very well.

MR. LIPSON:  Thank you, Your Honor.

SHAHID ALOWEMER

a witness herein, was duly sworn and testified as follows:

DIRECT EXAMINATION

BY MR. LIPSON:

Q.  Good morning, Ms. Alowemer.

A.  Good morning.

Q.  Where you do you live?

A.  I live here in Pittsburgh in the city called Dravosburg.

Q.  And what is your current occupation or what do you do?

A.  I live in my own house, in my parents' house, ███████ █████

Q.  And do you have a job, are you a student?  What do you currently do?

A.  I want to introduce myself.  I'm Shahid Alowemer.  I am a graduate from Brashear High School and a graduate from CCAC. I am currently a student at Pitt, University of Pittsburgh.  I work ten hours a week prior to my school, and I am the

second-born child to Mousab Alowemer and Fatima Alowemer. Mustafa is my big brother, and I have two younger siblings.

Q.  You said you work approximately ten hours a week.  Where do you work?

A.  I work in the Peterson Events Center in the food court.

Q.  And the Peterson Events Center, I'm assuming, is on the University of Pittsburgh campus?

A.  Yes, in the campus.

Q.  And what year are you at at the University of Pittsburgh?

A.  I'm a junior.

Q.  Have you chosen a major?

A.  Yes.  I am a biology major interested in research and hoping to learn many, many more things in the future.

Q.  You said that my client, Mr. Alowemer, is your brother, correct?

A.  He is my brother.  He is my older brother.

Q.  And you are the second of four children to your parents, correct?

A.  Yes.  Yes.

Q.  And how much younger than my client are you?

A.  Almost two years.

Q.  So you're approximately two years apart?

A.  We are best friends, basically.  Almost two years.  He was born in June 1998, I think I got it correct, and I was born in February 2000.

Q.  We're going to talk about some difficult things I know you have been through throughout your life along with your brother, Mustafa, but I'd like to talk about better times.  I want to direct your attention to life before the Syrian civil war.  I guess starting back before coming here to the United States, where were you born?

A.  I was born in Dara'a in Syria, me and all my brothers, we were born there.  We lived there and our -- with our parents, but the house was from my grandparents.  We lived with our grandparents.

Q.  I'll stop you there.

A.  Okay.

Q.  That's quite all right.  And when you said the word Dara'a that's D-a-r-a-'-a.  That's the name of the city?

A.  That's the name of the city.

Q.  That you were born in Syria?

A.  Yes.

Q.  And prior to the civil war in Syria, you started talking about some aspects of your life there.  Describe the neighborhood that you lived in.

A.  It was -- so we lived a simple life.  It was just a life with our parents.  We lived with our grandma at the time.  Our granddad passed away when I was 3 years old.  So we lived with her.  We were taking care of her.  My dad was taking care of her.  The place we lived, just a normal neighborhood.  We used

to go to school together.  Me and Mustafa, we would wake up early in the morning, have our breakfast, then walk to school. Our school was like two streets across of our house.  And so we would go to school.  After that we would come back from school and then have our lunch or like dinner and then we would do our homework and then play outside.  It was a very normal kid's normal life, even though --

Q.  Sorry.  Go ahead.

A.  I would say we were not the luckiest kids since we were young.  We were loved from our parents, our grandma, but, as you know, we are from the Middle East, so culturally the external family is important to us and the relationship is strong between all the family.  We were not that lucky to have our external family loving us.  We were more kind of used or left out or they were not -- they didn't like us as an external family should love their kids, as we say.

Q.  Okay. Well, let's take a step back.  Because I think my initial question was what your neighborhood was like.

A.  Yes.

Q.  Was it a safe neighborhood that you lived in?

A.  It was safe, yes.

Q.  So is it fair to say that you felt comfortable and there was not -- you didn't fear crime would occur?

A.  There was no crime.  Our neighborhood was a middle to kind of high class or like neighborhood.  So it wasn't a place

where there was like crimes or anything, no.

Q. And so we're talking about time before the Syrian civil war. The Syrian civil war started in 2011, correct?

A. Yes.

Q. So just before that started, how old were you?

A. I was less than -- I was born in 2000. The civil war started 2011. So I was less than 11 years old.

Q. And describing -- you said you would walk to school with your brother. Could you describe kind of your brother's role in the family in those before times, before the war?

A. Mustafa was always, always till the last time we were home together, the one who take care of the family. Even when we were really young, my parents used to work in -- so my dad worked in the construction, like construction, and my mom used to work in an office with like the human services things. When my mom would leave us to work and my dad -- like both of my parents are not there, Mustafa used to take care of us.

When we used to go to school and during the walk to school, he would wait for me until I finished because I'm always the lazy sister. He would wait for me and then we walked together to school. During the school, we have like a break time between the periods. School was not that organized. It was like a -- I don't mean anything, but it was like a public school, so it was not really organized. When we wanted to buy something from the place, a lot of students

8

would just gather on the window where they would sell us stuff, and so I was tiny.  I wasn't -- Mustafa would just come to me and say, hey, just stay here and I will buy whatever you want for you so you don't have to get squeezed between these students.  And he always took care of me inside the house, outside the house around in school, coming back from school, all the way.

Q.  What about within the larger family?  Would he provide any sort of care?  Did Mustafa provide any care for members of your family like your grandmother or your parents?

A.  Yeah.  Besides us, like when our parents would go to work, he used to take care of my grandma who was living with us.  As I said before, she was old.  She was 80 years old at the time. And she's not really able to stand up and just do whatever she needed to do.  So she needed someone to take care of her.

When my parents were not there, Mustafa was the one to take care of her.  I sometimes would get lazy because I was young, unfortunately.  Mustafa would take care of her.  He would stay around her.  Whatever she asked, he would do whatever she asked.

And also when inside the house, because parents out and we need someone to take care of us, Mustafa would close the door and make sure we're safe and then like we're not outside playing on the street.  And then he would prepare whatever like food for us.  So I was young.  My brothers also were

really young.  And we had like -- I'm not sure exactly, but at the time he was like one or two, three years old brother. Mustafa would clean the entire house for mom, because he know she would come back tired from work.  He also would prepare food to us even if it's the basic thing like making eggs for us, he would do that.

Clean the entire house.  And it was like not -- we didn't have like the electronics that it's easy to use.  It was like handmaid stuff to clean the house.  Take care of us.  And then even when we go out, we're allowed to go out and play outside, he is also the one to look for us and take care of us.

Q.  Was that something that your parents told him he had to do or is that something that he took upon himself?

A.  He never did anything because parents asked him.  He always took care because he would watch us, like watch my parents coming like tired from work and he would just do it by himself.  No one is asking him.  I used to get asked, hey, do this, and do that, and I would never do it, but he always held the burden.

Q.  Must have been nice to have an older brother looking out for you like that?

A.  He is the best.

Q.  It's the subject of this hearing so I think it's important that we get to it, but fast forward to after the civil war broke out.  I want to talk about the immediate times after the

civil war started. Can you please explain that experience from your perspective as a 10, 11-year-old child?

A. It was scary. It was terrifying. Like I remember we used to play outside whenever we allowed to. I remember looking at the window like from the window of our house and looking at, oh, the weather is really great, it's really nice to play outside, but we were not able to do this because our neighborhood was basically surrounded by snipers, like people who shoot. And they did not care. I have a cousin who is at that time was 8 years old. He was shot just two centimeters above his heart. So they did not care if it's a kid, old man, or whoever the person, even cats. They did not care. There was a lot of cats in the streets just dead.

Sorry. I kind of skipped --

Q. No. There's no correct order here.

A. It was scary because they would break into the houses and then just humiliate peoples, beating them up.

Q. Let's talk about that. When you say they, who is they?

A. I'm talking about the Syrian like army and soldiers, these people.

Q. Did it happen pretty quickly that the Syrian army came into your neighborhood?

A. Yes.

Q. And what started -- how did the war come to your neighborhood first? Was it through people or weapons, bombs?

How did that happen?

A.  It was -- so there was a lot of weapons.  Like do you mean like how it started or like what did they use or how did they come into the neighborhood?

Q.  Yeah.  How did they come into the neighborhood?

A.  They would -- so they have vehicles, they walk, they have weapons in their hands, and also there is bombing and shooting, all of that.

Q.  So let's talk about bombing.  In our interviews with our office you talked about an experience --

A.  Yes.

Q.  -- what it was like to be in your home during the shelling of your neighborhood.  Can you describe that for the court?

A.  You want me to talk about stuff I really wanted to forget for so long.  I remember so there wasn't power, dark all over the house.  We had rags and things to close the windows so the shells of the bombs do not come into the house.  I remember I was sleeping next to my mom on the floor and there was a bombing sound.  Like there was a (indicating.)  And then 30 seconds and then that bomb comes to the ground.  And so I remember we were not -- it was going on in the neighborhood of where we were at that time.  And we were not sure -- I wasn't sure if I was going to die next.  This bomb, this sound I'm hearing right now, is it going to become -- is it going to fall on our house?  Am I going to die now?

12

There was a period of time between the sound when the first bomb come out and then when the bomb land, and it was 30 seconds.  30 seconds.  Like 28 to 30 seconds.  I remember I was like in my mom's lap like close to her.  And the first sound start, and then I start counting.  I would count one, two, three, until 28.  When it comes to 28, I would just cover my head and the blanket and just squeeze myself to my mom's lap and just close my ears and just thinking about is it going to hurt?  How is it going to feel at that time?

And it happened a lot.  One of the times we were all squeezed in the corner because there was just bombing, crazy bombing everywhere.  And it was like one of the bombs just fell on the house exactly next door to us.  Like between -- like one meter between our house and their house.  And because -- our windows was glass.  And when the bomb just fell, the glass just shattered to all of us.  I remember Mustafa was sitting in the corner the closest to the window. Then my younger brother just close to him squeezing himself to Mustafa.  And then my other brother and me and my dad and just my mom looking at us like she is just saying good-bye to all of us.

Q.  I was going to ask you that.  During these times and these memories, it wasn't just you and your mother.  Mustafa was right there next to you?

A.  It was.  And he was mostly targeted, too.  He was targeted

13

whenever they came into the house.

Q.  So let's talk about that.  Because you mentioned that soldiers would come into the house?

A.  Yes.

Q.  Explain that more and if there's any examples that you can inform the court about?

A.  Yes.  So one of the days we were sleeping, and they came -- they just started breaking into the houses.  They came into the neighborhood.  They were shooting.  They were just running, screaming at people.  I remember it was -- when I woke up, it was 10 a.m.  My grandma and my mom was already awake.  My dad, my uncle at the time was in our house.  He slept in our house.  And Mustafa was asleep.  My other younger two brothers, they also were asleep.

And I woke up because I heard -- I was sleeping close to the window and I heard them running behind the house and we had like some kind of rocks behind the house.  So you could hear them.  Mustafa is a deep sleeper.  So he didn't wake up.  But I woke up.  And I remember I was in my sleeping clothes, my pajamas.  And I was like I heard them.  And I was like, let me go just dress my regular everyday things so when they come, they do not see me in my pajamas.  I run to the bathroom and then when I came out, they were already spread in the entire house.

Q.  About how many were there?

A.   There were a lot.   I can't count.

Q.   It was half a lifetime ago, but there was --

A.   There were a lot, yeah.   They do not come like one or two. A lot of them.   They would just come like -- like in the living room there were nine of them.   In the other room there was a lot of them.

Q.   Are they armed?

A.   Yes.

Q.   Did they have weapons?

A.   So they came into the house, I was coming out of the restroom and from the restroom I was just walking to the living room where the most of them were there, because our living room opened to the main door of the house.   I came there and I was so terrified and scared and to the point where my stomach was hurting me so bad I felt like -- and my legs were shaking so bad I feel like I was just going to pass out.

I came out and then they looked at me and just scary way of looking.   There is no, oh, that's a kid.   Let's maybe give her a smile maybe.   They looked, and then one of them said, to the wall, just pointed at me, saying, to the wall.

At that point I was scared because in Syria we know wall, to the wall means you're dead.   That's how -- this is how we know it was.   And then they went to the sleeping people, which my dad, my younger two brothers and then Mustafa and my cousin, and they wouldn't wake them up like, for example, I

thought maybe if they come to the house they're sleeping, oh, they're sleeping, I'm not going to wake them up maybe.  But when they came to the house, they would wake them up kicking them and pointing the gun to their mouth.  Like, for example, Mustafa, they put the gun to his mouth and said, hey, wake up, wake up.  And Mustafa woke up from his deep sleep looking like what's going on?  A gun pointed to his mouth, pointed to his head.

And then they woke the entire family who were sleeping up and they called them out.  And the younger brother who was at the time -- I'm not quite sure, but like 3 years, I would say, came out running to the living room and was looking at all these huge men around -- sorry -- these huge men around, and then one of them looked at him like this and he said, next to your sister.

And then they started to tell us to stand to the wall, one by one.  It was me, my youngest brother, the youngest one came running to me, and I just hugged him and the other younger one, then Mustafa.  Mustafa was kind of half asleep, so he just kind of sat on the floor.  And then there was one of these people who dressed differently than them.  He was wearing like different clothes than the other soldiers --

Q.  Before you go on.  The soldiers, what kind of uniform -- were they wearing military uniforms?

A.  Yes, they were wearing military uniforms.

16

Q.  Had the Syrian flag on the shoulder?

A.  It was Syrian.  Green.  It was a military uniform.

Q.  I'm sorry.  Continue.

A.  So Mustafa was -- we were standing on the wall, call it the wall of death.  Mustafa was sitting on the floor, and that dude who was a person who was wearing different clothes.  So back in Syria we knew that if a person come with the military and he is wearing different clothes, different like outfit than them, they're dangerous.  They are more -- they're Middle Eastern than the other people, the other soldiers.  They usually are not -- like they don't have mercy at all.

And that one person who was dressing differently came and just stood and looked at Mustafa was sitting on the floor and he just looked at him like this with a gun in his head and just pointed at him, and started looking at him really mean. My mom, I remember looking at my mom.  She's a mom.  And she was looking at all of us standing by the wall, her kids, and she looked at us like she was looking at us for the last time. Her first-born child is -- there's a gun in his head.

And that same day, my dad, he just was standing, like he woke up after they told him to wake up.  One of them said to him -- so we are his kids.  We are looking at our dad who is the protector of all of us.  He is the one who -- he's our big idol.  Like he's the one to protect us.  He was standing -- they came and they do not talk like normally to people.  They

would scream, swear at them, like at our parents, even my mom, like a female lady, they would scream, say bad words to her, and they just humiliate them, slap them, and a slap in our culture is really -- it's really -- it's really disrespectful. It makes the person's value just go basically as we say it's down to the floor, to the ground. It's not good.

And so slapping was a normal thing for them. They would slap people. They would humiliate them, kick them.

Q. I'm sorry. Not to interrupt. But you were saying seeing them do that to your father. What was the effect of that on you?

A. It was really hard. It just breaks the -- it breaks my heart. At the time I was 11 years old. And it just breaks my heart. I feel like there is no safety in this world no more. They came to my dad and they said, walk. Walk in front of me. With, of course, the gun in his back. The gun was exactly pointed at his back right here?

Q. I should note for the record that Ms. Alowemer is pointing to the back of her -- pointing to her back.

A. Yes. They were pointing that gun to his back and then they pushed him. So our house was two floors. When they pushed him, they for some reason they wanted to search the second floor. They pushed him and saying -- and one of them said walk. So the other sniper on the other building like get your head or like -- I don't know if I can use the interpreter

this time.  He said -- so the person who, the sniper was called Abu Jaffar, and he said -- and he said --

(Speaking with the interpreter.)

A.  Basically like that.

(Speaking with the interpreter.)

THE INTERPRETER:  To shatter your brain.  To shatter his brain.

A.  Basically that's how he said it.

Q.  So he led your father -- one of the soldiers led the father outside the house and, if I understand correctly, he said, walk in front, so the sniper gets you and maybe not us, that type of thing?

A.  Well, they knew each other.  But he wanted -- so the snipers, basically, they are seeing the entire area.  They see everything because they're watching.  And so if anyone look out or come out of the house or the place where they're not supposed to be, they are getting killed basically.  And so my dad was -- they told him to -- so because our house was two floors, there's stairs going up.  And our stairs was like obvious.  It wasn't closed.  It wasn't inside the house.  It was outside the house.  And so for my dad to come from inside the house to outside the house, he will be obvious to that sniper who was actually in the -- above the building.

Q.  I understand.

A.  People who are here today.

19

Q. Did they then take your father upstairs?

A. They told him to go upstairs and he said that one word to my dad, and me, my brother, look at him, hearing him saying such a thing to my dad and feeling like the person who is our protector, the person who is making us safe is no more there. He is just about to get killed. We are standing on the wall. We are about to die. Our dad is also going outside. So the other sniper get him. And then we're all dead. We were looking at each other like, okay, that's also -- is that going to hurt? Again, questioning ourselves, is it going to hurt, again? How is it going to feel now?

Q. They didn't kill your father. What did they do to your father?

A. Oh, they -- they beat my dad up. They broke his leg. They humiliated him. They were the reason we lived in so much pain for so many years.

Q. Because of the injuries that your dad sustained, did he have to go to the hospital, I assume? Take your time. There's some water, by the way, next to you and a tissue if you'd like them.

A. They were the reason why my brother suffered, my mom suffered, we all suffered. We lived in pain. We lived in danger. In Syria and outside Syria and even here.

Q. There were other things going on outside your home --

A. Wait. I need to talk. So they broke my dad's leg in

20

front of us.  And they were kicking him.  They were saying bad stuff to him.  After they left from, like after the day when they broke my dad's leg, I came to my younger brother and he was standing in the corner, and I looked at him and said, hey, you okay?  He was 3 years old.  And his pants were wet because he was terrified.

Q.  He had urinated on himself?

A.  Yes.  I said, it's okay.  We're okay.  And my dad because of that and because he was suffering a lot, his -- he had like a heart problem because of that

Q.  He still suffers from that problem today?

A.  And he still takes medication till now.

Q.  I want to move on from that very difficult incident.  And thank you for sharing that.  I know that's difficult.  You talked about in our prior discussions ways in which the Syrian army would make it difficult for the people that were in their homes related to the water supply.  Can you explain some of the things that the soldiers did?

A.  Yes.  They would make the water dirty.  So people drink -- like people had no choice but they needed water to survive. So there was two main ways to get water in our city.  One is the main water line which is controlled by --

Q.  A utility company?

A.  Yes.  The utility company.  And the other way was the tank above our house.  So they would like put dirty stuff in the

tank, and so the main line was never working.  The water, as we said, it was always cut.  There wasn't water.  They would not turn it on.  And the tank, they would either put dirty stuff and they would shoot at it so there's no water.  The water -- the tank will not fill.  There wasn't water in it.  And so many people had died of hunger and thirst and so many bad things.

Q.  Where was the access to food during the early days of this conflict?

A.  There wasn't no food.  So for us, my mom was able to manage our house.  So we had a little bit food in our house.  And so we were able to have some of that food, but other families, for example, our neighbors, they would come from like -- run between the houses so the sniper doesn't see them and come to our house and ask for food because they didn't have any in their house.  Some of the grocery stores in our neighborhood, they started just giving whatever they had for people so in order for them to live.  And they wouldn't take money.  They would just like write it on like notebooks and so later on, if life becomes normal, people would be able to pay them back.  But it kept happening till the point where grocery stores were empty.  There wasn't anything but the things that they were not eatable.  There was no use of them.

Q.  Is it fair to say that the working order of the community collapsed?  Food wasn't coming in?

A.   There wasn't.

Q.   And there was no place to survive?

A.   Most of the time the city was surrounded and so there's nothing allowed to come and nothing allowed -- and no one allowed to come out of the city.  That's how it was.  And so people will either be nice to each other and then if I have something, I will share it with you or you just died from hunger.

Q.   From our prior discussions, you referred that shortly when the war began there was about a two-week period where they locked down your family, correct?

A.   Yes.

Q.   Now, after that, when you left the home, what are some of the things that you observed?

A.   Like after we left --

Q.   Well, you were still living in Dara'a but after the lockdown ended, what did you observe in your neighborhood?  Were there any --

A.   Yes.  So at that time after the lockdown ended, men were still not allowed to walk out, they were not allowed to walk in the street.  And there was still snipers.  And if they see any man, he's dead.  They allowed women to go out for like a couple hours, like maybe one or two hours, or they would say, you are allowed to go out from like 1 p.m. till 5 p.m.  After that time, if you are seen in the street, you are dead,

23

basically.

And so at this period of time, they were allowed to go try to find something to eat. And it was the time where grocery stores were empty basically because people would run to these places and try to find something to eat and then come back. I remember one time I went with my mom. I was so scared because it was my first time seeing the army vehicles and things. That's at the beginning when it first happened. And I was so scared because I've never seen such a thing. It's not something we are used to seeing.

When we were walking in the streets, there was a lot of cats killed, like cats dead. Because there's a lot of stray cats in that city there. And so there was a lot of cats just dead and just after they died, they get bigger. There were a lot of them. I would ask my mom, mom, why? What happened? Why is this cat -- like what happened? Why is it like this? And she would just say, maybe they killed it or they did something to it. They didn't care. There was no mercy to no men, to no women, no mercy to old men. There not mercy to even animals.

Q. And you mentioned earlier that Mustafa was targeted because of his age and being --

A. Yes.

Q. -- being a boy of a certain age?

A. Yes.

24

Q.  Can you describe that and what did your brother do during that time to help provide the family -- provide for the family?

A.  Mustafa at that time was, I would say, 13, 14, maybe less, I don't know.  Between 12 and 14.  He was -- like, his height was above the average for his age, kids in his age.  And so whenever they came, whenever they came into our house, he was always targeted.  He was always -- the gun is always pointed at him.  He was always humiliated.  He was always -- they would just -- they hated him.  I don't know why.  And it was unfair to us because so at that time maybe they thought he was one of the kids that went out and protesting and walked and maybe they were the reason of what happened in Syria.

But Mustafa -- and it was unfair to us because our dad did not want us to break no law.  So he is -- so when families go out to protest, my dad would say, no, we stay home.  We're not going to get involved in any of that.  We are here in our house.  And so we were not -- he did not allow us to go and do any of that.  And we were scared.  We wouldn't do that.  And so whenever they come to our house, Mustafa was always targeted, they would think he was one of these kids who were -- whatever happened.

Q.  There came a time when your brother had to help get food for the family while in Syria.  Can you talk a little bit about that?

25

A.  Yes.

Q.  So it was really, really dangerous times because there was bombing, there was shooting.  Snipers never left.  So one night it was bombing and it was dark, and Mustafa would tell my mom, mom, I'm going to sit with my uncle who is next door to us.  He'd just say to my mom, I'm just going to stay with him.  I'm just like bored.  I don't want to stay here at home. At least I would just have some fun.  And then in that time when my mom think he is with my uncle, Mustafa was running from one house to another trying to provide bread and medication to people.  Our neighbor, there was a lot of old people in it.  So they needed medication.  And so Mustafa was running between the houses running, and he was actually injured because of that.

     I remember he came home that night when he was helping people, and then there was like blood all over his face from here to here, like above his eyebrow.  And it was like, like injury with the -- it felt -- it looked like a burn.  And then my mom had questioned him.  She said what happened?  What's this on your head?  And he said, oh, nothing.  I just fell.

Q.  Why do you think he told her that?

A.  He didn't want her to worry about him.  So he said, no, no, it's nothing.  I just fell.  I just fell.  Then we discovered it was a shell from a bomb.

Q.  Did your -- how did your mother handle all of this?  Was

26

it difficult for her?

A.   It was difficult for her.  And Mustafa wouldn't tell her anything to bother her.  He would -- he cared a lot about our feelings and us being in the best situation ever.  He didn't want my dad to be stressed.  He didn't want my mom to be stressed.  He didn't -- he was just -- he always kept it to himself so my parents do not worry about him.  And he would hold so much burden way, way above his age.

Q.   Well, let's talk about that.  I think we'll get into some details.  After -- there came a point at which you left Syria, correct?

A.   Yes.

Q.   It became too dangerous for your family?

A.   Yes.

Q.   And your parents decided to leave the country?

A.   Yes.  We almost got killed.  So we thought maybe it's time to flee.

Q.   Approximately how long after the war had started did your family decide to do that?

A.   The war started 2011.  We left the first month of 2013, I think.

Q.   So you were there in Syria for about 20, 21 months before you went to Jordan, is that right?

A.   Yes.

Q.   And that -- sorry.  I assumed an answer there.  Where did

27

you go when you left Syria?

A.   We left to Jordan.   We flee to Jordan.

Q.   And when you first got to Jordan, where did you initially live?

A.   We lived -- we were living in the Al Za'atari camp, refugee camp.   And then after that we move to Zarqa.

Q.   And Zarqa is a city?

A.   It's a city in Jordan, but outside and away from the camp, the refugee camp, the Al Za'atari refugee camp.

Q.   Can you please explain -- so when you moved to Jordan, did you go to school?

A.   I did -- yes, I went back to school.   My younger brother also went to school.   Mustafa didn't.

Q.   Why didn't Mustafa go to school?

A.   My dad was -- my dad was injured.   His leg was still -- he was not able to work and his heart also -- his heart condition was also new and he was not able to work.   And Mustafa had to hold all of this.

Q.   So is it fair to say that Mustafa was the one person in your family responsible for providing for the family?

A.   Yeah.   After we went to Jordan, he was 14.   He, to work, he had to do things that kids in his age are not able to do. And people who see a kid like him in his age, in his body, they should not let them work.   My parents were not able to say anything to that condition because it was -- there was no

one to provide for us.

Q.  And where are the places that he worked?

A.  He worked -- he worked in a company that makes construction metals and things.  And he worked in a leather factory.  And he also worked in -- he was helping an old man -- that was his first job in Jordan -- hold like heavy stuff and move stuff from place to place.

Q.  You talked about in your letter an injury he sustained?

A.  Yes.

Q.  While lifting heavy materials.  Can you talk more about that?

A.  Yes.  He -- I remember he came back one day from work.  He was working at the metal factory, the place where they make metals, and he used to hold these heavy metals.  He came back to home and he was just -- like his back, he was just like straight.  He wasn't able to move.  He would just move -- when he wanted to look at one of us, he would just move his entire body.  Like look with his entire body to us.  And he was so much in pain to the point where we were -- we all were shocked, like we have never seen him in this situation.  He didn't look like this before.

And my mom was just running and crying looking at him like what happened, what happened?  And he was -- usually he wouldn't say anything, and he would say like, no, I'm fine, I'm fine, I'm good.  But that day, he just -- he was not able

to hold it.  He was crying.  He said I suddenly held something.  It was really heavy.  And I'm not able to move my back.

And I don't know.  Maybe it was like he tore a muscle in his back and something.  Until now he sometimes tell my mom, my back hurt me.  It hurts.

Q.  How soon after he sustained that injury did he go back to work?

A.  He maybe like stopped for like two days or like three days and then just went back to work.

Q.  Why did he go back?

A.  To the same place that was the cause of the injury. Because there was no one to provide for us.  And he was scared.  He didn't want my parents to worry.  And he would like no, I'm fine, I'm fine, I can do it, no.  And he would just go back to work.  They were paying him really little money, like almost was not the cost of the hard work he was putting.

Q.  You mentioned the leather factory.  Can you talk a little bit about the effect that that had on your brother?

A.  The leather factory was the worst place ever.  He used to come back from that place -- and it was -- so it was a factory away from like the city.  It was like almost, I don't know, like 45 minutes or one hour away from the house.  He would like travel to that place.  And it was away.  There was like

no houses around that place because it was like full of chemicals and very poison chemicals.  He used to work in that place, and because it was leather and they need to put chemicals on that like leather to -- I don't know what they use.

Q.  To treat the actual leather?

A.  Yes.  Because it was like full of blood.  It was like new leather.  They would put these chemicals to, as you said, to treat it.  I don't know what they do to it.  And Mustafa used to his hands, they did not -- they didn't care.  To the point where his nails would just fall down.

Q.  Fall off?

A.  Yes.  Yes.  It would just fall off.  And he would come back to the house smelling so bad, so bad to the point my mom's heart was hurting but she would not be able to let him inside the house.  She would say, just get your clothes outside and then come inside.  It was very dirty, very -- the smell was awful.  And I remember because he worked there a lot, even when I sit next to him he had some kind of smell from that place.  And I would say I'm sorry, you smell so bad.

     It also affected him.  His hands were not looking normal. His back also, wasn't help to his back.  And he use to face a lot of dangerous incidents there.

Q.  Are you referring to the arrests for working without a permit?

A.   Beside, like other than that.  Because the place was not clean or there was -- I don't know what it's called but like dirt tank under the ground.  There was very sharp.

      (Speaking with interpreter.)

A.   Yeah, very sharp object, very sharp machines.  It was dangerous.  And also the arrests.

Q.   And why was he arrested?

A.   It was because he was working.  In Jordan, Syrians were not allowed to work.  So they would give Syrians like food coupons to go get food, but they were not allowed to work. Okay, you get food, but we don't care about how you live and you're not allowed to --

Q.   I'm listening.

A.   -- and you also are not allowed to work.  That's how it was.

Q.   And he was arrested on --

A.   He was arrested twice or three times because he was working.

Q.   For how long did this life that your brother was living -- I mean, providing for your family, last in Jordan?

A.   Since the first day.

Q.   And about how long was your family in Jordan?

A.   Almost four years.  Three years and so almost four years.

Q.   So for four years, while you and your siblings attended school and your father recovered from his injury, Mustafa was

held out of school and was providing for your family?

A.    Yes.

Q.    And he was providing for your family, working in these kinds of conditions where he could be injured or exposed to these kinds of chemicals?

A.    Yes, yes.  And he did go through a lot of hard times, but he would never say a word, caring about my parents' feelings.

Q.    Now, there came a point in time in which your family applied for asylum here in the United States?

A.    Yes.

Q.    And it was granted, right?

A.    Yes.  And we were very happy about it.

Q.    Let's talk about it -- well, let's start with your reaction.  When you learned that you would be leaving Jordan and coming to the United States, how did that make you feel?

A.    Oh, that's a happy time.  We were sitting, all of us, we were in the living room and my dad's phone was ringing, and then we picked up the call, and they said, hi, is this Mousab Al Alowemer?  And my dad said yes, this is Mousab Al Alowemer. And they said, congratulations.  You are basically coming to the United States.

       And we jumping that was happening and the screams of happiness, oh, my God.  Finally, life is becoming life, a good life, basically.  Mustafa was jumping of happiness.  I was screaming like very happily, finally, we're going to Hannah

Montana.  I was so happy.  Mustafa was happy.  Mom was really happy.  My mom is a big fan to the United States.  She always wanted to go to Texas, to Florida, to California.  She loves many places since she was really -- since she was a teenager.

So we were really happy, like we loved -- we suffered, we suffered in Jordan and in Syria, and we are finally coming to the dream land, the place we are finally seeing freedom and life.

Q.  And how did your -- you mentioned briefly how your brother responded, but from what you observed, how did your brother feel about that?

A.  He was so happy.  He was -- he actually gave the most reaction.  He was really happy.  He was excited.  He was happy.  He said, dad, finally, we are making it.  He is -- he was just so happy, just happiness was drawn in his face.

Q.  Let's talk about you resettled into Pittsburgh, in the City of Pittsburgh, correct?

A.  Yes.

Q.  And so let's talk about some of the good things that occurred.  The family was able to go to school here in Pittsburgh, correct?

A.  Yes.

Q.  And what about your brother?

A.  So I -- me and my younger brothers went to school first thinking that Mustafa won't be able to go to school.  And

Mustafa started to go to like a school to learn English but for -- I don't know if it's illiteral people.

(Speaking with interpreter.)

THE INTERPRETER:  Like, you know, like school which is designed for, you know, uneducated individuals, for laypeople.

A.  Like for old people.  So my dad went to it because he is not able to go to school.  And my mom, too.  And we thought that Mustafa also, because he was not able to go to school in Jordan, he also will need to go to that school.

Q.  Well, let's situate it.  So how old were you when you came to the United States?

A.  I was 16.

Q.  So is it fair to say then your brother was approximately 18 years old?

A.  Yes.

Q.  So he didn't know he was able to go to high school, correct?

A.  Yeah.  He didn't know.  And we all didn't know.

Q.  Did he end up being able to go to high school?

A.  Yes.  I was in school and my classmates they were his age. I asked one of them.  And I said, hey, how old are you?  And one of them said he was like Mustafa's age.  And then I was wondering, I was like, okay, why is Mustafa not able to go to school then?  Maybe he could go to school.  And then I went

back and I told my parents and I told Mustafa, I said Mustafa, you can actually go back to school. It's not -- it's not like impossible. You can do that. And then my parents talked to the people who were like the organization that were taking care of the refugees when we first came, and they said, oh, Mustafa, yes, Mustafa, in his age, he can go back to school, yes.

And then they were making up like making his paper and documentation, and then he went back to school, and I remember one day, we came out of the school -- because I was so happy. I want all my brothers to be educated. We were sitting outside the school. And I looked at him, and he was so happy wearing his backpack and just good high school student, and I just took photo of him. And I still have it to today. Because he looked so good in school.

Q. You talk about some of the optimism that you and your family and Mustafa experienced during those early days here.

A. Yes. We were really happy. We used to go a lot like walk in the downtown area, have a lot of fun with our friends who also were like Syrians and others who spoke -- like they were Hispanic, other students from the school. We also have a course, it was a -- we were involved in a program called learn and earn, and we learned English 101, we had a course English 101 at Carlow University. So we used to work three hours and then study three hours. We used to have a lot of fun.

36

Mustafa had a lot of friends in there, and they loved him dearly, to the point where I was kind of jealous. Oh, why Mustafa and not me?

Q. Did your brother graduate high school?

A. He did graduate high school. He did -- he studied ninth and tenth grade and then 11 and his senior year were like in one year. He worked really hard his last year and graduated with honor roll.

Q. It's fair to say that life was better here than in Jordan?

A. Very, very much. It was really happy times. The first year.

Q. Well, things were happy and better?

A. Yes.

Q. The experience in Syria and Jordan still affected your family, right?

A. Yes.

Q. Can you talk about some ways that that happened, that that still affected your family and in particular your brother?

A. So we had -- so first -- actually, not year. First couple of months were the happy times for us, the happy times where we're basically in our dream place. Then after that we started to lose a lot of like family members due to the war. And then after that we moved to a place called Northview Heights here in Pittsburgh, the North Side. And it wasn't the best place we lived and it wasn't -- it was not a nice place.

There was a shooting used to happen there, many people killed. My younger brothers, my other younger brothers were playing outside and someone came and just started shooting and they were -- they were in the same street next to that person who was shooting and we thought just -- I don't know.  It was really -- they almost were got in that shooting.

One time a person got killed and in front of us and he was laid on the street and no one cared about for a couple minutes, and people -- I don't know.  He was laid on the street.  And it was exactly like Syria.  People will die and no one care about, and to the point that people got used to it.  So it was like a small war, a small Syria for us.

Q.  How was your mother's health?

A.  My mom -- my mom suffered a lot.  She -- when we came here she was all right, but after, she got affected a lot and especially after Mustafa was arrested.

THE COURT:  I'm sorry.  I didn't hear that.  I'm sorry.

A.  After Mustafa was arrested she was affected a lot.  My mom was healthy.  She was healthy when Mustafa was arrested -- actually, both my parents.  When Mustafa was arrested, she had diabetes, high blood pressure, which is -- we never -- it's not something we know about.  She was -- she lost most than half of her weight.  My dad had -- so since his injury, he started taking heart medication, but after he had like

38

emergency -- like emergency pills he would take like whenever he had heart asthma, whenever his heart really is in pain.

Q.   Mm-hmm.

A.   He did not take this pill for so long through like after we came here until when Mustafa was arrested.  He almost take this pill -- like he had like five bottles of it ready.  Like he'd get it every, every couple weeks.  And he take almost three times a week.

Q.   Before your brother's arrest, how was his mental health?

A.   Mustafa?

Q.   Yeah.  Yeah, Mustafa.  Sorry.  What did you observe?

A.   He was not -- he was suffering.  Something was going on.  He would sometimes come back from school or like, yeah, he would come back from school and then just not be able to talk to us.  He would just go to his room, lock himself in his room and then just not talk, not eat well, not -- bad, bad mental health.  He would cry sometimes.  He wasn't -- he was not normal.  He had like a period of time like every month or like started to get more and more where he was just not able to talk.  Just by himself, alone.  Really like quiet, not feeling good.

Q.   Do you recall that there was an incident at Brashear High School?

A.   Yes.

Q.   Can you describe what you recall and what you observed?

A.   Yes.

Q.   In connection --

A.   I was home and then his teacher called us, and the school called us, and then his teacher came to our house and said Mustafa said he is going to commit suicide.  He did not want to live no more.  He had suffered a lot.  And we got a call from other place saying like if we need help, if we needed help.  And Mustafa at that time he was crying.  He went -- he came like from school and entered the house, but he went to his room and was crying.  He just closed the door and just was crying and did not speak for a couple weeks -- days.

Q.   At the time did the family ever discuss getting him mental health treatment?

A.   We did, but in the same time it wasn't -- it was hard.  So in the culture it's not a good reputation.  It's not a good thing for a young man basically to seek mental health.  It's not good for him.

Q.   Why not?

A.   They would have -- they would say things about him like he's a man.  He should be strong.  He should --

Q.   Not specifically about your brother, but you're saying culturally?

A.   Yes, culturally, yes.  He shouldn't be doing stuff.  Like why?  Is he weak?  Why would he go to basically see a therapist?  And they would say things like why?  Is he crazy?

Why would he go?  Very -- instead of understanding what's a person going through, they would make it worse to the point where he would -- a person would take it to himself and just suffer in silence basically.

Q.  Is that what you think your brother did?

A.  Yes.

Q.  Did your parents -- I'm not asking you to criticize your family, but did your parents think that Mustafa needed mental health treatment and he should get it?  Or did they subscribe to this cultural stigma about mental health?

A.  It was in between.  We wanted to help him so bad because he was suffering.  In the same time culture basically took over.

Q.  In the end culture took over?

A.  (Indicating.)

Q.  This is the point where if you could tell the judge something about your brother and the way that you know him, separate, apart from this offense, separate and apart from all that's happened over the last 3 1/2 years, if you could tell the court a story about him or the type of brother that he was, I think this is an opportunity where you can share that with the court.  If there's anything more you'd like to add?

A.  I hope I'm not being disrespectful.  Last Friday was really painful because many things, many things that were said about Mustafa does not describe who he is.  He is really,

41

really caring person.  He cares about me and my brothers.  He cares about, about my parents.  He suffered a lot, held the responsibility that was huge compared to his age.  I wish I could just open my heart and just show the court what Mustafa is really.  We got affected so much when Mustafa was away.  I'm almost losing my parents because of sadness at Mustafa.  Because he cares, he knew what we were going through.

His love to us and to our parents were obvious when they lost him, when he was arrested.  My mom every day whenever anyone come inside the house, she would say, oh, imagine that's Mustafa, imagine Mustafa opens the door and comes inside, imagine all Mustafa here, Mustafa was here, life would be so much easier.  If Mustafa was here, we wouldn't be suffering.

He was way, way better than all of us when me and my brothers were thinking about ourselves, and I wanted to study.  I want to do this.  And my other brother -- and he would say things like, oh, I want to be a businessman.  I want to have this and that.  Mustafa was always thinking about making my parents be more comfortable in this life.

In his graduation -- my mom would buy me stuff, and I was so happy.  Oh, my mom, give me this and give me that.  My other brother, oh, mom, give me this and get me that.  Mom wanted to surprise him.  So she bought him a suitcase like for his graduation.

42

Q.   A suit for his graduation?

A.   A suit.  I'm sorry.  I don't know how to say it.

Q.   That's okay.

A.   And he told my mom, mom, why did you -- that's your money.
Buy something for yourself.  You don't have to buy me
anything.  Mom, I could go in my normal everyday pants to
graduation.  You don't have to care about me.  He suffered a
lot and worked so much for all of us, to make my dad
comfortable, to make my mom comfortable, to take care of us,
me, his sister, and my mom and my other younger brother.

     And still life was never easy.  It was never nice.  It was
just -- we were never lucky in this life.  Whenever we say,
oh, life be finally getting happier, things just go bad.  And
all we're dreaming of day and night is Mustafa coming back to
house.  My younger brother that day was saying life would
never be normal if Mustafa stay in jail.  We will never be
normal until Mustafa come back out again.

Q.   Right.

A.   And my mom say, my health -- because you could see her,
like her reflection how she looks now.  She's way different.
Like me and my brothers, our hearts hurt when we look at her.
She is not as she used to look.  She does not smile like she
used to do.  I just -- I look at her sometimes and I say I
really miss her smile.  She does not smile no more.  When she
smiles, it's just like slight smile and that's it.  She never

smiles like she used to before.  My dad is never happy, and his heart condition is getting just worse and worse.

Life is getting so hard even on me.  Mustafa used to get -- used to have like a huge responsibility.  He made life easier, not only for me, my parents and my other younger brothers.  It's not easy no more.  I feel like sometimes -- I'm sorry for being harsh.  Sometimes I say you all love God, if we just die, all at once, so just life ends and we --

Q.  Maybe --

A.  -- just die and that's it.

Q.  I know that's how you feel at times, but you continue to be a student at Pitt and you continue and you push on, correct?

A.  He said, Shahid, I promise you when I come out, I will never make -- you will never have to work again.  I will work for you.  I will pay for your school.  I will help the whole family financially.  I will be the man to help you and be with you all the time.  I'm sorry.  But it's -- he was -- he was the base of our house.  Without him, without him, life is not good.  It's not easy.

Q.  I understand.  All right.  Thank you, Ms. Alowemer.

        MR. LIPSON:  Your Honor, I offer Ms. Alowemer for cross-examination.

        MS. SONG:  No cross-examination.  Your Honor.

        THE COURT:  You may step down, ma'am.  Thank you.

44

We'll take a ten-minute recess.

THE CLERK:  All rise.  Court is in recess until 11:48.

(Recess.)

THE COURT:  Mr. Saylor?

MR. SAYLOR:  Your Honor, the defense calls Christine Tapu.

(Oath Administered.)

THE CLERK:  Go ahead and have a seat.  Once you're seated, I want you to speak into the microphone and would you state and spell your name for the record?

THE WITNESS:  My name is Christine Tapu, Christine with a C-h-r-i-s-t-i-n-e, Tapu, T-a-p-u.

MR. SAYLOR:  Your Honor, may I?

THE COURT:  Mm-hmm.

MR. SAYLOR:  Thank you.

CHRISTINE TAPU

a witness herein, was duly sworn and testified as follows:

DIRECT EXAMINATION

BY MR. SAYLOR:

Q.  Good morning for another ten minutes, Ms. Tapu.

A.  Good morning.

Q.  You already spelled your name for the court.  Can you state your occupation as well?

A.  I'm a teacher in Pittsburgh Public Schools.

Q.   Just can you just give a brief educational background for the court?

A.   Sure.  I've been in Pittsburgh Public Schools now for 28 years.  I work primarily with the English language learners, but I can teach multiple subjects and have over the course of my career.  In my work with international students, a lot of my training and background I've learned overseas as I represented the United States in the United States Peace Corps and as a Fulbright Scholar.

Q.   Great.  Thank you.  And just want to thank you for being here.  Just to be clear, you were here on Friday to testify as well?

A.   I was.

Q.   Thank you for being here both days.  I want to talk about the subject of this hearing, and I just want to ask how you know the young man that's sitting to my colleague's left?

A.   So I met Mustafa in 2016 when he enrolled at Brashear High School.  At that time I was a teacher at Brashear but also the team leader, the department head, and then as the department head, I had the opportunity to work closely with the counselors to make sure that the students were placed appropriately and according to their transcripts and their language proficiency.

Q.   Great.  And you knew him going into high school, is that right, when he started high school?

46

A.   I knew him as enrolled, yes.

Q.   You said that was 2016?

A.   I believe so.

Q.   And you were his teacher directly?

A.   I was not teaching students at that level, but I did pick up a course for newcomer students where we learned some of the important survival language like colors and numbers, hello, how are you.  The students who sat in front of me had no English at all.  And that was where we were meeting their needs.

Q.   And so in 2016, 2017, Mustafa would have been in ninth grade?

A.   He was 18 years old when he enrolled in school and was placed into ninth grade because, in high school, it's a little bit different from the younger students who enroll in public schools.  They're placed according to their credit accumulation rather than their age.  So in Pennsylvania, we allow students to enter schools -- they're no longer permitted to enroll in high school if they're 21.  So they can't turn 21 when they're in -- before they start high school, but they can be 21 in high school.  So Mustafa met the parameters that we were able to allow him to enroll.

Q.   I do want to get to that, but I want to ask actually about Mustafa when you first met him in 2016.  What was his demeanor at that time?  What was his affect?

47

A.   As I mentioned, Mustafa had no language proficiency, and I'm accustomed to dealing with students with no language proficiency, but he had confidence in spite of his -- in spite of his language.  He carried himself with maturity.  He always had a smile.  He never assumed.  He always asked to, you know, to leave the room or to have a seat.  Just very humble and very courteous and just very -- he carried himself with a lot of maturity.

Q.   Was he loud, boisterous or more quiet and reserved?

A.   He was absolutely very reserved, very quiet, very cognizant of what was happening around him with the other students.  And he and a good friend of his would just laugh because, you know, they had all these ideas inside and they weren't able to explain it.  We would talk about things and things became very obvious that there was something there to talk about, but they just didn't have the language to be able to do it, but they carried themselves -- Mustafa in particular carried himself very graciously and very -- just with a lot of maturity.

   He had a lot of respect from his peers.  He had a lot of respect certainly from the Syrian males who were in classes with him, and he had a lot of respect from the other students who were with him who were often younger and who they looked to him as a role model.

Q.   What about his respect for teachers?

48

A.   Oh, my gosh.  So being in the business of public schools for 28 years, you come across all kinds of students, and Mustafa strikes me as one of the most courteous students that I've ever worked with.  Not because of his age, but because of just the kind of person that he was.  If I carried -- if I was carrying books or notebooks into the classroom at the beginning of class, he would stop what he was doing get up and help.  He was always there to help and just knew the right thing to do to be of assistance.  And he would do that.  And then his peers, his Syrian peers would kind of step up and do the same thing.  So he was always, always doing the right thing and leading his peers to a positive direction as well.

Q.   You mentioned he had some friends?

A.   Yes.  Yes.  There were -- with that group of kids who enrolled at that time he was with two other Syrian boys who he formed -- who he seemed to have a close relationship with. They were also older.

Q.   And what kind of student was Mustafa?

A.   Mustafa was a good student.  He was interested in learning.  He was always prepared, never called attention to himself in the classroom.  He was just quietly working and doing the right thing.

Q.   And could you get a sense of what motivated him or what motivated him to be a good student or be a diligent student?

A.   So initially I did not.  So as he was a ninth grader in

first semester, because of his English proficiency, I didn't know much about it, and that's the nature of what it is to work with students with very little English.  We don't know much about them because they can't share much about themselves, and the enrollment information that we receive is just demographics, you know, the address.  Maybe some transcripts shed some light, but there were no transcripts.  So just like all students who enter the school, he was, you know, kind of an open book.  We didn't know much about him.

Q.  You mentioned now twice in your testimony that you came to find out that he was a little bit older.  What problem did this present for Mustafa in terms of graduation?

A.  So for graduation, his -- the clock was ticking.  He was 18 at the time at enrollment.  Since state code doesn't allow students to turn 21 in a school year, he would have turned 21 the summer before his senior year.  And that happens often, but sometimes students of that demographic lose interest in school.  Work becomes more important for them and for their families.  So they kind of fall off.  And we never really know what is going to happen.  So we give students every opportunity we can to do, to get the education that they want.

Q.  What was the solution to this age graduation problem for Mustafa?

A.  So we let Mustafa continue with the courses that were required to fulfill the graduation requirements.  And junior

year began.  And Mustafa came back from a meeting with his counselor, and the counselor, because I had worked very closely with her over many years, she asked me to talk to Mustafa and just to confirm that he would not indeed be able to finish his senior year.  And we, you know, these kinds of things require creative solutions.

So over the course of several weeks, the guidance counselor and I crafted a plan to allow Mustafa to accelerate credit accumulation and graduate on time -- well, graduate early, in fact, to earn a diploma.  That required him to -- so it was a complicated plan, and that's why it took several weeks, but it allowed him to finish the first semester of the year, move into the second semester of his senior year as a person sitting in a class and then taking credits by way of an online learning platform to accelerate the credits that he wasn't able to take.

And the counselor and I put this together, and Mustafa was there, and he was thrilled.  He was happy.  And Mustafa left the meeting, Mustafa left the room, and I just looked at the counselor.  I'm like, do you think this is going to happen? I'm like, this is a lot of work.  This is a lot of work for an English-speaking kid.  I'm not really sure.  And so we talked about, you know, ways to assist Mustafa with his credit accumulation because it really was -- I mean, it was a daunting, daunting lift.

51

I had been running, overseeing an after-school program which had access to a lots of tutors from Pitt and outside community resources, and he agreed with this plan that he would stay after school every day that the after-school program was in operation, work on the credit recovery, seek out help from the people who were there, and he did it.  It was -- he accomplished what he needed to accomplish.

Q.  So he's fitting basically junior and senior year into one --

A.  Into one year.

Q.  -- school year?

A.  Yes.

Q.  And this is just for, to orient everyone, 2018 and 2019 were the years?

A.  Correct.

Q.  Junior and senior years?

A.  Yes.  And that would be a daunting task for an American-born student with native proficiency.  And the concern for the counselor and I was that Mustafa had gained a lot of English proficiency, but still that level of work was really very daunting.

Q.  You said he had to put in extra hours per day after the normal school day.  How many hours per day would he be putting in?

A.  So after school ran from 2:30 until 5:30 and we gave kids

52

a snack and food, but he often stayed back to do what he needed to do.

Q.   And you said that you maybe privately expressed some skepticism that he'd be able to accomplish this, but he did?

A.   I did.  We were both concerned because we've seen kids in similar situations, and you know, we try to set them up to be successful, but life often happens and gets in the way.

Q.   But in this case, Mustafa was successful in doing that, ultimately graduating?

A.   Yes.  He earned a diploma.

Q.   Just earlier we had his sister testifying here, and she testified about a Carlow English class that they took together.  Was that mandatory and part of this curriculum that you put together for him so he could graduate?

A.   So the Carlow curriculum is something that many of our students -- not -- students are allowed to participate and we promote the program because it exposes students to post-secondary experiences and it gives them a taste for college.  It is not for all students.  The students who participate in that program tend to be the students who are more academically inclined and, you know, kind of the upper tier students.  They're giving up their summers to do English and to learn.

Q.   So it was a voluntary program to try to learn English a little bit better and not part of the requirements?  Above and

beyond, in other words?

A.   Yes.   And to learn what it was like to be on a college campus with students who are working to bigger and better things.

Q.   I understand you also read books about the Middle East with some of the ESL and non-ESL classes?

A.   Yes.   So the year that I taught Mustafa -- I taught Mustafa was when he was a ninth grader and as a newcomer.   I lost touch with him.   He was not my student in his tenth grade year, but as a junior he joined my class that was a co-taught English literature class, American literature.   And at that point we were doing a co-teaching model which means I was working side-by-side with another English teacher and following the curriculum that all eleventh graders followed. And I was there to provide the adaptation for the language and the culture, and my colleague was the literature specialist.

We read a multitude of things.   In September when we were new to a curriculum, we started to read The Legend of Sleepy Hollow.   And being new to the curriculum and new to how students were responding to the curriculum, we weren't really sure how this was going to go.   So we provided ample opportunities, my partner teacher and I provided ample opportunities to explore the content.   And the author's kind of inaccessible to American students who grow up speaking English.   It's very inaccessible to nonnative speakers.   So we

54

provided an opportunity through the after-school program to watch the Hollywood version of The Legend of Sleepy Hollow.

So a small group came to participate. And I explained to the group of maybe ten students who were there, Mustafa and his friend, and I explained to the group, I'm like, now, we read the book. I'm not really sure how you're going to feel about this. There's some pretty gory things that happen because this is Hollywood and they want to get our attention. And I saw Mustafa turn and talk to his friend. And I was curious to know what their reaction was.

And Mustafa said, well, it can't be anything more gory than what we've seen. And I said, well, maybe? I said, you know, it's The Legend of Sleepy Hollow. It's about a headless man. And you know, they both agreed that, you know, seeing headless -- seeing people who had been beheaded on the street was not out of their realm of experience.

So you know, we watched the movie, and went about our business, and then a quarter later, right about now, November, December, we were reading I am Malala. And to be able to adapt the reading and be able to adapt the language for non-English speakers, we broke into small groups and did two small reading groups. So rather than deal with a group of 30 to discuss a book, we broke into two groups of 15, and I happened to be with Mustafa and his group.

And you know, we spend a lot of time, you know, reading

and understanding what the author was trying to tell us, and then Mustafa kind of volunteered to the group, the group was a mix of English language learners and American-born students who have grown up, you know, not in the best circumstances. Shahid had described what it's like to live in Northview Heights. Many students that were in that group came from Northview Heights or other similar housing situations on the west end of the city. So they've seen a lot. And they've encountered a lot of trauma.

And you know, Mustafa just quietly listened. And the American-born kids have a little swagger. They think they're kind of tough. And Mustafa quietly spoke up when we were talking about Malala and said, you know, I've seen that happen in my lifetime, too. He said, you think you're tough because you live where you live, but this was the reality for many people who live in different parts of the world like Malala.

So the students kind of fell silent. They didn't know what to say. They were all ears. And Mustafa just in very few words conveyed what I now understand to be a tremendous life experience in just a few words that spoke to the American students and spoke to the class about the literature we were reading and making personal connections with what I now recognize as his -- as his personal journey and his trauma with his upbringing.

Q. Thank you. So I want to direct your attention

particularly to that year in which you're teaching him and which he's engaging in his junior year or accomplishing his junior year credits in the fall of 2018, just to orient everyone, and then, excuse me, in the winter of 2019, is that correct?

A.  I believe so.

Q.  Was there a particular event or particular time that caused you to be concerned about Mustafa that you can tell the court?

A.  So in the winter of that year, Mustafa had already spent the first semester with me and my co-teacher, and we knew that part of Mustafa's graduation acceleration was to allow him to join a twelfth grade English class in the second semester. And you know, so we finished the final exam before the first semester and sent him on to our colleague where he was taking a senior level English class.  And it was the beginning of the semester.  And the beginning of the semester's a crazy, crazy time for schools and for counselors.

And Mustafa's counselor came into the classroom where we had the class that he had been in was we were with them, they were in the room with us.  And we were doing an activity that we refer to as a community-building circle where we all stand up and stand in a circle and just kind of answer questions that's maybe related to the literature or maybe related to how we're feeling.  It's just kind of a check-in, just see where

57

our students are.

So we're all standing in a circle and Mustafa --

THE COURT:  Can I interrupt you one moment?  This is on behalf of our court reporter.  Your speech tempo is pretty fast.

THE WITNESS:  I'm sorry.

THE COURT:  And she's excellent, but we're going to exhaust her.  So if you can just slow down a little bit?

THE WITNESS:  I'm sorry.

THE COURT:  She may be fine.  I'm just looking out for her.

THE WITNESS:  I appreciate that.

MR. SAYLOR:  I do it, too.

THE WITNESS:  Okay.  So where was I --

Q.  So you're sitting around in circle and sharing?

A.  So restorative circle and the community building circle was in process.  And we were talking about something at the -- nothing really heavy.  Mustafa came in with the counselor who had been working with him to get him situated in his new classes, and, as is our custom, we asked him and the counselor to join the circle.  When there are new people in the room, when new people come in, everybody in the room is included in the community building circle because they are part of the community.  And it was fortunate that the class already knew Mustafa so they were able to, you know -- they knew who he

58

was.

So it came to his turn to speak, and like I said, it was just a very light topic.  And Mustafa said something really very, very, very dark.  And I can't remember his exact words that initiated the conversation, that initiated his entry into the circle, but it was starkly different from what the students were talking about.  The gist of it was -- and I don't want to pretend to remember what the words were, but the gist of it was, you know, what is the point of living anyhow.

And the counselor was standing right next to him.  And you know, the counselor looked at me and I looked at her, and she left the room, and took Mustafa with her.  And I didn't really know what she was getting ready to do, but I know at that point of the year that it was, you know, scheduling and student needs were very high on her priority list because of the transition of semesters.

So I took the ball and I ran with it.  I went across the hall to the nurse who was just across the hall from us, and I explained to her, I said, I just heard something really very concerning.  And in American high schools, we have systems in place, and when students are in crisis we have a crisis team, we have a core group of people who are there to assist when students are having a crisis of any sort.  And she was one of the people on the crisis team.  The counselor was somebody on the crisis team as well.  So if she was with Mustafa at that

time, I was not.  I was following a protocol for what happens to students who are having a crisis.  I informed the nurse of what we just heard, and we instantly called -- our school has a group of translators who work with us.  I instantly called him, Mr. Omar, to come to the nurse, and I explained to both of them at the same time what we had just heard, and you know, we needed to do something.

And the counselor still had Mustafa, and I can't remember the timeline and the order of events, but I knew that I had a class that I needed to continue to teach.  So I left Mr. Omar and the nurse with that information.  Mustafa, I assumed, was with the counselor, and I went about my day.

Q.  And you heard his sister, Shahid, talk about an incident that she's describing in which she expresses -- in which she relates that her brother talked about self-harm.  Do you understand now or have you come to understand this is the same incident you're talking about that you escalated?

A.  Yes.  I have come to understand that.

Q.  And do you know what was done after that as a result?

A.  So Mr. Omar, our translator, informed me that the family was called.  It was explained to the family what had happened. And they refused -- they took him home, they took Mustafa home so we didn't have to monitor him for self-harm, but they were going to weigh the options for mental health services.  I believe Mr. Omar followed the family home to wait till the

county medical mental health team was able to arrive, and he returned to school to let us know that the family refused any services.

Q.  Did you ever interact or follow up with Mustafa in the weeks after that, if you recall?

A.  I did.  So Mustafa continued to come to the after-school program after having announced what he did, what his -- you know, what his mental state was.  You know, we kept a close eye on him and just made sure that we checked in with him on a regular basis.  You know, I did take it to the group of teachers who worked with Mustafa on a regular basis.  I said, so it's really hard to say.  You know, Mustafa comes from a place where it's sunny and warm all the time.  Pittsburgh winters can be a bit much.  I'm not sure if that's what it is or if there's something more.

So in the after-school space which afforded much more time than the regular school day to check in with kids and to find out how they were, I asked him, I said, you know, I'm glad you're back.  I'm really glad that you are working on something that's going to make your future better, you're working on your graduation requirements, you're working on something that is going to make your family very proud.

I said what you said in our classroom was really very alarming and shocking.  And I wasn't prepared for the response.  Mustafa started to talk about all the things that

he'd seen that were going on in Syria as we spoke, as we were, you know, living our lives in Pittsburgh and, you know, he talked about all the killing and all the people dying and the people that he may have known and, you know, talked about the uncertainty of not knowing where his family was and where his friends were, and are they the people who were suffering and dying and why is he -- why am I here with my family?  Why am I not there?  Why am I not one of those people who are in Syria on the news dead on the ground?

And I was speechless.  I didn't have anything to say.  I just reassured Mustafa that I was glad that he was here.  I'm glad that you're working on something that's positive for you and your family, and I'm here to support you if there's anything that we need to do.

Q.  Just to orient, this conversation occurs a few weeks after you described that in which he expressed some thoughts of self-harm?

A.  I believe it was a few weeks, and in the context of the after-school program where Mustafa was working on his credit recovery, he kind of slowed down a little.  His work, he wasn't as attentive to the work that he needed to graduate.  So I was a little worried that he was honestly thinking about following through with some self-harm.

Q.  Earlier in this conversation with me, you described -- and this conversation right here in court, you described his

demeanor when you first met him.  Did it change in the winter of 2019 when you are describing some of these later conversations with Mustafa?

A.  It had changed in that he was more sullen.  But he was still very courteous, still very much concerned in doing the right thing.  He didn't initiate conversations as much and just seemed to have like a heaviness to him which hadn't been there before.

Q.  You said it was surprising.  Is that right?

A.  Well, it was a complete 180 from the person who enrolled as a ninth grader.

Q.  You didn't see him that much later in the spring, is that fair to say, because he wasn't in your class?

A.  Exactly.  I didn't have regular daily contact with him because he was having English class with the senior level teacher.  He did come to the after-school program to continue work on his credit acceleration.

Q.  Got it.  Okay.  So you saw him somewhat regularly?

A.  Yes.

Q.  And then eventually he did graduate?

A.  Yes.

Q.  And how did you feel about him graduating?

A.  So both he and his friend worked on credit accumulation together and they both graduated, and I was ecstatic.  I was angry at myself for doubting him and the situation.  I was

63

proud of the work that he and his friend accomplished.  I was really, really proud of just the people who were there to help him.  It was just a beautiful, beautiful celebration of his work.

Q.  Ms. Tapu, so I just want to thank you for coming in.

MR. SAYLOR:  Your Honor, no further questions.  Offer for cross.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Ms. Song?

CROSS-EXAMINATION

BY MS. SONG:

Q.  Miss Tapu, I just have a few questions.  Talking about the acceleration that Mustafa Alowemer was able to accomplish, is that fairly unprecedented in your experience?

A.  Unprecedented, no.  Rare, yes.

Q.  Okay.

A.  We don't tend to put many students -- many students don't end up in this situation where they're aging out of high school.

Q.  But you made clear that certainly for a non-native-English speaker this was remarkable?

A.  Yes.

Q.  Which is why you questioned whether it could occur?

A.  Exactly.

Q.  And in fact, the defendant graduated with honor roll,

64

isn't that right?

A.   That's what his sister reports.   I don't remember that.

Q.   And to have accomplished, you know, that feat, certainly he exhibited in his communications with you an ability to plan and set that goal?   You mapped out the credit, aggressive credit schedule that you described with the defendant?

A.   So that would have been the counselor who did that. That's within their regular duty.   She was consulting me because I was more familiar with his English abilities and what he was able to likely accomplish.

Q.   But certainly to do that he had to know that that was the goal and understand the steps to accomplish that, isn't that right?

A.   So similar to any semester where a counselor schedules students for the class, they lay out, these are the requirements, this is what you've got to do, this is what you're signed up for.   And there was a lot of adult assistance just putting Mustafa in the right places so he can do the work that he needed to do.

Q.   But he had to do the work?

A.   He absolutely had to do the work.

Q.   And you've described that among his peers he was a leader, isn't that right?   He was respected and commanded respect among his peers?

A.   Yes.

Q.   And he was never a problem or didn't get in fights at school?

A.   Never.

Q.   He was able to control his impulses?

A.   Yes.

Q.   He didn't disrupt class?

A.   Never.

Q.   Or speak out?

A.   Never.

Q.   In school he was able to control his emotions to the point where he was not disruptive in class?

A.   Absolutely.

Q.   And again, to have accomplished that accelerated program that you describe, which is at least very rare, he certainly was exhibiting, you know, the ability to cognitively accomplish that and the maturity required to accomplish that?

A.   That's a question?

Q.   Yes.

A.   Yes.  Again, with assistance from the people who pointed him in that direction.

Q.   Right.  But you have also said that he's the one who had to do the work?

A.   Well, as in any high school student.  I mean, in that, he's not different from any student who finishes secondary education.  It's all up to the student.

Q.   Right.  But your testimony was that this was a very creative, unusual, rare, accelerated schedule that you put together, and you even questioned whether he was going to be able to do it?

A.   Correct.

Q.   The reality is that he accomplished it?

A.   Yes.

Q.   And he was the one who had to do it?

A.   Yes.

Q.   And he had to accomplish the goal that was set forth?

A.   Yes.

Q.   He exhibited maturity in doing that?

A.   Yes.

Q.   He exhibited good judgment in accomplishing that?

A.   Correct.

        MS. SONG:  Those are all my questions.  Thank you, Your Honor.

        THE COURT:  Anything further?

        MR. SAYLOR:  No, Your Honor.  Thank you.

        THE COURT:  You may step down, ma'am.  Thank you. Defense?

        MR. LIPSON:  Your Honor, at this time defense would call Dr. Lucy A. Guarnera.

        THE COURT:  Do I anticipate her testimony -- you had indicated would be an hour?

MR. LIPSON:  Approximately, Your Honor.  Yes.

THE COURT:  We're going to take a 40-minute lunch break.  I think we need to.  So it's now 12:30.  That's going to be 10 past one.

THE CLERK:  All rise.  Court is in recess until 1:10 p.m.

(Lunch recess.)

THE COURT:  Mr. Lipson?

MR. LIPSON:  Thank you, Your Honor.  Your Honor, the defense calls Dr. Lucy Guarnera, G-u-a-r-n-e-r-a.

(Oath administered.)

THE CLERK:  Go ahead and have a seat right there in the witness stand.  Watch your step.  And you've already spelled your last name, but can you please just state your name for the record, please.

THE WITNESS:  Yes.  It's Lucy Guarnera.

LUCY GUARNERA

a witness herein, was duly sworn and testified as follows:

DIRECT EXAMINATION

BY MR. LIPSON:

Q.  Good afternoon, Dr. Guarnera.

A.  Good afternoon.

MR. LIPSON:  Your Honor, I'm going to mark Defense Exhibit 6, which is a copy of Dr. Guarnera's resume, and my hope was to approach the witness, give her a copy of this so

she can authenticate it and we can move it into the record.

THE COURT:  Very well.

MR. LIPSON:  I provided a copy of Defense Exhibit 6 to the court but also to government.

Q.  Dr. Guarnera, what is Defense Exhibit 6?

A.  That's my CV.

Q.  And is this a document that you have seen before?

A.  Yes.  I wrote it.

Q.  That's my next question.  You authored this document?

A.  Correct.

Q.  And does this document appear to be the document that you wrote that is your curriculum vitae?

A.  Yes.

THE COURT:  Can I just interrupt for a second?  Is the government going to object to the credentials of this witness to testify?

MS. SONG:  No, Your Honor.

THE COURT:  And I've read the CV because you gave it to me earlier today.

MR. LIPSON:  Okay.

THE COURT:  So there's not going to be an objection to the credentials.  I think we can expedite some of this.

MR. LIPSON:  Oh, kind of already establish the facts that are in her -- in the CV, Your Honor, correct.

THE COURT:  Correct.  And I recognize her as an

expert in her field.

MR. LIPSON:  Wonderful.  All right.

Q.  Well, let's jump right into it, Dr. Guarnera.  You were hired by the defense team in this case, correct?

A.  That's correct.

Q.  And in connection with your work in this case you did a psychological evaluation of Mustafa Alowemer, correct?

A.  That's right.

Q.  Can you please detail the method that you employed in your evaluation?

A.  So the methods I employed were the standard methods, the best practice methods for conducting forensic psychological evaluations.  So forensic evaluation includes multiple different components so that we have as much information as possible on which to draw reliable conclusions.  So part of that was an interview, a clinical interview with Mr. Alowemer that lasted about ten hours total.  Part of that was contacting collateral sources, in this case family members, by telephone to interview them myself.  I also had access to many other collateral informants by way of notes from conversations with teachers at his school and friends.  I conducted psychological testing when I was with him, and I also reviewed the extensive record base in this case.

Q.  Why is it important when doing an evaluation to look at all these sources in order to come to the conclusions you were

asked to come to?

A.  Yeah, so in clinical practice with a psychologist, which is I think what we're most familiar with, you know, therapy or assessment kind of outside legal context, what matters most is what the individual says, what they care about, what they're bringing to a therapy session, something like that.  That's not the case in a forensic evaluation.  What the individual says is information we want to know, but it's certainly not the most important thing.  It is expected that in any forensic case there may be pressures for a person to downplay or exaggerate symptoms.  Their memory might not be perfect.  Things like that.  So you want to get as much information as possible so that you can draw the most reliable conclusions.

Q.  You talk about your experience with forensic evaluations.  Approximately how many people have you evaluated in your career?

A.  Hundreds.

Q.  And would you say that's low hundreds, high hundreds, mid-hundreds?

A.  Probably about 300 people I've evaluated for forensic purposes.

Q.  What about for nonforensic purposes as well?

A.  I'm thinking of all individuals I've worked with in a clinical capacity including for treatment.  It's probably around 500.

71

Q.  Now, do you have a history of working in criminal cases as a forensic psychologist?

A.  Yes.

Q.  And have you done work exclusively with the defense side or have you worked for also the prosecution as well?

A.  Yes, so I've worked with both the defense and the prosecution including federal prosecution.

Q.  Now as far as testimony, have you ever done any -- have you done any in-court testimony in connection with your forensic evaluations?

A.  Yes.

Q.  And for what side has that typically been?

A.  So I believe that has always been for the defense to date. Just the way forensic practice works, the majority of referrals we get are from the defense side, so my ratio reflects that, but I'm very happy to work with the prosecution also.  I've been requested to testify multiple times by the prosecution and each of those cases I think the cases were resolved by plea, so I was not required to testify.

Q.  Understood.  Now, you selected -- can you explain your philosophy in the type of psychological testing that you chose in this particular case?

A.  Sure.  So psychological testing is always tailored to the referral question.  Here there was, you know, concern about trauma symptoms given Mr. Alowemer's background and

72

experiences in the Syrian civil war.  And so the tests that I selected, two of them were specific to trauma-related symptoms and one was a more general psychopathology screen that could detect other sorts of problems as well to get a fuller picture and not get tunnel vision too early on what his problems may be.

Q.  Now, after you conducted your evaluation, which involved interviews, collateral sources, collateral interviews as well, looking at the discovery and your psychological testing, did you make any diagnoses for Mr. Alowemer?

A.  Yes, I did.  I determined that he meets criteria for post-traumatic stress disorder, or PTSD, complex post-traumatic stress disorder and major depressive disorder.

Q.  Can you explain a little bit what each of those diagnoses are for the court and to kind of explain causes and symptoms, typical symptoms?

A.  Yes.  So I feel like nowadays we kind of throw around the terms trauma or PTSD.  Sometimes they're used as even sort of a joke, oh, I have PTSD going back to this place or something like that.  I want to make clear that PTSD is not -- is not synonymous with undergoing a traumatic event.  Most people who undergo traumatic events do not develop PTSD.  PTSD is a very specific and severe mental health reaction that has very serious effects on the individual and typically can have a long and chronic course.

73

So there are multiple different kind of symptom clusters that come up. And I think the kind of the best way to explain it is to talk about what is it, why does it happen. PTSD is a reaction that happens when somebody undergoes a life-threatening situation or a threat to their bodily integrity, a threat of sexual violence, something like that. These kind of circumstances for a variety of reasons people can develop a disordered fear-learning and response.

So essentially the person learns that I almost died in this situation; therefore, I could almost die at many other points in my life when something -- you know, it can happen at any time because they learn that traumatic events are unpredictable and are out of your control. And specifically, that traumatic -- that life-threatening event could happen when I'm reminded, when there's a similar cue, something that was similar to the situation where the life-threatening event occurred and it happens again, that can be an even more acute reminder that death could be around the corner.

So as you might imagine, this is a pretty difficult way to live life, to be constantly at an elevated state of awareness, alertness, tension and anxiety because the expectation is that you could die at any time. So because of this heightened -- this heightened tension, this heightened anxiety, there are effects in many other areas of somebody's life. For example, people have problems concentrating, have problems sleeping

74

because you're essentially in a constant state of anxiety.

Another really important sort of symptom cluster that I think applies particularly to Mr. Alowemer is understanding the effect that PTSD can have on people's beliefs and thoughts about themself, others in the world.  So in order for us to get through our daily life we have certain kind of assumptions about the way that life works.  We assume that we can make choices that will affect our future, that we have an influence on our future.  We assume that, you know, people can be trusted at least to some extent at least so that you can move through life and interact with people and trust that they're not going to hurt you every chance they get.  And you have assumptions about yourself that you're a reasonably good person, most of us think that, that you're a reasonably good person that is doing the kind of the best that they can.

Developing PTSD after trauma shatters all of these assumptions.  These are symptoms of PTSD in the DSM-5.  So these assumptions no longer hold once you've been through a life-threatening event where you have no control over whether you live or die or limited control, where people, you know, people are seen as dangerous now.  You can't trust people because people are typically the cause of the harm particularly in interpersonal victimization, and it changes the way you think about yourself.

So you know, again, we like to think of ourselves as sort

of good people, but when people go through traumas, they tend to blame themselves because they're trying to find a reason to explain why this happened. You know, we have this sense of a just world, that good things happen to good people, bad things happen to bad people, and that helps us get through life day in and day out. But when bad things happen to good people, which is victims try to find a way to explain that and often the way to explain that is blaming themselves. This blame can be crippling, extremely devastating as people view themselves as someone who is to blame for what happened or continually at blame, that they're somehow destroyed, shattered, damaged, unable to live life the way that other people can live life.

Q. You know, I think what might be -- it would be helpful to me to understand -- I don't want to presume that it would be helpful to anyone else in this room because they maybe understand it. But why would someone's experience of an external force, some external trauma that was unpredictable, why would that translate to a self-blame as if they could have controlled that? That didn't compute for me.

A. So this is a very -- it's a very tragic symptom to observe because, regardless of the actual event, you see people blame themselves. I've seen this many times. Events where someone had no ability to control what happened, that they had no sense of -- they had no participation of the wrongdoing and still they find a way to blame themselves.

As I mentioned before, this kind of goes back to a just world hypothesis, that this was a belief that we all kind of have going around in life day-to-day, that bad things only happen to people who deserve it.  Because if we didn't think that, it's hard to -- kind of hard to live because anything bad could happen to you at any time.  That kind of anxiety which we used to avoid like clinging to this just-world hypothesis.

But when horrible events happen to somebody that are out of their control, that they didn't contribute to, that there's nothing that they could have done, the individual still struggles to find a way to have this kind of good and bad make sense of, I must have done something wrong.  There must have been some way I could have prevented this or I could have changed things.  In a way it's trying to be self-protective. How could I avoid this next time?  There must have been something I did.  There must have been some way I contributed. How can I protect myself in the future or, you know, keep this from happening, but a lot of times there's no way and you're just left with that feeling of guilt or blame.

Q.  You mentioned two other diagnoses that appeared from your testing with Mr. Alowemer.  One was complex PTSD and the other one was major depressive disorder.  Can you explain what complex PTSD is and where that -- where someone in your position would find the ability to diagnose someone with

complex PTSD?

A.    Sure.  So to be clear, an individual can and do sometimes develop PTSD in response to a single stressor.  So you know, you can develop PTSD after one car accident or after one -- you know, finding someone seriously injured on the side of the road.  You can develop PTSD from that.  In those situations, the symptoms, the impact on a person are typically more circumscribed in correspondence to the kind of limited penetration of that event into their life, their day-to-day life.

Complex PTSD often develops when it's not just a single incident or a handful of incidents.  It's a chronic, prolonged trauma from which the individual is unable to escape.  So the kinds of incidents that tend to cause chronic PTSD are things like kidnapping, being a child soldier, being in, you know, in a war zone, being in drug trafficking, being a child in a household with chronic, you know, physical or sexual abuse where the person is not able to leave and they're not able to protect themselves.  So because the trauma is more protracted, prolonged and reaching into every aspect of the person's life, the effects on the individual are correspondingly more severe.

So complex PTSD is found in the ICD, the International Classification of Diseases.  This is the most common diagnostic manual that's used internationally by virtually every country except the United States.  And so the way that

78

they describe it is you have to meet all criteria for PTSD and you have extra criteria because you have these more severe symptoms.

So the one that I think is most important for understanding Mr. Alowemer is what they called persistent beliefs about oneself as diminished, defeated or worthless, accompanied by deep and pervasive feelings of shame, guilt or failure related to the stressor.  The individual may feel guilty about not having escaped from or succumbing to the adverse circumstances or not having been able to prevent the suffering of others.

So these are themes that you can just hear over and over again in the case materials here.  You know, all of his family members, teachers, Mr. Alowemer himself are repeating, the medical records -- people are just repeating these themes of him feeling like he has failed, that he is unable to protect others back in Syria and now that he's safe in the United States, that because of this, he is diminished and defeated as a person.  And this appeared to have a very significant effect on him.

Q.  One thing you just said -- I think we didn't mention it earlier in the methods of the evaluation.  You just referred to medical records.  You also -- you may have said this earlier, but just to be certain, you also reviewed medical records associated with Mr. Alowemer as well?

A.  I did.  I reviewed the records I was given.

Q.  I didn't mean to cut you off.  Was there more to discuss about complex PTSD?

A.  There's one more point I wanted to touch on.  So another criteria for complex PTSD is difficulties of feeling close to others, and so this is something else that both Mr. Alowemer and his family and teachers described.  I think we heard Ms. Tapu talk about this.  That particular period, specifically in the winter of 2019, Mr. Alowemer began to feel alienated from others, from fellow students, from his teachers and spend more and more time alone.  And this is characteristic of complex PTSD.  All of the problems people are feeling, they make them feel withdrawn, not wanting to engage with others, have difficulty sustaining typical relationships.

Q.  Then as your third diagnosis, which is major depressive disorder, how did you come to diagnose Mr. Alowemer with that?

A.  So the major depressive disorder diagnosis was based -- and again, all of these same sources, interviews with him, with family, records, testing, all of his testing, his depression scores were very high.  And so to be clear, there's a lot of overlap between PTSD symptoms and depression symptoms.  You know, things like withdrawing from everyday activities or feeling low, things like that.  But there are some additional depressive symptoms that are not subsumed

under PTSD, like poor appetite, suicidality, things like that, low energy.  And so he did -- there is evidence of these additional symptoms, and so it seemed like this additional diagnosis was warranted.

To be clear, this is very common to have multiple diagnoses along with PTSD.  We call it comorbidity.  Comorbidity is the norm.  It's typical.  And major depressive disorder is one of the most common comorbidities.

Q.  That's what I was going to ask you.  With PTSD, it's not uncommon to also see an individual suffering from major depressive disorder?

A.  Yes.  It's particularly common with people who are not from western backgrounds.  So globally, depression is the most common response to trauma.

Q.  Over the course of your career in all the individuals that you worked with both in a forensic setting and a clinical setting, where would you place the trauma experienced by Mr. Alowemer as compared to other people that you evaluated?

A.  Mr. Alowemer has the most severe trauma history of anyone I've ever evaluated.

Q.  The most?

A.  Yes.

Q.  He's the one?

A.  The most severe.  So one of the strongest predictors of developing PTSD or complex PTSD in response to traumatic

events -- because, remember, many people experience these traumas and do not develop PTSD. One of the strongest predictors is the number of traumatic events an individual has experienced. And per his report and his family's report and understanding the context of the Syrian civil war, he has experienced dozens, hundreds of traumatic events that could have led to his death, and I think it's particularly important to note that this did not end when they came to the United States.

So per the DSM-5, it is -- it still qualifies as a traumatic event to learn about the violent death of somebody close to you, a family member or a close friend, and people do develop PTSD just based on learning about harm to other people. They don't have to witness it or it doesn't have to happen to them. And so the traumatic events did not cease just because he was physically safe in the United States. Continuing to learn about these traumas abroad and family, friends being killed in horrible ways abroad, seeing photographs of them on social media, these are additional traumas that seemed to have exacerbated his symptoms once he was in the United States.

Q. What effect would someone with the PTSD and complex PTSD and major depressive disorder that Mustafa -- that Mr. Alowemer suffered from, what if you were to then observe violence here in the United States? What effect could one

predict that that would have on someone like Mr. Alowemer?

A.   So there are several possible effects, but typically people are sensitized to violence.  It means that you are more -- you have kind of a lower threshold of fear, that in a situation that might not be seen as frightening to somebody else, you are more likely to view as frightening.

And in the case of, you know, that fear of violence, the individual has this kind of typical fear reaction where they're going through the cascade of physiological and psychological changes that a person goes through when they're facing an acute stressor.  It's putting you into survival mode.  I think we've all heard of fight or flight, but yeah, the person goes through fight, flight, freeze, this what's intended to be kind of a short-term survival-focused reaction to violence that's aroused when someone's not coming across a violent situation when they have PTSD.

Q.   You heard the testimony of Ms. Alowemer, Mr. Alowemer's sister, correct?

A.   I did.

Q.   And she referred to the Northview Heights neighborhood they're in as almost kind of a mini Syria for them.  What effect would that have on someone like Mr. Alowemer who's observing that after what he's observed?

A.   So again, the more traumatic events you go through, the more likely you are to have a severe reaction to them.  Also,

once you already have PTSD, the likelihood of an additional trauma having a significant effect on the person is higher. And that, you know, that makes sense because you have all these changes going in a certain direction of, you know, now I'm more afraid of people.  I blame myself for things.  I'm more hypervigilant.  And then, oh, gosh, something else happened.  That just confirms that fear-learning.

So for people to get rid of PTSD, the fear-learning has to be extinguished, meaning you get rid of this connection between a cue and danger.  So you learn, okay, these things I fear, they're no longer actually dangerous to me.  I don't have to be afraid of them anymore.  But you can't have that extinction of the fear response if you keep encountering dangerous things.  It just reinforces rather than extinguishes that fear-learning.  That's the basis of PTSD.

Q.  Thank you.  You wrote about this in your report.  I understand that we submitted this report to counsel for the government and the court.  So it's not necessary to go into every detail, but I do think it's important to discuss what is the effect of trauma and particularly the type of trauma that Mr. Alowemer experienced on an individual where they experienced that during their adolescent years?  How is that different for, say, for someone who experiences it later on in life?

A.  Yes.  So, you know, our brains are always capable of

84

changing to some extent.  We call that neuroplasticity or changeability.  But there is a particularly rapid and intense period of neurobiological change in childhood and adolescence kind of reaching up into the mid-20s.  You have extensive changes in cognitive abilities up until about age 16, and then social/emotional abilities to continue to develop until about age 25.

And so because the brain is rapidly reorganizing itself, it's kind of getting ready for its adult life.  You know, it's learning -- the brain is learning what it needs to be, what it needs to do for the person to be successful throughout the rest of their life, to survive and be able to thrive.  What the brain adapts itself to during adolescence is what you end up with when you're an adult.

And so for most of us that's perfectly fine because we're kind of -- we're being sort of apprenticed to adults throughout our lives and we sort of learn what we need to do, but if somebody is exposed to chronic threat or chronic deprivation when they're an adolescent, then that's what their brain adapts itself to, that's what it optimizes itself for. And the way that you are optimized to deal with threat or deprivation is not really the way that you want your brain to be if you're just trying to kind of live a conventional lifestyle.

So when you're under a life threat, the goal is immediate

survival.  Immediate survival.  That's all that matters because, you know, your brain says, hey, if I don't live past this moment, it doesn't matter what happens later on.  All that matters is making through this moment right here.

And so people who live through chronic threat as children or adolescent, you know, their brains are kind of optimized to this living in the moment, thinking about present survival and they fail to develop these abilities to take the longer perspective.  And to be clear, this is also true of adolescents in general.  So I think, you know -- you all are lawyers here.  I'm sure you're all familiar with Roper, Graham, Miller, this long series of Supreme Court cases about adolescents' ability, maturity, cognitive abilities and how adolescents as a class are different from adults.

So there's a lot of overlap between the adolescents as a class already have when it comes to making decisions and the deficits that develop when somebody experiences chronic threat or deprivation as a young person.  So these overlap and intensify one another so you have the most severe deficits when you have an adolescent who has also gone through these situations.

Q.  You talked about concept of threatened deprivation.  I don't want to presume.  A threat seems more self-explanatory. Can you explain what deprivation is in that context?

A.  Sure.  So deprivation is the lack of expected types of

environmental stimulation that you need to develop well.  So you know, as an example, if you have a young child who is raised in an orphanage without a caregiver, a consistent caregiver, who is, you know, in a room with blank walls, who is in a crib, who doesn't get -- doesn't have toys, doesn't have social stimulation with other kids, they fail to develop important cognitive abilities.

And so I use that as sort of an easily comprehensible example, but you look at Mr. Alowemer's background, his experiences in the war and in Jordan, he experienced a lot of deprivation as is pretty common during wartime exposure.  So he wasn't attending school.  He was often physically confined to small spaces like unable to leave his home or just travel short distances.  He was doing -- you know, involved in child labor which is very monotonous and kind of cut off from typical social experiences, educational experiences, relationship experiences.

And so this kind of deprivation is important because the brain operates on like a use it or lose it principle.  So as the adolescent brain is figuring out, hey, what do I need to be for my adulthood, if you don't use these certain -- if you don't use these synapses, they get pruned or they get eliminated in the goal of creating a more efficient and specialized brain.  And so if you fail to use the skills you need to develop complex social relationships and think about

anything beyond immediate survival, you may not be able to develop them to the same extent later.

Though to be clear, again, the brain is plastic. This can be ameliorated to some extent, but it's not good if you lose the ability to develop these cognitive skills as a child or adolescent because of deprivation.

Q. Would another aspect of deprivation also be something not living a life where you're exposed to other members of your peer group and you're actually spending those adolescent years with those much older than you? Is that another example of deprivation?

A. Sure. So social relationships, social exposure is important to develop social skills and the cognition that comes around social skills. So if you're not able to spend time with peers, you're not able to spend time with varied, you know, varied individuals, you're isolated or alone like somebody who is working at a factory or in the fields cleaning leather skins by themselves for long periods of time, you don't get that same kind of stimulation, and you fail to develop these abilities.

Q. This effect of threatened deprivation on an adolescent brain, does it actually change the physical shape of a brain? I mean, is this just emotional or is there also a physiological aspect to this?

A. So everything we do, everything we feel springs from our

brain.  So when we see these behavior differences between people with backgrounds of chronic threatened deprivation and kind of normal controls, you can see the differences in their brain also.  So you can see differences in structure, so in like the actual sizes of particular brain structures.

You know, for example, you see a thinner cerebral cortex in individuals with chronic deprivation.  So literally the gray matter, the outside of their brain is thinner, it weighs less, it's smaller.  You also see changes in functionality which can be observed using imaging and things like that.

For example, the amygdala is a subcortical structure that is responsible for fear response, among other things.  And you can see that people who have been exposed to chronic threat have a hypersensitive amygdala response when they're facing threat.  So their amygdala, quote/unquote, lights up on the scan much more easily and brightly even if they're facing stressors they don't consciously recognize as threatening like angry faces, things like that.

Q.  Just to be clear, in connection with your work on this case, you didn't do -- observe any MRIs or images of Mr. Alowemer's brain.  This testimony is more of kind of a general observation, correct?

A.  Yes, of course.  An individualized MRI would not be helpful in this case.  You're looking at average changes across groups of people.  So looking at one snapshot of one,

you know, thickness of cortex tells you nothing because you don't know what that person's development would have been without that threat or deprivation.  You can only kind of view this by comparison.

Q.  Understood.  So moving on to you referenced your evaluation in certain situations that apply to Mr. Alowemer, but moving to your conclusions about how Mr. Alowemer's, I guess, mental and emotional profile affected his conduct in this case, can you give examples and areas of how his PTSD, complex PTSD and major depressive disorder affected his conduct in this case, in your professional opinion?

A.  Yeah, so I think there are a lot of ways in which Mr. Alowemer's mental health influenced his conduct in this case.  You know, one way I think it made a big difference is thinking about the timing, about when this occurred.  So there is plenty of writing that people often are more prone to engage in terrorism-related violence after they've experienced sort of some sort of acute emotional problem, something that puts them in a state where they're looking for something.

So for Mr. Alowemer, he engaged in the offense conduct beginning in the early spring of 2019.  This was immediately after this well-documented acute emotional crisis that everyone speaks to.  This is in the records.  It's in numerous collateral sources.  Everyone talks about this, of him beginning to withdraw more and more from everyday life to

become more hyperfocused on the experiences people are undergoing in Syria, to spend more and more time on the internet and to feel like life has no purpose and that he is failing and betraying his people by being safe here in the United States.

Q.   Can I go to that point?  Because the government in its submissions in this case, as I have understood it, argued that Mr. Alowemer was looking at content online that showed an interest in ISIS and certain ISIS agenda-related content, propaganda, as it's been referred to by other government witnesses.  That occurred before this acute crisis that occurred on February 12th, 2019.  How can that be reconciled with what you were just saying?

A.   Yeah, so it is a foundational, you know, fact in terrorism research, one of the most important things to understand that literally thousands, if not millions of people around the world hold pro-terrorism or pro-jihadi points of views.  There are national polls, international polls that show that people are sympathetic to terrorism or, you know, yeah, 9/11 hijackers had it right, yeah, America had it coming.  Literally millions of people believe this, yet terrorism is a very low-base rate event.  It does not occur very often.  We're talking about very small numbers.

I believe Dr. Clarke alluded to this on Friday also saying, hey, this is the Holy Grail or like the needle in the

91

haystack of terrorism research, if we could figure out how we get from these, you know, literally millions of people who have these opinions to the very few people who actually take any sort of action to be supportive of terrorism.

And so this seems to fit Mr. Alowemer's situation exactly, that this is something that he was thinking about and looking into earlier, kind of accessing websites, getting involved -- you know, being exposed to propaganda, but he didn't take any action for quite a long time.  The only time any action occurred was after this acute emotional crisis after he's contacted by the FBI.

So those would seem to be the pivot points that move him from being just one of millions who have these views to someone who is actually taking any sort of actions.  That's why that's really important.

Q.  Kind of a what makes this case different from other cases and that acute emotional crisis seems to stand out to you in your evaluation?

A.  Yes.  Certainly.  And also just the broader symptomatology about his self-blame and survivor's guilt which everyone talks about seems to be such a big theme with him is that this seems to be motivating the initial involvement or interest to begin with of, you know, I blame myself for being safe here in the United States.  I blame myself for leaving my people.

You know, I think we've heard today a lot of testimony

about how he was oriented -- very oriented to help other people, that this has been a part of his personality for a long time, and that he feels like he is not helping people here.  He is not helping his people who are still suffering.  Syrians are still suffering.

So clearly this was not the right direction to go to, but he grew to see ISIS as a way to help, that they were fighting Assad, you know, the government that had victimized his family and so many other people he knew, and that, you know, he's viewing propaganda, per his report, viewing propaganda showing that, hey, ISIS forces are providing food, they're providing medical care, they care.

So is this true?  Of course it's not.  You know, this is propaganda.  It was not accurate.  But these are trauma symptoms.  This self-blame, this desire to find a way to change things for his people who are suffering, this also springs from his trauma.  So even the initial kind of interest in ISIS seems to be very trauma related, and you can't really understand it without understanding what he went through in the war.

Q.  In your report, you refer to five ways in which his neurodevelopmental deficits affected his offense conduct.  First one was impaired executive functioning.  Can you explain what that means?

A.  Yeah, so executive functioning is the term given to higher

order of thinking, things like planning, weighing different decisions, like weighing pros and cons of various courses of action.  Controlling impulses.  Monitoring different sources of information.  You know, weighing competing values.  These are sort of the -- this is kind of what makes us human.  Like it is our most, like, complex forms of thinking and decision-making.

In people with PTSD, executive functioning is overall depressed, but even more importantly, it is most depressed when people are in stressful situations.  So we kind of call this hot cognition versus cold cognition.  For someone who has PTSD, when they are experiencing acute stress, their executive functioning abilities go down the toilet.  And that's because they are -- that survival mode takes over.  And again, when we are in survival mode, fight or flight, the goal is immediate survival because nothing matters past that.  If you die right now, who cares what the consequences are down the line?  You've got to make it past this moment.

So because people with PTSD are sensitized to threat, they see and feel threats all around them.  They experience cues as threatening that other people would experience as benign.  When they're in a stressful situation, their executive functioning is not good.  I think we've all experienced this of making bad decisions when we're stressed, but if you have PTSD, you're stressed all the time.  You experience life --

you feel that life threat virtually all the time, and so you don't make good decisions especially when the threat is higher or your stress level's higher, like after this acute emotional crisis.

Q. You observed the testimony of Ms. Christine Tapu, correct?

A. I did.

Q. And you saw her testimony about how Mustafa, over the course of three years, worked within a kind of complex plan to get him to graduate before he aged out of the system, correct?

A. Yes.

Q. And Ms. Tapu testified about he was able to stay committed to those after-school programs, correct?

A. Yes.

Q. And even after the acute emotional crisis in February of 2019, he came back and he maintained that schedule, correct?

A. Yes, after I think she said a period of kind of drop-off of interest in his school activities.

Q. He ultimately graduated, right?

A. Correct.

Q. How can you reconcile that with someone who has a diminished or I think as you referred to it earlier depressed, impaired -- depressed or impaired executive function?  How can one do both of those things?

A. So the important difference, I think, is the context of the stress.  So high school may be stressful, but it's not

life-threatening. You know, attending multiple classes that have been laid out for you, you know, it requires you to focus, pay attention, show up, but it's not going to put you in that same fight or flight situation as when you are interacting with individuals that, as far as I understand, Mr. Alowemer had reason to believe, you know, were actual terrorists associated with ISIS with explosives knowledge who now knew who he was and where he lived. And so the -- and, you know, fearing potential criminal justice involvement as a consequence, all these things.

These are just apples and oranges. You can't really -- there's really no comparison of the way someone with PTSD is going to respond in a situation with overtones of life threat versus just being in school.

It's also important to remember that people can have different domains of competence at the same time. So it's very common for somebody to exert all of their effort at school to keep things together and then fall apart at home. Or they stay employed because the employment's really important to them, and then they have no relationships with other people. So you don't necessarily see the same kind of deficits globally in every single area of a person's life. It sort of depends on them and kind of what they're doing.

Q. My apology. I was going to take what you were going to say. Would perhaps four to six years of having to work day in

and day out to support your family have trained someone to handle that kind of schooling as well as while experiencing impaired executive functioning?

A.   That's exactly what I wanted to add.

Q.   Sorry.

A.   Is that -- no.  It seems that everybody agrees that Mr. Alowemer's ability to shoulder hardship while hiding his emotional pain is unsurpassed.  His whole family speaks about this.  Everybody speaks about this.  Ms. Tapu just said, I had basically no idea he was feeling this way until one day it kind of broke and he opened up and he told me about all these things.  This is not super-surprising since avoidance is a key PTSD symptom that people do not -- because being reminded of traumatic events is extremely emotionally painful and can even be physically painful, people shut it away, lock it away, they don't like to speak about it.

So for Mr. Alowemer, he has this avoidance component going on and he has this apparently extremely strong sense of responsibility to those around him which in his mind requires not revealing his level of suffering so that he doesn't let his family down as, you know, and then reveal what he's going through.

So I am not very surprised in this case that in certain circumstances, certain settings like a school, people didn't understand what he was experiencing because he specifically

97

and on purpose kept it to himself.

Q.  I know you were saying that colloquially, but are you surprised at all?  You said you are not very surprised.  Were you surprised at all that he was able to maintain that?

A.  The extent to which he is able to endure suffering is extreme.  So yes, I'm somewhat surprised.

Q.  You also reference hyperarousal to threat.  Can you explain what that is and how you believe it applies to Mr. Alowemer's case?

A.  So this is related to several ideas I think I've presented previously.  So because people with PTSD have lived through life-threatening situations, you know, their brain has taught them, hey, if you want to survive, you need to be on the lockout at all times.  You need to be aware of your surroundings.  You need to be looking for things that could signal threat to come.

And so the way this often shows up is that people with PTSD see threats or see cues that might indicate threats in even kind of neutral or benign situations because they have this fear-learning problem where they've overgeneralized that life-threatening situation to other situations in life where the threat does not apply.  This is the fundamental pathology in PTSD, this over-generalization of fear-learning to other situations so you feel afraid everywhere or particularly when you're reminded of the initial trauma.

And so what's really important to understand is that I think when we're assessing someone's response to a threat, there's this tendency to put ourselves in that situation, to make ourselves the kind of exemplar or comparison point of what would I have done in that situation?

Q.   Lawyers do that all the time.  I understand.

A.   How would I have responded?  And that is tempting, but the problem is that's not the relevant comparison point.  The comparison point is somebody who has had these life-threatening experiences, how are they perceiving, how are they reacting?

So I mean, an easy example I think we can all understand is there's all sorts of cases where, you know, police officers shoot somebody who was holding a wallet or holding a cellphone because they perceived in that moment that it was a threat because they've been through threatening situations in the past, it's fight or flight situation, the blood is up, and so there is that heightened perception of threat in that moment where you see something benign as threatening.  You literally see it that way, you perceive it that way when it is not the case.

So as applied to Mr. Alowemer, there's at least two important ways this comes up.  So one is this fear of police. So he reported to me, and this is also I think in his post-arrest interview, that he says, I was very afraid of

police, so I didn't really know -- I didn't know how to get out of this situation.  You know, these are terrorists who now know who I am and I've been kind of involved.  So I'm on the hook somehow.  I've been involved in some way.  And I'm going to walk into a police station, as a young Arab man who can barely speak English talking about a terrorism plot, to try to get help.  I just felt like I couldn't do it.  I thought I was going to be shot on the spot.  This is what he said to me.

There's pretty good evidence in the record that he was very afraid of police in America and this makes sense if you think about his background.  He had learned in Syria that uniformed people with guns will kill you, they will kill you and they will not hesitate.  We heard Ms. Alowemer talk about this no mercy, no waiting.  If you're in the wrong place at the wrong time, you are dead.

So this is an overgeneralization of threat again.  This is not Syria.  U.S. police are not Assad's forces.  But again, this is a central pathology in PTSD is this overextension of these same ideas to different situations where they don't apply.  And so his fear of police seems to be pretty well supported and makes sense in light of his pathology.

The second way it applies is thinking about his response to the supposed terrorist, the FBI employees and confidential human source.  His report is that he at various times felt afraid of them, and this is not to say this was his only

100

motivation or the only thing he felt.  He does not claim that. He says at times I was interested.  I was excited to have these interactions.  I thought this would make me feel better, feel connected.  They hyped me up.  I was thinking about the propaganda.  Fear was not the only motivation, but it seems likely that it was an important one.

Certainly the FBI agents did not issue any threats.  You know, I've read those hundreds and hundreds of pages of transcripts and there are no threats in there, nor would they make any.  But again, you can't replace -- you can't put yourself in as the exemplar.  You can't substitute your judgment for Mr. Alowemer's judgment when thinking about how he would respond because, you know, I'm just an American woman who doesn't have any bad experiences with police and doesn't know anything about terrorists.  But you're inputting somebody who has lived through life-threatening war who knows that there are people like this out there who will kill, who will bomb.  These are very real to Mr. Alowemer.  And he knows that if you cross these people, you're in trouble.

Q.  And at the time that he was dealing with them, I think from the first meeting, they had held themselves out to be experienced in -- I don't want to say the art of terrorism, but they were experienced in skills that would be valuable in the terrorist world, correct?

A.  Yes.  So particularly the UCE, the undercover covert

employee, I think is the right acronym, held himself out to be a bomb-making expert who knew how to make bombs, who had made bombs. It doesn't appear that there's any reason to think that Mr. Alowemer did not believe that to be the case. So he is at least at minimum involved with somebody who knows how to make bombs, who has made bombs in the past, who now knows who he is, where he lives, who his family is.

And Mr. Alowemer reported and I think this -- you know, there is no corroboration for this, but it makes sense that he had observed himself being surveilled. So he thought he was being followed, that people knew where he was. And this would have been the FBI surveillance, and this intensified his fear that they know who I am now. If I just leave, my family's going to be in danger.

Q. In addition to impaired executive functioning and hyperarousal to threat, you also referred to increased suggestibility and compliance. Can you explain how that applies to this case?

A. Yeah, so there a lot of research that individuals with aberrant backgrounds have heightened suggestibility and heightened compliance. So suggestibility is the tendency to kind of take on other people's views as your own. So to sort of be convinced into things by other people. And compliance is a willingness to go along with what people tell you to do whether or not you agree privately. So these are somewhat

distinct but pretty related.  Generally it's a susceptibility to influence from others.

And so, as I mentioned, there's extensive research about how trauma increases susceptibility to influence.  There are a lot of potential reasons for that.  The jury's kind of out on exactly why that is, but there's many possibilities.  For example, a lot of people have been through traumatic events.  They learn that the best way to avoid harm is to do what people say, especially scary people or people in authority.

So you know, we heard Ms. Alowemer earlier today talk about being ordered to the wall or being told to go outside whilst people put guns to their heads.  In that situation you learn, hey, compliance is the best way to safety.  I should do what people say especially if I think they might be dangerous.  That's one possible explanation, although there are many others.

So in Mr. Alowemer's case, if you read through the hundreds of pages of transcripts, as I know we all have, you get a very different sense than if you just read kind of the worst of the worst statements which are certainly in there and are disturbing and not easily -- not easily excused, and I don't think anyone here today is trying to excuse them.  But if you look through everything, you can find many, many examples of Mr. Alowemer seeming to respond to cues from the FBI employees and following their lead, going beyond his

original inclinations to please them or comply with them, to do what it is clear that they wanted him to do, which is commit to some sort of violent plan.

And so I lay out several examples of this in the report, but there are many where he is attempting to throw up some roadblocks or off-ramp himself or find a reason not to keep going and he hears, you know, that's not actually a roadblock. You can discard that and you should keep going. Or the FBI agents make it clear what they are looking for him to do and he sort of moves in that direction getting closer and closer toward violence. And so it's hard to understand what happened during those months and months where they're interacting with each other without thinking about influence, without thinking about suggestibility and compliance and his vulnerability to that given his background.

Q. The fourth thing you mentioned is deference to authority figure, but I believe that kind of dovetailed with your discussion about susceptibility. So I'll jump over -- unless there's a point, a special point you'd like to make on that before we move on to the fifth and final factor?

A. No. That's fine. I think he appeared to hold out the FBI employee as experts as his mentors, so to speak, as people who are above him, authority figures, so would be even more prone to compliance or suggestibility to people he viewed as authority figures.

Q.  He made statements to them directly to that effect during the investigation correct?

A.  Correct.  He repeatedly made statements along the lines of, you know, you know everything.  I know nothing.  I don't know anything about this.  I wouldn't be doing this if you weren't here.  Things like that.

Q.  The last thing you meant, the fifth and final factor, the way you believe his mental and emotional condition affected his conduct in this case is the social influence on risky behavior.  Can you briefly get into that?

A.  Yeah, so adolescents as a class are very prone to be influenced by their peers.  That is because of the earlier development of social reward centers compared to later development of cognitive control abilities.  So that prefrontal cortex, that CEO of the brain with all those executive functions, that develops into the mid-20s but earlier on adolescents become hyperattuned to what their peers are doing, what people around them are doing.  And so that means somebody like Mr. Alowemer would have been more likely to do risky things with other people.  You know, you see a lot of juvenile crime in groups, for example, much more than you do with adults.

And this seems to match the situation exactly of, you know, he took no movement towards terrorism when he was alone. He was just looking at things online and only began to take

action when he was with other people.  And you can, again, looking through the transcripts, you can really see that social influence happening being leveraged.  For example, the FBI agents are constantly praising him and flattering him for things that he does in a way that kind of, you know, gets you where you're like, oh, this is so obvious.  Like, can't you see that this is so fake that you are being flattered in this way because it's so kind of out there and extravagant, but to an adolescent this social reward is really, really powerful.

You also have a positive reinforcement situation going on where wherever he does something they want him to do, they respond positively, they give him praise, yeah, yeah, right, right, this is good, this is right.  So these are just general psychological principles of social learning that, when you receive positive reinforcement, it creates that behavior.  And you see that happening.  He says, you know, I got to get some clothes to look like you guys.  This is kind of classic adolescent social influence happening coming from the FBI employees and bringing him closer in line to what they want him to do.

Q.  You touched on this earlier and perhaps this is now considered hornbook knowledge in the field of adolescent psychology, but Mr. Alowemer, during the months of his contact with the undercover FBI agents, was 20 years old.  He wasn't a teenager.  He wasn't 18.  Is that still considered

adolescence?

A.    So increasing developmental neurobiological knowledge over the last 25 years or so has continued to show that adolescent brains continue to develop into their mid-20s.  I think we're all pretty familiar with this by now.  And specifically looking at research with this kind of middle group, like the 18 to 21, they behave more like younger adolescents when it comes to decision-making like that 13 to 17 group, than they do people in their mid-20s, that 22 to 25 group.

So when you do research studies looking at what this middle group, what do they do, who are they more like, kids or adults, they're more like these younger kids.  And so for that reason more and more this age range is being called late adolescence rather than early adulthood because really you still have all of these same characteristics, these same vulnerabilities as younger adolescents even when you're 18 or 20 years old.

Q.    Would that adolescent, I guess, phase of an individual's life be maybe exacerbated or extended if they experienced long, chronic exposure to trauma, threat and deprivation, that kind of stuff?

A.    Yes.  Exactly.  So you need to kind of make it through adolescence to develop these social and emotional skills, these cognitive skills to be an adult.  If you have your adolescence eliminated because of war so you're not able to

have these typical developmental experiences, then you got to catch up. And so it seems that Mr. Alowemer was still catching up at that time.

Q. Thank you, Dr. Guarnera. I wanted to -- you touch upon this in your report, but it's come up I think twice with Ms. Alowemer and Ms. Tapu's testimony. Can you discuss treatment and the, I guess, willingness and openness to mental health treatment in refugee communities?

A. So in Mr. Alowemer's case, he apparently has had no treatment of any kind at any point. I have no evidence to the contrary. To be clear, this is common among individuals with PTSD generally because, again, one of the primary symptoms of PTSD is avoidance. Thinking about the trauma is extremely painful, devastating. And so the thought of entering treatment where, you know, the person thinks, hey, presumably I'll have to talk about this or think about this somehow, it can be overwhelming. So people avoid treatment. Just as a baseline, people with PTSD are very avoidant of treatment.

And the refugee community, the problems are even worse. There's a lot of research about refugees and Syrian refugees in particular about their treatment utilization and willingness to enter treatment, and a couple themes come up that appeared very relevant to Mr. Alowemer's case looking at that research. So one is that Syrian refugees tend to assume their experience -- their mental health reactions are

essentially par for the course of, like, hey, this is the way you should feel after you've been through what I've been through.  Plus all my friends and family feel this way.  So what's the problem?  What do I even need treatment for?  They're not putting it in this category of this is a mental health problem that can be treated, that should be treated.  It's just considered as this is your cross to bear after experiencing war.  So that seemed to be the case with Mr. Alowemer.

And another factor that seemed very important and that Ms. Alowemer also talked about during her testimony is the fact that for so many refugee families the whole family is traumatized.  Everyone has been through the trauma together.  And so they all have symptoms.  They all were suffering, and they all have impairment.  And so normally you expect that parents are able to help their children access treatment that are able to be there for them and care for them, but when you have a family where everyone in the family has severe symptoms, this is not always possible.  The parents are too busy, too distressed or too busy dealing with their own problems in order to, you know, notice, recognize, act, plan, to get treatment for the children.

And so you tend to see worse outcomes generally for Syrian refugees when both the parents and the children both have PTSD symptoms.  And again, I heard this from all the family members

that everyone kind of recognized that particularly Ms. Alowemer was suffering so much and her symptoms were so at the forefront that Mr. Alowemer's problems were kind of swept under the rug to just sort of hoping that it would get better because there was just no kind of energy to deal with that. And certainly, per Mr. Alowemer and other people, he was also -- he was doing that himself.  He was trying to hide his symptoms from his parents so as not to burden them.

Q.  Mindful of the time here, but the last topic I want to get into is in risk assessment.  I don't want you to re-testify about everything that's in your report, which I know that the parties and the court have reviewed, but I want to ask you a question about an argument that the government made in its papers.

The government, and I quote, wrote, and this was a quote from a case out of the Ninth Circuit:  Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation and the need for incapacitation.

As a professional in the area of forensic psychology and psychology in general, what is your view of that statement?

A.  That statement is not scientifically supported.

Q.  Can you explain that?  Explain what is scientifically supported as it relates to terrorists and their capacity for rehabilitation?

110

A.   So in general, there is much less scientific information --

Q.   I should say, quote/unquote, terrorists and their likelihood for rehabilitation.

A.   Sure.  People who are convicted of terrorism offenses.  So in general, there is much less scientific information about terrorism than I think we all would like, and much less than for other kinds of violence.  This has been a problem for decades, and it continues to be a problem.  What is the date on that quotation, by the way?

Q.   That quote is actually a cite back to the Second Circuit -- Second Circuit's decision in the United States v. McKinney, which is a January 27th, 2003, case.

A.   2003.  Okay.  This has been a problem for decades.  It certainly was true in 2003 and is true now.  So terrorism is a very low base rate behavior.  It doesn't happen very much, so it's hard to study.  It's very hard to do any kind of follow-up studies on what happens after people commit terrorism, some sort of terroristic act.  And the people -- you know, it's garbage in, garbage out, so to speak.  You can only do studies based on the information that you have, and governments tend to have the most information about terrorism offenders that they do not share with researchers.

     So for all of these reasons, we have very limited information about terrorism recidivism, and we had almost none

in 2003.  It would be my impression that that is just kind of a puristic rule of thumb like gut-feeling statement that is not based on scientific information.

The best we have now, which is not very good, is that looking at a lot of studies that have small samples, biased samples, short follow-up times, again, this is poor quality of research.  You go from 5% to 50% recidivism in terrorism offenses depending on who you're looking at.  What that really tells us is two things:  Number one, most people probably don't recidivate in the terrorism offense, but number two, we barely know because are you in the 5% group or are you in the 50% group?  It's going to depend on a lot of contextual factors that we don't have information on.

So it is not accurate to say that terrorism offenders are known to be worse or more likely to recidivate than other types of violent offenders.  We just don't have that type of information.

Q.  In connection with what you said earlier, you referred to the effect that chronic trauma could have on an individual like Mr. Alowemer, and I think you referred to the concept of the fear-learning being extinguished?

A.  Correct.

Q.  And you also referred to that use it or lose it.  Are these things that can be corrected with treatment, like trauma-based responses?  The use it or lose it makes me think,

oh, it must be lost.  Is that the case?

A.  So that's not entirely the case.  So the brain remains plastic throughout adulthood even though the greatest period of plasticity is in the younger ages.  So it already appears that through schooling and some other things, Mr. Alowemer has started to ameliorate some of these deficits and that can continue to be the case as he ages by partaking in really any sort of enriching activity that is available to him.  So school, programming, anything like that.

Regarding treatment for trauma symptoms, again, in this case there seems to be -- I don't think you have an offense without his trauma background and his trauma symptoms. Fortunately, there are really effective treatments for trauma, none of which he has ever tried or had the opportunity to try. So that makes me feel hopeful that, with appropriate treatment, a lot of these problems that he's been having, like these intense feelings of alienation and self-blame that kind of drove him to identify with these ISIS folks online, like his hypervigilance to threat that made it feel like he couldn't go to the police when he was in trouble, things like that, they can actually get better if you complete trauma-specific treatment, something like prolonged exposure or a cognitive processing therapy.  These are well-supported treatments for trauma that can be effective on even long periods after the event occurred.

Q.  Would post-offense conduct that Mr. Alowemer exhibited in this case demonstrate the capacity for rehabilitation?

A.  So I mean, I've had access to his jail records, talked to people about the way that he has conducted himself since his arrest and spoke to him after he was arrested.  For all the information I have, it seems like he is able and willing to engage in treatment.  There's no -- I don't see any red flags that would make me say that he is not a good candidate for treatment.

Q.  Last question, Dr. Guarnera.  You said you don't see this offense without his trauma.  Is it fair to say that you believe that his trauma and the resulting symptoms, if not the sole cause, were a direct, significant cause for his conduct in this case?

A.  Yeah, I think direct and significant is fair.  Certainly not the only cause, but important causes that shaped the way -- shaped his attraction to this group, shaped the way he responded to the FBI employees and shaped his conduct when trying to determine how -- whether to maintain or whether to disengage.

        MR. LIPSON:  Thank you.  No further questions, Your Honor.  I offer up Dr. Guarnera for cross-examination.

        THE COURT:  Very well.

                    CROSS-EXAMINATION

BY MS. SONG:

Q.   Good afternoon, Dr. Guarnera.

A.   Good afternoon.

Q.   Now, to be clear, you're not testifying today as an expert in terrorism, is that correct?

A.   I'm not sure what I was qualified in in particular.  I'm a clinical psychologist.

Q.   Well, you've never published or written on terrorism, is that right?

A.   That's correct.  I'm a clinical psychologist and a forensic psychologist.

Q.   And your CV doesn't represent that you have spoken, published or written on terrorism, per se?

A.   Violence, yes.  Terrorism specifically, no.

Q.   You are not testifying today as an expert in terrorism risk assessment, isn't that correct?

A.   I'm not sure how to answer that.  So I conducted a terrorism risk assessment in accordance with current good practice, and I explained that in the report.

Q.   Your CV doesn't reflect any publications, speaking or course work on terrorism risk assessment, isn't that correct?

A.   So that is correct.  So it is not necessary --

Q.   That was a yes or no question.

A.   Okay.  Sure.

Q.   Thank you.  Dr. Guarnera, you were present through all of the testimony on Friday, November 4th, isn't that right?

A.   That's correct.

Q.   And in your report, you represent that the defendant adopted ISIS ideologies over the course of one year, isn't that right?

A.   Yes.  So I did hear on Friday that there was evidence that he was involved earlier, so that was new information to me.

Q.   And so you did hear testimony that as early as 2015, '16 and '17 the defendant engaged in pro-ISIS proactive communications with actual people?  You heard that testimony?

A.   What do you mean by proactive communications with actual people?

Q.   The testimony was that there were one-to-one communications, not posts, but proactive communication between the defendant and other individuals who were holding themselves as ISIS militants and adherents.

        MR. LIPSON:  Objection, Your Honor.  I don't believe the testimony said that that was dating back to 2015 or 2016. I think the government elicited testimony to say that there was content found on his phone with date stamps dating that far back, but not any evidence of actual direct communications with people believed or perceived to be militants.

        MS. SONG:  Your Honor, this is cross-examination, and that was the testimony, and Mr. Lipson can redirect.

        THE COURT:  Overruled.

Q.   Now, Dr. Guarnera, would you agree that four years is not

a brief period of time?

A.  I think it depends on what you're talking about, but potentially.

Q.  Well, you say in your report that the defendant was trying on the ISIS identity for a brief period of time.  That was your term in your report?

A.  That's correct.

Q.  And you say that it was short-lived was another term that you used?

A.  Yes.  So it appears that his active engagement was short-lived.  He apparently had a longer associations -- or association is probably not the right word.  Longer interest.  And that goes to speak to what I mentioned before that many, many, many people have interest; far fewer people take any action.

Q.  Well, but in your report you specifically say that the defendant was trying on an ISIS identity over the course of about a year, 2018 to 2019, is that what you wrote?

A.  That is what I wrote with the information I had, yes.

Q.  In your report you also write that the defendant told you that he only started accessing ISIS accounts in the spring of 2018, isn't that correct?

A.  If that's what I wrote, then that's what he told me.

Q.  And Dr. Guarnera, your conclusions and opinions about the defendant briefly and in short-lived fashion trying on an ISIS

identity presumably credited the defendant's statement that he only started accessing ISIS content in 2018, isn't that right?

A.  So it was not entirely the defendant's statement.  It was also all the information that I had.  So the discovery information I had discussed accessing the dark sites or whatever in 2018.  So that was the information I was going off of.  It wasn't just his statement.  It was the discovery material.

Q.  So but the question is did you or did you not credit his statement that he told you that he only started accessing that material in 2018?

A.  As far as I knew at the time it was supported by the information I had, the kind of investigatory information.  So I had no reason to not believe it at that time.

Q.  So that opinion, your opinion was foundationally premised on the fact that he told you that he only started looking at that content in 2018 and whatever other materials you reviewed, isn't that correct?

A.  I'm sorry.  Can you ask that question again?

Q.  Well, your opinion was based on what he told you, correct?

A.  What he tells me is one of many sources that I consider. I'm not going to say --

Q.  So among other things, your opinion was based on what he told you?

A.  Yes.  Yes.  Among other things.

Q.   As well as materials that you reviewed?

A.   Yes.  Correct.

Q.   Dr. Guarnera, you did not conduct any neuropsychological testing on this defendant?

A.   No, I did not.

Q.   And you could have referred him for such testing, isn't that right?

A.   So testing is always assigned only as relevant.  So in this situation what was most relevant was his reaction under stressful or threatening situations.  That's not something that's going to be aroused in neuropsychology testing when you're sitting in a nice, quiet room.  So I did not think it was important in this case.

Q.   But you certainly could have acquired more data specific to neuropsychological testing had he been referred for additional evaluation, correct?

A.   I mean, you can always get more information.  The question is whether it's relevant or important or not and, for the reason I said, I did not think it was necessary or relevant in this case.

Q.   And in this case, although you devote a significant portion of your report to the neurobiology of adolescent trauma and you include brain scan imaging, no such imaging of this defendant was conducted, isn't that right?

A.   So I explained this on direct.  You cannot get

information -- the kind of information you want you cannot get from a single MRI of a single individual. It does not -- it is completely uninformative and not, you know, typical or the standard of practice in a case like this. Because if you see a certain size of a certain, you know -- again, if you see a certain size of the frontal cortex, that gives you no information whatsoever. You don't know what that person's size of their frontal cortex might have been had they never gone through trauma. You can only learn about these differences through comparisons of large groups. So you wouldn't do MRI imaging in a case like this. It is just simply not informative or relevant.

Q. Dr. Guarnera, let me rephrase that. So yes or no, there was no imagery related to this defendant that is in your report, correct?

A. Certainly not.

Q. And yes or no, none of the imagery that you depict and include in your report relates to this defendant, isn't that right?

A. Yes. So anytime you cite a scientific study, the individual was not a participant in that study, of course, yes.

Q. You agree that brain scans are conducted in connection with forensic examinations in other cases?

A. For other types of questions. So like brain injury. For

120

example, if someone had a severe blow to the head, you might get useful information.  Dementia, things like that.  In a case like this, it will not be informative and is not typical.

Q.  Well, if it's not informative, would you explain why it was important to include imagery from other brains of other unrelated people in your report?

A.  Sure.  It's the same reason that I cite any scientific study in a report.  So every scientific study I cite in there is using other people, not Mr. Alowemer.  And that's exactly the same for the studies where I pulled the images, the brain images.  So it's demonstrating a difference that tends to be found when looking at people who have serious trauma backgrounds and people who don't.  So given Mr. Alowemer's serious trauma background, that information is relevant to thinking about his neurobiology.

Q.  Recognizing that every brain and every individual is different?

A.  Certainly.

Q.  Dr. Guarnera, you used the term hot cognition in your report in a few places.  Today you mentioned cold cognition.  Would you agree that cold cognition would be more akin to deliberate, patient, thoughtful, the opposite of those impulsive characteristics that you described for hot cognition?

A.  So I think those words would typically apply to cold

cognition.  The most important thing is the level of stress or life threat at the moment when thinking about it.  So people who live in chronic threat like somebody in an intimate partner violence relationship, a child who is in an abusive family, something like that, they're under threat for long periods of time.  So it doesn't mean they can't, you know, plan or, you know, have moments when they're in sort of colder cognition situation, but overall they're having a higher level of threat.

Q.  Dr. Guarnera, your report includes a statement that the defendant did not appear to experience a total conversion and you credit in particular his statement that he didn't want to make a bay'aa video.  Had you actually reviewed the defendant's bay'aa pledge video prior to being in court on Friday?

A.  I saw it for the first time in court on Friday.

Q.  You would agree, Dr. Guarnera, because you wrote it in your report that, with respect to terrorism offenses, quote, human behavior is complex and multi-determined and it is impossible to know the influences behind anyone's past behaviors with certainty?

A.  Yes.  That's certainly correct.

Q.  And if it's impossible, Doctor, you yourself cannot know the influences behind this defendant's behaviors with certainty, isn't that right?

122

A.   So nobody can know what anybody is thinking or feeling or believing at any point in time.  That's not possible.  We don't have like an x-ray into people's brains, and psychologists are no different, which is why I make those statements.  We can, however, look at evidence in the case.  So looking at all things that are available to make our best inferences, our best hypotheses that can be more or less supported by the evidence.

Q.   If it's impossible, Doctor, that would include you among --

A.   Yes.  So at no point do I claim that I can know for certain what he was thinking, feeling or believing because nobody can.  That's correct.

Q.   And Dr. Guarnera, similarly, on page 39 of your report you write:  No one can know the defendant's full motivations and intentions in committing the crime.

     And that no one would include you, isn't that right, Doctor?

A.   That's correct.

Q.   And on page 41, you write that:  To be clear, there are many times in the transcripts when Mr. Alowemer appears to take the initiative in proposing ideas or making plans to pursue a terrorist plot without a clear suggestion or directive by an FBI employee.

     You agree with that statement because you wrote it, right?

A.  Yes.  So there seems to be plenty of evidence of mixed and fluctuating motivations over time, which is what Mr. Alowemer said, that at times he just wants the cues, at times he's feeling sort of more invested or excited.  So I think you see a mix of both.

Q.  So you stand by your observation, though, that notwithstanding about what you say about his being other directed, there are many times that he is not other directed or directed by anyone, correct?

A.  So times that we can observe.  So an important thing to be thinking about is also that the idea of this pervasive sense of threat of being involved with these people who are very threatening.  Threats extend across space and time.  You don't have to have been immediately threatened to feel the effect of it.  So that's something that we can't detect or know about but is potentially an influence on his behavior even when there's not something in the transcript to say, hey, he's responding directly to the FBI person.  There's potentially that threat out there.

Q.  And Dr. Guarnera, on direct you conceded that nowhere in the hours and hundreds of pages of transcripts that you observed was there an overt threatening statement by any of the FBI employees to the defendant, correct?

A.  Correct.

Q.  Now, Dr. Guarnera, in your report, you note that the

defendant told you he selected a Nigerian church as a target because he believed it to be empty and in an abandoned neighborhood.  Isn't that right?  You wrote that in your report?

A.  Yes.  So that's what he said and what he also told the FBI interrogators after he was arrested.

Q.  In fact, you made no effort to determine whether that church actually had an active congregation and learned that there were many people living right around that church, isn't that right?

A.  So I don't think there was any assumption it wasn't an active congregation.  They talk about people being at church Sunday morning, things like that.  The question was when they were going to detonate the explosive it was chosen to do in the middle of the night when people wouldn't be there.

Q.  Well, my question was you didn't do any independent investigative follow-up to see if that was a true statement, isn't that right?

A.  If what was a true statement?  I'm sorry.

Q.  That the church was abandoned in the area it was and not inhabited?

A.  Sorry.  The point that I'm quibbling with is I don't think there was any assumption by anybody that the church was abandoned.  It was whether there were any people there at the time.  As for the neighborhood, no, I don't know.

125

Q.   You write in your report the defendant told you he selected the church because he believed it to be empty and in an abandoned neighborhood.  The question to you is did you do anything independently to verify or corroborate that statement by the defendant?

A.   No.

Q.   You write in your report, Dr. Guarnera, that, while no one can know the defendant's intentions with certainty, yet again, that would include you?

A.   Certainly.

Q.   You, Dr. Guarnera, did not review the actual audio or video recordings of the defendant in this case?  Just transcripts?

A.   Oh, yes, just the transcripts.

Q.   You would agree that a person's intonation or demeanor or the tone of their communication could be important in making assessments about their intentions?

A.   So it's possible.  There's also many different presentations of people with trauma backgrounds.  I think there's sort of stereotypes about the way people should or shouldn't behave when they're in these kind of situations.  So I think there's a lot of possibility for the sort of cues to be misleading.

Q.   You certainly wouldn't have been comfortable, I presume, testifying to your opinions if you had not interacted with the

defendant personally, is that right?

A.  It depends on their questions.  So many times I will write reports or testify without having seen the person.  It depends on the question being asked.

Q.  In this instance it was important and a priority for you to meet with him in person, is that correct?

A.  It would be standard practice to conduct a clinical interview.  So yes, it was important that I met with him, sure.

Q.  You write in your report rather carefully, Dr. Guarnera, you say:  First, I wish to acknowledge that you agree that there is no way for any professional to determine with certainty whether or not an individual will engage in terrorism in the future.

Isn't that right?

A.  Certainly.

Q.  And that would include you?

A.  No one can predict the future, not even me.

Q.  And so the best that any individual can do is to guess or speculate?

A.  I would not say guess or speculate.  Those words imply randomness, arbitrariness, gut feelings.  We do have more information than that to go off of to make an educated guess, I would say.

Q.  But not --

A.   That's based on evidence.

Q.   But not with certainty and certainly not with scientific certainty, as you yourself concede?

A.   I don't know what you mean by scientific certainty. That's not a phrase that I use because you can use scientific principles to get better than a 50-50 point to try to determine whether someone's going to be violent in the future or not.

Q.   You're not suggesting that the fact that if no professional could determine with certainty, you're not suggesting that your opinions have a scientific certainty attached to them?

A.   They are not 100% certain as no one can know any future behavior with 100% certainty, but they use science to get to a best -- you know, a best guess based on all the scientific information we have.

Q.   You agree and state that the predictive validity for the risk of terrorism is not well established?

A.   Correct.

Q.   And you agree and state that terrorism risk assessment has extremely low base rates of terrorism samples, isn't that right?

A.   Correct.

Q.   And you agree and state that none of the available structured approaches for terrorism risk assessment have been

subjected to validity studies and there are no head-to-head validity studies at all, isn't that right?

A.   So none have been subjected to prospective validity studies.  So seeing -- testing someone and seeing if they're going to commit violence in the future.  Some have been subjected to retrospective validity studies.

Q.   So when you wrote that there are no head-to-head validity studies at all --

A.   That is true, yes.

Q.   That is true?

A.   That's correct, yes.

Q.   Dr. Guarnera, you also agree and state that none of the available structured approaches for terrorism risk assessment have been subjected to validity studies, period, isn't that correct?

A.   No.  So again, some have been subjected to retrospective, but none have been subjected to prospective validity studies, and I believe that's what I say in the report.

Q.   Well, going back to your own phrasing upon direct, you said that the state of the research is poor?

A.   Correct.  That is true.

Q.   So there's simply no basis to determine whether these predictive risk assessment instruments are accurate given the small sample size and the state of the research?

A.   So I wouldn't go that far.  So the risk factors that are

in these instruments are derived from available empirical information about factors that are associated with terrorism offenses.  So they're not kind of random guesses.  They're not just gut feelings which is what people tend to do when they're just thinking about risk in a totally unstructured way.  It's been shown to be very inaccurate.  So the risk factors do have empirical backing.  There's a reason they were selected, but you're right that we don't have great numbers on how accurate any particular instrument is, that is correct.

Q.  Well, you appear to be arguing against yourself, Dr. Guarnera, because you say that there is no statistical formula nor lists of risk factor that can predict terrorism. Do you stand by that statement that's in your report?

A.  Yes.  So you're saying you can't -- you can't count up risk factors and say, oh, he's got a risk factor of five. Therefore, that means this risk of terrorism.  That's what I mean.  There are empirical supported risk factors for terrorism that are drawn from scientific consensus.

Q.  Now, Dr. Guarnera, again, in your report you were careful to say that no one can know anyone's true beliefs and, therefore, you cannot know whether this defendant has repudiated his ISIS ideology, isn't that correct?

A.  Correct.  It's always possible someone holds beliefs privately, but there was a lot of information from folks who have spoken to him since he was incarcerated and he does not

show this now.  That's all we have.  That's all we can have.

Q.  And Dr. Guarnera, you have to agree that in assessing the defendant's risk assessment as low, this is using an unscientific hypothesis, as you concede, that cannot be known with certainty?

A.  No, I can't agree with that statement.  I'd be happy to explain why.

Q.  Did you or did you not write in your report:  While the accuracy of this hypothesis cannot be known with certainty?

A.  So there is no type of risk assessment, even the most well supported for common violence, where you can predict with certainty what someone will do or not do.  That is not possible.  That's not even a possible goal.  And so that's why I try to be very careful in explaining the limits of my opinion so that the information I provide can be contextualized and whoever the decisionmaker is can decide to what extent they want to credit or not credit this.  I never want to make claims that are stronger than what the science can support.

Q.  And notwithstanding the facts, given your desire to be careful, it was important to you to qualify your opinions on 17 different occasions to establish that no one can know, and that would include you, with certainty?

A.  Certainly.  No one can know what another person thinks, feels or believes, and no one can know what another person

will do in the future.  That is, no one has a crystal ball. It's not possible.

MS. SONG:  Those are all my question, Your Honor.

THE COURT:  Redirect?

MR. LIPSON:  Yes, Your Honor.  Your Honor, at the outset of redirect I don't think I did this as a formal matter, but I'd like to move into evidence what was marked as Defense Exhibit 6 which is Dr. Guarnera's CV.  I don't know if I formally --

THE COURT:  You did.  I think in the beginning.  Let me double-check my notes.

MR. LIPSON:  I didn't write that down.  I wasn't walking and chewing gum at the same time.

THE COURT:  I think that was at the beginning, but we'll double do it and direct it is admitted.

MR. LIPSON:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. LIPSON:

Q.  On cross-examination you were asked several questions about Mr. Alowemer's reported past interest in ISIS-related materials dating back before 2018, is that correct?

A.  Correct.

Q.  And you explained to counsel for the government that you wrote your report because it was based on the information that you had at the time that you wrote the report, correct?

A.  Correct.

Q.  And between the testimony on Friday and the testimony today, you have learned that Mr. Alowemer may have had interest in ISIS-related propaganda for even before, perhaps in 2017, 2016, and there are date stamps of material on his phone dating back to 2015?  You heard that testimony, correct?

A.  Yes, I did.

Q.  Does knowing that change your fundamental conclusions in your report?

A.  So that's a good question and something that I thought about since Friday.  And so there are a couple important things to think about and talk about in that regard.  So one, as I sort of hinted at before, I think it puts into further stark relief the influence of the in-person or individualized interactions with the FBI employees.

    So knowing that perhaps he was accessing ISIS propaganda going back to 2015 or contacting people on the internet or something, I'm not sure exactly what it is, I haven't seen exactly what it is.  I've just heard that there was some sort of interest or contact back to 2015.  What that shows is that he had some inclination, interest, attitudes that he held for longer but still took no action, took no action until interacting with the FBI employees.

    So I think that is important.  So that's one important thing to think about and talk about.  The other is while it

seems like he's now had a longer interest here, the question is -- and I think I put this in the report -- is to what extent does this penetrate into his life, his thinking, his goals, his plans?  It appears that even if he held these opinions for longer than I was initially aware of, held some of these attitudes, that he still didn't have this totalizing conversion experience that terrorism experts speak about where the old self is discarded and the new self, the jihadi self is the only self that matters.

So while he was, you know, apparently looking at ISIS propaganda back to 2015, he was still the provider for his family, still working, still attending school in the U.S., still kind of being the navigator, so to speak, of his family here in the U.S. dealing with paperwork, all these things.  He held some of these beliefs, but they didn't take front and center role in his life.

So I think it's relevant and important that he held these for longer.  I'm not sure if that fundamentally changes the risk calculus.  At the end of the day it still seems like he's someone who had this online interest only until the acute emotional crisis where he's starting to feel worse and worse, blaming himself more and more, feeling like I've got to get involved.  I have no excuse, that's what he said directly to the FBI employees.  I didn't want to talk to you.  I didn't want to do this video, but I felt like I had no excuse, as

things get worse.  So we have that and we have this indirect contact with the FBI contact with the FBI employees.  Those seem to be the key ingredients that moved him from one of those millions of people who held these views and maybe look at the stuff online to somebody who took some action.

So those two factors are still the same and kind of the most important things to think about for future risk is, hey, how can we help his mental health so he's not in this place again that he's looking for society, looking for connection online, and how can we keep him from getting in contact with people who are more experienced, have more -- you know, have influence, have some sort of direct tie to ISIS?

And so I included those in my risk mitigation strategies of, hey, let's get mental health treatment and cut him off from anyone who could possibly be a direct line to terroristic activities in the future because it seems like he needs that, that he had years where he was just an online kind of fanboy, as I think Dr. Clarke put it, without taking any action, where we had those two ingredients.

Q.  Just to clarify, those two ingredients being --

A.  Acute mental health crisis and direct contact with people who are specifically encouraging him to engage in terrorism. And so I don't mean direct contact like friending somebody on Facebook.  I mean talking directly one-on-one with somebody who says, hey, let's get a plot going, which is what happened.

Q.   On cross-examination you were asked about the purpose for putting brain image scans into your report.  Do you recall that?

A.   I do.

Q.   And we discussed that on direct examination, to talk about the concept of physiological effect of trauma in adolescents, correct?

A.   Yes.

Q.   And those -- you didn't testify on direct nor claim in your report that those brain image scans belonged to Mr. Alowemer, correct?

A.   Certainly not.  That's not the way I described them nor what the caption said nor the kind of obvious function of them in the report.

Q.   Those were illustrative of what then?  What were you seeking to try to explain to the court by putting those images in there?

A.   So those were images showing -- you know, showing in a graphic what I also explained in words based on the scientific evidence available, which is that people who undergo chronic threat or chronic deprivation during the developmental period, they have characteristic brain changes on average that are linked with these psychological or functional changes.  So those were just images demonstrating studies that had shown that, just a selection of studies that have shown that.

Q.  You testified on direct that taking an MRI scan -- I think you said this on cross-examination as well.  Taking an MRI scan of Mr. Alowemer wouldn't have told you anything?

A.  Yes.  It would have told me zero, which is why it's not done for a case like this.

Q.  That goes to another line of cross-examination, why you didn't do neurocognitive testing as well of Mr. Alowemer, correct?

A.  Yes.  I think I explained that on cross.  I'd be happy to say it again.

Q.  I guess it goes to this larger concept.  There are thousands of psychological tests that you could have conducted on Mr. Alowemer, correct?

A.  Yes.  Thousands.

Q.  If you were given an unlimited budget and an unlimited amount of time, you could have hooked him up to as many monitors and then you'd have more data, correct?

A.  I don't think I would agree with that necessarily because you select the test based on the referral question of what's relevant.  It's not the case that if I had unlimited time, I would have done unlimited tests.  Because they wouldn't be relevant.  You have to tailor what you're doing to the referral question which here was the impact of trauma.

Q.  And the determination of relevance kind of goes to your understanding of the science about the way the brain works,

correct?

A.  Can you rephrase that?

Q.  When you talked about certain sort of data being relevant or irrelevant, that's based on your knowledge of the science of psychology, correct?

A.  Sure.  It's ultimately a judgment call, but there's certain best practices and norms about what tests are most recommended, most commonly used, best validated for certain forensic questions.

Q.  Psychology, the field of psychology is fundamentally tied to science, correct?

A.  Yes.  It's a field of psychological science.

Q.  And science is the process of hypothesis, testing that hypothesis and trying to get to a place where you can get the same result from over and over again in order to verify a theory or hypothesis, correct?  That's my imperfect way of explaining the scientific method.

A.  Yeah, so science advances by triangulation, by doing lots of different research studies that speak to the same question. The more information you amass the more confident you can be that this is a real finding and a real thing in a real world that you can be confident in.

Q.  So more confident.  In the field of psychology, in the science of psychology, is there certainty?

A.  No.  It's not possible.

Q.  And just because there's not certainty with a particular conclusion in the field of psychology, does that mean that it is a guess or a speculation?

A.  Certainly not.  So you're basing your information, you're basing your opinions off of the best available evidence, but it can never be known with certainty.  The reason I hope that my opinions and my report are helpful to the court is that the court has to make -- has to make a decision about psychological matters, about how culpable a person is, about how likely they are to offend again.  These are not optional. Every judge has to do this when they sentence.

And so I hope that my opinions provide helpful information when making those determinations so that it's not a guess, you know, it's not a flip of a coin, that there is, you know, as much scientific information as we have that's being funneled into that decision.

Q.  The government went through various instances throughout your report, your 60-page report, where you explain that you as essentially a scientist in the field of psychology cannot know something for certain.  Do you recall them doing that -- counsel for the government doing that on cross-examination?

A.  Yes, I do.

Q.  Why do you put those statements in your report?

A.  To be honest and straightforward and clear with what I can and cannot say.  So I could put them on every sentence that I

write.  And any psychological expert you have in this court is operating under the same constraints and the same limitations on knowledge.  If they don't put those caveats in, then that is a mistake on their part because we're required ethically to reveal the limits of our opinions.  So that is what I'm intending to do by putting in those caveats, not to overstate the certainty that I have which is that is not possible to be 100% certain.

Q.  Because there are limits to your opinions does not mean that your opinions lack incite into the subject matter that you're expressing?

A.  Certainly not.  I hope not, yes.

Q.  That's because they're based on scientific principles and empirical data, correct?

A.  Yes.  So let me give you an example.

Q.  Please.

A.  We all know and science supports that there is a very strong tie between smoking and lung cancer, right?  We all know this.  However, so you know, like 90% of people who have lung cancer were smokers.  If you smoke, you increase your risk of lung cancer by a huge amount.  However, what is the percentage of people who smoke who develop lung cancer?  It is only 6%.  So that means that the vast majority of people who smoke do not develop lung cancer.

Can we pick out -- you know, is it true that smoking is

scientifically empirically associated with lung cancer?  Yes, that is an important scientific finding.  The risk of someone who smokes is much higher than somebody who doesn't smoke.  But can we say just because somebody smokes they are going to develop lung cancer?  Absolutely not.  Because there's a lot of smokers out there and lung cancer is a lower base rate behavior.  So that's an analogy of the way psychological scientific knowledge works.

We have scientific information that shows there's a correlation, a relationship between trauma backgrounds and these, you know, offending or these kind of problems.  We know that from the science.  Does that mean we know what any particular one person is going to do in the future or if there is 100% going to be an outcome?  No, you can't know that because you're dealing with low base rate behaviors and violence.

So I hope that can make clear a little bit what we're talking about of you're not guessing, but you also don't know with certainty because you have a -- there's a lot of people in the world with a lot of different characteristics that are all interacting in different ways, and the best we can do is talk about, hey, what do we know about science about what's most likely, about what makes sense, not what is definitely going to happen.

Q.  You're a professor in the University of Virginia, correct?

A.  Correct.

Q.  And you studied at the University of Virginia, correct?

A.  I did my Ph.D. there, yes.

Q.  Can you explain just briefly to the court where the University of Virginia and the studies that are conducted there in the field of risk assessment stand in the academy on issues of risk assessment?  Is there a school of thought on risk assessment that is well respected at the University of Virginia?

A.  Yes.  So I work at the Institute of Law, Psychiatry, and Public Policy.  This is a research, forensic practice, training and consultation institute that's been around since the '70s.  And as part of that and folks at the law school, UVA is really at the forefront of the science of risk assessments.  So to name one is professor John Monahan who is still at the law school is considered the father of risk assessment, one of the progenitors of risk assessment.  I consulted him about this evaluation to try to get -- make sure I was doing all the best practices for terrorism risk assessment.  So certainly there is a traditional in scholarship that was -- that was and is present at UVA regarding risk assessment that I've tapped into to make sure I was using the best practices here.

Q.  You concede that there is no -- risk assessment models for violence have stronger empirical data than the risk assessment

142

models for terrorism?  You can see that, correct?

A.  Correct.  I say that very clearly in the report.

Q.  But you rely on the principles of risk assessment coming from UVA in applying those principles to the concept of risk assessment for terrorism, correct?

A.  Yes.  So there are some general principles of risk assessment that apply regardless of the type of violence you're thinking about or you care about.  You know, risk assessment for terrorism, risk assessment for intimate partner violence, risk assessment for suicide.  There's all types of risk assessments you can do depending on the behavior in question.

The key thing, the most important thing that we have learned since the 1950s is that structured approaches to risk assessment are better than unstructured approaches.  When I say unstructured, I mean kind of looking at somebody and talking to them and just kind of thinking to yourself, I think this person is risky or I think this person isn't risky or I feel scared of this person so I'm going to say they're risky.  That's unstructured judgment, unstructured clinical judgment.  That is very inaccurate and doesn't work well at all.  It works less well than the flip of a coin.  When clinical psychologists were doing this, they were right one out of three times.

Since then we've developed more structured approaches that

are based on empirically supported risk factors for violence. So even though there are particular instruments or you have an instrument you select or whatever isn't as well supported for terrorism risk assessment as for general violence risk assessment, what's important is that it's still this structured process that is cabining discretion based on empirically supported risk factors.  It is not this uninstructed shoot-from-the-hip I feel scared of this, therefore, I think this person is risky.  So in that sense risk assessment of terrorism, as I've done here, according to current best practices, even though they're limited as I explain, is well within the broader scientific tradition of risk assessment as we know it to be the most accurate, which is to make it structured.

Q.  Are you confident in the conclusions in your report?

A.  I believe everything I wrote in my report.  Otherwise, I would not have written it.

Q.  Is there anything about your work on this case that I have not asked you a question about that you think the court should know about or have we covered everything?

       MS. SONG:  Your Honor, this is redirect.  This is not connected to cross at this point.

       THE COURT:  Sustained.

       MR. LIPSON:  No further questions, Your Honor.

       THE COURT:  Any recross?

MS. SONG:  No.

THE COURT:  You may step down.  Thank you.

Mr. Lipson?

MR. LIPSON:  Your Honor, no further witnesses at this time.  I don't know the order in which -- I think the defense rests as far as adding anything to the record.  Thank you.

THE COURT:  Government, anything?

MS. SONG:  We have no further evidence to present, Your Honor.  We do have an impact statement.  I don't know when the court is prepared to take that.

THE COURT:  As I assess the circumstances moving forward, we have issues of departure request by the defense and also have objections to paragraphs of the PSIR and we have victim impact allocution and argument of counsel relative to sentencing.  So I think in fairness, I would like to at this point discuss, and for the benefit of everyone in applying the court's rulings forward, go to the objections to the paragraphs within the PSIR that were the subject of tentative rulings.  Do counsel wish to be heard on any further as to those?

MS. SONG:  Nothing further from the United States, Your Honor.  We responded.

MR. LIPSON:  Your Honor, with respect to the factual objections to paragraphs 22, 23 and 24, I have one point I just want to briefly review.

145

(Pause in proceedings.)

MR. LIPSON:  Your Honor, Mr. Alowemer maintains his objections to those paragraphs.  I believe that those paragraphs are written -- they were drafted by counsel for the government or at least someone working with counsel for the government.  They were adopted wholesale by the probation office.  I think that the record certainly through the cross-examination of Special Agent Edquist established that there was greater context to which some of these interactions between Mr. Alowemer and the undercover agent, whether it be the OCE or the UCE, occurred, that there was greater context to that.

I think with respect to the motivation referenced in paragraph 22, I think that the proposed paragraph in paragraph 3 of document 127 that the defendant proposes is more factually accurate.  I think it's more faithful to what actually occurred in this case.

With respect to the objection in paragraph 23, which is reflected in paragraph 4 of document 127, the PSR says at several points during the meeting the UCE made clear that the explosive force necessary to accomplish Alowemer's desire to attack would likely kill many people in the residential area surrounding the church even if the church were unoccupied at the time of the explosion.  Mr. Alowemer expressed at that time that he did not believe that the houses around that area

146

were -- had anyone living in them.  I think that that should be included in the report.  Whether or not the government believes Mr. Alowemer is of no moment.  That is reflected in the record and that was conceded to by Special Agent Edquist.  So I do think that should be included.

Finally, with respect to Mr. Alowemer's objection to paragraph 24, the PSR currently reads Alowemer provided the UCE with the items that he had purchased in the preceding days but were intended to be used for the assembly of a destructive device.  That is technically accurate, but I think from agent -- but in the same way it tellingly omits the key fact that we went through with Special Agent Edquist, ad nauseam, and I understand that, Your Honor, that it was ad nauseam, that the UCE was specifically listing the items there needed to be purchased, directed Mr. Alowemer to and the CHS to purchase those items, suggested where he could find them and the manner in which they should be purchased such as in small amounts over a period of time.  I think that tells the truth but not the whole truth, Your Honor.  So I do think that those objections should be sustained and that the PSR paragraphs be amended accordingly.

MS. SONG:  Well, I just respond, Your Honor, that the defendant's statements about the church were not uniform.  I mean, he admitted to having been over in that area on six or more occasions to see people attending the church, seeing

people in that area.  It's simply impossible to know which statement at which particular point in time he wants to adhere to.

As to paragraph 23, it makes clear that, you know, the list was provided in response to the defendant's question about what he could purchase to help assemble an explosive device strong enough to destroy the church.  The statements are accurate as written.  We were comfortable adding the statement that at least upon the last expression the defendant's, you know, primary objective was destroying the church, not the people inside.  And we proposed adding that statement to paragraph 22.

THE COURT:  As to paragraph number 22, the objection's overruled.

As to paragraph 23, the objections are overruled in part.  The sentence "the defendant's prior stated motive was to destroy the church," will be added to paragraph 23.

As regards paragraph 24, the defense objections are overruled.

Mr. Lipson, do you want to present anything further concerning or argument concerning the departure issue?

MR. LIPSON:  Your Honor, I think I'll go into greater detail about this overall in the variance argument at 3553(a), Your Honor, but I think I'll say for purposes of the departure, I do think that Dr. Guarnera's testimony makes

148

clear that of the hundreds of people that she's evaluated, that no one person, no one evaluee both in the forensic or nonforensic context had experienced the trauma that Mr. Alowemer experienced.  She noted it.  That then translated into her diagnosis of PTSD, complex PTSD and major depressive disorder.

I'm talking just for purposes of the departure how this puts this case outside of the norm, outside of the heartland of cases where -- that the court sees in connection with mental and emotional conditions.  I want to make clear, to the extent that my filings and my arguments were not clear in both the positions with respect to sentencing factors or the sentencing memorandum, Mr. Alowemer's not asking for a departure under 5K2.13.  That provision of the guidelines makes clear that the offense involved a crime of violence or anticipated crime of violence is just not available for departure.  That's conceded.  Those factors can, nonetheless, be considered for purposes of a variance under 3553(a).

But 5H1.3 is still available for a departure.  And I do think that the mental and emotional conditions here are presented, in combination with other conditions, to such an extraordinary degree that a formal departure is warranted in this case.  I'll go into the details of the effects of that in the 3553 analysis, but the extremity of it I think is necessary for the departure analysis.

THE COURT:  You're only asking departure at this point as to 5H1.3?

MR. LIPSON:  Yes, Your Honor.

THE COURT:  I believe you argued 4A1.3(b)(1) as well, which is overrepresentation of criminal history, as well as aberrant behavior under 5K2.20.

MR. LIPSON:  I'll make brief -- very brief argument on that.

THE COURT:  I just want to make sure I rule on what you're moving.

MR. LIPSON:  Of course.  I do understand.  I did put those in the position with respect to sentencing factors.  So I do appreciate that, Your Honor.  I do believe the terrorism enhancement moving an individual with no criminal history from zero points category I to category VI is an extreme enhancement.  It's what the guideline tells the court to do. I do think the resulting guideline calculation is based on a criminal history that is divorced from his criminal history. I understand that Congress in directing the Sentencing Commission to make such an enhancement or the Sentencing Commission in creating such an enhancement did so with no empirical analysis.  It was an emotional response to a serious issue at a time in this country where there was a lot of fear.

So I think that to say that as a practical matter under the guidelines he's criminal history category VI, I just

150

don't think that his record compares to individuals who actually fall into that category.  So I do think it's overrepresented by the guideline calculation.

With respect to aberrant behavior, Your Honor, I would note, similarly, he does not have a criminal history. And starting on March 8th, frankly, Your Honor, I would argue that really starting on June 2nd of 2019 is when this crime was committed.  I do not think that the conduct that occurred from March 8, 2019, to June 1st, merely talking to these individuals, represented a crime at that point.  On June 2nd, I think things changed, Your Honor.  And so he was arrested 17 days later, 2 1/2 weeks later.

And so we have an individual who over the course of the first 20 years of his life, there's no known crimes that he committed, and then in the last 2 1/2 weeks before he was in custody he committed the first crime.  Now it's a serious crime; there's no doubt about that, Your Honor.  But I do think that this offense conduct and especially what the court heard from Ms. Alowemer and from the letters talks about an individual who cares for his family, cares for those around him, cares for his community, and, therefore, this represents aberrant behavior, especially given the circumstances of the acute emotional crisis he suffered in mid-February.  Thank you.

THE COURT:  Ms. Song?

151

MS. SONG:  Your Honor, just briefly, it does appear as an end run around 5K2.13 to specifically frame the defendant's request for a departure under 5H1.3.  They are arguing diminished capacity.  There's a guideline that provides for that and the guideline itself says if we're talking about a crime of violence or a threat of violence, it's not to be granted.  And in this case, you know, there was a violent detailed plan, as the court well knows.

A few other points, you know, with respect to PTSD. Unfortunately, PTSD and depression are extremely common, and this would set a very, very difficult precedent in this court if it were to grant a substantial departure on that basis. You know, sadly, our courts are filled with military combat veterans, victims of domestic violence, refugees from other world conflicts.  And this court's challenging weighing is to weigh all of the evidence that you heard about PTSD against the severity of this offense.

The defendant and his family experienced unfortunate and traumatic things in Syria, and so did millions of other people, unfortunately, and they were not driven to plot to explode a bomb at a church in a residential city neighborhood. And so the question is through the sentencing would a departure serve the goals of criminal justice system?

There is, Your Honor, some serious question and caution in what to do with the defense expert.  There is a

152

flaw.  The defense expert in her report described the defendant's trying on this fleeting, brief identity with ISIS, and fixed his conduct from 2018 to 2019, and that simply does not comport with the facts.  As the court has heard, the defendant's commitment to ISIS was foundational and it preceded his immigration to this country.  He told Special Agent Edquist that he had terrorist compulsions and urges years prior dating back to Jordan well before he arrived in the United States.  So it is just factually wrong to try to characterize this as some adolescent, you know, trying on identity phenomenon when in fact it was deep seated and the Special Agent Edquist testified to proactive communications dating back to 2015.

I think as well if Your Honor is considering, you know, what to do with the PTSD diagnosis and a departure, the evidence is completely inconsistent with the defense expert's observations about hot cognition and an inability to make executive decisions.  There's a plan.  There was a detailed plan.  It was deliberate.  It was thoughtful.  The defendant exhibited, you know, very careful consideration.  Well, not the Shia mosque because there are video cameras there and there's a code on the door and I went by there and concerns about being caught in surveillance.  All of that, you know, sort of weeks-long, months-long deliberation and thought about what the appropriate target was is completely inconsistent

153

with the depiction of him as being incapable of executive decision-making, setting goals, setting priorities.

You heard his own teacher, you know, the fact that he was able to be patient and delay gratification and to be doing multiple things at the same time is simply inconsistent with this idea that he was impulsive, that this hot cognition, you know, drove him to try to please these FBI undercover agents.

There is no evidence that shows that anyone other than him was directing the action and directing the plan. And so I think, Your Honor, it's, unfortunately, incumbent on the court to reconcile the proof that just does not support the narrative that is painted by the defense expert.

And, you know, again, it's very fresh in the court's mind, I won't reiterate it, but as you approach what to do with that departure motion, you know, to her credit, the expert was clear, no one can know. And there is simply no certainty involved here. And there is no statistical formula, no set of risk factors, nothing can predict whether this defendant is dangerous. And yet the expert, you know, went through the motions to do so and concluded that he was at low risk. But I think it's very interesting, Your Honor, notwithstanding the conflicts with the evidence that her opinion is based on, to look at her therapeutic recommendations.

First of all, she provides some important advice.

154

She suggests that the defendant needs constant supervision, which is completely unrealistic unless he's in prison.  And that he needs an absolute sort of bar and to be prohibited and cut off from the internet.  And we submit again that the best way to assure that is to incarcerate him for a substantial period of time.

Overrepresentation of criminal history, I don't have much to argue beyond what we've set forth, Your Honor.  It would be very -- you know, a very odd result if, by virtue of the defendant's conduct, that you have found merits the application of the terrorism enhancement, which requires that his criminal history be projected as a VI, whatever it is to begin with, that now the court should downward depart significantly on the basis of overrepresentation of criminal history.

This is what Congress in the sentencing guidelines have directed and because crimes of terrorism are that dangerous and present that much of a risk and they're the ones that mandate that his criminal history category shall move to VI.  And within this crime, as the court aware, there are many factors that make it warranted.  It was sustained; it was violent; it was targeted; it was in essence a hate crime directed at innocent people by virtue of their religion and nationality and race; and it was designed to trigger other effects and be the first in a series of other acts that he

155

would undertake with other people in other parts of the United States.

So we think that on those facts, a departure under 4A1.3(b) is simply inappropriate.  And I don't have anything additional to add on the 5K2.20.

THE COURT:  In relation to the downward departures, considering 4A1.3(b)(1), overrepresentation of criminal history, it's my ruling that, Mr. Alowemer, with this conviction and criminal history, criminal propensity is very serious, and based on the evidence presented and your background, sir, I find that overrepresentation does not support a departure.  This is so even in the circumstance where the application of the terrorism enhancement applies.  So the defense motion for departure based upon 4A1.3(b)(1) is denied.

As to the mental and emotional conditions, which is 5H1.3, the extent of Mr. Alowemer's post-traumatic stress disorder and depression as well as all psychological discussions contained within the doctor's report is certainly a condition and circumstance that this court has given serious consideration to.  Given this court's determination of the applicability of the terrorism enhancement, the guideline calculation for a typical case scenario considering Mr. Alowemer's offense level and criminal history alone and that's after the application of the terrorism enhancement, is

156

360 months of incarceration.  That said, the period is reduced to conform to the applicable statutory maximum of 240 months which applies in this case with the count one conviction.

I considered Mr. Alowemer's mental health to be very relevant in this case; however, such condition in the totality of the circumstances presented in this case does not present to an unusual degree or distinguish this case from the typical case covered by the guidelines in order to support a departure decision.  Therefore, the defense motion for departure based upon 5H1.3 is denied.

As to the aberrant behavior pursuant to 5K2.20, the facts of this case do not present a single criminal occurrence or transaction.  For sustained duration over at least several months Mr. Alowemer undertook many acts that were consistent with furthering his intention to provide material support to ISIS, a terrorist organization.  He engaged in serious planning and action to carry out his plans and intent to support the goals and objectives of ISIS within the United States and to motivate others to take up actions similar to his in order to further his ISIS objectives.  Again, this court has considered as this came into play with aberrant behavior and mental health components Mr. Alowemer' mental and emotional condition.

I've also considered his employment history which includes his work in Syria and Jordan and in the United States

to support his family.  I've also considered the reports of his helpful conduct and kindness to his family, friends, neighbors and fellow classmates.  I find that he did not take any efforts to mitigate the effects of his offense before his arrest, and I've also considered defense arguments about his intense post-arrest remorse that have been written to and also his relatively good behavior and work services during his pretrial detention.  All of these factors have been considered and in total I conclude that such factors do not support a departure in the totality of the circumstances in this case.  Therefore, the defense motion for departure based on 5K2.20 is denied.

Also, after considering all of these factors under the guidelines in combination as has been argued by the defense in their sentencing memorandum, I conclude that such combination of factors pursuant to the guidelines do not present a case to support a departure in this case.  As such, on the basis of a combination of departure factors for consideration, the court denies the defense motion for departure.

Those rulings bring us to the computation of the guidelines.  Having considered all the matters pertinent to the calculation of Mr. Alowemer's advisory guideline range and in light of the rulings that have been made by the court in this case, I find the advisory guideline range in this case as

158

follows:

Mr. Alowemer's base offense level is 26.  The base offense level is increased by two levels pursuant to section 2M5.3(b)(1) because the offense involved the provision of, A, dangerous weapons; C, explosives; and, E, funds or other material support or resources with the intent, knowledge, or reason to believe that they were to be used to commit or assist in the commission of a violent act.

The base offense level is also increased by 12 levels pursuant to and because the offense is a felony that involved or was intended to promote a federal crime of terrorism pursuant to 3A1.4(a).

This brings the adjusted offense level to 40. Mr. Alowemer's adjusted offense level is reduced by two levels to reflect his acceptance of responsibility and reduced by an additional one level to reflect Mr. Alowemer's timely acceptance of responsibility.  The total offense level is, therefore, 37.

With regard to criminal history, Mr. Alowemer has zero criminal history points.  His criminal history category is Roman numeral VI, however, because of the application of section 3A1.4(b) mandating that where enhancements in 3A1.4(a) applied, the criminal history category shall be category VI.

Based upon a total offense level of 37 and a criminal history category of VI, the advisory guideline imprisonment

range would be 360 months to life.  However, the statutory maximum term of imprisonment for count one that may be imposed is 240 months.  Therefore, the guideline term of imprisonment is 240 months.  The guideline range provides for a term of supervised release from one year to life in a range.

The defendant is not eligible for probation.  The guideline fine range for this offense is $40,000 to $250,000.  A special assessment of $100 per count is mandatory, for a total special assessment in this case with count one conviction at $100.  Restitution is mandatory, and I have not heard the government make mention of the restitution, if any.  There was no request for restitution prior to the commencement of these proceedings.  Is there any change on that, Ms. Song?

MS. SONG:  Not at this time, Your Honor.

THE COURT:  There will, therefore, not be restitution ordered in this case.

In relation to forfeiture, the following items will be ordered to be forfeited:  An Apple iPhone 5S with IMEI 35882305112361; a Samsung J7 cellular phone with IMEI 35860109141464; an LG LM-X410 cellular phone with IMEI 355380099566223; a Dell Inspiron 3670 computer, express service code 2574745958; and associated electronics storage media seized on June 19, 2019.

At this point we are going to proceed to a sealed portion of this sentencing proceeding.  We do have a lot of

people in the courtroom, so at this point I think we'll adjourn with counsel, Mr. Alowemer, and the marshals to my library for purposes of sidebar.  For everyone else in the courtroom, this is not a lengthy proceeding, but we need to be doing this outside of your hearing, so rather than have everyone leave the courtroom, if you can just wait patiently, we'll be back in.

(Sidebar conference held.)

(Sidebar conference concluded.)

THE COURT:  Just for the record, we've been working back in the library.  The court reporter has been on, full on all afternoon.  We are going to take a ten-minute recess before taking any further record just to give herself a little bit of a break and everyone will have a comfort break.  Ten minutes.

THE CLERK:  All rise, court is in recess until 4:05.

(Recess.)

THE COURT:  Counsel, I will now receive any additional comments or information concerning sentencing and also any input from any victim as well as allocution by the defendant.  Ms. Song?

MS. SONG:  Yes, Your Honor.  We'd ask Pastor Michael Day to provide victim impact to the court.

THE CLERK:  Do you prefer him to stand before you?

THE COURT:  Wherever you're more comfortable.

(Oath administered.)

THE CLERK:  Once you're seated, can you please state and spell your name?

THE WITNESS:  Michael Day, M-i-c-h-a-e-l D-a-y.

MS. SONG:  Go ahead.

THE WITNESS:  Hello and good morning or good evening now to you all.  Thank you, Your Honor, for this opportunity.  Thank you, Court, for this opportunity to share today.

I've written a statement not as a pastor but as a man, as a human being.  I am a husband.  I am a father.  I am a son.  I am a brother.  I am a friend.  With that being said, that shows that I'm not the only one that has been impacted by this treacherous attack.  My wife, my daughter, my extended family and friends but also my neighbors and the community that I serve every day.  In the community on the North Side, Wilson Avenue, where our church resides where at least 50 to 60 families reside there and have been residing there as long as I've been alive.

I am third-born generation pastor of that very community.  My grandfather pastored there for 60 years before passing in 2016.  My father then took over the ministry, and then in 2017 I became the pastor of that same facility.  So as you hear, my family have been in that community for over 60 years.  There have been children, graduations, funerals, weddings, dedications in that community for over 60 years.

162

That community is not vacant.  I pastor a 200-member church currently where several of those families are a part of my ministry.  But this attack was not just on our church.  It was on our neighbors.  It was in the community.  It was in the city.

This negative impact is seemingly never over.  And I hear even as throughout this trial concerning trauma, this trauma has been going since 2019 for us.  We are still dealing with it.  Sometimes it can seemingly never clear in our head some gray cloud over our ministry, over our community.  And no matter how much positive work, how many lives we change and community events and all the different projects that we serve in our community for these families, we are still named and connected to this very event with statements such as, oh you're the pastor with the church of the bomb attack.  Well, wasn't this the church that the man tried to blow up?  We have always since 2019, June '19, have been marked because of this event.

People are still leery of us.  Our church has suffered greatly because of this.  Members have left. Community programming that provided many resources have stopped.  Because of this our church has suffered tremendously financially, losing thousands of dollars in donations and funding.  Following this attack, as we all know, here comes COVID-19, which takes us deeper into a hole.  As you can see,

163

this caused a ripple effect.

This attack hurt many and still are suffering today. Even today I heard about PTSD, and I can speak on PTSD whether my personal experience with something simple as a car accident or where my very own family lives in Northview Heights and I've lost two cousins due to gun violence in Northview Heights less than 24 hours apart, and I was on the news again, both under the age of 18.

Those kids in Northview Heights suffer from PTSD hearing gunshots every night. Yet they are not plotting or planning to blow up anyone's home. They're not plotting and planning to blow up anyone's places of worship. They're not even trying to retaliate. They're simply trying to live, recover, grieve. I bury hundreds of young people yearly as a pastor in the community, and I see PTSD every week. And in those families and in those lives, they're not thinking about retaliation. They're trying to move forward on how to live, how to navigate the pain that they are dealing with in losing a loved one.

So I say that in reference to the comments and the suggestions and the recommendations, the scientific evidence that's being stated here where I live it every day and I see it every day, I walk it every day where people are living in war zones, from 5 to 13-year-olds, to 18-year-olds living in war zones right here in our communities. Yet they are not

164

saying let's plan or plot to blow up someone's home.  Yes, we do have some of those young people who are reckless, but they're not out here trying to have mass killings in communities and in cities in the name of religion or ideology.

Our community needs help.  Our church needs help.  And I'm thankful for all the friends and community leaders that have supported us since June 19, 2019, but this is a real serious situation.  I have a 5-year-old daughter, and at that time she was 2.  She's 5 now.  She understands, because she sees her daddy often on television fighting for violence, to decrease violence in our city and fighting for the community that he serves in, but it could be my daughter that, if this would have went through, my daughter would be fatherless.  A daughter would be another young African American lady without a father because of this plot.

So I think about that.  So yes, the bomb didn't go off, but there were other bombs psychologically that did go off in our community.  There were other things that went off in our ministry that now we are paying the repercussions for.

I'm going to say, although forgiveness has been given to the defense table, it does not remit him from the repercussions of his actions.  A God-fearing man and a leader, it is my responsibility to show genuine love and forgiveness, but it is also my responsibility to teach.  We reap what we sow.  Justice must be served so that we may live in peace and

harmony together.

I'm thankful for the FBI and our AD and our team for all the hard work.  As I close, love covers all, even in a time of correction and judgment.  Thank you, court.  Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Lipson, do you wish to argue on behalf of Mr. Alowemer first or proceed with allocution?

MR. LIPSON:  Your Honor, I'll argue first and have Mr. Alowemer have the last word.

THE COURT:  We'll also hear from the government, but yes.

MR. LIPSON:  Is it possible, Your Honor, for argument to proceed and Mr. Alowemer to speak last?

THE COURT:  Any objection?

MS. SONG:  I don't object, Your Honor.

THE COURT:  That's fine.

MR. LIPSON:  Your Honor, this is a difficult case. This is a case that I think warranted the efforts of the defense team and the representation that we tried to give Mr. Alowemer in this case, and it's a serious case in the resources committed by the Department of Justice in investigating and prosecuting this case.

This kind of case is difficult to understand.  It begs the question why did this happen and how can something

166

like this happen for someone like Mr. Alowemer and for everyone that was affected by this.  Your Honor, I'm going to go into factors I believe the court can consider, but I don't want to be lost that Mr. Alowemer and the defense team acknowledges this is a very difficult case to know exactly how to proceed.

Your Honor, the guidelines, by virtue of the statutory maximum, are 240 months.  Notwithstanding arguments that government has made in its papers, that's the starting point.  The starting point is 240 months.  That's what Third Circuit case law tells the court.  That is the applicable guideline in this case notwithstanding Mr. Alowemer's continued objection regarding the terrorism enhancement.  But that is where the court has calculated the guidelines and that is the starting point for the analysis.

Ultimately, the defense team argues and what I'm arguing for today, Your Honor, is a sentence where the court varies substantially below that starting point of the court's analysis, and, consistent with the sentencing memorandum submitted by the defense team, a sentence within the non-terrorism enhancement guideline range is sufficient but not greater than necessary, and that's 78 to 97 months.  So Your Honor, I will submit that the high end of the court's consideration should be 97 months followed by Mr. Alowemer's deportation in this case.  I think that that would be

sufficient but not greater than necessary and address the sentencing factors that the court has to consider today.

The primary reason why a substantial variance is warranted in this case is based on Mr. Alowemer's trauma and the factors that are relevant under the departure guideline of 5H1.3.  I argued for a departure earlier.  I argued that this made this case exceptional.  The court disagreed, but those factors can nonetheless be considered by the court for purposes of a variance under the 3553(a) factors. Mr. Alowemer has what Dr. Guarnera testified to as the worst -- the worst exposure to trauma that she has ever observed in her time as a psychologist, both in the forensic field and in her clinical work.

So the question is so what?  Why does that matter? Mr. Alowemer had a tough background.  That doesn't justify what he did and that's not what I'm going to be arguing to the court today.  It matters, though, because what it means is at the time of his offense, sitting here today he still is, but at the time of his offense he was sick.  He was sick and that sickness contributed to his commission of this offense.  As Dr. Guarnera testified today, without the trauma, I don't believe this offense ever happened.  She can't say that with certainty, but I don't think that's the standard here.  The standard is relying on empirical principles can Dr. Guarnera's testimony on that issue be credited, and I believe the court

168

should credit that observation.

That sickness distorted the world around him.  Just before Mr. Alowemer was befriended by the online covert employee in this case on March 8, 2019, he experienced an acute emotional crisis on February 12th of 2019.  That's 3 1/2 weeks earlier.  During that acute emotional crisis he experienced suicidal ideation after learning that family members have been killed in Syria which is consistent with what he experienced continually after his family left the Middle East and returned here to the United States.

His sickness caused him to make poor choices and come to conclusions that at the time lacked rationality. Dr. Guarnera referred to this as impaired executive function. She explained this made it more likely for him to engage in risky behavior, which can be evidenced by willingness to meet with and plot with people he believed to be members of ISIS in order to curry favor so he could ultimately return back to Syria.  He believed at the time that ISIS was a force that actually provided good to the people of Syria, that they were a peacekeeping and resource providing organization through the propaganda that he observed online.  That was not a rational conclusion.

His impaired executive functioning and also his hyperarousal of threat also prevented him from finding and offering, as Agent Edquist referred to it on the stand, a way

to extricate his way from the situation once he got in too deep. His impaired executive function caused him to feel alone with people that he was closest with, as talked by Ms. Alowemer, and to be close with people he shared most in common.

Now, the government appears to suggest through its questioning that, because Mr. Alowemer managed to go to school and complete high school, all of high school in three years, that there's clearly no impaired executive function here because how can someone achieve those goals and go through all of that if they're operating at a diminished level. Your Honor, Dr. Guarnera explained that. There's a difference between a low threat or no threat environment that school presents and the high threat environment that one would perceive if they were dealing with people purporting to be ISIS.

As I'll explain a little bit more, Agent Edquist testified that it would be reasonable for an individual holding -- for someone in Mustafa's position who was talking to someone holding themselves out to be an explosive expert affiliated with ISIS as the UCE did or a financial instruments expert as the CHS did, that he would have felt those threats. And that makes it fundamentally different, apples and oranges, to the concept of what he was doing at school.

His sickness made him fearful of the people he sought

out and that he began meeting with.  Dr. Guarnera talks about this as hyperarousal of threat.  As I said, Agent Edquist conceded that these people held themselves out to be really dangerous people.  Dr. Clarke concurred that ISIS is a pretty scary organization that does some pretty horrific things.  And consistent with what's in the record, Mr. Alowemer was scared of the very people that maybe he could have turned to in such a situation if he had a change of mind, the police.  On the day of his arrest, while in the squad car heading down to FBI headquarters, he asked, are you guys going to kill me?  And in the post-offense interview, agents pleaded with him to help him understand, we don't do that.  We don't harm people. You're being videoed for your protection.  We're reading you your rights for your protection.  And that concept with what he had been through in his life both in Syria and in Jordan, that was not something that he understood or that he trusted.

As Dr. Guarnera said, threats span space and time. That throughout his communications with the UCE and CHS he was not acting fearful and at times buying into this plan and at times directing this plan.  That did not mean he was not operating under this hyperarousal of threat.  I think Dr. Guarnera's report and her testimony today explain how those concepts work together and why someone who has experienced the trauma that Mustafa's experienced, why he would respond that way to that circumstance.

Mustafa, also his sickness made him susceptible to the suggestions and enthusiasm demonstrated by the UCE and the CHS. I want to make clear, I'm not arguing entrapment. Entrapment is not an applicable defense in this case. That is, Mr. Alowemer did not decide to throw a Hail Mary here and go to trial on the entrapment defense. It was just not something that he believed -- it was not a winnable defense here. So that is not the nature of this argument. The nature of this argument is to understand how his interactions with the OCE, the UCE and the CHS worked to inform his behavior and his responses.

Your Honor, I'll refer ad nauseam -- I'll use that word again -- when I went through the record with Agent Edquist, I tried to provide examples of how his interactions occurred over a period of time. With respect to the bay'aa video, the context on March 8 of 2012, the OCE befriends Mr. Alowemer on Facebook. On March 13th, he first mentions the bay'aa video. It is not until April 12th of 2019 that Mr. Alowemer sends that bay'aa video. But on the day of the actual sending, the OCE tells him what to wear, that it had to be by video, what to say and how to delete it off his phone.

I'm not going to presume how these investigations play out in other circumstances, but that bay'aa video, which was played at the preliminary hearing, which was played at the detention hearing, was conduct that Mr. Alowemer willingly

172

entered into but was done at repeated suggestions by the undercover FBI agent.  The concept of meeting with the brothers, the ISIS brothers in the United States is also an area that was pushed by the OCE, that Mr. Alowemer consented to do, but it was pushed by the OCE.

On April 9th, 2019, the OCE says, do you want to meet with one of the brothers or do you want to do the dead drop of the phone?  Mr. Alowemer says, I want what's safest for them.  Whatever they think is secure, I will do, Allah willing.  What do I tell them?  Asks the OCE what should I do?  And the OCE says, brother, whatever you want.  I don't see that two friends meeting in a coffee shop as raising suspicion for them, just greeting a normal chat.  Mr. Alowemer responds, I have no problem, my brother.  I want what's safest for them.  The OCE says, okay.  Then I will tell the brother that you are willing to meet -- I will tell the brother that you are willing to meet one of the brothers and he will deliver the device, Allah willing.

That was how the meeting was set up.  That was how the circumstances that the OCE gave him the contact information of the UCE with a directive of what was to happen next.

This concept with the OCE in nafir versus lone wolf, on one occasion the OCE asked Mr. Alowemer what do you prefer, nafir to travel back to Syria and fight on your homeland soil

or lone wolf as in individual or small cell group here in the United States. Mr. Alowemer says, I want to go back to Syria. But time and again the OCE says, the brothers in ISIS are not really big on nafir and there's, of course, other ways to support ISIS. There are other ways to do this such as strike at the heart of the enemy, I believe he said, behind their soil, and slowly the plan percolated into what it eventually became. Mr. Alowemer said, sure when he could have had an opportunity to meet them. Mr. Alowemer participated in this crime, Your Honor, but the interactions and the suggestibility slowly molded the direction that this went.

Your Honor, I went through the halftime speech, as I kind of refer to it as that the UCE gave on April 16th, 2012 -- 2019, during their first meeting where the UCE explains that are we a bunch of keyboard warriors using keyboard courage or are we willing to do something? Because if we're not willing to do something, that's hypocrisy, quote/unquote, they're not a real Muslim, quote/unquote, they're a coward, quote/unquote. That was the tone that was set at the first meeting by the UCE, the individual that held himself out to be a bomb expert working with ISIS.

And then lastly, this notion of is the purpose of this plan to destroy a building or is it to kill people? What's the purpose? What's the primary objective? Mr. Alowemer came up with this plan, this despicable plan, but

174

it was fundamentally to destroy that building and the UCE keeps on saying, well, what are we trying to do here?  Because to blow up a building is one thing, but are we trying to kill people, too?  And so much so that after Mr. Alowemer on the fourth meeting says, actually, we're only going to do one bomb and we're going to do it at 3 a.m. and it's just to destroy that building, the UCE says, but the next time we're going to kill people, right?  And Mr. Alowemer says Allah willing, I believe.  So Your Honor, I believe that that's another example.

Your Honor, I think it's significant that, despite that suggestibility, Mr. Alowemer retreated back on this concept of a second bomb.  I think the court found as a factual matter that he did that and that he decided to make it just one explosive device at 3 in the morning, which I understand, Your Honor, is still very serious, but it's relatively better than two.  And Your Honor, he did retreat and say, instead of letting everyone know that ISIS did this, that in fact we're going to stay quiet.  I think, Your Honor, that goes to him tempering down how much he was trying to proliferate attacks in the United States in his last statement about what he wanted to do.  There are prior statements where Mr. Alowemer made comments about toying with a second bomb or toying with leaving a calling card, but his last statement before his arrest on this, which was June 11 of 2019, which is

the fourth meeting, his last statements were one device and let's stay quiet. I think that that's significant, Your Honor.

Your Honor, with respect to suggestibility, we submitted a report by Dr. Stevan Weine. Dr. Stevan Weine talks about the online environment in which individuals like Mr. Alowemer are served propaganda by groups like ISIS, and that ISIS targets individuals like him, people who are disaffected and displaced and who have grievances and they give them a sense of purpose and an online community with people that will support and understand them. That Mr. Alowemer sought this out is not excusable, but much in the way that this court hears arguments that an individual born in a neighborhood or a home in which they were exposed to drug use or drug -- or drug distribution offenses or violent crimes, they grow up and end up committing some of those offenses, their exposure to that at a young age, at formative years in their life, might inform the decisions that they make as an adult. Although that doesn't excuse their decisions as an adult, it at least explains why. It helps the understanding of this offense. It helps put it in a context that mitigates culpability.

Dr. Weine's report talks about the analog in a case like this. Mr. Alowemer, from Syria, displaced in Jordan, asylum in the United States seeking information about his

home, about his family, about the country that he grew up in, goes to the deep recesses of the internet and finds this propaganda trash but which distorts his view of reality and what he can do to try to change the trajectory of his life and for his country. As Dr. Weine says, it does not excuse his conduct, but it explains and provides understanding about his conduct.

His sickness made him more likely to defer to people that he viewed as authority figures. Not a novel term, but Dr. Guarnera refers to this as deference to authority figures. Agent Edquist acknowledged that the UCE and the CHS held themselves as experienced members affiliated with ISIS, explosives and financial instruments. Mr. Alowemer's own statements to the UCE and the CHS I think are even more direct -- more direct evidence of this. He says, I will do anything you tell me currently because, truthfully, I don't know anything. That's at Government Bates 430. On another occasion, he said, I don't know much about creating -- I don't know that much about creating bombs and stuff like this, so I'm just trying to learn. Government Bates 493. And finally, he says -- I think this is the most telling -- if you are not here, we wouldn't be doing anything because I don't know nothing, like literally nothing about this. Government Bates 515.

His sickness made him more likely to engage in risky

behavior.  Dr. Guarnera refers to this as the social influence on risky behavior.  The best evidence of this Dr. Guarnera cites is that he may have been interested in this prior to March 8, 2019, but he did not take actionable efforts to plot an attack or conspire with others to plot an attack until he was befriended by the OCE on March 8, 2019.  Dr. Guarnera's report based it on conduct that was reflected in Agent Edquist's affidavit in support of a Facebook search warrant where they referenced 2017 dark web activity and maybe 2018 Facebook activity.  In testimony Edquist suggested that there was maybe activity online that occurred in 2016 and 2015.

Dr. Guarnera didn't rely on that when she made her calculation, but, as she testified today, that incorporating that information her conclusion is even stronger because it shows a longer period of time of exposure to this ISIS propaganda and the recesses of the internet environment where that stuff proliferates and yet he still didn't do anything until he was befriended by the OCE on March 8 of 2019.

Your Honor, I've said this a few times now, but my client is responsible for his actions, but his sickness, his PTSD and the symptoms that he experienced as a result of that PTSD, his complex PTSD and his major depressive disorder significantly contributed to this offense.  Your Honor, I think when you take a look at that based on a variance under 3553(a), he is less culpable than someone who does this

without bringing that kind of trauma and mental health and emotional condition to this offense. That reduced culpability warrants a variance from the extraordinarily high guidelines in this case.

Your Honor, the government makes an argument that a downward variance for mental and emotional conditions in a terrorism case would reward would-be jihadists that are Syrian refugees and key to them, don't worry, you can do this and get off light as long as you just talk about your trauma. That's the gist of the government's argument or response. I think that misconceives how trauma affects the human brain, and specifically an adolescent human brain.

Deterrence assumes and indeed requires the rational act. It assumes that there's an individual that says, if I do this, then I'm going to get in trouble, I'm going to get a penalty like this. So therefore, risk/reward balance, I won't do that. Like a fundamental pillar of what we do here in the criminal justice system, what is the adequate amount of deterrence? But in a case like this which is fundamentally an offense involving mental illness, which I think the record establishes in this case, that concept of deterrence is reduced. I think this notion that a severely traumatized Syrian refugee who is thinking about engaging in this activity is going to be more inclined to do it if Mr. Alowemer gets a variance from the 20-year guideline in this case, I guess the

intellectual appeal of that argument, but practically speaking, I just don't believe that that's how that works, Your Honor.  I think that misconceives why these offenses occur, how they come about and what ultimately needs to be done in order to achieve deterrence in a case like this.

At its core, Your Honor, is the government's belief that terrorists -- and I quote this language -- terrorists, even those with no criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.  And they cite to the Ninth Circuit's decision in the United States v. Ressam, R-e-s-s-a-m, at 679 F3d 1069 to the Ninth Circuit, an en banc opinion from 2012.  That case cites to the Eleventh's Circuit's decision in the United States v. Jayyousi, J-a-y-y-o-u-s-i, at 657 F3d 1085.  That case cites to the Second Circuit's opinion in Mekini.  So United States v. Mekini, M-e-k-i-n-i.  That's 319 F3d 88, a 2003 Second Circuit case which cites nothing for that proposition.  That is a decision by a three-judge panel 14 months after September 11 based in New York without a scientific basis for that statement.

Dr. Guarnera, who comes from the University of Virginia, who pioneers risk assessment, future risk assessment and violent crime and applies those principles in this terrorism context, said there is no scientific basis for that

statement by those courts.  And at the heart, that's what the government believes this is about.  And it ends up into a dead-end dicta by a court.  And so, Your Honor, I don't think the court can rely on that or the government's argument on that basis.

Your Honor, the nature and circumstances of this offense I think warrant separately a downward variance.  The court is tasked with the responsibility in every case but in a case like this to try to determine relative culpability.  And the reason why we do that is not everybody that commits this offense around the country does so for the same reasons or in the same circumstances.  The importance of that is to understand why something like this happens and how we can -- what we can do about it.

The government argues that but for the fortuitous introduction of the undercover FBI agents in this case, that people may have died.  I disagree with that.  We don't know that.  That is a speculative statement.  If there's been any kind of speculation here today by any of the parties, that is the most speculative statement.  There is little doubt that Mr. Alowemer demonstrated interest and in many ways agreed with the tenants of ISIS.  That is clear from the record.  But there is also little doubt that -- there is no evidence that he ever plotted anything even approaching this or engaged in any plot in conformity with ISIS before he was contacted by

the OCE.  It just doesn't exist.

I don't mean to impugn the investigation.  I don't mean to impugn what these agents did in order to root out what they believed was a dangerous person, but to say that but for their actions people would have died, I don't agree with that. I don't think the government can say, without pure speculation, that anything would have happened.

What Mustafa says on June 2nd, 2019, the same day that he presents the plan of the plot at Legacy International Worship Center is:  I didn't want to the bay'aa allegiance.  I don't want to -- I didn't want to communicate with you or with Abu Hafsa.  And then I just thought about it.  I don't have any excuse.  I mean, I have the opportunity.  These are the people that he believes are members of ISIS.  These are the people that he's working with from April 16th to the day of his arrest on June 19th, and he says, I don't want to do this, but I had the opportunity, so I did send the bay'aa, so I did meet with you.

So Your Honor, I don't agree with the government's statement on that.  This does not, once again, excuse his conduct.  I have to keep saying this.  I don't want it to be perceived as disavowing his acceptance of responsibility.  At the heart, that's not the argument.  The argument is about degree of culpability, mitigating circumstances.

The way in which this investigation unfolded served

to intensify an already difficult circumstance.  It's a sad case because we know from records from the school and from testimony from his family Mr. Alowemer was in a really bad place.  To have survived what he survived in Syria and Jordan, to come here and be in a country with difficulties but in a country that at its core gave him and his family the most opportunity and the greatest of western tradition freedoms, to at that point feel like he had no reason to live, or to feel that the situation was hopeless or to feel that his life had no meaning because many people and his countrymen were dying overseas, it's sad because it shows that kind of adolescent focus on the now but not the future.  And I think that's what drove him to this.

And had he gotten the treatment or therapy that he needed for his issues, maybe we wouldn't be here.  He refused those.  Dr. Guarnera explained why that may have happened.  I think Ms. Alowemer explained why that happened and maybe her parents' views on these issues.  We know that he didn't get that, and we know that we're here today 3 1/2 years later.

Your Honor, moving on to the second main issue of why a variance is warranted is the deportation that will await Mr. Alowemer at the end of his Bureau of Prisons sentence.  He will be deported.  He'll be separated from his family.  He will not be permitted to return to the United States.  He will be marked with the stigma of having been deported from the

183

United States.  He'll be deprived of valuable services and opportunities in whichever country he is sent to, and those together represent a collateral punishment above and beyond any carceral punishment the court can order today.  And in many ways it's more significant.  That's a life sentence away from his family.  That's a life sentence away from this country.  And so Your Honor, the guidelines don't account for that and a variance is warranted.

The government's argument in one of its papers that -- it cites cases in a footnote that really don't stand for a proposition that the court cannot consider them.  The Marin Castaneda case doesn't say that the Third Circuit says you can't consider this or that there's a circuit split on that issue.  It says that the court can't consider deportation as it relates to the type of confinement that that individual will get as an -- with an ICE detainer within the BOP.  And that case acknowledges a distinction between what the Seventh Circuit and D.C. Circuit says where they say yes, you can consider it, and the Second Circuit that says, no, you can't consider it.  But we also know in these line of cases that in Thavaraja, T-h-a-v-a-r-a-j-a, the Second Circuit in 2014 specifically found that the defendant's status, deportability status was a factor that the court can and should consider in fashioning an appropriate sentence.

And the defendant in there had a 240-month sentence

184

and that factor, along with a bunch of other factors, likely mental health, likely nature and circumstances of the offense, likely family circumstances, ultimately received a sentence of 108 months.  So whatever circuits that the government is claiming the Third Circuit acknowledged in 1998 in Marin Castaneda is not that the court can't consider Mr. Alowemer's deportability.  And in fact, in a terrorism case, the Second Circuit did that.

Your Honor, the closeness of the Alowemer family and the role that Mr. Alowemer had in that family and the effect of his incarceration and separation from that family has had on Ms. Alowemer, their parents and their siblings was eloquently explained by Ms. Alowemer today.  Very vulnerable testimony to talk about a family crushed by his removal from them.  That's not going to change.  He's going to be deported, Your Honor.  And when that happens, he's not returning through those doors.  As much as Mr. Alowemer's mother hopes that happen every time the door opens, that is not ever going to happen.  And an additional variance should be granted in recognition of that because it represents a punishment above and beyond of anything that can be ordered to the BOP.

Your Honor, I make an argument in this sentencing memorandum about harsh conditions of pretrial confinement.  My clients call this COVID time.  I think of it as a little bit different.  Individuals in custody during COVID, which

185

Mr. Alowemer has been in custody during the entire pandemic, have experienced two primary harsh conditions of confinement. One, there are higher rates of COVID transmission in jails. Prisoners in jail experience a higher rate of contracted COVID and death and related complication from COVID.  Mr. Alowemer didn't experience death or related complications, but he contracted COVID twice, once in Mahoning County jail and once in Allegheny County Jail.  But probably the more important one is, Your Honor, is that during COVID, in order to try to protect the prisoners and the guards and the other employees that work at the jail, the jail's had to lock things down 23 and 1.  23 hours in your cell.  One hour out.  No in-person visitation.  No support services like mental health services could come in.

Now, at times the jail made accommodations, but it was not the same as it was before.  And over time some of those restrictions have dissipated and those are important, but for the vast majority of his time he was in custody with these severe restrictions, that time was harder time.  That time was time where he was more separated from his family. That was time where he did not get the services that a typical prisoner appearing before a court in federal court in the 21st century gets.  That other defendants during this time also experienced it doesn't mean we shouldn't give him credit for that.  It means that everyone deserves credit for that.

Prisoners had it worse for the last three years.  Mr. Alowemer has been in custody since June 19th of 2019 and has observed this entire pandemic from a jail cell.  I think that needs to be acknowledged.  His time was harder.  I don't know the appropriate ratio, Your Honor, but I do believe it is part of the considerations that the court should have in fashioning an appropriate sentence in this case.

Your Honor, I should note that, when some of those COVID restrictions were gradually relaxed, what did Mr. Alowemer do?  He took advantage of his time in custody to better himself and to engage in post-offense rehabilitation.  He was a pod worker at ACJ, which required him to establish himself as a reliable and responsible person.  He taught Arabic classes to his fellow prisoners.  And I forget.  I think it was page 29 and 30 of Defense Exhibit D with the letters that show a prisoner talking about how Mr. Alowemer's class that he taught to his fellow prisoners helped create normalcy in a time in which, first, people are incarcerated, so there's no normalcy, but incarcerated during the time of COVID created that connection, that feeling like a normal person that really benefited that particular fellow prisoner.

So Your Honor, not only did he better himself, but he made efforts to try to better those around him.  And I think that post-offense rehabilitation should be considered by the court.  That's also reflected, Your Honor, in the remorse that

187

he expressed to multiple friends and family who submitted letters to the court as well.

Lastly, Your Honor, the sentence that we're asking for today, 78 to 97 months, would not represent a disparate sentence from the cases that were cited in the defense sentencing memorandum. There are other cases where individuals got more. There's cases where they got less, Your Honor. But this would not be an outlandish sentence of a sentence that falls into that area. So Your Honor, I don't think that the court needs to worry about any sentencing disparity issues if it grants the defendant's request for a variance.

Your Honor, before I conclude, I just want to address a core argument that I believe the government asked. The government somehow is trying to make an argument through its papers at least that, because of the plea agreement Mr. Alowemer got, that he already got his benefit. The government has done the heavy lifting for the court because his guidelines with the terrorism enhancement are 30 to life and because the plea agreement was a plea to only count one, he got a benefit because it capped his sentence at 20 years.

Your Honor, I disagree with that. I disagree with that first as a policy matter. The government got him to waive all of his trial rights, virtually all of his appellate rights. They got spared the expense of going to trial in this

188

case and the expense of truly litigating that case.  They got their benefit for this bargain and Mr. Alowemer got his benefit.  But that takes us to the 240 and that's the starting point.  I think the court should resist any urge by the government to see the starting point at 30 to life and that through their, I guess, mercy that that's how we get to 240.  I don't think that's an accurate way to look at it, Your Honor.

        The guidelines say it's 240, and that's the starting point, and from there is where these variances that Mr. Alowemer is asking, that's the point from which the court should go.

        Your Honor, ultimately, I'll just conclude, this is a very difficult case, and we've heard testimony about the disruption that this caused the community here in Pittsburgh and Pastor Day's congregation, the disruption that it caused to Shahid Alowemer's family and the disruption that it caused to Mr. Alowemer's life ultimately.  He presents a profile that is extraordinary in terms of the duration and severity of his trauma and the effect that it had on him.  Ultimately, Your Honor, I think with his coming deportation and what he's done already in custody, a sentence at the pre-terrorism enhancement guidelines is sufficient but not greater than necessary in this case.  Thank you.

        THE COURT:  Ms. Song?

MS. SONG:  Thank you, Your Honor.  This is a very difficult decision for the court.  This is a young man.  He's facing a very lengthy term of imprisonment.  There is clearly sadness and pain in relation to his family and in relation to the consequences of his events -- of his crimes.  But our criminal justice system requires us to make hard decisions and to put aside sympathy in the need to protect the public and to punish egregious action and intention.

This defendant's objectives were unambiguous.  He wanted to take revenge for the ISIS brothers in Nigeria by destroying a Christian Nigerian church.  He wanted to, in his words, plant bags of fear and explosives to shock the enemies of Allah all over America and lock down the City of Pittsburgh, strike fear in the region and among Christians. He wanted to make civilians and law enforcement scared to step.  Those are his words.  And while no bomb actually exploded, the defendant's crimes had palpable, frightening impacts on real victims, including Pastor Day.

Very briefly, the court is aware and we briefed the 3553(a) factors, it is really the danger and the protection of the public that have to be a priority for this court.  The nature of this offense shows the immediacy and the need to protect the public from his danger.  This was a crime of terrorism.  There was a risk of death and danger that was extraordinarily high.  The plot included a weapon of mass

190

destruction.  And upon contact with the undercover FBI employee in April of 2019, this defendant immediately asked for a secure phone for communications and for a weapon with a silencer so he could hunt the enemies of Allah in the forest include a lone U.S. soldier.  From first contact these were his ideations.  This was not an isolated incident.  This is sustained.  The court has heard that the plans gathered force from March through June and it was the defendant's plans and the defendant's ideation that became more and more specific.

However, he ascribed this criminal predisposition to years prior, and he described it as something in his heart that was pushing him to do terrorist things and he knew that it was wrong.  And that statement, Your Honor, goes to danger because he himself knew it was wrong and this was a compulsion that he had been harboring for years.  The why of this crime also makes it aggravated, Your Honor.  This was a crime that was committed in the name of a foreign terrorist organization, one of the most deadly and militaristic, as you heard from other testimony in this case.  It is also aggravated because it has all of the hallmarks of a hate crime.  The defendant targeted a place of worship based upon the perceived nationality and religion and he targeted a building in a populated neighborhood after being consistently admonished that the people who lived in that neighborhood would die, whatever time of night or morning the bomb was actually set to

go off.

The defendant, if you recall, also very early in his communications with the undercover FBI agent actually sent photos and the names of classmates that were Yazidi students that he was offering up to ISIS as potential targets.  He sent their names and their photographs.  Other targets in his midst, as you heard through the testimony, were a Shia mosque that he exercised judgment and eventually moved off of, American soldiers, students with whom he graduated.  And Your Honor, through his ardor and enthusiasm in showing the undercover FBI employee his vision for the United States with the White House with an ISIS flag over it, the aggravated terrorist nature of his intentions and crimes are made most clear.

The plot was detailed, as the court is aware.  And I do think it's important for the court to look carefully at some of the exhibits that were admitted at the hearing on Friday.  There are three texts.  And I think they're illustrative, Your Honor, for a number of reasons.  First, Exhibit 2.5, that the government submitted, it's a text, and the defendant says, you know, just to summarize, he talks about being the oldest son in his family, but then says, but that doesn't mean that we all gonna stop from jihad.  I have some ideas that I've been looking for almost, almost from two weeks.  So this is him communicating to the FBI undercover not

in a way that's deferential to authority but I have ideas, I'm the eldest son, but this doesn't mean that there's anything inconsistent with jihad.  He was able to reconcile all of these things in his criminal intention.

If you look at the next one, Your Honor, Government Exhibit 2.6, the defendant texts, brother, I'm counting every minute to meet you, but this week and next week are the finals and I have to study a little harder to finish up my stuff.  I have a good plan and, inshallah, you might like it, brother.  Again he's studying for finals and preparing to graduate and at the same time formulating a terrorist plot.  These texts are simply inconsistent with the depiction of him as being incapable of executive decision-making, prioritization, deferred gratification, and all those sophisticated cognitive functions.

And finally, Your Honor, 2.7, the defendant says, there are a couple of studies or students that work with the military.  If they're going to college with me, we might start hunting, brother, and feed them.  And as you know, this was code for explosives.  So again, the defendant is articulating in his communications there are these students that are ROTC or military affiliated and it looks like they may be going to CCAC with me and so at some future time maybe we can hunt them and blow them up.  I mean, these are not impulsive statements.  These show calculation and anticipation, and I think that goes

towards his danger.

Your Honor, we would -- as to danger as well, we'd encourage the court to look at Exhibit 2.8, and this shows it's important that the only one sending bomb-making instructions on two separate occasions was the defendant.  The only one inviting anyone into explosives channels was the defendant.  The only one who was on a first-name basis with the host of the explosives channel was the defendant.  And on the date that he invited the FBI employee, there were 29 members in this explosives group.  And so I think that, again, Your Honor, it's important to understand that this was not a contained universe.  It was not just the defendant communicating with FBI agents, but he was in communication with others and clearly on a first-name basis with others.

And notwithstanding where the plot was on the date of arrest, the defendant, as you heard through testimony, was actually proud and boastful at one point to have proposed the idea for setting a secondary device that would have triggered a delayed explosion, killing first responders, and specifically targeting the police of zone one station.

Throughout this investigation, Your Honor, again, completely contrary to the defense depiction of the defendant, he was constantly calculating how not to get caught and employing operational security at a very sophisticated level, as you heard affirmed through the government's ISIS expert,

opening and closing accounts, all of the plans that he had for changing names, coding communications, covering license plates, using gloves, these demonstrate a level of sophistication and an appreciation for the consequences of his actions and ability to take actions to avoid getting caught.

And finally, Your Honor, you understand through the testimony that this was not intended as a one-off.  His vision was to inspire other ISIS adherents.  It's the government's position that he said we need to not communicate with each other, but he never backed off of claiming the event for ISIS by leaving a flag there and a sign, we have arrived, and hoping to inspire other attacks.

With respect to the history and characteristics of this defendant, Your Honor, he met with the FBI undercover five times.  He initiated contact within 24 hours of getting his contact information.  The court can see from photos that the government submitted that the defendant was smiling and expressive at these meetings.  He wasn't cowering in fear. Special Agent Edquist described the -- after listening to the audio and the video, that the defendant was laughing, he was enthusiastic, he was jovial.  He was not taking direction; he was not acting like a person who was acting out of fear.  But most importantly, Your Honor, the defendant's plan shows who was driving this action.  And the court has the defendant's handwritten plan with checkmarks as he went through each of

the items with the FBI undercover employees, the maps where he used a pen to trace the routes, routes for escape, where the CHS was to sit and surveil the zone one police station, a big circle on the corner where this church was.  The defendant's own writings and own statements show the degree of sophistication for his plan and deliberation.

And the 3.7 exhibit is the embodiment of his intent. And it's not just a how-to, but it makes very clear that his goal was to strike fear, affect the United States, affect Christians in their worship, and to claim the act on behalf of ISIS.

Your Honor, very briefly, we think that any deportation questions are speculation.  This court doesn't have jurisdiction to decide it one way or another.  The defendant was here lawfully, he had lawful status, and it's his conduct that has put his immigration status at risk.  The United States is not deporting anyone to Syria right now, and so we think it is just inappropriate for this court to consider, particularly in a crime like this, where it is material support of terrorism, in support of ISIS, on U.S. soil, to grant a variance on the basis that he may be deported.

With respect to COVID time, Your Honor, this defendant was detained as a danger.  It is entirely inappropriate to offer him a variance downward for time that

he spent that would not be available to somebody that wasn't a danger and wasn't detained.

And to downward vary because ISIS was effective at recruiting and that the defendant, after communicating and consuming ISIS material, from 2005 to 2019, may have been susceptible to that recruitment, if anything, just shows what a danger he does and did present and is certainly not a basis for a downward variance.

Your Honor, the defendant's intentions can never be known with certainty, and you heard from their expert witness that there is no scientific way to predict risk or to predict whether this defendant's going to engage in terrorism in the future, but the sentence in this case needs to reflect both the impossibility of that prediction and to also account for the concrete, real risk to the public.  You know, it's interesting and almost ironic, Your Honor, that research on the destructive impacts of modern terrorism actually instructs this case.

Terrorists target innocent civilian populations in highly public explosions or plots because they want to destroy, because they want to cause death or injury, and they want to create a climate of fear and intimidate the public. Crimes of terror, wherever they're committed, impact mental health, they increase PTSD and anxiety in a community and in a nation.  And terrorist actors, especially ISIS, commit these

acts because they want to ratchet up the tension and sectarian violence between different religions and different ethnicities and even different races. And all of those negative impacts from terrorism, Your Honor, are embodied and were realized through the defendant's conduct in this case. And while he seeks a lower sentence based on his trauma and his PTSD, the very crimes that he engaged in impacted the public, they sowed trauma and fear and stress among the residents around the church. They heightened tension among people of different faiths, different races, different ethnicities and nationalities on the North Side of Pittsburgh, in the City of Pittsburgh, in Western Pennsylvania and, you could argue, even in the United States.

Pastor Day sat before this court and spoke of real pain. The incident will always be etched on his mind. And even though the bomb didn't go off, as he conceded, both Pastor Day and his congregants have struggled with shock, with fear, with anxiety, and they have suffered financially. Some members of his congregation and residents in the neighborhood continue to harbor the fear that somebody some day in the name of ISIS may try to attempt to finish successfully the defendant's plan to destroy their place of worship in the name of revenge and for ISIS.

The defendant's intended violent acts of terrorism were fueled by a toxic combination of extremism, of

intolerance, of hate and of sustained and deep-seated criminal desire, and we think that the only possible sentence that appropriately accounts for those motivations and the crime, Your Honor, is a very stringent sentence that does not grant the defendant a significant variance for all of the reasons that they've argued.  Thank you, Your Honor.

THE COURT:  Mr. Lipson?

MR. LIPSON:  One moment.

(Off-the-record discussion.)

MR. LIPSON:  Your Honor, one very brief point.

THE COURT:  I was asking for Mr. Alowemer's allocution.

MR. LIPSON:  I was not getting a counterargument, I understand that.  Yes, Mr. Alowemer is prepared to speak.  Your Honor, is it appropriate --

THE COURT:  Wherever he's comfortable.

THE DEFENDANT:  Your Honor --

THE COURT:  You may want to have a seat and talk into the microphone.  I think that would be better.

THE DEFENDANT:  Your Honor, Pastor Day, and the government, I'm here today apologizing for my actions as well as to all the victims.  This situation changed the lives of everyone and all families involved.  I understand the severity of my crime.  Before coming to America, I've never done anything I had to apologize for.  In America, I learned very

important things like sympathy, empathy and what it is to apologize.  I'm here today humble and open-hearted.  So I'm really sorry for all I have done.  I no longer think or act the way I used to.  I no longer support ISIS.  My mind-set at this time is different today.  That's why I can apologize today with confidence knowing that I'm a better person in life.

I grew up in a really negative environment that has affected my way of thinking.  Losing close friends, close family and struggling to survive made me look at the world different.  I was the sole provider for my family more than once in my life.  I stopped school for four years before coming to America to provide for my family.  Being the oldest of my siblings, it was my duty, it was my job to take care of the family due to my father being injured and could no longer provide for our family.  I worked since age 12 doing jobs of an adult and gave my childhood to provide for my family at the same time risking my life due to the conditions of growing up in the Middle East, literally going through active war zones to go to work to provide for my family.

Family is everything to me.  I'm hoping for leniency, for mercy, for a second chance at freedom, to be a positive, productive member of society.  I have a lot of support from my family, friends, and neighbors where I learned so much about life in America, specifically, and life, period.  America has

200

made me feel different and feel like a human being.  I feel safe, conflict free, and peaceful.  I'm at a point emotionally and mentally prepared to stay on the right track for the duration.

I just want to conclude my apology by saying that I'm sincerely sorry from the bottom of my heart for the financial, emotional, and spiritual well-being of all the victims.  And thankfully, I get a chance to apologize.  Thank you for all those people who testified today, and I hope my apology is accepted.

THE COURT:  Counsel, is there any reason why sentence should not be imposed at this time?

MS. SONG:  No, Your Honor.

MR. LIPSON:  No, Your Honor.

THE COURT:  I'm not sure if I recall what I said on Friday last week, but I want to repeat that I have read every filing, every exhibit, every letter, every footnote in this file and in your case, Mr. Alowemer.  I've considered also the arguments presented and all the evidence that we received in this proceeding.

This case, your case, Mr. Alowemer, has had nothing but tragic impact upon yourself, the unfortunate, innocent victims, your family, friends, our community, including the United States.  Negative ramification is the only thing that has happened from your activity in this case.

In sentencing I must consider the 3553(a) factors and impose a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing. Those purposes are just punishment, deterrence, protection of the public, and rehabilitation of you. In making those considerations and deciding sentencing in this case, I have to consider the nature and circumstances of your offense, your history and characteristics, looking at the court record, the presentence investigation report, all the sentencing memoranda, which I indicated earlier was excellent from both sides, and to hear all the evidence and consider the evidence in these proceedings.

As to the nature and circumstances of the offense, in your plea you have admitted that you knowingly provided material support or resources to a foreign terrorist organization and that you knew that the organization was designated a terrorist organization or that the organization had engaged or was engaging in terrorist activities or terrorism. You conceded that you knowingly provided material support or resources to a foreign terrorist organization, and that organization was ISIS. The government evidence supports that ISIS was and is a foreign terrorist organization at all relevant times.

You plotted to bomb the Legacy International Worship Center using a weapon of mass destruction, which was a bomb.

202

You targeted the church, which you described as both Christian and Nigerian, in order to take revenge for our brothers in Nigeria, and that's a quote.

You offered to provide information about attack targets in Pittsburgh to support ISIS. You offered to help ISIS brothers identify Yazidis living in Pittsburgh to avenge ISIS brothers in Baghuz. You offered to kill an American servicemen because, quote, he had killed our sisters in Baghuz in Iraq, unquote. You expressed your desire to travel abroad to conduct jihad and asked the OCE to help you. You asked to be provided with a weapon with a silencer. You pledged bay'aa or an oath of allegiance to the leader of ISIS, Abu Bakr al-Baghdadi, in a video that you recorded of yourself. You expressed a desire to meet other ISIS members in the United States, and you met with persons who you thought were such and proceeded to plan for the bombing attack at the worship center.

You asked for a secure telephone to communicate with the UCE and other ISIS brothers so that you couldn't be detected or surveilled. You sent the UCE what appeared to be an ISIS propaganda video that depicted a large truck bomb being detonated apparently in the Middle East. You sent several Arabic language instructional documents with step-by-step instructions to manufacture explosive, toxins, poisons, and an IED. You purchased items that were intended

to be used in the construction of a bomb, six bottles of acetone nailpolish remover, seven ice packs and three 9-volt batteries.

You planned the proposed operation for the bombing. You surveilled the area, chose the area, planned the movements of cars and participants, planned the placement of the bomb, timing, discussed collateral damage and potential for human injuries.

You considered and preliminarily discussed your plan for a second bomb which you eliminated in later planning stages. You stated your added objective was to disrupt police response and impact the City of Pittsburgh. You initially discussed your plan to place an ISIS-affiliated flag or a sign with words "we arrived" near the scene of the attack which seemingly was eliminated in later planning stages.

In all, your stated intentions or action was to support the cause of ISIS and to inspire other ISIS sympathizers in the United States to rise up and to seek revenge for actions against ISIS in other areas.

In relation to the history and characteristics of you, Mr. Alowemer, you have had a horrific, traumatized, and tragic adolescence in Syria and Jordan. Particularly, your Syrian experience was excessively harsh. You witnessed terrible atrocities to others including family, friends, neighbors. You were deprived of schooling and age-appropriate

204

socializations.  Significant burdens of family support responsibilities were willingly accepted by you and performed for all, including friends and neighbors.  In Jordan, you were incarcerated and threatened with deportation back to Syria.

Living with untreated psychological effects of PTSD and your depression, both personally and within other family members, was a hardship that you and your family have borne.

In arriving at life in the United States you were presented with great opportunities.  You had school, you had support systems, you had access to medical care, resources, all positive opportunities for you in this country.  Exercise of some of those opportunities was willingly taken and accomplished through your graduation.  Some of the opportunities that were available, particularly medical care, were impacted by survivor's guilt and personal and family symptoms of mental health conditions as well as cultural impediments and a refusal of mental health care.

You were very young at the time of this offense and claim some immaturity, yet some of your actions demonstrated significant maturity and cognitive functioning sufficient to plan and accomplish your high school graduation, to enroll in college, and to plan and take steps to implement the terrorist actions in this case.

You have no other criminal history and no family or social or school behavioral problems reported.  The defense

sentencing memo with all of the exhibits thoroughly present a very comprehensive and detailed overview about you and your life until your arrest and also follows your life during your pretrial detention.

I've read all the reports, and we've heard today of your helpfulness to family and others, kindness and selflessness.

The report by Lucy Guanera, Ph.D., psychologist, as well as her testimony today was very helpful and thorough. I've considered her assessments of your present psychological condition for PTSD and depression diagnoses and opinions about your future psychological needs, criminal propensities, and risks. I've carefully considered her opinions about the causal relationship between your personal history, life experiences and psychological status at the time of your criminal conduct and arrest.

The many letters from your family, friends, classmates and teacher, as well as neighbors, offers positive attributes about you and generally opine that your actions involving this conviction are not representative of you or your character.

I've considered the testimony that's been presented in these two days of sentencing proceedings, testimony from FBI Agent Nicholas Edquist, as well as Colin Clarke. I've considered testimony of your sister; your teacher, Ms. Tapu;

206

and also Dr. Guarnera today.  I've considered the arguments presented by counsel as well as their written presentations in this case.  All of that has been considered by me and balanced.

In relation to sentencing, I have to consider the need for the sentence imposed to reflect the seriousness of your offense, to promote respect for the law, and to provide just punishment for your offense.  In relation to seriousness, there is no possible way to view this offense or your conduct to mitigate the absolute seriousness of this crime.  To everyone's credit who have come forward on your behalf, including legal counsel, no one has challenged this reality. Promoting the ISIS ideology, seeking revenge in the name of ISIS, aiding the causes of ISIS and inspiring others to pursue acts of terrorism and violence is so very wrong, dangerous, and criminally serious.

All of the actions you took to seek out other ISIS participants, to plan, research, take actions, in furtherance of your intent to bomb the Legacy International Worship Center served to put others in grave danger of physical and psychological harm.  And we heard today from the pastor of the psychological harm that was experienced and continues to be experienced even though the bomb was never detonated.  That harm is what our anti-terrorism laws are designed to prevent and that is the very harm terroristic acts intend to cause.

207

Your offer to disclose to ISIS brothers the locations of Yazidi opponents, enemies of ISIS, to avenge ISIS brothers in Baghuz is very serious.  Your asking for a gun with a silencer to attempt to kill an American soldier in revenge for American actions in Baghuz and Iraq is serious.

Promoting respect for the law is another purpose. Our society relies on compliance with our laws enacted to maintain peaceful coexistence for all civilians in our country.  The criminal acts that you undertook were absolutely contrary to our laws and serve to undermine, disrespect and disrupt our government's laws and way of life.

Securing just punishment.  Given the seriousness of your crime and that the criteria for application of the terrorist enhancement have been met, the initial sentencing guidelines as a statutory maximum for count one would have called for 360 months of incarceration.  That consideration and that duration is not in my contemplation for sentencing. I just point that out to indicate that, with the statutory count one maximum of 240 months, the guideline punishment is very severe and reflects the just punishment for terroristic actions that are reflected in count one.  Consideration of the 18 USC Section 3553 factors are also related to your sentencing and will be discussed later.

I've considered also the time that you've spent in detention during COVID protocols and restrictions as well as

208

your having contracted and endured COVID while incarcerated. I'm also aware of the probable deportation consequence that may occur following your conviction and service of your period of incarceration.  Without repeating all of the things I've already discussed concerning other rulings made in this case and the facts that I've considered in making those rulings, a lot of those, 99.9% of those facts also speak to the 3553 criteria and factors that I must consider.  I have considered all the facts that I've mentioned and I'm also going to outline to some degree how those facts also relate to the Section 3553 sentencing factors.

Mr. Alowemer, you knew full well what you were doing and you undertook an active role in all aspects in relation to your investment and commitment to the terrorist ideology of ISIS.  You intentionally took all actions with the intent to inspire ISIS commitment from others, to revenge actions of other governments, Nigeria and the USA, for actions taken against ISIS brothers in Nigeria, Syria and Iraq.  You also intended that your acts would instill fear in others who did not follow your or ISIS' beliefs.

While the defense and Dr. Guarnera give very sympathetic insights to explain the reasons why you perhaps came to seek out and adopt your commitment and pledge to ISIS ideology and actions, the report and testimony and argument does not excuse that all of your actions were knowing,

209

intentional, and deliberate.  Sentencing must appropriately respond to the totality of these considerations when looking at the purpose of just punishment.  In saying all of this, I'm not negating the mental health consequences of your past life and how they relate to sentencing as well.

Another purpose is to afford adequate deterrence to criminal conduct.  Given the seriousness of your activity -- of the activity of terrorism and the clandestine methods used to propagandize, encourage and enlist others to rise up and take action to carry out terroristic acts, punishment for this conviction must also serve to deter others from engaging in such conduct.

I note that you were very aware and clear about your stated hopes and goals, that through your actions in bombing, others would have been inspired to take up the cause and act in the interests of ISIS.  Just as you hoped that your criminal actions would inspire others to join ISIS, punishment for your crime of attempting to provide material support and resource to ISIS must also serve to deter others from pursuing such criminal conduct.  Given the gravity and seriousness of the consequences of actions you took, deterrence is a significant consideration in determining an appropriate sentence in your case.

Another purpose, to protect the public from further crimes by you.  Clearly, your family and friends believe that

you present a low risk of further crimes, particularly terrorism; however, these same people have also voiced total shock that you could have done what you did in this case. Clearly, you were capable of such crime, and their beliefs as to your future criminality also have to be balanced with their observations and the uncertainty of the reality of future conduct.

Dr. Guarnera's assessment of your potential for future terroristic threat or risk is couched in conservative opinions based upon research and data; however, such provides no absolute assurance for future public safety vis-a-vis you and terrorist activities.  I have given great consideration to all findings and input presented within her entire report and testimony today.

Another purpose is to provide you with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Mr. Alowemer, your sentencing will recommend psychological programming and treatment to address your mental health needs in relation to your PTSD and depression.  Also, to the extent available, we will be recommending that the Bureau of Prisons provide you with vocational training to prepare you for a law-abiding and productive life after incarceration.

A concern that I have, although it will be included in your supervised release provisions, is adopting

Dr. Guarnera's risk factor or recommendation for supervision and restrictions during supervised release after you're released from incarceration.  Because of the ICE detainer and the probability of deportation, those protective risk mitigating factors may not be something that is within my sentence's control to monitor your behavior once you are deported, which factors into the risk, but does not significantly impact any decision.  I'm just pointing that out that I have heard Dr. Guarnera's recommendations concerning the risks and monitoring future internet activity and all of those conditions will be in this sentence, but the practicality of that pending deportation will not help you in that regard.

I have considered the kind of sentences available.  I considered the kinds of sentences and the sentencing range established under the United States Sentencing Guidelines.  I've considered pertinent policy statements issued by the Sentencing Commission, and I've considered the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  And here in your case, Mr. Alowemer, you are an outlier in relation to your past history and the mental health circumstances that were existing at the time of this offense, and I have considered that differential in relation to sentencing for you today.  I've also considered all of the

212

information provided on behalf of the victims today.

For the reasons I have just discussed on the record, I have concluded that the appropriate sentence to meet the considerations of the sentencing guidelines and of 18 USC Section 3553(a) factors in your case to provide a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing and, again, that is just punishment, deterrence, protection of the public, and rehabilitation of you, is a sentence that varies from the guideline range and the statutory maximum sentence of 240 months.  Therefore, your request for variance is granted.

Mr. Alowemer, pursuant to the Sentencing Reform Act of 1984 and after consulting the sentencing guidelines and considering the parties' arguments concerning factors enumerated in 18 USC Section 3553(a) and all that I have considered concerning sentencing in this case, it the judgment of this court that you, defendant, Mustafa Mousab Alowemer, is hereby sentenced as follows:

Mr. Alowemer, you are sentenced to a term of imprisonment of 208 months.  Upon release from imprisonment, you shall be placed on supervised release for the remainder of your life.  Restitution will not be ordered in that it was not requested.

You shall forfeit to the United States an Apple iPhone 5S with IMEI 35882305112361; a Samsung J7 cellular

phone with IMEI 35860109141464; an LG LM-X410 cellular phone with IMEI 355380099566223; a Dell Inspiron 3670 computer, express service code 2574745958; and associated electronic storage media seized on June 19, 2019.

In accordance with the above sentence, Mr. Alowemer, you are hereby committed to the custody of the Bureau of Prisons to be imprisoned for a total term of 208 months. I will be recommending mental health treatment and vocational training, but in addition to those requests, defense, are there any additional requests or recommendations?

MR. LIPSON: Your Honor, I would request that the court make a recommendation that Mr. Alowemer be sentenced to a facility as close to the Pittsburgh area as possible so he can be as close to his family as possible so they may visit him during his term of incarceration.

THE COURT: Mr. Alowemer, I will make that recommendation and the other recommendations I've indicated about the mental health and vocational training. I need to alert you, as counsel will explain, those are merely recommendations. The Bureau of Prisons will be the party responsible for making all of those decisions.

Mr. Alowemer, while you're on supervised release, you shall not commit another federal, state, or local crime. You shall comply with the standard conditions of supervision that have been recommended by the Sentencing Commission and adopted

214

by this court.  You shall also comply with any additional conditions imposed upon you by me.  When you report to your probation officer, he or she will review the mandatory, standard, and special conditions that you must comply with while on supervised release, and you will be provided with a written copy of the conditions of supervision.  Some of those conditions will include the following:

You shall not illegally possess a controlled substance.  You shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.  You shall pay -- strike that.  You shall report any change of address within 30 days to the United States Attorney's Office.  You shall provide the probation officer with access to any requested financial information.  You will be prohibited from incurring new credit charges or opening additional line of credit without the approval of your probation officer.

You are permitted to use a computer and allowed access to the internet.  You shall consent to the installation of any hardware or software to monitor any computer or any other electronic communication or data storage devices used by you to confirm compliance with this condition.  You shall pay the monitoring costs as directed by the probation officer. You shall consent to the periodic unannounced examinations by the probation officer of any computers, cell phones, or any other electronic communication or data storage devices that

you have access to to confirm compliance with this condition. You shall consent to the seizure and removal of hardware and data storage media for further analysis by the probation officer based upon a reasonable suspicion of a violation of the conditions imposed in this case or based upon a reasonable suspicion of unlawful conduct by you.  Failure to submit to the monitoring or search of computers or electronic media or data storage devices by you may be grounds for revocation.

If your employment requires the use of a computer, you may use a computer in connection with your employment that is approved by your probation officer providing you notify your employer of the nature of the conviction or charge.  The probation officer shall confirm compliance with this notification requirement.

You shall provide the probation office with accurate information about your entire computer system, hardware or software, and other electronic communication or data storage devices or media to include all passwords used and the name of the internet service providers.  You shall abide by the provisions of the Computer Restrictions and Monitoring Program approved by the court.

You shall submit your person, property, house, residence, vehicle, papers, business, or place of employment to a search conducted by a United States probation or pretrial services officer at a reasonable time and in a reasonable

manner based upon reasonable suspicion of contraband or evidence of a violation of a condition of supervision. Failure to submit to a search may be grounds for revocation. You shall inform any other residents that the premises may be subject to searches pursuant to this condition.

You shall participate in mental health assessment and/or treatment program approved by your probation officer until such time as you are released from the program by the court. You shall be required to contribute to the cost of services in an amount determined by the probation office. These costs shall not exceed the actual cost of the service, and the probation office is authorized to release your presentence report to a treatment providers if so requested.

You shall participate in the United States Probation Office's Workforce Development Program as directed by your probation officer. You shall cooperate in the collection of DNA as directed by your probation officer, pursuant to law.

You shall be deported if, after notice and hearing pursuant to the Immigration and Naturalization Act, the Attorney General demonstrates by clear and convincing evidence that you are deportable. If so, and you are deported, you shall not re-enter the United States unless authorized in advance by the Secretary of the Department of Homeland Security or the Attorney General of the United States.

The periodic drug testing provided and mandated by

217

the Violent Crime Control and Law Enforcement Act is waived. I find that this offense is not drug related and that you have no current or past history of substance abuse.

I find that you do not have the ability to pay a fine and, thus, I'm waiving a fine in this case. It is further ordered you shall pay to the United States a mandatory special assessment of $100 per count or in this case for a total of $100 which shall be paid to the United States District Court forthwith.

Mr. Alowemer, I previously advised on the record that I examined the factors set forth in Title 18 United States code Section 3553(a) in making factual findings relevant to your sentence. I believe I have explained in detail, based on all the evidence, the reason for the imposition of this sentence in light of those factors. I believe that a sentence of 208 months followed by a period of lifetime supervised release is sufficient but not greater than necessary to meet the goals of sentencing in this case.

Counsel, are you aware of any reasons why sentence should not be imposed as stated?

MS. SONG: No, Your Honor, and at this time the United States moves to dismiss counts two and three from the indictment.

MR. LIPSON: No, Your Honor. I would note just for the record, Mr. Alowemer maintains his objection to the

218

application of the terrorism enhancement, and that's all, Your Honor.  No other reason why sentence cannot be imposed.

THE COURT:  And there's no objection to the dismissal of the other two counts?

MR. LIPSON:  Certainly not, Your Honor.

THE COURT:  Those are dismissed.  Are there any objections to the procedural or substantive reasonableness of the sentence?

MS. SONG:  No, Your Honor.

MR. LIPSON:  I think I just covered that, Your Honor, but nothing beyond what I just objected to.

THE COURT:  Understood.

Ms. Stewart, is there any need for clarification concerning the orally stated sentence?

MS. STEWART:  No, thank you.

THE COURT:  I hereby order the sentence imposed as stated.

Mr. Alowemer, you have the right to appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there's some other fundamental defect in the proceeding that was not waived by your guilty plea.  In addition, you and the government have agreed that you may appeal your sentence as to my ruling on the application of section 3A1.4 of the United States Sentencing Guidelines.  However, other than that issue, you have waived

some of your rights to appeal.  Such waivers are generally enforceable, but if you believe that the waiver itself is not valid, you can present that theory to the appellate court.

In that your plea does contain a waiver of appellate rights, you need to be aware that this waiver may affect any rights you may have to subsequently request any change or modification of your supervised release either in regards to your time of supervised release or to your conditions of supervised release.

Mr. Alowemer, with few exceptions, any notice of appeal must be filed within 14 days of judgment being entered in your case.  If you're unable to pay the costs of an appeal, you may apply for leave to appeal in forma pauperis.  If you so request, the Clerk of Court will prepare and file a notice of appeal on your behalf.

Mr. Alowemer, you are detained and you will remain detained until placement by the Bureau of Prisons for the remainder of your sentence.

Sir, I do wish you all the best in the rehabilitative and therapeutic aspects of your sentencing.  It's my hope on behalf of the court that you are able to resolve the residual mental health issues from your past and prepare yourself for a better law-abiding life in the future.  I also wish the best for all victims of your crime, and I hope that they, too, can therapeutically resolve the residual effects from this crime.

220

I also wish your family and friends the very best as they come to terms with your actions and the consequences thereof, all very sad and all very tragic, but I wish the best for all from this point forward.  It's the beginning of a new day, and I wish you all the best.

        Counsel, are there any other matters for consideration before we conclude?

        MS. SONG:  No, Your Honor.  Thank you.

        MR. LIPSON:  No, Your Honor.

        THE COURT:  Very well.  We are adjourned.  Thank you.

    (Proceedings concluded at 6:05 p.m.)

                      -----

                C E R T I F I C A T E

        I, JANE PROUD, RDR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.

    S\ Jane Proud
    JANE PROUD, RDR, CRR
    Official Court Reporter

                    I N D E X
    WITNESS:            DIRECT  CROSS  REDIRECT  RECROSS

    For the Defense:

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SHAHID ALOWEMER | 3 | -- | -- | -- |
| CHRISTINE TAPU | 44 | 63 | -- | -- |
| LUCY GUARNERA | 67 | 113 | 131 | -- |

    Victim Impact Statement:

    PASTOR MICHAEL DAY       169